IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TAMMY HURD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 07-117-MPT |
| v. | : | |
| | : | |
| DELAWARE STATE UNIVERSITY | : | |
| and DANDESON PANDA, individually | : | |
| and in his official capacity, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |


**DEFENDANT DANDESON PANDA, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY'S OPENING BRIEF IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**


Respectfully submitted,


<u>/s/ Richard R. Wier, Jr.</u>
Richard R. Wier, Jr. (#716)
Michele D. Allen (#4359)
Richard R. Wier, Jr., P.A.
Two Mill Road
Suite 200
Wilmington, DE 19806
(302) 888-3222
*Attorney for Defendant Dandeson Panda*

DATE: May 30, 2008

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    Dr. Panda Is Entitled to Judgment As A Matter Of Law On Plaintiff's Claim
            For a Violation of Title IX, 20 U.S.C § 1681 Because The Only Claim
            Remaining Against Dr. Panda On This Count Is Against Him In His Official
            Capacity Which Must Be Dismissed Because It Is Tantamount To A Claim
            Against DSU.
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    Dr. Panda Is Entitled To Judgment As A Matter Of Law On Plaintiff's
            Presumed Claim Under 42 U.S.C.S § 2000d of Title VI of the Civil Rights Act
            of (1964) Because All Material Facts Have Been Presented And There Is No
            Genuine Issue As To Any Material Fact And Therefore Plaintiff Has Failed
            To Make Out A *Prima Facie* Case Of Racial Discrimination. . . . . . . . . . . . 13

      D.    Dr. Panda Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claim
            Under 42 U.S.C § 1983 Because Plaintiff's Claims Are Barred By The 11th
            Amendment Against Panda In His Official Capacity; The Section 1983 Claim
            Is Subsumed In Title IX And Moreover She Has Failed To Show Any
            Violation of Her Due Process Rights. . . . . . . . . . . . . . . . . . . . . . . . . 15

            1.    Plaintiff's Section 1983 Claims Are Barred By The 11th
                  Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    Plaintiff's Section 1983 Claim For Violation Of Title IX Must
                  Be Dismissed As The Section 1983 Claim Is Subsumed In Title
                  IX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            3.    Plaintiff's Section 1983 Claim For Violation Of Title VI Must
                  Be Dismissed Because Plaintiff Has Failed To Allege Any

Factual Basis To Support That Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

    a.    **Plaintiff's Substantive Due Process Rights Were Not Violated.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

    b.    **Plaintiff's Procedural Due Process Rights Were Not Violated.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**V.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

## TABLE OF CITATIONS

**CASES**

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

*Blickling v. Kent General Hosp., Inc.*, 872 F. Supp. 1299 (D.Del. 1994). . . . . . . . . . . . . . . . . . . . . . . **8**

*Board of Regents v. Roth*, 408 U. S. 564, 568-69. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Board of Curators of the Univ. If Missouri v. Horowitz*, 435 U.S. 78, 86 (1978) . . . . . . . . . . . . . . . . **19**

*Bostic v. The Smyrna School District*, 2003 U.S. LEXIS 3458 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . **9**

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

*Chapman v. Trs. of Del. State Coll.*, 101 F. Supp. 441, 444 (D. Del. 1951) . . . . . . . . . . . . . . . . . . . . . **16**

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999) . **16**

*Couden v. Duffey*, 533 F. Supp. 2d 490, 506 (citing) *Kentucky v. Graham*, 473 U.S 159, 166 (1985) . **9**

*County Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

*Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

*Davis v. Monroe County Board of Education*, 526 U.S. 629, 650 (1999) . . . . . . . . . . . . . . . . . . . . . . . **10**

*Fragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10, 11**

*Gebser v. Lago Vista Independent School District*, 525 U.S. 274, 291-92 (1998) . . . . . . . . . . **10, 11, 16**

*Johnson v. Falen Health Institutes, Inc.*, 267 F. Supp.2d 679 (W.D. Ky. 2003) . . . . . . . . . . . . . . **12,13**

*Kraus v. HowroyD-Wright Employment Agency, Inc.*, 2008 U.S. Dist. LEXIS 1254 . . . . . . . . . . . . . . **11**

*Manning v. Temple University*, 2004 U.S. Dist. LEXIS 26129 *15 (citing) . . . . . . . . . . . . . . . . . . . . . **14**

*Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). . . . . . **8**

*McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

*McKay v. Delaware State University*, 2000 U.S. Dist. LEXIS 14653 * 39 (D. Del.) . . . . . . . . . . . . **15, 16**

*Mercer v. Duke University*, 50 Fed. Appx. 643, 2002 U.S. App. LEXIS 23610 (4th Cir. 2002) . . . . . . **13**

*Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1 (1981) . . 16

*Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 139 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 17

*O'Hara v. Colonial School District,* 2002 U.S. LEXIS 12153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pfeiffer v. Marion Center Area School District,* 917 F.2d 779, 789 (3d Cir. 1990) . . . . . . . . . . . 16, 17

*Preiser v. Rodriguez,* 411 U.S. 475 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*San Antonio Indep. Sch. Dist. V. Rodriguez,* 411 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Williams v. Sch. Dist. Of Bethlehem,* 998 F.2d 168, 176 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 16

**STATUTES**

**Fed. R. Civ. P. 56©)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**20 U.S.C § 1681** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**42 U.S.C § 1983.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**42 U.S.C.S § 2000d** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pursuant to Fed. R. Civ. P. 56©), Defendant, Dandeson Panda (hereinafter Dr. Panda), submits the following in support of his Motion for Summary Judgment.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff specifically alleges this case arises under 20 U.S.C § 1681 *et. Seq* of Title IX of the Education Amendments of 1972; 42 U.S.C.S § 2000d of Title VI of the Civil Rights Act of 1964, and 42 U.S.C § 1983. Complaint ¶ 1. Plaintiff filed her Complaint on or about February 28, 2007, alleging that Dr. Panda sexually and racially discriminated against her and his actions created a sexually and racially hostile education environment, and further that she was denied due process. *Id.*

On May 4, 2007 Dr. Panda filed a Motion to Dismiss the allegations of liability against him individually under Title IX and VI and to dismiss the claim for punitive damages against him individually under Title IX and VI.

On May 24, 2008, Plaintiff filed her Response and conceded that Dr. Panda could not be held personally liable under Title IX and Title VI. Additionally, Plaintiff conceded that punitive damages were not available under Title IX and VI.

On January, 28, 2008, the Court entered a Memorandum Opinion holding that the Title IX claim could not proceed against Dr. Panda in his individual capacity and dismissed any claim for punitive damages. It appears, however, that the Court's opinion inadvertently failed to additionally rule that the Title VI claim against Dr. Panda in his individual capacity was also dismissed. Dr. Panda specifically addresses that issue *infra*.

Discovery has been concluded in this matter and Plaintiff has failed to establish a genuine issue of material fact that she was sexually or racially harassed or discriminated against or that she

was denied any due process.  Therefore, Dr. Panda moves this Court for an Order granting

Summary Judgment in his favor and against Plaintiff on all counts of the Complaint.

## II.    SUMMARY OF ARGUMENT

1.      There is no genuine issue as to any material fact and the material facts establish

that Dr. Panda has no liability to Plaintiff, therefore, Dr. Panda is entitled to Summary Judgment.

2.      Dr. Panda is entitled to Summary Judgment on Plaintiff's claims for sexual

harassment under 20 U.S.C. § 1681 *et. Seq* of Title IX. of the Education Amendments of 1972

because this claim has been dismissed against Dr. Panda in his individually capacity and any

claim against him in his official capacity is  tantamount to a claim against Delaware State

University (hereinafter "DSU"), and, therefore should be dismissed.  Furthermore, all material

facts have been presented and there is no genuine issue for trial since Plaintiff has failed to

support a claim for sexual discrimination.

3.      Dr. Panda is entitled to Judgment as a matter of law on Plaintiff's claim

under 42 U.S.C.S § 2000d of Title VI of the Civil Rights Act of (1964), because all material facts

have been presented and there is no genuine issue for trial since Plaintiff has failed to make out a

*prima facie* case of racial discrimination.  Furthermore, this claim must be dismissed against Dr.

Panda as Title VI does not impose any individual liability on him and he has no liability on any

official capacity claim, which  must be dismissed as it is tantamount to a claim against DSU.

4.      Plaintiff's claim under 42 U.S.C. § 1983, is barred by the Eleventh Amendment

against Dr. Panda in his official capacity.

5.      Plaintiff's claim under 42 U.S.C. § 1983 is subsumed within her Title IX claim

and, therefore, must be dismissed.

2

6.    Dr. Panda is entitled to Judgment as a matter of law on Plaintiff's claim under 42 U.S.C. § 1983, because all material facts have been presented and there is no genuine issue for trial since Plaintiff has failed to establish any denial of her due process rights.

## III.    STATEMENT OF FACTS

Tammy Hurd, (Plaintiff) was a student at Delaware State University ("DSU") in 2003 or 2004, but she does not specifically recall when she began attending classes at DSU. Tammy Hurd Deposition (hereinafter "*Hurd Depo*") at 7[1]. Dr. Dandeson Panda ("Dr. Panda") received his bachelor's degree from the University of the District of Columbia and his MBA from Atlanta University and his Ph.D. from Howard University. *Panda Deposition* (hereinafter "*Panda Depo.*) at 8.[2] Plaintiff first met Dr. Panda in 2002 or 2003 when she began attending his classes. *Hurd Depo.* at 12.

Plaintiff admits that she took several classes with Dr. Panda and did not recall having any problems with him during her  first class with him. *Hurd Depo.* at 14. Plaintiff was taking more than one class with Dr. Panda during a semester. *Id.*  Throughout Plaintiff's complaint, responses to interrogatories, and her deposition testimony she alleges that Dr. Panda made inappropriate comments to her. Dr. Panda denies making any of the alleged statements. *Dr. Panda Depo.* at 89, 99,131. However, even when taking the facts in the light most favorable to Plaintiff the comments fail to rise to the level of sexual or racial discrimination.

Plaintiff first alleges that sometime in September 2004, she believes that it was the first week of class,  Dr. Panda saw her on her cell phone and he asked her if it was a "booty call".

---

[1] Tammy Hurd Deposition Excerpts are attached hereto at Appendix 1.

[2] Dr. Panda Deposition Excerpts are attached hereto at Appendix 2.

Compl. ¶10; *Hurd Depo.* at 16, 18.  Plaintiff did not respond to Dr. Panda.  *Id.*  Plaintiff admits

that she did not report Dr. Panda's alleged comments to anyone.  *Id.* at 18.

The next alleged comment Plaintiff claims Dr. Panda made to her, was outside of the

classroom on campus sometime in September 2004.  *Hurd Depo.* at 21; Plaintiff's Response to

DSU's First Set of Interrogatories No. 6.  Dr. Panda allegedly saw Plaintiff walking with another

student by the name of Derek and Dr. Panda made a comment that Plaintiff and Derek were on a

hot date.  *Id.*  Plaintiff admits that she told Dr. Panda that she and Derek were not a couple and

that she was simply annoyed and aggravated by his statement.  *Hurd Depo.* at 24.  However,

Plaintiff admits that she and Derek were romantically involved in the past.  *Id.* at 86.

Plaintiff alleges that approximately three months  later, on or about December 2004, Dr.

Panda said to her that Derek had something big for her.  *Hurd Depo.* at 25.  To which Plaintiff

responded that she and Derek were not a couple and Plaintiff alleges that Dr. Panda then told her

that they should be a couple.  *Id.*  Plaintiff responded by saying that she was living with her

boyfriend and that if Derek was interested he would have "to get in line with the rest of the them

and be patient."  *Id.*  Plaintiff alleges that Dr. Panda then asked how he could get in line and she

asked him if he wanted to get in line to which Plaintiff alleges he responded yes.  *Id.*  Plaintiff

then responded, "what place do you want to be in line? You have to be patient like everyone else."

*Id., Panda Exhibit 5.*[3]  Plaintiff alleges that in response Dr. Panda said, you are right we should

not have sex because if we did then you would be screaming my name when you are with your

boyfriend.  *Id.*  At which time Plaintiff admits that she then said, "stop being bad."  *Id.*  When

questioned as to what Plaintiff thought Dr. Panda meant when he allegedly said that Derek had

---

[3] Panda Depo. Exhibit 5 at Appendix 3.

4

something big for her, she admits that she inferred it was something of a sexual nature and she further admits that she then responded in a joking manner that Derek would have to get in line. *Hurd Depo.* at 26.

Plaintiff then alleges that on or about February 1, 2005, Dr. Panda saw her walking in the parking lot before class and he said that Derek had something for her. Plaintiff's Response to DSU's First Set of Interrogatories No. 6[4]. Plaintiff further alleges on that date that Dr. Panda approached her and Derek in class and told Derek that he knew Derek had something Plaintiff needed and that he should give it to her. *Id.* At which time Plaintiff alleges that Dr. Panda then told her that Derek had something that would hurt her. *Id.* Again, Plaintiff admits that she told Dr. Panda that Derek would have to get in line. *Hurd Depo.* at 41.

On or about February 10, 2005, Plaintiff alleges that Dr. Panda asked her what she would do for him if he asked her to show him some skin and before she could respond she alleges Dr. Panda said that she would give him a high five. Response to DSU's First Set of Interrogatories No. 6. On or about February 17, 2008, Plaintiff alleges that Dr. Panda accused her of trying to file a sexual harassment suit against all the black men at school. *Id* To which, Plaintiff responded that if she was, then they should line them all up. *Hurd Depo.* at 35. Plaintiff also alleges that Dr. Panda said a black man would put a hurting on her because you know what they say about black men. *Id.*

Some time after the above incidents, Plaintiff admits that she confided in Dr. Panda that she and her husband were having issues and he moved out and she was very upset. *Hurd Depo.* at

---

[4] Plaintiff's Response to DSU's First Set of Interrogatories No. 6 are attached hereto at Appendix 4.

31.  Dr. Panda gave her an uplifting speech about not letting things get her down and focusing on her education and she admits that she was appreciative of his comments.  *Id.* at 32;  Response to DSU's First Set of Interrogatories No. 6.  Later that day, Plaintiff alleges that she had another class with Dr. Panda and he saw her and noticed that she was still sad and told her not to be sad, to keep moving, that she was strong and them he said that she was an attractive women and that she would get dick anywhere.  *Id.* at 33.  She admits that she just shook her head and explained to him that he did not understand and that it was not about that.  *Id.*  Plaintiff admits that there were no other students around who would have been close enough to hear and that she did not report the comment to anyone.  *Id.* at 33, 34.

Plaintiff alleges she was racially discriminated against by Dr. Panda, but has failed to cite to any facts in either the Complaint or in her deposition which support her allegation.  In fact, Plaintiff stated in her deposition that she did not recall any racial comments towards her from Dr. Panda other than a reference that a black man would put a hurting on her.  *Hurd Depo.* at 39.  However, she further admits that Dr. Panda did not racially discriminate against her.  *Id.* at 117.  In a failed attempted to support her racial discrimination claim Plaintiff alleges that Dr. Panda accused her of filing a sexual harassment suit against all black men in the school and allegedly stated that you know what they say about black men, and a black man would put a hurting on her.  *Id.* at 121.   These alleged comments do not support a claim for racial discrimination, see discussion *infra.*

On or about January 3, 2005, Plaintiff admits that when she spoke with Mark Farley ("Farley") about Dr. Panda that she may have only discussed one alleged comment by Dr. Panda that occurred in December 2004.  *Hurd Depo.* at 91.  She further admits that she told Farley that

she did not want to pursue a formal complaint against Dr. Panda she just wanted Farley to be

aware of it in case she received a bad grade. *Id.* at 90,91. Farley suggested that Plaintiff e-mail

Dr. Panda and explain to him that his comments were unwelcome. *Id.* at 92. Plaintiff allegedly e-

mailed Dr. Panda and the e-mail began, "<u>Happy New Year</u>!!! <u>I am so excited to start this new</u>

<u>semester</u>. . . I just wanted to remind you that I am still in need of the syllabus for . . . I also wanted

to mention quickly that I was uncomfortable with our conversation the last day of class regarding

my dating life. <u>I very much enjoy your class and your teaching methods</u>, however if we could just

avoid conversations such as the one we had the day of finals I would really appreciate it.. . ."[5]

(Emphasis added) However, the e-mail address of "<u>dpanada@desu.edu</u>" was not Dr. Panda's e-

mail address. *Panda Depo.* at 98-99. Dr. Panda's e-mail address was "<u>dpanda@desu.edu</u>". *Id.*

Although Dr. Panda initially stated that he received the e-mail sometime in January 2005 he later

clarified that he did not recall receiving the e-mail, until sometime in the later part of March, after

his discussion with Mr. Farley. *Id.* at 154. Moreover, the e-mail did not allege any sexual or

racial harassment or hostile environment. In March 2005 Plaintiff again met with Farley and

reviewed her allegation, at which time an investigation began. On June 30, 2005, Dr. Panda

voluntarily resigned from DSU.

## IV.    ARGUMENT

### A.    Summary Judgment Standard

Summary Judgment should be entered for Dr. Panda because all material facts have been

presented, there is no genuine issue as to any material fact, and based on the facts, Dr. Panda is

---

[5] E-mail from Plaintiff to Dr. Panda on January 4, 2005 attached at Appendix 5.

entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). *See Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986).

On a motion for Summary Judgment, "the moving party bears the initial burden of showing – that is, point out to the court that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). "The moving party is not required to negate the non-movant's claim, but instead must only point out the lack of evidence supporting the non-movant's claim." *County Floors, Inc. v. Partnership Composed of Gepner and Ford,* 930 F.2d 1056, 1061 (3d Cir. 1991); *Blickling v. Kent General Hosp., Inc.,* 872 F. Supp. 1299 (D.Del. 1994).

Once the moving party meets their burden, the non-moving party "may not rest upon the mere allegations or denials of his pleading." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). The non-moving party instead "must set forth specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson,* 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the non-moving party will not prevent the grant of a motion for Summary Judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on that issue. *Id.* at 249. Mere speculation or conjecture by the non-moving party clearly cannot preclude the granting of Summary Judgment.

For the reasons set forth herein, the undisputed facts establish that Dr. Panda is entitled to Summary Judgment.

**B.    Dr. Panda Is Entitled to Judgment As A Matter Of Law On Plaintiff's Claim For a Violation of Title IX, 20 U.S.C § 1681 Because The Only Claim Remaining Against Dr. Panda On This Count Is Against Him In His Official**

8

**Capacity Which Must Be Dismissed Because It Is Tantamount To A Claim Against DSU.**

Initially, Plaintiff brought suit against Dr. Panda in his individual and official capacities. On May 4, 2007, Dr. Panda filed a Motion to Dismiss the Title IX claim against him in his individual capacity as the Court has held that there is no cause of action against an individual under Title IX. *Bostic v. The Smyrna School District,* 2003 U.S. LEXIS 3458 (D. Del. 2003). Plaintiff, in her response conceded that a claim against Dr. Panda individually could not proceed under Title IX. *See* Plaintiff's Response to Dr.'s Motion to Dismiss, D.I. 10. On January 28, 2008, the Court entered a Memorandum Opinion holding that the Title IX claim could not proceed against Dr. Panda in his individual capacity.

The Court also concluded in its Memorandum Opinion that this claim could proceed against Dr. Panda in his official capacity. *D.I.* 43 at 4. Although the Court allowed the action to proceed against Dr. Panda at the initial stage Dr. Panda argues that the Title IX claim against him in his official capacity should now be dismissed as it is tantamount to a claim against the entity. A suit against a person in their official capacity is "generally . .. only another way of pleading an action against an entity of which an [official] is an agent." *Couden v. Duffey*, 533 F. Supp. 2d 490, 506 (citing) *Kentucky v. Graham,* 473 U.S 159, 166 (1985). "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, 'in all respects other than name', to be treated as a suit against the entity." *Id.* In *Couden v. Duffey,* the officers were dismissed in their official capacities because the municipal entities had been dismissed and the Court concluded that a suit against the officers in their official capacity "would constitute, in all respects other than name, a suit against the county or city." *Id.* Therefore, any finding against Dr.

9

Panda in his official capacity is a claim in name only and is tantamount to a claim against DSU, and, therefore, should be dismissed. Although, in accordance with this Court's prior ruling that the case may proceed against Dr. Panda in his official capacity, the claim against Dr. Panda in his official capacity should now be dismissed as it is wholly duplicative of the claim against DSU.

To the extent that Dr. Panda remains in the case in his official capacity the claim against him must still be dismissed. In order to prevail on her Title IX claim she must demonstrate: 1) that there was either *quid pro quo* sexual harassment or a sexually hostile education environment; 2) that she provided actual notice to "an appropriate person" who had authority to take corrective measures; and 3) that the institution's response to the harassment amounted to deliberate indifference. *Gebser v. Lago Vista Independent School District,* 525 U.S. 274, 291-92 (1998). .

Plaintiff has alleged a sexually hostile education environment. Compl. ¶ 22. In order to prevail on proving a sexually hostile education environment Plaintiff must show 1) she suffered intentional discrimination because of her sex; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected her; and 4) the discrimination would have detrimentally affected a reasonable person of her sex in her position. *Davis v. Monroe County Board of Education,* 526 U.S. 629, 650 (1999). Plaintiff has failed to set forth sufficient evidence for a reasonable jury to find that she was subjected to a sexually hostile education environment. Plaintiff can not show that the alleged comments made by Dr. Panda were pervasive and regular. When determining whether the conduct is pervasive and regular the Court should look at all of the circumstances including the "frequency of the discriminating conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with [a student's academic] performance." *Fragher v. City of Boca Raton,* 524 U.S.

10

775, 787-88 (1998).   Simple teasing, offhand comments, and isolated incidents (unless extremely

serious) are not enough to make a *prima facie* case of sexually hostile education environment.

*Kraus v. HowroyD-Wright Employment Agency, Inc.,* 2008 U.S. Dist. LEXIS 1254, *28 citing

*Fragher,* 524 U.S. at 788.  Pervasiveness must be conduct which is "more than episodic"; [it]

must be sufficiently continuous and concentrated in order to be deemed pervasive." *Id.*

Plaintiff can not show that the alleged incidents rise to the level of the pervasiveness and

regularity that the Courts have required.  When viewing the alleged remarks in the totality of the

circumstances it is clear that Plaintiff was a willing participant in these discussions and facilitated

the joking banter between herself and Dr. Panda.  Specifically,  Plaintiff asked Dr. Panda what

number he wanted "to be in line" and told him "he would have to be patient with everyone else if

he wanted to get in line."  Hurd Depo. at 25; *App.* at 3.  Plaintiff admitted that it was her

assumption she thought that Dr. Panda was referencing things of a sexual nature, however, she

was not offended because she continued to engage him in conversation.  *Id.* Moreover, Plaintiff

can not show that the comments were on such a  regular basis as to create a hostile environment.

There were two alleged comments in September of 2004.  The next alleged comment did not

occur until December 2004 and then the next alleged comment did not occur until February 2005.

At best, the alleged incidents were sporadic and isolated and none were so severe as to rise to the

level of a hostile educational environment.  *See Kraus,* 2008 U.S. Dist LEXIS 1254 (the Court

held that the continued IM messaging between Plaintiff and her supervisor regarding her

supervisor having sexual dreams about her, wanting to shower with her, wanting to kiss her and

have sex with her combined with a physical incident in which her supervisor hugged her during an

office meeting did not constitute a hostile environment because Plaintiff was a willing participant

in the conversations and that they engaged in sexual flirtation and that the incidents were not sufficiently severe to create a hostile work environment); *Johnson v. Falen Health Institutes, Inc.,* 267 F. Supp.2d 679 (W.D. Ky. 2003) (The Court ruled that although the nursing instructor's actions of physically touching the Plaintiff at least five times and often discussing his body parts in class were inappropriate they failed to rise to the level of hostile environment because the conduct was not pervasive enough to create severe harassment on a regular basis.)  Although, the alleged comments by Dr. Panda, assuming *arguendo*, they are true, may have been inappropriate they clearly fail to rise to the level of creating a hostile educational environment.  Plaintiff has failed to show that her educational environment was permeated with insults and discriminatory actions.  Under the totality of the circumstances the comments, at best amount to  mere joking banter back and forth between Plaintiff and Dr. Panda.  Plaintiff has failed to establish that the comments were so pervasive as to create severe harassment on a regular basis that would rise to the level of a hostile environment.

Plaintiff has also failed to allege any facts to support that Dr. Panda's conduct detrimentally affected her.  Plaintiff admitted that she was able to complete all of her classes through other teachers at the University and was able to complete her first degree to obtain her Bachelors of Arts (B.A.) degree in Business Management.  *Hurd Depo.* at 82, 101.  Plaintiff further admits that she must complete one more class to achieve her second B.A. degree in Marketing and that Mr. Farley told her to contact him when she was ready, but over the last three years Plaintiff has made no effort to contact him regarding completing the final class and obtaining her second degree in Marketing.  *Id.* at 101   Therefore, Plaintiff has failed to establish that Dr. Panda's alleged comments created a hostile environment, in light of the fact that she

12

completed one degree and only has one class remaining to achieve her second degree. *See*

*Petrone v. Cleveland,* 993 F. Supp. 1119 (6th Cir. 2000) and *Johnson v. Galen Health* Institute,

Inc., 267 F.Supp. 2d 679 (W.D. Ky. 2003) (finding that the Plaintiffs in those cases failed to show

a hostile environment in part because they successfully completed their program or classes).  For

all the foregoing reasons, Plaintiff has clearly failed to establish that Dr. Panda's alleged

comments  were so severe and pervasive and detrimentally affected her so as to create a hostile

educational environment.

 Moreover, Plaintiff has additionally failed to show that she provided actual notice of the

alleged harassment and that DSU acted with deliberate indifference.  She admitted she did not

initially tell Mr. Farley about the comments and it is not contested that when she did, DSU

properly took action.  Dr. Panda specifically relies upon the arguments set forth in DSU's Motion

for Summary Judgment and incorporates them by reference herein.   Plaintiff has failed to make

out a *prima facie* case that Defendants violated her rights under Title IX and, therefore, as a matter

of law, Dr. Panda is entitled to summary judgment.

**C.      Dr. Panda Is Entitled To Judgment As A Matter Of Law On Plaintiff's
            Presumed Claim Under 42 U.S.C.S § 2000d of Title VI of the Civil Rights Act
            of (1964) Because All Material Facts Have Been Presented And There Is No
            Genuine Issue As To Any Material Fact And Therefore Plaintiff Has Failed
            To Make Out A *Prima Facie* Case Of Racial Discrimination.**

 Initially, Plaintiff brought suit against Dr. Panda in his individual and official capacities

for violation of 42 U.S.C.S § 2000d of Title VI. On May 4, 2007, Dr. Panda filed a Motion to

Dismiss the Title VI claim against him in his individual capacity because "it is well established

that Title IX. . . is also modeled after Title VI and is interpreted and applied in the same manner as

Title VI", *Mercer v. Duke University,* 50 Fed. Appx. 643, 2002 U.S. App. LEXIS 23610 (4th Cir.

2002). Plaintiff, in her response, conceded that a claim against Dr. Panda individually could not proceed under Title VI. *See* Plaintiff's Response to Dr.'s Motion to Dismiss, D.I. 10. On January 28, 2008, the Court entered a Memorandum Opinion but inadvertently failed to include Dr. Panda's lack of liability under Title VI. Therefore, to the extent a claim against Dr. Panda in his individual capacity remains under Title VI is must be dismissed.

For the reasons stated, *supra,* the claim against Dr. Panda under Title VI against him in his official capacity should also be dismissed. Assuming *arguendo* that the Court continues the case against Dr. Panda in his official capacity it must still fail. Plaintiff alleges that she was subjected to unlawful racial discrimination and racial harassment in violation of Title VI. Complaint ¶ 26. However, Plaintiff has failed to assert a viable claim under 42 U.S.C. § 2000(d), [Title VI], and therefore Dr. Panda is entitled to judgment as a matter of law. Plaintiff admitted in her deposition that Dr. Panda did not racially discriminate against her and she does not recall him making any racial remarks. *Hurd Depo.* at 39, 117-118. At best, Plaintiff alleges that Dr. Panda referenced race, referring to black men, during conversations they had. *Id.* at 121. Those alleged references cited, *supra,* do not rise to the level of racial discrimination in violation of Title VI.

In order for Plaintiff to establish a *prima facie* case of racial discrimination, under [Title VI], she must show that: (1) she is a member of a protected class; (2) she has suffered an adverse action at the hands of the Dr. Panda in her pursuit of her education; (3) she was qualified to continue in her pursuit of her education; and (4) she was treated differently from similarly situated students who are not members of the protected class. *Manning v. Temple University,* 2004 U.S. Dist. LEXIS 26129 *15 (citing) *McDonnell Douglass Corp. v. Green,* 411 U.S. 792 (1973) .

Plaintiff has failed to establish a *prima facie* case of racial discrimination. Plaintiff has

14

failed to show any adverse action that was taken against her in pursuit of her education other than her own voluntary choice to not return to DSU. In fact, Plaintiff admitted in her deposition that DSU made arrangements for her to complete her remaining classes and obtain her degree in Marketing. *Hurd Depo* at 82, 101. Moreover, Plaintiff admitted that she has not made any attempts to contact DSU to make arrangements to complete her second degree in Marketing. *Id* at 101. It is undisputed that Plaintiff was qualified to continue to pursue her education, but she has voluntarily chosen not to continue. Lastly, Plaintiff has failed to show that she was treated differently from similarly situated students who are not members of the protected class which she alleges to be a part of, as stated *supra*. Therefore, Dr. Panda is entitled to Judgment as a matter of law because Plaintiff has failed to provide a scintilla of evidence that would allow a reasonable jury to conclude that her rights under Title VI were violated.

### D. Dr. Panda Is Entitled To Judgment As A Matter Of Law On Plaintiff's Claim Under 42 U.S.C § 1983 Because Plaintiff's Claims Are Barred By The 11th Amendment Against Panda In His Official Capacity; The Section 1983 Claim Is Subsumed In Title IX And Moreover She Has Failed To Show Any Violation of Her Due Process Rights.

Plaintiff presumably is alleging a claim under Section 1983, 42 U.S.C. § 1983, for violation of her due process rights although not specifically stated. Section 1983 provides a cause of action for "any person who had been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of state law." *Curley v. Klem,* 298 F.3d 271, 277 (3d Cir. 2002).

### 1. Plaintiff's Section 1983 Claims Are Barred By The 11th Amendment

Section 1983 claims are barred by the Eleventh Amendment when they are against state entities and state officials sued in their official capacities. *McKay v. Delaware State University,*

2000 U.S. Dist. LEXIS 14653 * 39 (D. Del.) citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989). For purposes of the Eleventh Amendment DSU has been held to be an instrumentality of the State of Delaware. *Id.* citing *Chapman v. Trs. of Del. State Coll.,* 101 F. Supp. 441, 444 (D. Del. 1951). Therefore, Plaintiff's Section 1983 claim against Dr. Panda in his official capacity is barred by the Eleventh Amendment. A party may only sue the state if it waives the immunity defense or if Congress has abrogated the state's immunity. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670 (1999). Neither DSU or Dr. Panda have waived their Eleventh Amendment immunity defense. Therefore, the Eleventh Amendment bars Plaintiff's § 1983 claims against DSU and Dr. Panda. *See McKay v. Delaware State University,* 2000 U.S. Dist. LEXIS 14653 * 39.

**2.      Plaintiff's Section 1983 Claim For Violation Of Title IX Must Be Dismissed As The Section 1983 Claim Is Subsumed In Title IX.**

Plaintiff's Section 1983 claim for violation of Title IX must be dismissed as it is subsumed by Title IX. Plaintiff has alleged a claim against Dr. Panda under 42 U.S.C. §1983 for depriving her of her Fourth and Fourteenth Amendment rights, as well as rights secured by Title IX. Plaintiff's claim under 42 U.S.C. §1983 must be dismissed as the Supreme Court in *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1 (1981) has held that "when remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983" *Nat'l Sea Clammers Association,* 453 U.S. at 20. The Third Circuit has held that the *Sea Clammers* doctrine applies to lawsuits alleging claims under both Title IX and § 1983. *Williams v. Sch. Dist. Of Bethlehem,* 998 F.2d 168, 176 (3d Cir. 1993); *Pfeiffer v. Marion Center Area School District,* 917 F.2d 779, 789 (3d Cir. 1990). The *Sea Clammers* doctrine holds that Congress may provide that a statute does not allow for § 1983 remedies either explicitly or by creating a comprehensive statutory enforcement scheme that intends to foreclose the § 1983 remedies. *See generally*

*Preiser v. Rodriguez,* 411 U.S. 475 (1973). Generally statutory construction holds that the detailed statute preempts the more general remedies. *Id.* Therefore, Plaintiff's §1983 claim is subsumed by Title IX because the Courts have determined that Title IX is the exclusive remedy for redressing sexual discrimination in public schools. *O'Hara v. Colonial School District*, 2002 U.S. LEXIS 12153 citing *Pfeiffer,* 917 F.2d at 789 (affirming the dismissal of plaintiff's constitutional claims against a school district and individual Dr.s because they were "subsumed" by Title IX).

> **3.    Plaintiff's Section 1983 Claim For Violation Of Title VI Must Be Dismissed Because Plaintiff Has Failed To Allege Any Factual Basis To Support That Claim.**

Plaintiff's claim under Section 1983 is unclear as to the violations alleged. It appears from the heading at Count, but not in the body of the Complaint, that Plaintiff alleges a violation of her due process rights. Plaintiff's claim for violation of her due process rights must fail as she has failed to establish any facts to support her allegations.

> **a.    Plaintiff's Substantive Due Process Rights Were Not Violated.**

To the extent Plaintiff is raising a violation of her substantive due process rights to property under the Fourteenth Amendment her claim must fail. The substantive due process protection of the Fourteenth Amendment prohibits those acting under color of state law from taking away a person's property interest for reasons that are "arbitrary, irrational, or tainted by improper motive." *Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 139 (3d Cir. 2000). The property interest which is alleged to have been taken must be considered fundamental under the Constitution. *Id.* The Supreme Court has failed to recognize the pursuit of a secondary education as a fundamental right for purposes of due process, although the Courts have found a property

17

interest in continued enrollment in school.  *San Antonio Indep. Sch. Dist. V. Rodriguez,* 411 U.S.
1 (1973) (holding that a right to public college education is not a fundamental right and assuming
without deciding that continued enrollment in university is a protected interest).

 Plaintiff does not have a fundamental right for purposes of due process to pursue her
undergraduate education.  Assuming *arguendo,* that Plaintiff has a protected property interest in
her continued education,  her claim must still fail because Plaintiff can not cite to any action
which took away any protected property interest.  Plaintiff alleged in her complaint that her
education was substantially delayed and that she has not been able to complete her second degree
in Marketing.  Compl. at ¶ 20.  Any delay or failure to obtain her second degree is a direct result
of  Plaintiff's actions or inactions.  Plaintiff admits that she stopped attending DSU in or about
February of 2005, while she was in the middle of a semester.  *Hurd Depo.* at 81,82.  She had
between three to five classes to complete.  Plaintiff completed those classes through other teachers
at DSU. *Id.* at 82, 101. Plaintiff admits that she only needs to complete one more class to obtain
her second degree in Marketing. *Id.*  She further admits that Mr. Farley told her, when she was
ready, to contact him. *Id.*  To date, Plaintiff has made no effort to contact Mr. Farley to make
arrangements to take the class. *Id.*  Therefore, to the extent Plaintiff has a property interest in her
continued education she has failed to show any facts that would support any actions by Dr. Panda
that were arbitrary, irrational, or tainted by improper motive that would amount to a taking of said
property interest.  For those reasons, Plaintiff's claim for violation of her substantive due process
rights must fail.

### b. Plaintiff's Procedural Due Process Rights Were Not Violated.

 To succeed on a claim for violation of procedural due process Plaintiff must show that

there was a protected property interest and the procedural safeguards surrounding the deprivation were inadequate. *Board of Regents v. Roth,* 408 U. S. 564, 568-69. Generally, procedural due process attaches to academic dismissals. The Supreme Court has held that the procedural safeguards that are attributed to such a process is an engagement of "informal give and take" with the administrative body. *Board of Curators of the Univ. If Missouri v. Horowitz,* 435 U.S. 78, 86 (1978). Assuming *arguendo,* Plaintiff has a property interest in her continued education with DSU, as stated, *supra,* Plaintiff has failed to show that there was any deprivation of that right that violated any procedural safeguards. Plaintiff was permitted to immediately continue her classes with other professors. The completion of these classes allowed her to obtain her degree in Business Managment. By Plaintiff's own admission she stated she only needs one more class to achieve her second degree in Marketing and that she has made no efforts to contact Mr. Farley to make arrangements to take the class. Plaintiff can not rely on her own procrastination to support a deprivation of any property right or to support her allegation that Defendants substantially delayed her education and prevented her from obtaining her degree. There is no need to address whether the safeguard procedures were violated because there has not been a deprivation of any property right. Therefore, it is clear that Dr. Panda is entitled to Judgment as a matter of law on Plaintiff's Section 1983 Claims of racial discrimination because she has failed to allege any violation of either her substantive or procedural due process rights.

## V.  CONCLUSION

For the aforementioned reasons,Dr. Panda, respectfully requests that Judgment as a matter of law be entered in his favor and against Plaintiff on all claims.

Respectfully submitted,


 /s/ *Richard R. Wier, Jr.*
Richard R. Wier, Jr. ( #716)
Michele D. Allen (#4359)
Two Mill Road, Suite 200
Wilmington, DE 19806
Rwier@wierlaw.com
302.888.3222
Attorneys for Defendants

Dated: May 30, 2008

IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF DELAWARE

TAMMY HURD,                          :
                                     :
            Plaintiff,               :
                                     :          C.A. No. 07-117-MPT
     v.                              :
                                     :
DELAWARE STATE UNIVERSITY            :
and DANDESON PANDA, individually     :
and in his official capacity,        :          JURY TRIAL DEMANDED
                                     :
            Defendants.              :


**DEFENDANT DANDESON PANDA, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY'S APPENDIX**



Respectfully submitted,



*/s/ Richard R. Wier, Jr.*
Richard R. Wier, Jr. (#716)
Michele D. Allen (#4359)
Richard R. Wier, Jr., P.A.
Two Mill Road
Suite 200
Wilmington, DE 19806
(302) 888-3222
*Attorney for Defendant Dandeson Panda*

DATE: May 30, 2008

# APPENDIX 1

Tammy E. Hurd

Page 7

1          Q.    Is that where you graduated from?

2          A.    Yes.

3          Q.    And after that, where, if at all, did you go

4    to school?

5          A.    I also attended college at Delaware Technical

6    and Community College.

7          Q.    And about what year did you go there?

8          A.    2000 to 2002 or 2003.

9          Q.    And when did you start at Delaware State

10   University?

11         A.    I don't recall.  It was either 2000 or 2003.

12         Q.    So after DelTech?

13         A.    As soon as I was done, yes.

14         Q.    Did you get a degree or anything at DelTech?

15         A.    I did.

16         Q.    And what was that in?

17         A.    Marketing.

18         Q.    And did you have any problems at Delaware Tech

19   or anything with any of the professors there?

20         A.    I had one incident with one professor.

21         Q.    Can you tell me about that?

22         A.    He was --

23               MR. POLIQUIN:  I object to the question.

24   You still have to answer the question.

Tammy E. Hurd

Page 12

1        A.    December of 2000.

2        Q.    And do you have any children?

3        A.    We do.

4        Q.    How many?

5        A.    We have two.

6        Q.    And their names?

7        A.    Chelsea Kent and Brandon Kent.

8        Q.    And Chelsea's age?

9        A.    Fifteen.

10       Q.    And Brandon's age?

11       A.    Twelve.

12       Q.    Do you have any other children?

13       A.    No.

14       Q.    How did you or how do you know Dr. Panda?

15       A.    I attended, maybe, three or four of his

16    classes.

17       Q.    Okay.  Tell me about your first encounter with

18    Dr. Panda, the first class that you took?  Let me ask you

19    this:  Before you took a class with Dr. Panda, were you

20    aware of him as a professor at Delaware State University?

21       A.    No.

22       Q.    Okay.  And you said that you started Delaware

23    State University in 2003, 2004?

24       A.    2002 or 2003 is what I said, I thought.

Tammy E. Hurd

Page 14

1     Q.    Okay.  And the first class that you took with

2     Dr. Panda, did you have any problems?

3     A.    I don't believe so; I don't recall.

4     Q.    About how many people do you think were in

5     that first class?

6     A.    Usually, the classes had anywhere from 15 to

7     30 students.

8     Q.    Okay.  And do you remember what grade you got

9     from Dr. Panda for that first class?

10    A.    I don't recall.

11    Q.    And your first class with Dr. Panda was

12    without any incident.  Did you feel him to be a good

13    professor at that time?

14    A.    I don't recall if there was any incidents at

15    that time because I don't know when this class

16    particularly was.

17    Q.    Your first class?

18    A.    I don't know when that class was.  I don't

19    know if it was, you know, July of 2000 whatever or when.

20    Q.    Well, you took two to three classes, just so

21    I'm clear, with Dr. Panda; correct?

22    A.    I don't recall how many classes I have taken

23    with Dr. Panda for certain.

24    Q.    Okay.  Have you taken more than one class with

Tammy E. Hurd

Page 16

1    receiving a booty call.

2          Q.   And do you recall what class that was in?

3          A.   I don't.

4          Q.   Do you recall what class you were in?

5          A.   I don't.

6          Q.   Okay.  And tell me how exactly the incident

7    happened with this phone call.

8          A.   Dr. Panda had stepped out of the class.  I saw

9    that I had a missed phone call; it was from my children's

10   school.  So I stepped out of the class as well to listen

11   to the voicemail to see if I needed to pick up the

12   children.  And when I stood out and was dialing for the

13   voicemail, he made the remark.

14         Q.   And what was the exact remark?

15         A.   "What is that, a booty call?"

16         Q.   And what did you say?

17         A.   Nothing at that time.

18         Q.   Did you respond in any way?

19         A.   I don't recall.

20         Q.   Was there anybody else present?

21         A.   I'm not certain.

22         Q.   Did Dr. Panda say anything else at that time?

23         A.   No.

24         Q.   What did he do after that?

Tammy E. Hurd

Page 18

1        A.    No.

2        Q.    Did you approach Dr. Panda after class and

3    address the issue with him?

4        A.    No.

5        Q.    Did you at that time report that comment that

6    Dr. Panda allegedly made to anybody?

7        A.    No.

8        Q.    Okay.  Were you married at that time?

9        A.    I don't recall.

10        Q.    Okay.  Do you recall if you went home and you

11    told any friends, relatives, anybody about the incident

12    that you allege Dr. Panda said to you?

13        A.    I don't recall.

14        Q.    And I'm sorry, do you recall even just

15    around-about time as to when this may have occurred?

16        A.    Around-about time, you mean during the day?

17        Q.    I'm just looking for a time frame, month,

18    year?

19        A.    Oh, I don't recall.  I could tell you that it

20    was maybe the first few weeks of the class, but I can't

21    tell you what month it was or what year it was.

22        Q.    And how did that comment make you feel?

23        A.    I was uncomfortable.

24        Q.    The class that you were taking with Dr. Panda,

Tammy E. Hurd

Page 21

1       A.    Correct.

2       Q.    Tell me about the first one that you recall.

3       A.    The first one I recall, Dereck and I were

4    walking to our vehicles from lunch, and Dr. Panda made a

5    remark that we were on a hot date or something to that

6    effect.

7       Q.    And who is Dereck?

8       A.    Dereck is a student in class with me.

9       Q.    Does Dereck have a last name?

10      A.    Batton B-A-T-T-O-N.

11      Q.    And do you know a phone number and address?

12      A.    I do not have an address for Dereck.  I do

13   have an old cell phone number, which I don't know if it's

14   active.

15      Q.    Okay.  When was the last time that you had

16   spoken to Dereck?

17      A.    Four to eight months ago.

18      Q.    Okay.  And Dr. Panda's alleged comment was,

19   what, are you on a hot date; is that correct?

20      A.    He made some sort of remark to that effect,

21   yes.

22      Q.    And was there anybody else present other than

23   you and Dereck?

24      A.    No.

Tammy E. Hurd

Page 24

1    both together and said, Hey, what are you two on a hot

2    date? or something like that?

3        A.    Something to that effect.

4        Q.    And again, just annoyed, aggravated?

5        A.    Correct.

6        Q.    Okay.  And did you report that comment to

7    anybody?

8        A.    We did not.

9        Q.    Did you address that comment, other than

10   saying we are not together, with Dr. Panda?

11       A.    Restate the question.

12       Q.    Sure.  Did you, other than saying to

13   Dr. Panda, we are not together, did you address that

14   comment with him at all?

15       A.    No.

16       Q.    Okay.  Did you report that comment to any

17   friends, relatives, spouse?

18       A.    No.

19       Q.    Did you report it to any other students?

20       A.    No.

21       Q.    The next comment that you allege Dr. Panda

22   made?

23       A.    The next comment that Dr. Panda made was on my

24   last day of class when I turned in my final exam.

Tammy E. Hurd

Page 25

1      Q.    And what was that?

2      A.    I don't know verbatim.  I don't have my notes,

3   but it was along the lines that he would make remarks

4   that Dereck had something for me.  And I again told him

5   that Dereck and I were not a couple.  We both had

6   significant others that we lived with.  And he made

7   another remark that we should date or get together.  I

8   told him that I was living with my boyfriend, that if

9   Dereck was interested, he would have to get in line with

10  the rest of them, as a joke.  And Dr. Panda then inquired

11  how he could get in line.  And I asked him, "You want to

12  get in line?"  And he said, "Yes, I want to get in line.

13  What do I have to do to get in line?"  I said, "You have

14  to be patient, like everyone else."  And he says, "You

15  are right.  You are right.  We shouldn't have sex,

16  because if we had sex, you would be screaming my name

17  when you are with your boyfriend."

18     Q.    And what was your response?

19     A.    I told him to stop being bad, that I needed

20  him to e-mail me the syllabuses for the next semester,

21  which was the reason -- after my test, I also started a

22  conversation with him, was to ask him for the syllabuses

23  for the next semester since I had two classes with him

24  the next semester and I could get a jump start on some of

Tammy E. Hurd

Page 26

1    the assignments and some of the study work.

2            Q.    And what was his response to that?

3            A.    To e-mail him and he would get them to me.

4            Q.    Okay.  So you go in to turn in your final

5    exam, and you initiate the conversation with Dr. Panda?

6            A.    Regarding the syllabuses.

7            Q.    And he says along the lines, hey, Dereck has

8    something for you.  Did you ask him what that is?

9            A.    No.

10           Q.    Do you have an indication as to what that was?

11           A.    In his tone of voice and the way that he said

12   it, yes.

13           Q.    And what did you think that was?

14           A.    Something sexual.

15           Q.    But he didn't say that?

16           A.    He did not.

17           Q.    Okay.  And then you said, it sounds, in a

18   joking manner, well, then, Dereck is going to have to get

19   in line with everybody else?

20           A.    Correct.

21           Q.    Insinuating that Dereck has to get in line

22   with everybody else who wants sexual stuff from you?

23                 MR. POLIQUIN:  Objection.  You can

24   answer the question.

Tammy E. Hurd

Page 31

1         Q.    Did you make a response at all?

2         A.    I said, No, these children are out of school

3    today.  I had to bring them with me.

4         Q.    Okay.  Was there anybody else present when

5    this alleged comment was made?

6         A.    No.

7         Q.    When was the next comment that you recall?

8         A.    The next comment that I recall is when my

9    husband and I had issues, he moved out, Dr. Panda saw

10   that I was sad that day and asked me what I was upset

11   about, because I'm not normally a down person.  And I

12   kind of told him that my boyfriend moved out.  He gave me

13   a speech about lifting yourself, and what he does in the

14   morning to make himself in a good place.

15        Q.    Was he specific or does he or did he just say

16   I do things in the morning?

17        A.    He was specific about having a cup of coffee,

18   a glass of water, and a shot of something.  Again,

19   because of his heavy accent, some of the things he says

20   are inaudible for me and I don't ask him to clarify.  It

21   seems to agitate him if people ask him to repeat things

22   that he says.

23        Q.    Did this conversation with Dr. Panda happen,

24   this conversation being where you said that you were

Tammy E. Hurd

Page 32

1    visibly upset, was that in class or outside of class?

2        A.    That was in class.

3        Q.    Okay.  And were you crying?

4        A.    No.

5        Q.    How did he know you were upset?

6        A.    I just wasn't very active in the classroom

7    that day.

8        Q.    And he approached you?

9        A.    He did.

10       Q.    And did you tell him what was wrong?

11       A.    I told him that my boyfriend had moved out.

12       Q.    And then he just gave you some uplifting

13   things as to what he does in the morning to make himself

14   feel good?

15       A.    Yes.

16       Q.    And were you appreciative of that?

17       A.    I was.

18       Q.    And when was the next alleged comment?

19       A.    That day, I had two classes with him and they

20   were back to back.  So in between the classes I was

21   sitting at my desk still when the first incident

22   happened, and then I got my things together, went to the

23   next classroom for the next class.  And at the end of

24   that class -- I'm sorry, at the beginning of that class,

Tammy E. Hurd

Page 33

1    before all of the students were in the class, he walked

2    up to me again and said, you know, nice words, to not be

3    sad, to keep moving, you are a strong girl.  And then he

4    made the remark that messed it all up.  He said, You are

5    an attractive woman, don't worry, you can get dick

6    anywhere.

7         Q.   And what did you say?

8         A.   I shook my head at him and said, You don't

9    understand; it's not about that kind of thing.

10        Q.   And how did you feel at that time, other than

11   your sadness with respect to your boyfriend moving out?

12        A.   Yes.  I was appreciative, like I said, in the

13   beginning that he had had nice words, but then disgusted

14   by the whole ordeal.

15        Q.   Did you file anything else?

16        A.   Just disgusted and ready to throw-up.

17        Q.   And were there any other people present at the

18   time that this alleged comment was made?

19        A.   There were students in the class, none of them

20   were close enough to hear.  They were trickling in for

21   the start of class.

22        Q.   And did you tell any other students about that

23   alleged comment?

24        A.   I told Dereck.  Dereck was also in that class

Tammy E. Hurd

Page 34

1   with me.

2        Q.   And what did Dereck say?

3        A.   Dereck shook his head and laughed, you know.

4        Q.   And the only thing that you told Dr. Panda at

5   that time was, You just don't understand?

6        A.   I said, It's not about that kind of thing; you

7   don't understand.

8        Q.   Okay.  Did you go and report that to anybody

9   else other than Dereck, that alleged comment?

10       A.   I did not.

11       Q.   When was the next alleged comment that you

12  claim was made by Dr. Panda?

13       A.   I don't recall.

14       Q.   Do you recall whether or not there were any

15  other comments made by Dr. Panda?

16       A.   There were remarks made by Dr. Panda.  He made

17  a remark in class one time to me.

18       Q.   Which was?

19       A.   After I had met with Mark Farley again.  After

20  I did report these incidents, I did not report them on

21  the day that they happened, but I did eventually report

22  them.  Dr. Panda asked me, in front of everybody in

23  class, if I was suing him for sexual harassment.

24       Q.   And what was your response?

Tammy E. Hurd

Page 35

1      A.   He redirected his question again.  He said, I

2   hear you are suing all the black men at this college for

3   sexual harassment.  I said, If I am, then line them all

4   up.

5      Q.   Is that the only response you gave?

6      A.   He then went on to make remarks about how no

7   one could get him for sexual harassment.  Sexual

8   harassment is not definable by the laws.  He also

9   finished up his little tyrant (sic) with that and stepped

10  over to me a little later that -- an innuendo about how a

11  black man would put a hurting on me.

12     Q.   Was anyone else present that heard that?

13     A.   I'm not certain if Dereck was sitting next to

14  me or not.

15     Q.   Was there any responses from anybody else in

16  the class when you allege Dr. Panda was going off on this

17  tirade about sexual harassment?

18     A.   No.

19     Q.   And you claim this was in front of the entire

20  class?

21     A.   Most of the class was in the room at the time.

22     Q.   Okay.  And at that time, had you discussed

23  with anybody about filing a lawsuit, prior to those

24  comments by Dr. Panda?

Tammy E. Hurd

Page 39

1        A.    Correct.

2        Q.    And at this time you don't recall any other

3    comments that were made by Dr. Panda?

4        A.    Not at this time.

5        Q.    Do you claim that Dr. Panda made any racial

6    comments toward you?

7        A.    I don't recall, other than the reference of

8    the black man putting a hurting on me.

9                MS. ALLEN:  Can I get these marked?

10                (A document was marked as Hurd Exhibit

11    No. 1 for identification.)

12    BY MS. ALLEN:

13        Q.    Ms. Hurd, I've handed you a document that's

14    been marked Hurd 1.  Does that look familiar at all to

15    you?

16        A.    Yes, it does.

17        Q.    Are these answers that you work with -- and I

18    don't want to know what you and your attorney discussed,

19    but are these answers that you worked with, answers that

20    you provided to your attorney in response to questions by

21    Dr. Panda?

22        A.    They are.

23        Q.    I am just going to ask you to turn to question

24    No. 10.  And in the response to No. 10, it appears you

Tammy E. Hurd

Page 41

1    nature.  He would then go on to say, like on February

2    1st, "You've got something he needs.  Dereck has

3    something that will hurt you."

4         Q.    And at least on one of those occasions you

5    told Dr. Panda that Dereck would have to get in line?

6         A.    I only said that one time.

7                    After that, and after the instances of

8    walking to the car, I was just annoyed at that point.

9         Q.    The February 10th, 2005, that you have

10   referenced in your responses to interrogatories, can you

11   tell me where that occurred?

12        A.    That happened in class.

13        Q.    And was there anybody else present?

14        A.    There was.

15        Q.    Who else?

16        A.    A classroom of students.

17        Q.    To the point where they heard what Dr. Panda

18   said?

19        A.    They heard everything up to, "You would give

20   me a high five, right?"

21        Q.    So it's your statement here that the entire

22   class would have heard Dr. Panda ask you to show him some

23   skin?

24        A.    Correct.

Tammy E. Hurd

Page 82

1    to get both of your degrees?

2         A.    I was in the middle of a semester, had to

3    finish up those four or three or five classes.

4         Q.    And did you do that?

5         A.    I did, through other teachers.

6         Q.    So that was completed?

7         A.    Correct.

8         Q.    And after that, what else do you need to

9    complete your two degrees?

10        A.    One degree should be completed, the Business

11   Management degree.

12        Q.    Okay.

13        A.    And I need one more class for the Marketing

14   degree.

15        Q.    Okay.  And you say that you can only get that

16   at Delaware State University?

17        A.    I was told at that time to look to see if any

18   neighboring colleges or on-line colleges offered that

19   course, and nobody offered that course or a comparable

20   course at that time.  So, yes, that was the only class

21   left to take at Delaware State University.

22        Q.    And you have listed here in your complaint

23   that you are looking for compensatory damages.  Do you

24   know how much you are looking for in compensatory

Tammy E. Hurd

Page 86

1      Q.    Have you ever had anything more than a

2  platonic relationship with Dereck?

3      A.    Yes.  We have been romantically involved.

4      Q.    At what point were you romantically involved?

5      A.    I'm not certain.

6      Q.    Was it before or after these incidents you

7  have discussed with Dr. Panda?

8      A.    I'm not certain.

9      Q.    Was it anytime in the past three years?

10     A.    No.

11     Q.    Was it while you were a student at Delaware

12 State University?

13     A.    Yes.

14     Q.    Do you recall when it was in relation to when

15 you started and when you left Delaware State University?

16     A.    No.  I think it was towards the beginning of

17 the career there, but I'm not certain.

18     Q.    Would you agree that that would have been

19 sometime before the incidents with Dr. Panda?

20     A.    I'm not certain.

21     Q.    What caused you to stop having a romantic

22 relationship with Mr. Batton?

23     A.    There was no particular incident.

24     Q.    Did you continue to socialize and remain

Tammy E. Hurd

Page 90

1   Dr. Panda?

2        A.    When I went to see Mr. Farley.

3        Q.    And do you recall when that was?

4        A.    It was either December or January.  I know

5   that I wanted to meet with him before the semester

6   started.

7        Q.    There is some records or some indication of a

8   January 3rd, 2005 meeting; does that sound familiar?

9        A.    That sounds familiar.

10       Q.    And that was the first time that you told

11  anyone at Delaware State University in terms of the

12  administration --

13       A.    Correct.

14       Q.    -- about this.

15             Can you describe that January 3rd, 2005

16  conversation with Mr. Farley?

17       A.    I told Mr. Farley that these incidents that

18  happened.  That I knew I had had two more classes to take

19  with him this coming up semester, and that if things had

20  gotten worse, I wanted him to be aware of what happened.

21  So if I had, perhaps, a poor grade in his class, he

22  wouldn't try to say that it was because I had a poor

23  grade in his class.

24       Q.    Do you recall telling Mr. Farley at that time,

Tammy E. Hurd

Page 91

1  as of January 3rd, 2005, you did not want to pursue a

2  formal complaint against Dr. Panda?

3      A.   Correct.

4      Q.   I believe you have been shown what has been

5  marked as Hurd Exhibit 1, and you were asked about

6  paragraph 10.  And some of the pages aren't numbered, but

7  I see your response to question No. 10.

8           Did you see where I am referencing?

9      A.   Yes.

10     Q.   Do you agree, based on the chronology that you

11  provided, there were two incidents that had occurred,

12  September 2004 and December 2004, prior to your going to

13  meet Mr. Farley on January 3rd, 2005?

14     A.   Correct.

15     Q.   Those were the two incidents you went to

16  discuss with him, with Mr. Farley?

17     A.   I am not positive about the September 2004,

18  but I am certain about the December 2004.

19     Q.   So it's, perhaps, only the one, December 2004

20  incident that you mentioned to Mr. Farley when you met

21  with him on January 3rd, 2005?

22     A.   I did mention it to him, yes.

23     Q.   And in the course of that conversation, you

24  said to him, I am just telling you this as background

Tammy E. Hurd

Page 92

1    information in case I get a bad grade, but I don't want

2    to pursue a formal complaint at this time?

3                    MR. POLIQUIN:  Objection.  You can

4    answer the question.

5                    THE WITNESS:  I said I am telling you

6    this in case things get worse this semester and I happen

7    to have a bad grade, I want you to be aware.  And he

8    asked what actions I wanted to take.

9    BY MR. CASARINO:

10       Q.    And what did you say?

11       A.    I didn't want to file a formal complaint, but

12   I did want him to be aware that he was not to interact

13   with me in that fashion.

14       Q.    Shortly after that January 3rd, 2005 meeting

15   with Mr. Farley, you sent an e-mail to Dr. Panda?

16       A.    Correct.

17       Q.    And, in fact, I believe it's been marked as

18   Hurd 4.  It looks like it was sent the next day, January

19   4th, 2005.  Whose idea was it to send that e-mail?

20       A.    Mr. Furley's.

21       Q.    And whose idea was it that the e-mail should

22   come from you as opposed to someone like Mr. Farley?

23       A.    Mr. Farley.  He was afraid that if I let it

24   come from him that it could have an impact on my grades

Tammy E. Hurd

Page 101

1        Q.    And I'm a little confused about this degree

2    you keep discussing, the business degree.  You indicated

3    that you have earned the degree but not actually received

4    the certificate, the diploma?

5        A.    Correct.

6        Q.    Have you actually called up the university or

7    written to them and said, Please send me a copy of my

8    diploma or my diploma?

9        A.    No.

10        Q.    With respect to this final marketing class

11    that you need to take to get your marketing degree, have

12    you ever written to or called the university and said,

13    Can I just complete that class from home study like I did

14    the other ones?

15        A.    No.  I know the option was open.

16        Q.    So that option was open to you by the

17    university?

18        A.    Mr. Farley said that when I was ready, to give

19    him a call.

20        Q.    But as of right now, you have not given him a

21    call?

22        A.    No.

23        Q.    What other schools have you checked with to

24    see if that class was available there?

Tammy E. Hurd

Page 117

1        A.    Sure.

2        Q.    And I'm still trying to understand, as

3   Mr. Casarino is, still trying to figure out your claim

4   for racial discrimination.  What's that based upon?

5                MR. POLIQUIN:  Objection.  It's already

6   been asked.

7   BY MS. ALLEN:

8        Q.    Let me make it specific to Dr. Panda.

9   Dr. Panda did not racially discriminate against you, did

10  he?

11               MR. POLIQUIN:  Objection.

12               THE WITNESS:  No.

13  BY MS. ALLEN:

14       Q.    And that was no?

15               MR. POLIQUIN:  Objection.  You can

16  answer the question.

17               THE WITNESS:  No.

18  BY MS. ALLEN:

19       Q.    You don't have a claim for racial

20  discrimination with respect to Dr. Panda's actions?

21               MR. POLIQUIN:  Objection.

22               THE WITNESS:  I will leave that to my

23  lawyers to decide.

24  BY MS. ALLEN:

Tammy E. Hurd

Page 121

1    Going to the February incident, occurred on February

2    17th, 2005.  Specifically, you state that Dr. Panda

3    initiated a conversation with you, accusing you of filing

4    a sexual harassment suit against all black men in the

5    school?

6         A.    Correct.

7         Q.    So he was specifying that you were somehow

8    filing some sexual harassment lawsuit against all the

9    black men in the school?

10        A.    Correct.

11        Q.    And then you also said that a black man would

12   put a hurting on you?

13        A.    Yes.

14        Q.    What did you understand that to mean?

15        A.    A sexual innuendo.

16        Q.    He was only referencing it in that a black man

17   would put a hurting on you?

18        A.    Correct.

19        Q.    And he also stated that you know what they say

20   about black men?

21        A.    Yes.

22        Q.    And black men will put a hurting on you, but

23   we won't go into that?

24        A.    Correct.

.

# APPENDIX 2

Dandeson Panda

8

1     A.   Yes.

2     Q.   Where do you currently reside?

3     A.   700 Riverside Road, Salisbury, Maryland.

4     Q.   What is your educational background,

5  Dr. Panda?

6     A.   I have a bachelor's degree from the

7  University of the District of Columbia.  I have

8  an MBA from Atlanta University, and a Ph.D. from

9  Howard University.

10     Q.   What was the degree, the bachelor's

11  degree?  Did you have a major?

12     A.   Marketing.

13     Q.   And you stated you also had a master's

14  degree?

15     A.   Yes.

16     Q.   And what was that in?

17     A.   Marketing.

18     Q.   And you also had have a Ph.D.?

19     A.   Yes.

20     Q.   What subject is that in?

21     A.   Organizational communication management.

22     Q.   When did you complete your Ph.D.?

23     A.   '91.

24     Q.   Prior to your employment with Delaware

Dandeson Panda

89

1    separated from Delaware State University?

2        A.    She is a chairman of the foreign language

3    department.

4        Q.    Anyone else?

5        A.    My wife was present.

6        Q.    Excuse me?

7        A.    My wife was present.

8        Q.    Anyone else?

9        A.    Not that I can remember.

10       Q.    What is your understanding of what a booty

11   call is, Dr. Panda?

12       A.    I have no understanding.  I have no

13   knowledge.

14       Q.    Have you ever asked a female student if

15   she received a booty call?

16       A.    No.

17       Q.    Have you ever asked if two students in

18   your class were dating?

19       A.    No.

20       Q.    Have you ever asked if two students in

21   your class were a couple?

22       A.    No.

23       Q.    Have you ever told a female student that a

24   male student has something for you?

Dandeson Panda

98

1    A.    Yes.

2    Q.    -- conversation with her?

3    A.    I deny having any conversation with her.

4    Q.    What exactly are you denying?

5    A.    What she is saying, I denied it.

6    Q.    What exactly is she saying in here that

7    you're denying?

8    A.    She's saying I have a conversation with

9    her and she does not appreciate the conversation.

10   Q.    Are you denying that you had any kind of

11   conversation with her?

12   A.    Yes, sir.

13   Q.    Did you want to know what made her feel

14   uncomfortable?

15         MR. WIER:   Asked and answered.

16         THE WITNESS:   As I said, I don't know

17   what she was referring to.

18   BY MR. POLIQUIN:

19   Q.    On the top of the e-mail it

20   says, "dpanada@desu.edu?  Is that how you spell

21   your last name?

22   A.    No.  It's dpanda@desu.edu.

23   Q.    Well, how did the e-mail get to you if it

24   was sent to what seemingly is a wrong e-mail

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

99

1  address?

2       A.    That's my e-mail address dpanda@desu.edu.

3            MR. WIER:  He is asking you the

4  spelling of your name.  It looks like "Panada."

5            THE WITNESS:  Oh, I don't know.

6  BY MR. POLIQUIN:

7       Q.    But you did receive this e-mail in

8  January 2005?

9       A.    Yes, sometime around that.

10      Q.    But this isn't your e-mail address, is it?

11      A.    No.  My e-mail address is just dpanda.

12      Q.    Do you have any explanation as to how you

13  would have received an e-mail that went to the

14  wrong address?

15      A.    No.

16      Q.    Do you know if Mark Farley forwarded you

17  this e-mail?

18      A.    It might have been.

19      Q.    Do you recall if Mark Farley forwarded you

20  this e-mail?

21      A.    It's possible he did.

22      Q.    If Mark Farley forwarded you this e-mail,

23  and you understand Mark Farley is the head of

24  human resources; right?

Dandeson Panda

131

Q.   It's your contention that you're innocent
of these charges?

A.   Yes, sir.

Q.   And ultimately what happened to your
employment with Delaware State University?

A.   I left.

Q.   And why did you leave?

A.   There was some separation agreement and I
left.

Q.   Why did you agree to the separation
agreement?

MR. WIER:   Objection to the extent it
calls for discussions with counsel.

Answer if you can, independent of
advice.

THE WITNESS:   There was no need for
me to fight it.

BY MR. POLIQUIN:

Q.   Well, you were innocent?

A.   Yes, I'm innocent.

Q.   Why wouldn't you fight it?

A.   Because there was too much involved and it
was taking a toll on my family.

Q.   Did your family encourage you to fight it

# APPENDIX 3

CONFIDENTIAL

Confidential
Information

**Approximately 9-04**

Dr. Panda went into the hallway for a knock at the door. I received a phone call earlier that had left a message. Concerned that it was a call about my children I went into the hallway as well and retrieved the message. Dr. Panda noticed and asked me if I had received a "booty call".

During the remainder of the semester Dr. Panda would stop Derek and I and make remarks about us as a couple. Even though we both tried on each occasion to tell him we were both involved with other people he still ignored these remarks and coupled us. This did not bother us but it did lead to final exam day.

**December 04**

After finishing my exam, I walked over to Dr. Panda to turn in my exam. Dr. Panda began the conversation as follows:

**Dr. Panda:** Derek has something for you. Derek says he has something really big for you.

**Tammy:** Derek has a girlfriend he does not need me and I live with my boyfriend. Derek is the big man on campus. He does not need any more girls.

**Dr. Panda:** Derek says he has something that will be really big for you.

**Tammy:** Well Derek will has to get in line with everyone else. I live with my boyfriend. (Then I informed Dr. Panda that I will be in his class next semester and could he please e-mail me the syllabus so that I can get a head start on my notes.)

**Dr. Panda:** (He then informed me that if I left my e-mail address he would send the syllabus to me and continued with) Derek tells me he has something for you.

**Tammy:** Derek will have to get in line. My son wants to know what they do once they get in line.

**Dr. Panda:** What do they do once they get in line?

**Tammy:** They be patient.

**Dr. Panda:** I want to get in line too.

**Tammy:** You want to get in line?

**Dr. Panda:** Yes what do I have to do to get in line?



Confidential
Information

**Tammy:** What place do you want in line? You have to be patient, like everyone else, I live with my boyfriend.

**Dr. Panda:** I want to be first.

**Tammy:** You are being bad. Don't for get to email me the syllabus so that I can get ahead start. I want to be prepared next semester.

**Dr. Panda:** You right we shouldn't hook up. If we hooked up you would be with your boyfriend and scream my name. You would be making love to your boyfriend and you would scream out Panda Panda. Then your boyfriend would wonder what you were screaming.

**Tammy:** (trying to laugh off the situation) You are being bad, don't forget to email me.

This concerned me so much that I decided to have a meeting with the Human Resource Director for Delaware State University regarding the behavior. I knew that I was going to have 3 – 4 more classes with him and wanted to make sure something was documented in case things got worse. The summation of the meeting was that I was to e-mail Dr. Panda and tell him that his remarks were not acceptable. It was the general belief between the HR director and myself that if the conversation was to come from the HR director it could have serious ramifications on my grade the following semesters. This meeting was held on January 3, 2005 and I emailed Dr. Panda that week. Dr. Panda never replied to the e-mail but I am certain he received the email based on his remarks to me at the beginning of the semester. Like "Derek is not here to protect you this time." And when I had to go to his office with two children he asked, "Are these your bodyguards?"

**1-27-05**

Begins the "Derek has something for you." As I was leaving class.

**2-1-05**

Saw me walking in the parking lot and began the "Derek has something for you." I said nothing and just smiled and walked on to class. Dr. Panda approached Derek and I in class and told Derek "I know you got something she needs. You should give it to her." Then to me "Derek has something that will hurt you." Derek replied "I know exactly what she needs." While patting me on the back. Derek did not know that the following week Dr. Panda started to make remarks to me again. The patting on the back is a pet peeve Derek knows that I have and was doing it to be funny not sexual. He did not realize that he was opening up the same dialog again from last year.

# APPENDIX 4

**September 2004**

Dr. Panda went into the hallway for a knock at the door. Plaintiff received a voice mail message on her phone. While retrieving the message, Dr. Panda noticed and asked Plaintiff is she received a "booty call".

During the remainder of the semester, Panda would stop Derek and Plaintiff and make remarks about the two as a couple. Even though both of them informed him that they were involved with other people, he continued the remarks.

After finishing her exam, Plaintiff turned in her exam to Dr. Panda. Dr. Panda began the conversation by saying, "Derek has something for you. Derek says "he has something really big for you" several times.

**December 2004**

Plaintiff informed Panda that Derek has a girlfriend. Panda continued saying "Derek says he has something that will be really big for you." During the same conversation, Panda also said, "You're right we shouldn't hook up. If we hooked up you would be with your boyfriend and scream my name. You would be making love to your boyfriend and you would scream out, Panda, Panda. Then your boyfriend would wonder what you were screaming."

**January 2005**

During the class, Panda said, "Derek is not here to protect you this time." And when Plaintiff went to his office with her two children he asked, "Are these your bodyguards?"

**January 27, 2005**

Panda says "Derek has something for you" as Plaintiff was leaving class.

**February 1, 2005**

When Panda saw Plaintiff walking in the parking lot before their class, he said "Derek has

something for you." Also, Panda approached Derek and Plaintiff in class and told Derek "I know you got something she needs. You should give it to her." Then he said to Plaintiff, "Derek has something that will hurt you."

**February 8, 2005**

After the first exam, Plaintiff approached Dr. Panda with her test and he began the conversation again with "Derek has something for you." After Derek turned in his test, Panda began the conversation with him regarding Plaintiff. Derek told Panda that he might be going to Vegas with Plaintiff. Dr. Panda replied, "If she takes me to Vegas, I would tear that pussy up."

**February 10, 2005**

During the class lecture, Panda was talking about cultural differences. Dr. Panda approached Plaintiff and asked, "If I ask you to show me some skin, what would you do for me?" Plaintiff did not reply fast enough and he said, "You would give me a high five right?" He then looked to Derek and said, "You need to hook a brother up. What they don't know, you know."

**February 15, 2005**

During Panda's lecture, the talk turns towards women in different cultures and what powers they have in each culture. Dr. Panda posed the question as to the power women have over men in the United States. The talks turned to sexual harassment. Dr. Panda announced "You cannot get me for sexual harassment. You cannot get a dime. Sexual harassment is not clearly defined."

**February 17, 2005**

On this date, Panda initiated a conversation with Plaintiff accusing her of trying to file a sexual harassment suit against all the black men at school. He also said that "a black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that."

In the second class for the day, Dr. Panda approached Plaintiff saying he hoped she was not offended by what he said earlier. When Derek asked the two if they had something going on that he didn't know about, Panda asked Derek if he wanted to fail. He directed Derek to keep to his own business.

**February 22, 2005**

Dr. Panda displayed animosity towards Plaintiff.

**March 1, 2005**

Dr. Panda asked Plaintiff if she was mad at him. Plaintiff told him that she had a lot going on right now. Panda then gave her an "up lifting" speech about not letting things get to her and to focus on her education.

During the second class, Dr. Panda approached Plaintiff again and told her that if she needed to talk to someone that a minister would be a good idea. Plaintiff then disclosed that she had caught her boyfriend cheating on her and that she threw him out a couple of weeks ago. Dr. Panda then said "Don't worry about it, you are a girl and you can get dick anywhere. Men are dogs, you can get dick anywhere."

7.    Identify and describe all documents within your possession, custody or control and all persons relating or referring to the communications, gestures, references or other conduct of whatever form you identify in response to Interrogatory number 6 herein.

**ANSWER:**

See attached.

8.    Identify and describe all communications, documents within your possession, custody or control, and/or persons relating or referring to the "information that students were angry with" you as referenced in paragraph 16 of the complaint.

# APPENDIX 5



casinobrats@comcast.net
01/04/2005 09:19 AM

To   dpanada@desu.edu
cc
bcc
Subject   Tammy Kent/Int MKT and INT MGT

Dr. Panda,

Happy New Year!!! I am so excited to start this new semester. I am going to see what I can do to finish up my degrees and begin teaching ASAP. I am just reminding you that I am still in need of the syllabus for International Management and International Marketing. I want to begin my notes early so that I may be able to focus more in class instead of steady writing notes from the book.

I also wanted to mention quickly that I was uncomfortable with our last conversation the last day of class regarding my dating life. I very much enjoy your class and your teaching methods, however of we could just avoid conversations such as the one we had the day of finals I would really appreciate it.


I am going to finish checking up on a few things regarding the alternative program through the state of Delaware for teaching. If it looks like something that I can accomplish then I may be in need of a couple more classes of yours this semester. I will let you know by the end of the week. I may need your help in getting in because they are already booked in the system.

Thank you for your time and patience,
--
Tammy Kent
270-6684



DEPOSITION
EXHIBIT
PANDA-6
4/25/08 TB
PENGAD 800-631-6989