## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TAMMY HURD, | : | |
| Plaintiff, | : | |
| v. | : | |
| DELAWARE STATE UNIVERSITY and DANDESON PANDA, individually and in his official capacity, | : | C.A. No. 07-117 |
| Defendants. | : | |

### APPENDIX TO DELAWARE STATE UNIVERSITY'S
### MOTION FOR SUMMARY JUDGMENT

### WHITE AND WILLIAMS LLP

**MARC S. CASARINO (#3613)**
824 North Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
(302) 467-4520
casarinom@whiteandwilliams.com
*Attorney for Defendant, Delaware State University*

Dated: May 30, 2008

PHLDMS1 4318821v.1

## INDEX

Delaware Technical & Community College.................................................................A1

Chronology .............................................................................................................A5

Deposition of Plaintiff, Tammy Hurd...................................................................A10

Deposition of Dandeson Panda..............................................................................A37

Deposition of Mark Farley.....................................................................................A47

Deposition of Nanda Viswanathan ........................................................................A84

Deposition of Allen Sessoms, Ph.D.......................................................................A87

Letter from Plaintiff to Allen Sessoms, Ph.D. ......................................................A89

Email from Plaintiff to Dandeson Panda ...............................................................A90

Letter from Allen Sessoms to Dandeson Panda.....................................................A91

*McKay v. Delaware State University*......................................................................A92

*Carter v. Delaware State University*....................................................................A105

*Carter v. Delaware State University* (3rd Circuit Opinion).................................A114

*Levarge v. Preston Board of Education*...............................................................A117

*Amy Krause v. Howroyd-Wright Employment Agency, et al.* .............................A123

*Alegria v. State of Texas* ....................................................................................A152

*Babiker v. Ross University School of Medicine* ..................................................A166

*Langadinos v. Appalachian School of Law*.........................................................A176

*Adams v. Andrews* ..............................................................................................A189

*Aoutif v. City University of New York*.................................................................A192

# DELAWARE TECHNICAL & COMMUNITY COLLEGE

Date Issued: 07-JAN-2003
OFF6
Page:  1

Student No: 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

Record of: Tammy Elizabeth Kent
4853 S State St
Magnolia, DE 19962

Issued To: Tammy Kent
4853 S State St
Magnolia, DE 19962

Course Level: Credit
Only Admit: Spring 1999-2000

Current Program
College : Delaware Tech
Major : Marketing & Management

| SUBJ | NO. | C | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|---|--------------|------|-----|-----|---|

**INSTITUTION CREDIT:**

Summer 2000
Marketing & Management
CIS 107  6  INTRO TO COMPUTERS/APPLICATION  3.00 A  12.00
ENG 121  6  COMPOSITION  3.00 C  6.00
MAT 012  6  REVIEW OF MATH FUNDAMENTALS  4.00 AB  10.00
Ehrs:  10.00 GPA-Hrs:  6.00 Pts:  18.00

Fall 2000-2001
Marketing & Management
ACC 101  6  ACCOUNTING I  4.00 B  12.00
BUS 101  6  INTRODUCTION TO BUSINESS  3.00 A  12.00
ECO 111  6  MACROECONOMICS  3.00 A  9.00
ENG 122  6  TECHNICAL WRITING/COMMUNICATIO  3.00 A  6.00
Ehrs:  13.00 GPA-Hrs:  13.00 Pts:  39.00

Spring 2000-2001
Marketing & Management
ACC 112  6  ACCOUNTING II  4.00 B  12.00
CIS 115  6  SPREADSHEET/GRAPHICS PROCESSIN  3.00 A  12.00
MKT 012  6  PRINCIPLES OF MARKETING  3.00 A  12.00
MAT 013  6  ELEMENTARY ALGEBRA - SELF-PACE  4.00 AB  10.00
Ehrs:  14.00 GPA-Hrs:  10.00 Pts:  36.00
Academic Recognition

Summer 2001
Marketing & Management
MAT 153  6  COLLEGE MATH AND STATISTICS  4.00 A  12.00
MKT 212  6  PRINCIPLES OF MARKETING  3.00 A  12.00
Ehrs:  7.00 GPA-Hrs:  24.00 Pts:  7.00
Academic Recognition

Fall 2001-2002
*********************  CONTINUED ON NEXT COLUMN  *******************

| SUBJ | NO. | C | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|---|--------------|------|-----|-----|---|

**Institution Information continued:**

Marketing & Management
ACC 201  6  Business Law  4.00 A  12.00
FIN 201  6  Money and Banking  3.00 B  12.00
MGT 212  6  Principles of Management  3.00 A  12.00
Ehrs:  10.00 GPA-Hrs:  33.00 GPA:  3.30
Academic Recognition      Good Standing

Spring 2001-2002
Marketing & Management
ACC 201  4  Business Statistics I  3.00 B  6.00
MGT 215  6  Small Bus/Entrepreneurship  3.00 A  12.00
MGT 261  6  Management Policy & Strategy  3.00 A  12.00
MKT 111  4  Salesmanship  3.00 W
MKT 214  6  Advertising/Sales Promotion  3.00 A  12.00
Ehrs:  12.00 GPA-Hrs:  12.00 GPA:  3.50
Dean's List      Good Standing

Fall 2002-2003
Marketing & Management
ACC 221  6  Cost Accounting I  3.00 B  9.00
MGT 213  6  Problems in Management  3.00 A  12.00
MGT 231  6  Human Resource Management  3.00 B  9.00
MKT 111  4  Salesmanship  3.00 A  9.00
Ehrs:  12.00 GPA-Hrs:  39.00 GPA:  3.25
Dean's List      Good Standing

*************** TRANSCRIPT TOTALS ***************

|  | Earned Hrs | GPA Hrs | Points | GPA |
|--|-----------|---------|--------|-----|
| TOTAL INSTITUTION | 78.00 | 70.00 | 231.00 | 3.30 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 78.00 | 70.00 | 231.00 | 3.30 |

*********************  END OF TRANSCRIPT  *******************

RECEIVED
JAN 1 4 2003
OFFICE OF... ...ENTS
DELAWARE ST... UNIVERSITY
1200 N. DUPONT HWY.
DOVER, DE 19901

This transcript is being released in accordance with the
Family Educational Rights and Privacy Act of 1974.

A1

# KEY TO TRANSCRIPT

**1. Transcript**

Official Transcripts bear a signature of the Campus Registrar as well as the Seal of Delaware Technical & Community College. Official copies will be released to the student; however, these copies will bear the stamp "Issued to Student." Pursuant to Federal Law (Family Educational Rights and Privacy Act), this information is transferred at the request of the student, but only on the condition that you will not permit any other party to have access to such information without consent of the student.

**2. Credit Hours**

Delaware Technical & Community College operates on a semester basis with semester credit units reflecting class and laboratory time for each course. Prior to Fall Semester 1993, the College operated on a quarterly basis.

**3. Campus Code**

Each campus is indicated by a number:

2 - Owens Campus          5 - Stanton Campus
4 - Wilmington Campus     6 - Terry Campus

**4. Accreditation**

Delaware Technical & Community College is a multicampus institution with four campus locations; each is accredited by the Commission on Higher Education, Middle Atlantic Association of Colleges and Schools.

**5. Grade Point Average Addendum**

This policy became effective the Fall Semester of 1994. Courses taken prior to this term are excluded.

**If a student repeats a course, the highest grade in the course is calculated in the grade point average. The lower grade earned in the course is excluded when calculating the GPA but is not deleted from the student's record. An "E" placed next to the course indicates the repetition of a course excluded in the GPA and an "I" indicates the repetition of a course included in the GPA.**

**6. A Registrar's Office** is located at each campus. The Registrar may be contacted for further information. Campus telephone numbers are listed below.

Owens Campus      - (302) 855-1672      Stanton Campus  - (302) 454-3834
Wilmington Campus - (302) 571-5317      Terry Campus    - (302) 857-1080

AUTHENTICITY TEST: The face of this document has a blue background; Apply liquid bleach to the background. If authentic, the paper will turn brown.
ADDITIONAL TEST: When photocopied, the word COPY appears prominently across the face of the entire document.

# EVALUATION EXPLANATION

## CURRENT GRADES

| SYMBOL | DESCRIPTION | GP | MEANING |
|---|---|---|---|
| A | Outstanding | 4.0 | Excellent performance |
| B | Above Average | 3.0 | Above average performance |
| C | Meets Objectives | 2.0 | Average performance |
| R | Recycle | 0.0 | Needs further work in course |
| O | Official Withdrawal | -- | Withdrawal *with approval of College* |
| I | Incomplete | -- | Student unable to complete course requirements because of circumstances beyond his/her control |
| W | Withdrawal | -- | Withdrew from courses |
| L | Listener/Audit | -- | No evaluation given for course work performed |
| AU | Academic Amnesty (U Grade) | -- | Not counted in GPA |
| AR | Academic Amnesty (R Grade) | -- | Not counted in GPA |
| AE* | Outstanding | -- | Not counted in GPA |
| BE* | Above Average | -- | Not counted in GPA |
| CE* | Meets Objectives | -- | Not counted in GPA |
| SE* | Continuing Satisfactory | -- | Not counted in GPA |
| RE* | Recycle | -- | Not counted in GPA |

# ACADEMIC HONORS

**TERM HONORS**
President's List (4.00 GPA, full-time)
Dean's List (at least 3.25 GPA, full-time)
Academic Recognition (at least 3.25 GPA, 6-11 credits)

**GRADUATION HONORS**
Summa Cum Laude (3.80-4.00 CUM GPA)
Magna Cum Laude (3.50-3.79 CUM GPA)
Cum Laude (3.25-3.49 CUM GPA)

## INACTIVE GRADES

| SYMBOL | DESCRIPTION | GP | MEANING |
|---|---|---|---|
| D** | Distinctive | 4.0 | Excellent performance |
| P** | Proficient | 2.5 | Satisfactory performance |
| U | Unofficial Withdrawal | 0.0 | Withdrawal without approval of College |
| WO** | Official Withdrawal | -- | Withdrawal without approval of College |
| WI** | Unofficial Withdrawal | -- | Withdrawal without approval of College |
| WP | Withdrawal Passing | -- | |
| WR | Withdrawal Recycling | -- | |
| X | Continuing Unsatisfactory | -- | |
| S* | Continuing Satisfactory | -- | |

*    Grades for Below 100 Level Courses          Used only for below 100 level courses
**   No GPA Calculation Prior to Fall 1977

A2

Student No: D10025298                     Date of Birth: 21-APR 1970                     Date Issued: 11-JAN-2008     Page: 1
                                                                                                                   UNOFFICIAL

U N O F F I C I A L

Record of: Tammy E Kent
Current Name: Tammy E Kent
258 N Old Mill Rd
Dover, DE 19901

Issued To: DSU Counsel

Course Level: Undergraduate
Only Admit: Spring 2003

Current Program
    College : Business
    Major : Marketing

| SUBJ NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|

TRANSFER CREDIT ACCEPTED BY THE INSTITUTION:

SMR00 - FA02    Delaware Tech & Cmty College

| SUBJ NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|
| 0001 101 | ENGLISH COMPOSITION I | 3.00 | C | | |
| 0001 102 | ENGLISH COMPOSITION II | 3.00 | C | | |
| 0025 121 | COLLEGE ALGEBRA | 4.00 | B | | |
| 0040 201 | PRINCIPLES OF MACROECONOMICS | 3.00 | B | | |
| 0040 202 | PRINCIPLES OF MICROECONOMICS | 3.00 | A | | |
| 0040 208 | INTRODUCTORY STATISTICS | 3.00 | C | | |
| 0040 990 | ELCTV: MONEY & BANKING | 3.00 | B | | |
| 0041 105 | MANAGEMENT PROCESSES | 3.00 | A | | |
| 0041 191 | UNIV SEM I - MANAGEMENT | 1.50 | A | | |
| 0041 192 | UNIV SEM II - MANAGEMENT | 1.50 | A | | |
| 0041 990 | ELCTV: HUMAN RSRC MGT | 3.00 | B | | |
| 0041 990 | ELCTV: MGT POLICY & STRATEGY | 3.00 | A | | |
| 0041 990 | ELCTV: PROBLEMS IN MGT | 3.00 | A | | |
| 0042 202 | ACCOUNTING I | 4.00 | B | | |
| 0042 202 | ACCOUNTING II | 4.00 | B | | |
| 0042 302 | LEGAL ENVIRONMENT | 3.00 | B | | |
| 0046 300 | ELCTV: COST ACCOUNTING I | 3.00 | A | | |
| 0046 300 | PRINCIPLES OF MARKETING | 3.00 | A | | |
| 0046 407 | ADVERTISING | 3.00 | A | | |
| 0046 990 | ELCTV: SALESMANSHIP | 3.00 | B | | |
| 0046 990 | ELCTV: SMALL BUSN/ENTRPRSHP | 3.00 | A | | |
| 0052 105 | MICROCOMPUTER APPLICATIONS | 3.00 | A | | |
| 0052 990 | ELCTV: SPRDSHT/GRAPHICS PROC | 3.00 | A | | |

Ehrs: 70.00  GPA-Hrs : 70.00  QPts: 231.00 GPA: 3.30

INSTITUTION CREDIT:

Spring 2003

| 0001 201 | WORLD LITERATURE I | 3.00 | C | 6.00 | |
| 0016 100 | LIFETIME FITNESS AND WELLNESS | 2.00 | A | 8.00 | |

********* CONTINUED ON NEXT COLUMN *********

| SUBJ NO. | COURSE TITLE | CRED | GRD | PTS | R |
|---|---|---|---|---|---|

Institution Information continued:

| 0023 105 | BASIC ECOLOGY/LAB | 3.00 | A | 12.00 | |
| 0025 125 | FINITE MATHEMATICS | 3.00 | A | 12.00 | |
| 0031 395 | GLOBAL SOCIETIES | 3.00 | A | 12.00 | |
| 0034 202 | AMER CIV FRM 1865 | 3.00 | A | 12.00 | |

Ehrs: 17.00  GPA-Hrs: 17.00  QPts: 62.00 GPA: 3.64
Dean's List

Fall 2003

| 0001 202 | WORLD LITERATURE II | 3.00 | B | 9.00 | |
| 0008 251 | ELEMENTARY FRENCH I & LAB | 3.00 | C | 6.00 | |
| 0041 255 | PROFESSIONAL DEVELOPMENT I | 1.00 | P | 0.00 | |
| 0041 445 | STRATEGIC MANAGEMENT | 3.00 | A | 12.00 | |
| 0043 300 | Managerial Finance | 3.00 | A | 12.00 | |

Ehrs: 13.00  GPA-Hrs: 12.00  QPts: 39.00 GPA: 3.25

Spring 2004

| 0006 101 | INTRO TO MUSIC* | 3.00 | B | 9.00 | |
| 0025 225 | CALCULUS FOR BUS & SOC SCI I | 3.00 | A | 12.00 | |
| 0041 256 | PROFESSIONAL DEVELOPMENT II | 1.00 | P | 0.00 | |
| 0041 306 | OPERATIONS MANAGEMENT | 3.00 | B | 9.00 | |
| 0041 420 | ORGANIZATIONAL BEHAVIOR | 3.00 | A | 12.00 | |

Ehrs: 13.00  GPA-Hrs: 12.00  QPts: 42.00 GPA: 3.50

Fall 2004

| 0001 200 | SPEECH | 3.00 | A | 12.00 | |
| 0008 102 | ELEMENTARY FRENCH II | 3.00 | A | 12.00 | |
| 0022 101 | DESCRIPTIVE ASTRONOMY | 3.00 | B | 9.00 | |
| 0041 305 | MANAGEMENT INFORMATION SYSTEMS | 3.00 | B | 9.00 | |
| 0046 315 | BUYER BEHAVIOR | 3.00 | A | 12.00 | |

Ehrs: 15.00  GPA-Hrs: 15.00  QPts: 54.00 GPA: 3.60
Dean's List

Spring 2005

| 0041 257 | PROFESSIONAL DEVELOPMENT III | 1.00 | P | 0.00 | |
| 0041 440 | INTERNATIONAL MANAGEMENT | 3.00 | A | 12.00 | |
| 0046 420 | INTERNATIONAL MARKETING | 3.00 | A | 12.00 | |
| 0046 426 | MARKETING MANAGEMENT | 3.00 | B | 9.00 | |

********* CONTINUED ON PAGE 2 *********

A3

Student No: D10025298

Date of Birth: 21-APR-1970

Date Issued: 11-JAN-2008
Page: 2
UNOF

Record of: Tammy E Kent
Level: Undergraduate

U N O F F I C I A L

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|--------------|------|-----|-----|---|

Institution Information continued:
Ehrs: 10.00 GPA-Hrs: 9.00 QPts: 33.00 GPA: 3.66
IN PROGRESS WORK
0012 121    MICROCOMPUTER SOFTWARE APPL    3.00 IN PROGRESS
            In Progress Credits  3.00
********** TRANSCRIPT TOTALS **********************
            Earned Hrs  GPA Hrs  Points    GPA
TOTAL INSTITUTION   68.00   65.00   230.00   3.53

TOTAL TRANSFER      70.00   70.00   231.00   3.30

OVERALL            138.00  135.00   461.00   3.41
************** END OF TRANSCRIPT *******************

A4

CONFIDENTIAL

Confidential
Information

**Approximately 9-04**

Dr. Panda went into the hallway for a knock at the door. I received a phone call earlier that had left a message. Concerned that it was a call about my children I went into the hallway as well and retrieved the message. Dr. Panda noticed and asked me if I had received a "booty call".

During the remainder of the semester Dr. Panda would stop Derek and I and make remarks about us as a couple. Even though we both tried on each occasion to tell him we were both involved with other people he still ignored these remarks and coupled us. This did not bother us but it did lead to final exam day.

**December 04**

After finishing my exam, I walked over to Dr. Panda to turn in my exam. Dr. Panda began the conversation as follows:

**Dr. Panda:** Derek has something for you. Derek says he has something really big for you.

**Tammy:** Derek has a girlfriend he does not need me and I live with my boyfriend. Derek is the big man on campus. He does not need any more girls.

**Dr. Panda:** Derek says he has something that will be really big for you.

**Tammy:** Well Derek will has to get in line with everyone else. I live with my boyfriend. (Then I informed Dr. Panda that I will be in his class next semester and could he please e-mail me the syllabus so that I can get a head start on my notes.)

**Dr. Panda:** (He then informed me that if I left my e-mail address he would send the syllabus to me and continued with) Derek tells me he has something for you.

**Tammy:** Derek will have to get in line. My son wants to know what they do once they get in line.

**Dr. Panda:** What do they do once they get in line?

**Tammy:** They be patient.

**Dr. Panda:** I want to get in line too.

**Tammy:** You want to get in line?

**Dr. Panda:** Yes what do I have to do to get in line?

Confidential
Information

**Tammy:** What place do you want in line?  You have to be patient, like everyone else, I live with my boyfriend.

**Dr. Panda:** I want to be first.

**Tammy:** You are being bad.  Don't for get to email me the syllabus so that I can get ahead start.  I want to be prepared next semester.

**Dr. Panda:** You right we shouldn't hook up.  If we hooked up you would be with your boyfriend and scream my name.  You would be making love to your boyfriend and you would scream out Panda Panda. Then your boyfriend would wonder what you were screaming.

**Tammy:** (trying to laugh off the situation) You are being bad, don't forget to email me.

This concerned me so much that I decided to have a meeting with the Human Resource Director for Delaware State University regarding the behavior.  I knew that I was going to have a 3 – 4 more classes with him and wanted to make sure something was documented in case things got worse.  The summation of the meeting was that I was to e-mail Dr. Panda and tell him that his remarks were not acceptable.  It was the general belief between the HR director and myself that if the conversation was to come from the HR director it could have serious ramifications on my grade the following semesters.  This meeting was held on January 3, 2005 and I emailed Dr. Panda that week.  Dr. Panda never replied to the e-mail but I am certain he received the email based on his remarks to me at the beginning of the semester.  Like "Derek is not here to protect you this time." And when I had to go to his office with two children he asked, "Are these your bodyguards?"

**1-27-05**

Begins the "Derek has something for you." As I was leaving class.

**2-1-05**

Saw me walking in the parking lot and began the "Derek has something for you," I said nothing and just smiled and walked on to class. Dr. Panda approached Derek and I in class and told Derek "I know you got something she needs.  You should give it to her."  Then to me "Derek has something that will hurt you." Derek replied "I know exactly what she needs." While patting me on the back, Derek did not know that the following week Dr. Panda started to make remarks to me again.  The patting on the back is a pet peeve Derek knows that I have and was doing it to be funny not sexual.  He did not realize that he was opening up the same dialog again from last year.

DSU0003

Confidential
Information

**2-3 Missed class – kids had a half day**

**2-8-05**

After the first exam I approached Dr. Panda with my test and he began the conversation again with "Derek has something for you." I just left and said that I would see him at the next class. After Derek's test Dr. Panda began the conversation with him regarding me. Derek trying to gear him to another direction told him that he might be going to Vegas with me. Dr. Panda replied, "If she take me to Vegas I would tear that pussy up." Derek laughed it off and left the classroom.

**2-10-05**

During the class lecture Dr. Panda was trying to make a point in regards to cultural differences. This is his way to sneak sexual innuendos into the classroom with out seeming like he is doing anything wrong. Dr. Panda approached me and asked, "If I ask you to show me some skin what would you do for me?" I did not reply fast enough and he said, " You would give me a high five right?" He then looked to Derek and said, "You need to hook a brother up. What they don't know you know."

**2-15-05**

During the lecture talks turn towards women in different cultures and what powers they have in each culture. Dr. Panda posed the question as to the power women have over men in the United States. The talks turned to sexual harassment. Dr. Panda announced "You cannot get me for sexual harassment. You cannot get a dime. Sexual harassment is not clearly defined."

**On 2- 17-05 Dr. Panda initiated a conversation with me as follows.**

**Dr. Panda:** Tammy I hear that you are trying to file a sexual harassment suite on all the black men at school.

**Tammy:** I don't know anything about that, but if I am just line them up.

**Dr. Panda:** No I hear you are trying to file a sexual harassment suit on all the black men at school including me.

**Tammy:** I get sexually harassed at work. I work at the casino and get sexually harassed a lot there.

**Dr. Panda:** Yes, but that is by white men. I am talking about the black men.

DSU0004

**A7**

Confidential
Information

**Tammy:** That is not true, they are mostly black men. I have been offered $1000.00 before for a day's service.

**Dr. Panda:** A $1000.00 what you gonna do for that kind of money.

**Tammy:** Nothing, I have better things to do with my time. Like work, kids, school work.

**Dr. Panda:** This was a black man? Why you not take him up on it?

**Tammy:** Yes gold teeth and all. Because it was just not my thing, someone that acts like a Holy Roller here is my picture of my dead girlfriend, believes that God will make everything right and then try and offer me money? That does not sit well with me at all.

**Dr. Panda:** That black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that.

In the second class for the day Dr. Panda approached me again.

**Dr. Panda:** Tammy I hope you were not offended by what I said earlier.

**Tammy:** I don't know what you mean.

**Dr. Panda:** In the other class what I said I hope did not offend you.

**Derek:** Do you two have something going on that I don't know about? (Derek and I had already discussed the earlier class. Derek and I have an understanding where he tries to deflect Dr. Panda's attention away from me.)

**Dr. Panda:** Derek do you want to fail?

**Derek:** I don't understand, do I want a Pail?

**Dr. Panda:** I said fail you know like pass or fail?

**Derek:** Oh, fail no I don't want to fail.

**Dr. Panda:** Then I suggest you keep to your own business.

We all laughed as Dr. Panda returned to the front of the class. Derek and I agreed that it was big of Panda to apologize. I saw it, as a way for Panda to protect himself from me because is really is afraid of me legally.

DSU0005

A8

Confidential
Information

**2-22-05**
Class was very uncomfortable for me as Dr. Panda displayed obvious animosity towards me.

**2-24-05**
No class snow storm.

**3-1-05**

First class Dr. Panda noticed I was down and asked me if I was mad at him. I told him that I had a lot going on right now. He gave me a very nice up lifting speech about not letting things get to me and to focus on my education.

Second class Dr. Panda approached me again and told me that I needed to talk to someone and that a minister would be a good idea. I told him that I do not go to church and reminded him that I was fighting for my children this semester. He then said that it seamed like it was more than that and I said I had caught my boyfriend cheating on me and that I threw him out a couple of weeks ago. Dr. Panda then said "Don't worry about it, you are a girl you can get dick anywhere. Men are dogs you can get dick anywhere."

**3-3-05**

Testing no incidents.

**3-8 & 10 – 05**

Spring Break no incidents

**3-15-05**

Class cancelled

**3-17-05**

Did not attend class. Was not ready to deal with Dr. Panda.

DSU0006

**A9**

Tammy E. Hurd

Page 16

1    receiving a booty call.

2         Q.   And do you recall what class that was in?

3         A.   I don't.

4         Q.   Do you recall what class you were in?

5         A.   I don't.

6         Q.   Okay.  And tell me how exactly the incident

7    happened with this phone call.

8         A.   Dr. Panda had stepped out of the class.  I saw

9    that I had a missed phone call; it was from my children's

10   school.  So I stepped out of the class as well to listen

11   to the voicemail to see if I needed to pick up the

12   children.  And when I stood out and was dialing for the

13   voicemail, he made the remark.

14        Q.   And what was the exact remark?

15        A.   "What is that, a booty call?"

16        Q.   And what did you say?

17        A.   Nothing at that time.

18        Q.   Did you respond in any way?

19        A.   I don't recall.

20        Q.   Was there anybody else present?

21        A.   I'm not certain.

22        Q.   Did Dr. Panda say anything else at that time?

23        A.   No.

24        Q.   What did he do after that?

Tammy E. Hurd

Page 29

1    or husband about it?

2          A.    Yes.

3          Q.    And when did you talk to him about it?

4          A.    Probably that day or that evening.

5          Q.    And would that be Jason Hurd?

6          A.    Yes.

7          Q.    And what did you tell him?

8          A.    I told him the incident that happened and that

9    I was nervous about going to school the next semester.

10         Q.    And what did Jason say?

11         A.    He was upset and said that I should report it.

12         Q.    And is that when you decided to report it?

13         A.    Yes.

14         Q.    And when you say you told Jason that you were

15   nervous about going back to school the next semester, why

16   were you nervous?

17         A.    I was afraid of more remarks like that, and it

18   escalating further.

19         Q.    Did you have to take Dr. Panda as a professor?

20         A.    Yes.

21         Q.    Those classes were not available by any other

22   professor?

23         A.    No.

24         Q.    Were there any other comments, alleged

A10a

Tammy E. Hurd

Page 17

1      A.   He directed his attention towards the reason

2  he left the classroom.

3      Q.   Which was?

4      A.   To speak with somebody else.

5      Q.   Do you know who that other person was?

6      A.   I don't recall.

7      Q.   Was that other person present when you allege

8  that Dr. Panda said, was that a booty call?

9      A.   I don't recall.

10      Q.   What did you do after Dr. Panda then directs

11  his attention back to this other person?  What did you

12  do?

13      A.   I walked around the corner to listen to the

14  message.

15      Q.   What did you do after that?

16      A.   I went back into the classroom.

17      Q.   Did Dr. Panda eventually come back into the

18  room?

19      A.   He did.

20      Q.   Did he say anything else to you at that time?

21      A.   No.

22      Q.   Did you tell anybody in class, when you

23  returned back to class, about what Dr. Panda had

24  allegedly said to you?

Tammy E. Hurd

Page 43

1            (A document was marked as Hurd Exhibit

2    No. 2 for identification.)

3    BY MS. ALLEN:

4        Q.   Did you file a lawsuit against Dr. Panda and

5    against Delaware State University?

6        A.   I did.

7        Q.   And what I have shown you as Hurd 2, does that

8    appear to be the complaint and lawsuit you filed against

9    Delaware State University and Dr. Panda?

10       A.   It does.

11       Q.   And I note on the last page, it's a verified

12    complaint.  So you have sworn to the allegations in the

13    complaint; correct?

14       A.   Correct.

15       Q.   Why did you file this lawsuit?

16             MR. POLIQUIN:  Objection.  You can

17    answer the question.

18             THE WITNESS:  The whole thing, from the

19    very beginning, was to protect the other girls coming

20    from behind me.

21    BY MS. ALLEN:

22       Q.   Can you be more specific about that, to

23    protect what other girls?

24       A.   Any other girls that may have to take a class

Tammy E. Hurd

Page 44

1    with Dr. Panda.

2        Q.    Were you aware of any other girls that you

3    allege Dr. Panda was making improper comments to?

4        A.    Not at the time that things were happening to

5    me.

6        Q.    So it was just a general protection?

7        A.    Yes.

8        Q.    Were there other females in your classes that

9    you took with Dr. Panda?

10       A.    There were.

11       Q.    And did you see any interaction between

12   Dr. Panda and those girls?

13       A.    No.

14       Q.    Did you ever hear any improper comments that

15   Dr. Panda may have made to any of those other girls?

16       A.    No.

17       Q.    Did you receive any complaints from any of the

18   other girls in his class that Dr. Panda's treatment was

19   of an improper nature?

20       A.    No.

21       Q.    I'm going to direct your attention to

22   paragraph 16 of the complaint, which has been marked as

23   Hurd 2, and that's on page 3.  It says here, subsequent

24   to your complaints, you received information that

Tammy E. Hurd

Page 45

1    students were angry with you for filing the complaint

2    responsible for getting Dr. Panda in trouble?

3        A.    Correct.

4        Q.    Can you be more specific?  Can you tell me how

5    you received that information and what information you

6    received?

7        A.    I received a phone call from another student.

8        Q.    And who was that?

9        A.    His name is Alvin.  I'm not positive of his

10   last name, but I believe it's Green.

11       Q.    Um-hmm.

12       A.    That noticed that I was not in the class for a

13   few days, and wanted to know what was going on with me.

14   And I told him that there were things going on at school

15   that I couldn't attend right now.

16       Q.    Okay.  Did you tell him anything else?

17       A.    I didn't have to.  Alvin knew what was going

18   on.  He knew that there was a white girl in school that

19   had gotten Dr. Panda in some trouble.

20       Q.    Did he say how he knew that?

21       A.    He heard other students talking about it in

22   class.

23       Q.    Did he say who those other students were?

24       A.    He did not.

A14

Tammy E. Hurd

Page 46

1        Q.    Was Alvin in any of your classes?

2        A.    He was.

3        Q.    Any of your classes with Dr. Panda?

4        A.    I'm not certain.

5        Q.    What class was Alvin in with him?

6        A.    I know that Alvin was in my class with

7   Dr. Rodriguez, but I'm not sure of the title.

8        Q.    And you don't know Alvin's last name?

9        A.    I do not.

10       Q.    And so Alvin would not have been present

11   during any of these alleged comments that you claim

12   Dr. Panda made?

13       A.    Correct.

14       Q.    Just to focus on what you had said, did you

15   finish out the semester with Dr. Panda?

16       A.    No.

17       Q.    You did not finish his class?

18       A.    Not with him.

19       Q.    Okay.  And why was that?

20       A.    He was removed.

21       Q.    And Alvin said that you had been missing

22   classes; did you not return to school at some point?

23       A.    No.

24       Q.    No, you did not return?

Tammy E. Hurd

Page 48

1          A.    They would vary from children being sick to

2    not wanting to be in his presence.

3          Q.    And how many classes do you think you missed

4    because you didn't want to be in his presence?

5          A.    Anywhere from six to ten.

6          Q.    And the six to ten, would that be a total for

7    the two classes?

8          A.    A total for any of the classes I have with

9    him.

10          Q.    Okay.  Did anybody ever approach you and say

11    that they were angry that, or that they knew you had

12    filed a complaint against Dr. Panda?

13          A.    No.

14          Q.    So in paragraph 16, when you say you received

15    information, that was just solely through Alvin?

16          A.    It was.  I never went back to school again.

17          Q.    Before you left school and didn't return, did

18    you have any encounters with any students that

19    specifically said to you that they were angry with you

20    for filing a complaint against Dr. Panda?

21          A.    No.

22          Q.    Did you receive any written correspondence

23    from any students or anybody that you are aware of that

24    said they were angry or upset with you for filing a

Tammy E. Hurd

1    complaint against Dr. Panda?

2        A.    No.

3        Q.    Paragraph 17 of your complaint it says, "The

4    information involved threats that a "white chick" had

5    taken Dr. Panda down."  And then you have an e-mail cited

6    from you to Mark Farley.

7                  What information do you have about these

8    threats of a white chick had taken Dr. Panda down?

9        A.    When I was speaking with Alvin, he informed me

10   that he had heard in class that the reason for

11   Dr. Panda's absence was that a white chick had brought

12   down Dr. Panda, and that they had a 20-page diary or

13   journal of some sort of the actions that he had done.

14       Q.    And did Alvin tell you what class he had heard

15   this in?

16       A.    He did not.

17       Q.    Did he tell you anything as to what the

18   students' reactions were to that?

19       A.    They were very upset.  They were irate, and

20   they were putting together a petition to reinstate

21   Dr. Panda.

22       Q.    Did you ever see a petition to reinstate

23   Dr. Panda?

24       A.    No.

Tammy E. Hurd

Page 50

```
 1          Q.    And, again, you don't have any personal

 2    knowledge of these threats, only from what Alvin told

 3    you?

 4          A.    Correct.

 5          Q.    You have here in your paragraph No. 19 that as

 6    a result of, I assume, Dr. Panda's and the other

 7    defendants' actions that you were ostracized, humiliated

 8    and traumatized.

 9                Can you tell me what you mean by that?

10          A.    I felt like I couldn't go back to school.

11          Q.    Let's focus on that for a second.  Why did you

12    feel that way?

13          A.    I felt that way for more than one reason.  I

14    felt that way because of the students wanting him back in

15    place.  I felt that way because his wife worked at the

16    school as well, at the library.

17          Q.    Other than what Alvin said to you, you weren't

18    really sure how the students were reacting to Dr. Panda's

19    removal, were you?

20          A.    I only spoke to Alvin, as I didn't really

21    socialize with many of the students at school.  I am much

22    older.

23          Q.    So you never attempted to go back to school

24    and had an incident or anything like that?
```

Tammy E. Hurd

Page 51

1      A.    No.  Dereck did, and he had an incident which

2  if they are going to say a remark to a six-foot-three,

3  200-pound guy, I'm sure that they would have something to

4  say to me as well.

5      Q.    And what did they say to Dereck?

6      A.    They screamed at him to get out of the class.

7      Q.    And when was that?

8      A.    The first day that he went back to class

9  himself.

10     Q.    And who screamed at him, just other students?

11     A.    Yes.

12     Q.    And they told him to get out, why?

13     A.    Because they knew that he was involved with

14  it, as well.

15     Q.    Okay.  And how do you know that that happened?

16     A.    Dereck informed me.

17     Q.    Did Dereck still continue to go to school?

18     A.    He did.

19     Q.    Anything else with respect to complaint No. 19

20  as to why you felt that way?

21     A.    I'm embarrassed that the whole thing happened

22  to me.  I was really afraid for a long time to even go

23  home at night.  I knew that some of the kids worked in

24  the admissions building and were friends of Dr. Panda's.

A19

Tammy E. Hurd

Page 52

1    And I was afraid that my personal information was

2    jeopardized.  I would call friends when I got home and

3    have them sit on the phone with me while I checked out

4    the whole house until I got locked up in the house.  I

5    would park at my door, not even a foot and a half away,

6    my car from the door, so I could just hurry up and get

7    inside.

8        Q.    What were you afraid of?

9        A.    I didn't -- the unknown.  Afraid of somebody

10   wanting to hurt me because they are not very kind

11   students.  I was involved in other things at the school

12   or knew of other instances at the school where kids were

13   beat up with baseball bats, and shot at, and things like

14   that.  And I didn't want to be one of those statistics.

15       Q.    And did the incident that you are talking

16   about with the baseball bats, did that involve somebody

17   making a complaint against a professor?

18       A.    No, that did not.

19       Q.    And what about the allegations of shootings,

20   did they involve somebody making a complaint against a

21   professor?

22       A.    I don't know.

23       Q.    Other than your mere and complete speculation

24   that you thought that these students may retaliate

Tammy E. Hurd

Page 53

1    against you, do you have any factual basis to support

2    that fear?

3                    MR. POLIQUIN:  I'm going to object to

4    the question.

5    BY MS. ALLEN:

6        Q.    You can answer.

7        A.    Okay.  That's what he said before.

8                    Nothing other than Alvin's phone calls

9    to me as my touch stone at the school.

10       Q.    So no harassing phone calls from any other

11   students?

12       A.    No.

13       Q.    No harassing e-mails?

14       A.    No.

15       Q.    No harassing letters or notes at your house?

16       A.    No.

17       Q.    Anything in your campus mailbox?

18       A.    No such thing.

19       Q.    And you claim that you were traumatized from

20   this.  Can you be more specific as to that?

21       A.    The emotions of it all, the rawness, the hurt,

22   the remarks, the vulnerability, especially knowing you

23   are in a position of subordination to somebody who holds

24   your grade in their hands, and there is no way around

Tammy E. Hurd

Page 56

1          A.    The allegation was implied by his looks.

2          Q.    Okay.  And you don't allege that Dr. Panda

3     ever required sexual favors from you in exchange for a

4     grade, do you?

5          A.    No.

6          Q.    Have you completed your degree at DSU?

7          A.    I have earned my Business Management degree,

8     but have not received my diploma.  And I am one class

9     away from my Marketing degree, which is the original

10    reason I went to that college.

11         Q.    And do you intend on getting that?

12         A.    I want my degree.  That last class, however,

13    is only offered by Delaware State University and is not

14    offered, when I last checked, at any other college.

15         Q.    Okay.  And you can't take it at Delaware State

16    University?

17         A.    I'm not comfortable going back to the campus,

18    and I don't know that they would allow me to do it as a

19    distance learning.

20         Q.    You say in your complaint, in paragraph 21,

21    that DSU has received past complaints of Dr. Panda's

22    conduct with female students.

23               What are you referring to?

24         A.    Mark Farley inform me of that.

Tammy E. Hurd

Page 66

1    correct?

2                        MR. POLIQUIN:  Objection.  You can

3    answer the question.

4                        THE WITNESS:  Through Alvin I did.

5    Alvin is the one who told me -- and I trusted him.  Him

6    and I were friends for two years at the college.

7    BY MS. ALLEN:

8        Q.   And correct me if I am wrong, maybe I missed

9    something.  Alvin said to you that the students were

10   angry.  He didn't say anybody was after you, did he?

11       A.   He said they are gunning for you, do not come

12   back to school.  All they know is that a white chick

13   brought down -- the white chick or the white bitch, both,

14   brought down the black teacher.  Those were his words.

15   And since I am the only white person in his class, and

16   I'm the only white person not attending the classes any

17   longer, it's a pretty accurate summation of who it is who

18   brought down the teacher.

19       Q.   And are you taking any medication as a result

20   of this?

21       A.   No.

22       Q.   Are you seeking any type of counseling right

23   now?

24       A.   No.

Tammy E. Hurd

Page 84

1    having sessions about the ex-husband.

2    BY MS. ALLEN:

3         Q.    Okay.  So at least two stressors at the time?

4         A.    Yes.

5         Q.    And the amount of damages that you are seeking

6    in pain and suffering?

7         A.    I don't know.

8         Q.    And no medical expenses that you are aware of?

9         A.    No.

10              MS. ALLEN:  I don't think I have any

11   more questions.

12                         EXAMINATION

13   BY MR. CASARINO:

14        Q.    I'm Marc Casarino for Delaware State

15   University.  I introduced myself earlier this morning.  I

16   have a few questions.  I'm going to try not to do

17   duplicates and cover the same ground, because that's not

18   going to do any of us any good.

19              You mentioned as to Dereck Batton that

20   you had an old cell number; do you know what that old

21   cell number is?

22        A.    I don't right now because my PDA is booting

23   up.  As soon as it boots up, I can give that information

24   to you.

A23a

Tammy E. Hurd

Page 85

1              MR. POLIQUIN:  Marc, just to let you

2     know, I did pass that on to you at some point in time.

3              THE WITNESS:  I did give it to my

4     lawyer.

5              MR. CASARINO:  All right.  I will look

6     for that.  Thank you.

7     BY MR. CASARINO:

8         Q.   I believe you said you last talked to Dereck

9     maybe four to eight months ago?

10        A.   Correct.

11        Q.   Since February of 2005, how many times have

12    you talked with Dereck?

13        A.   Off and on, Dereck and I would talk.  We are

14    not close friends where we just talk all the time, but

15    just sporadic catch-ups.

16        Q.   And how frequently is that?  I don't know what

17    off and on or sporadic means?

18        A.   Once every few months, not very often.

19        Q.   Do you ever socialize with him, other than

20    talking on the phone?

21        A.   No.  We have had lunch together in Baltimore

22    when he moved there on two occasions.

23        Q.   What race is Dereck?

24        A.   White.

A23b

Tammy E. Hurd

Page 86

1      Q.    Have you ever had anything more than a

2   platonic relationship with Dereck?

3      A.    Yes.  We have been romantically involved.

4      Q.    At what point were you romantically involved?

5      A.    I'm not certain.

6      Q.    Was it before or after these incidents you

7   have discussed with Dr. Panda?

8      A.    I'm not certain.

9      Q.    Was it anytime in the past three years?

10     A.    No.

11     Q.    Was it while you were a student at Delaware

12  State University?

13     A.    Yes.

14     Q.    Do you recall when it was in relation to when

15  you started and when you left Delaware State University?

16     A.    No.  I think it was towards the beginning of

17  the career there, but I'm not certain.

18     Q.    Would you agree that that would have been

19  sometime before the incidents with Dr. Panda?

20     A.    I'm not certain.

21     Q.    What caused you to stop having a romantic

22  relationship with Mr. Batton?

23     A.    There was no particular incident.

24     Q.    Did you continue to socialize and remain

A23c

Tammy E. Hurd

Page 88

1    Q.    How many people?

2    A.    Eight, seven or eight.

3    Q.    These are all folks from Delaware State

4    University?

5    A.    No.  These were all co-workers.

6    Q.    Dereck worked with you?

7    A.    No.

8    Q.    So you knew Dereck only from Delaware State

9    University?

10    A.    Correct.

11    Q.    And you were taking him on a trip with you to

12    Las Vegas with some of your co-workers?

13    A.    No, he never went.  He implied that he wanted

14    to go.  I told him he was welcome to go, that there was

15    another bed that he could sleep in with another co-worker

16    of mine.  But he never took it any further.

17    Q.    I took from the typewritten diary that you had

18    provided that at the time Dereck made the representation

19    to Dr. Panda he had in his mind that he was going with

20    you to Las Vegas.  Is that accurate?

21    A.    I don't know what Derek's thought process was

22    at that time.

23    Q.    With respect to this gentleman named Alvin,

24    perhaps Green, last name unknown, you mentioned that he

Tammy E. Hurd

Page 89

1    called you at least one time to say that fellow students

2    on campus were upset that you had reported this conduct

3    with respect to Dr. Panda; is that correct?

4        A.    There was more than one conversation.

5        Q.    You read my mind.  Later on you referenced

6    conversations plural.  I wanted to follow up.  How many

7    times did you and Al talk regarding that?

8        A.    We probably spoke three to five times

9    regarding that.

10       Q.    All the same general nature of conversation?

11       A.    Yes.

12       Q.    Can you give me the general nature of those

13   conversations?

14       A.    He was checking up on me.  He wanted to

15   reiterate that if I could at any point stay home from

16   school and not go, that he felt that that's what was best

17   for me.  That there was kids gunning for me, and that

18   they know that the white chick or the white bitch brought

19   down the black teacher.

20       Q.    What race was Alvin?

21       A.    He was black.  He is also the one who put me

22   in touch with Tylesha.

23       Q.    When was the first time that you advised

24   anyone at Delaware State University about this conduct by

Tammy E. Hurd

Page 90

1   Dr. Panda?

2        A.   When I went to see Mr. Farley.

3        Q.   And do you recall when that was?

4        A.   It was either December or January.  I know

5   that I wanted to meet with him before the semester

6   started.

7        Q.   There is some records or some indication of a

8   January 3rd, 2005 meeting; does that sound familiar?

9        A.   That sounds familiar.

10       Q.   And that was the first time that you told

11  anyone at Delaware State University in terms of the

12  administration --

13       A.   Correct.

14       Q.   -- about this.

15            Can you describe that January 3rd, 2005

16  conversation with Mr. Farley?

17       A.   I told Mr. Farley that these incidents that

18  happened.  That I knew I had had two more classes to take

19  with him this coming up semester, and that if things had

20  gotten worse, I wanted him to be aware of what happened.

21  So if I had, perhaps, a poor grade in his class, he

22  wouldn't try to say that it was because I had a poor

23  grade in his class.

24       Q.   Do you recall telling Mr. Farley at that time,

Tammy E. Hurd

Page 91

1  as of January 3rd, 2005, you did not want to pursue a

2  formal complaint against Dr. Panda?

3      A.   Correct.

4      Q.   I believe you have been shown what has been

5  marked as Hurd Exhibit 1, and you were asked about

6  paragraph 10.  And some of the pages aren't numbered, but

7  I see your response to question No. 10.

8              Did you see where I am referencing?

9      A.   Yes.

10      Q.   Do you agree, based on the chronology that you

11  provided, there were two incidents that had occurred,

12  September 2004 and December 2004, prior to your going to

13  meet Mr. Farley on January 3rd, 2005?

14      A.   Correct.

15      Q.   Those were the two incidents you went to

16  discuss with him, with Mr. Farley?

17      A.   I am not positive about the September 2004,

18  but I am certain about the December 2004.

19      Q.   So it's, perhaps, only the one, December 2004

20  incident that you mentioned to Mr. Farley when you met

21  with him on January 3rd, 2005?

22      A.   I did mention it to him, yes.

23      Q.   And in the course of that conversation, you

24  said to him, I am just telling you this as background

Tammy E. Hurd

Page 95

```
 1          Q.    Do you know if Dereck discussed the matter
 2    with anyone?
 3          A.    Not that I'm aware of.
 4          Q.    According to the records that we have seen,
 5    the next meeting after January 3rd, 2005, that you had
 6    with Mr. Farley was March 21st, 2005.  Does that ring a
 7    bell?
 8          A.    I had three meetings with him, you are saying?
 9          Q.    No, I'm only aware of two.
10          A.    Two meetings with Mr. Farley.
11          Q.    The records indicate a meeting, a second
12    meeting was March 21st, 2005.  Does that ring a bell for
13    you?
14          A.    Yes.
15          Q.    And around that same time you sent a letter to
16    Dr. Allen Sessoms at the university?
17          A.    Correct.
18          Q.    What was the purpose of sending the letter to
19    Dr. Sessoms?
20          A.    To have him aware of what was going on as
21    well.
22          Q.    Prior to that letter had you brought any of
23    this with respect to Dr. Panda to Dr. Sessoms attention?
24          A.    No.
```

A28

Tammy E. Hurd

Page 96

1          Q.    You physically went and met with Mr. Farley on

2    March 21st, 2005?

3          A.    Yes.

4          Q.    And at that time you provided to Mr. Farley

5    the full listing of incidents, for instance, that is

6    repeated at paragraph 10 of Hurd 1?  Is that the

7    typewritten chronology that you had prepared?

8          A.    Yes.

9          Q.    When did you prepare that chronology?

10         A.    As I was going along, I started preparing it.

11   Right after the first instance, December of '04.

12         Q.    Well, the first incident you had is that

13   September 2004 conversation in the hallway about the

14   booty call?

15         A.    Correct.  But I did not create this document

16   until after my meeting with Mr. Farley.

17         Q.    In January of 2005?

18         A.    Yes.

19         Q.    Whose idea was it to create this document?

20         A.    Mine.

21         Q.    What is it that caused you to create this

22   document given the one incident that you are referring to

23   in December of '04?

24         A.    My mother has always taught me that the best

Tammy E. Hurd

Page 100

1          A.    Oh, yes.

2          Q.    Was it considerably before, the day before, a

3     week before?

4          A.    I don't know.  I don't know.

5          Q.    Okay.  Is it safe to say you went and

6     consulted a lawyer prior to making a formal complaint to

7     the university?

8          A.    Yes.

9          Q.    This conversation with Mr. Farley about

10    staying off campus or staying away from campus, whose

11    idea was that; was it his or yours?

12         A.    It was his.

13         Q.    And you had mentioned, I think, before, and

14    I'm not going to go over it again, you were in the middle

15    of courses obviously at this time?

16         A.    Correct.

17         Q.    And had you finished out the courses that you

18    were in the middle of; is that correct?

19         A.    Correct.

20         Q.    And did you that from home?

21         A.    Correct.

22         Q.    So the university was willing to allow to you

23    finish up your courses through home study?

24         A.    Yes.

Tammy E. Hurd

Page 101

1    Q.   And I'm a little confused about this degree

2  you keep discussing, the business degree.  You indicated

3  that you have earned the degree but not actually received

4  the certificate, the diploma?

5    A.   Correct.

6    Q.   Have you actually called up the university or

7  written to them and said, Please send me a copy of my

8  diploma or my diploma?

9    A.   No.

10    Q.   With respect to this final marketing class

11  that you need to take to get your marketing degree, have

12  you ever written to or called the university and said,

13  Can I just complete that class from home study like I did

14  the other ones?

15    A.   No.  I know the option was open.

16    Q.   So that option was open to you by the

17  university?

18    A.   Mr. Farley said that when I was ready, to give

19  him a call.

20    Q.   But as of right now, you have not given him a

21  call?

22    A.   No.

23    Q.   What other schools have you checked with to

24  see if that class was available there?

Tammy E. Hurd

Page 106

1    of claim as with respect to Dr. Panda?

2        A.    No.

3        Q.    I am still a little unclear on it.  What is

4    the basis for claiming that Dr. Panda discriminated

5    against you racially?

6        A.    I don't know how to answer that question.

7        Q.    Well, you filed a complaint against Dr. Panda

8    and the university claiming racial discrimination as to

9    you, you are the plaintiff.  Describe that for me in your

10   own words.  Why did you file that lawsuit?

11       A.    I felt that I was targeted as the white person

12   that took down the black teacher.  After hearing, later

13   on, from other girls that came forward that were not

14   white, they were black, there was no understanding of

15   them being targeted, only me, because I was the white

16   girl.

17       Q.    And this targeting you are referring to, this

18   wasn't targeting specifically by Dr. Panda or any

19   administrator or anyone else at the university besides

20   students?

21       A.    Students.

22       Q.    Okay.  And again, you never heard any such

23   "targeting" directly.  You just heard it secondhand from

24   this guy Alvin?

Tammy E. Hurd

Page 115

1      Q.    And you did begin them?

2      A.    I did.

3      Q.    In your answer to No. 19, you describe an

4    incident with other, I guess, males at the school.  And

5    this is an incident in response to whether or not, or why

6    you felt fearful.  And I don't think that we discussed

7    that earlier.

8              Can you describe that for me as to what

9    happened; your understanding of what happened on that

10   day?

11     A.    With these boys?

12     Q.    Yes.

13     A.    I was on the second floor with the balcony to

14   my right.  And these three young men were walking towards

15   me, and would not make any way for me.  I was coming

16   straight for them.  So I stepped over to the side, to my

17   right, which normally people move to the right and then

18   the other people move to their right and make a little

19   more room for each other.  They didn't make, and refused

20   to make, any more room for me so I could walk on through

21   down to the steps and out to my car.  So I had to quickly

22   turn my body and press it against the wall, right at the

23   balcony.  And they were making snide remarks.  And I made

24   a remark myself that their mothers must be very proud of

Tammy E. Hurd

Page 116

1  them, which then made them more aggressive towards me.

2  And asked me if I wanted to suck their dick, and taste

3  some of that, and other inappropriate remarks like that.

4  And I just high-tailed it to my car.

5      Q.   Okay.  And this alleged incident was before

6  you had any conversations with Alvin?

7      A.   Yes.

8      Q.   So there is no indication or any facts to

9  support that this incident is in any way related to your

10  complaint about Dr. Panda?

11              MR. POLIQUIN:  Objection.  You can

12  answer the question.

13              THE WITNESS:  I'm not certain.

14  BY MS. ALLEN:

15      Q.   Because the boys didn't say anything that

16  referenced Dr. Panda; correct?

17      A.   Nothing about Dr. Panda was out in the

18  community at that time, that I'm aware of.

19      Q.   So it's your understanding that nothing was

20  out about -- your complaint with Dr. Panda was not known

21  in the community at the time this incident happened?

22      A.   Correct.

23      Q.   Okay.  So this could just be some very rude

24  and ignorant people at Delaware State University?

A34

Tammy E. Hurd

Page 117

1      A.    Sure.

2      Q.    And I'm still trying to understand, as

3  Mr. Casarino is, still trying to figure out your claim

4  for racial discrimination.  What's that based upon?

5            MR. POLIQUIN:  Objection.  It's already

6  been asked.

7  BY MS. ALLEN:

8      Q.    Let me make it specific to Dr. Panda.

9  Dr. Panda did not racially discriminate against you, did

10  he?

11            MR. POLIQUIN:  Objection.

12            THE WITNESS:  No.

13  BY MS. ALLEN:

14      Q.    And that was no?

15            MR. POLIQUIN:  Objection.  You can

16  answer the question.

17            THE WITNESS:  No.

18  BY MS. ALLEN:

19      Q.    You don't have a claim for racial

20  discrimination with respect to Dr. Panda's actions?

21            MR. POLIQUIN:  Objection.

22            THE WITNESS:  I will leave that to my

23  lawyers to decide.

24  BY MS. ALLEN:

Tammy E. Hurd

Page 118

1          Q.    But you don't recall him making any racial

2    remarks to you?

3          A.    Not at this time.

4          Q.    Have you ever filed a lawsuit before?

5          A.    No.

6          Q.    And have you ever been convicted of a crime?

7          A.    No.

8                    MS. ALLEN:  I think that's all I have.

9                    MR. CASARINO:  I will be very brief.

10                        EXAMINATION

11   BY MR. CASARINO:

12         Q.    On Hurd 2, that March 25th e-mail that's

13   attached as Exhibit C, I direct your attention back to

14   that.  It's the end of the complaint.

15         A.    Yes.

16         Q.    In the final paragraph it says, "Many thanks

17   in regards to Dr. Liverpool, Dr. Nanda and yourself on

18   your hard work on this issue.  I am comforted in knowing

19   that these girls are now going to be safe that he is not

20   teaching right now."

21                    That paragraph, you are referring to the

22   hard work that Mr. Farley, Dr. Liverpool and Dr. Nanda in

23   responding to your March 21st complaint; correct?

24         A.    Yes.

Dandeson Panda

89

1   separated from Delaware State University?

2       A.   She is a chairman of the foreign language

3   department.

4       Q.   Anyone else?

5       A.   My wife was present.

6       Q.   Excuse me?

7       A.   My wife was present.

8       Q.   Anyone else?

9       A.   Not that I can remember.

10      Q.   What is your understanding of what a booty

11  call is, Dr. Panda?

12      A.   I have no understanding.  I have no

13  knowledge.

14      Q.   Have you ever asked a female student if

15  she received a booty call?

16      A.   No.

17      Q.   Have you ever asked if two students in

18  your class were dating?

19      A.   No.

20      Q.   Have you ever asked if two students in

21  your class were a couple?

22      A.   No.

23      Q.   Have you ever told a female student that a

24  male student has something for you?

Dandeson Panda

92

1    A.    When the allegation was made.

2    Q.    What is your response to these

3    allegations?

4    A.    Denied.

5    Q.    Do you deny all the allegations?

6    A.    Yes, sir.

7              MR. WIER:  Just to clarify.  When you

8    said the allegations made, I don't know -- and I

9    don't know the answer -- whether he is referring

10   to the complaint or that March allegation.

11   BY MR. POLIQUIN:

12   Q.    I'm referring to what's been shown to you

13   as Panda-5.  You're denying the allegations

14   specifically represented in what's been marked as

15   Panda-5; is that correct?

16   A.    Yes.

17   Q.    So you never asked Tammy Hurd for a booty

18   call?

19   A.    No.

20   Q.    Did you ever inquire as to whether Tammy

21   Hurd and Derek Batton were a couple?

22   A.    No, sir.

23   Q.    Who is Derek Batton?

24   A.    A student in my class.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Dandeson Panda

98

1    A.    Yes.

2    Q.    -- conversation with her?

3    A.    I deny having any conversation with her.

4    Q.    What exactly are you denying?

5    A.    What she is saying, I denied it.

6    Q.    What exactly is she saying in here that

7    you're denying?

8    A.    She's saying I have a conversation with

9    her and she does not appreciate the conversation.

10    Q.    Are you denying that you had any kind of

11    conversation with her?

12    A.    Yes, sir.

13    Q.    Did you want to know what made her feel

14    uncomfortable?

15              MR. WIER:  Asked and answered.

16              THE WITNESS:  As I said, I don't know

17    what she was referring to.

18    BY MR. POLIQUIN:

19    Q.    On the top of the e-mail it

20    says, "dpanada@desu.edu?  Is that how you spell

21    your last name?

22    A.    No.  It's dpanda@desu.edu.

23    Q.    Well, how did the e-mail get to you if it

24    was sent to what seemingly is a wrong e-mail

A39

1      Q.    But you received it?

2      A.    Yeah.

3      Q.    When you received the e-mail, did you see

4      who it was from?

5      A.    Tammy Kent.

6      Q.    Did you check, there's something called a

7      cc and bcc.

8      A.    Uh-huh.

9      Q.    Was there any other names there that you

10     recall?

11     A.    No.

12     Q.    Did you see the fact when you sent the

13     e-mail that it was sent to the wrong address, did

14     you ever notice that?

15     A.    No.

16     Q.    And you weren't concerned about a

17     statement about her avoiding conversations with

18     you like the one you had on the day of finals?

19     A.    No.

20     Q.    Did you have a conversation with Tammy

21     Kent on the day of the finals that she is

22     referring to?

23     A.    No, sir.

24     Q.    Is it your statement that you didn't have

Dandeson Panda

103

1    any conversation with Tammy Kent on the day of

2    finals?

3        A.    No, sir.

4        Q.    How do you know that?

5        A.    If I have conversation, she would come and

6    talk to me.  I had no conversation with her.

7        Q.    Were you concerned about the fact that

8    she's lying -- that she's referring to a

9    conversation in this e-mail that you never had

10   with her?

11       A.    I never had any conversation with Tammy.

12       Q.    Did you find that strange?

13       A.    Yes, sir.

14       Q.    You never followed up with anyone else

15   concerning that concern she had about that

16   conversation?

17       A.    No, sir.

18       Q.    Did you talk to your wife about it?

19       A.    Yeah, I talked to my wife.

20       Q.    After you got this e-mail, you talked to

21   your wife about it?

22       A.    I talked to her when I got the papers.

23       Q.    What papers are you referring to?

24       A.    Papers like this one, I talked to her.

Dandeson Panda

131

1      Q.    It's your contention that you're innocent

2   of these charges?

3      A.    Yes, sir.

4      Q.    And ultimately what happened to your

5   employment with Delaware State University?

6      A.    I left.

7      Q.    And why did you leave?

8      A.    There was some separation agreement and I

9   left.

10     Q.    Why did you agree to the separation

11  agreement?

12          MR. WIER:    Objection to the extent it

13  calls for discussions with counsel.

14          Answer if you can, independent of

15  advice.

16          THE WITNESS:    There was no need for

17  me to fight it.

18  BY MR. POLIQUIN:

19     Q.    Well, you were innocent?

20     A.    Yes, I'm innocent.

21     Q.    Why wouldn't you fight it?

22     A.    Because there was too much involved and it

23  was taking a toll on my family.

24     Q.    Did your family encourage you to fight it

132

1    or encourage you to end your employment with

2    Delaware State University?

3        A.    I was at a point where I would have ended

4    my employment with Delaware State University.

5        Q.    So you didn't think it was worth the

6    fight, is that a fair statement?

7                MR. WIER:  Objection.  Misstates.

8    BY MR. POLIQUIN:

9        Q.    Did you think this was worth fighting for?

10       A.    It's worth fighting for my reputation but

11   I secured counsel.

12       Q.    I am not asking you about securing

13   counsel.  I'm asking specifically why wasn't it

14   worth fighting for your reputation if you were

15   innocent of these charges?

16               MR. WIER:  Objection.  I ask him not

17   to respond to the extent it involves discussions

18   with counsel and settlement negotiations.

19               Also asked and answered.

20   BY MR. POLIQUIN:

21       Q.    Would you like the court reporter to

22   repeat the question?

23       A.    No.

24               MR. WIER:  I think he has answered

Dandeson Panda

133

1       it.

2                   MR. POLIQUIN:  He hasn't said

3       anything.  You have made an objection.  We are

4       waiting for an answer.

5                   THE WITNESS:  I answered the

6       question, tell you I seek legal counsel.

7       BY MR. POLIQUIN:

8          Q.    Seeking legal counsel is not a reason for

9       not fighting for your reputation if you're

10      innocent.  I'm asking you --

11                  MR. WIER:  I --

12                  MR. POLIQUIN:  Let me complete my

13      statement, and Mr. Wier you will be able to

14      speak.

15      BY MR. POLIQUIN:

16         Q.    I am asking why not fight the charges if

17      you're innocent?  It has nothing to do with your

18      legal counsel.  I'm not asking you to disclose

19      conversations you had with counsel.  I'm simply

20      asking you why.

21         A.    Why?  I have secured counsel and --

22                  MR. WIER:  Let me just object because

23      I think it does implicate legal discussions and a

24      settlement resolution, which is confidential.

**W&F**

1    And because he has counsel and has provided

2    advice in connection with that, I think his

3    testimony is he got counsel and relied on

4    counsel.  I don't think it's appropriate now to

5    ask him, "Well, why didn't you fight it?"

6    Because the answer is because he had counsel and

7    that's how it was resolved.

8              MR. POLIQUIN:  I respectfully

9    disagree with that characterization.

10   BY MR. POLIQUIN:

11      Q.   So you decided rather than fight the

12   charges to agree to separate yourself from the

13   university?  Is that a correct representation of

14   what happened?  Am I stating something that's not

15   true?

16      A.   I had legal representation.  I am in the

17   process of getting a settlement.

18      Q.   No one forced you to resign from Delaware

19   State University; is that correct?

20      A.   That's correct.

21      Q.   And no one forced you to sign what is

22   Exhibit 9 here, Panda-9?

23              Do you recognize that document?  I am

24   not going to get into the details of that

Dandeson Panda

135

1    document.  This is a separation agreement and

2    general release that you signed to separate you

3    from Delaware State University, isn't that

4    correct?

5       A.   Yes, sir.

6       Q.   No one forced you to sign this agreement;

7    right?

8       A.   No, sir.

9       Q.   And if at the end of the investigation by

10   Mr. Farley there was a substantiation of the

11   charges, you could have appealed that decision,

12   isn't that correct?

13      A.   Yes, I could have appealed the decision.

14      Q.   You chose not to do that, but rather

15   signed the separation agreement and separated

16   yourself from Delaware State University, isn't

17   that correct?

18      A.   This is attorney-client privilege

19   conversation.

20      Q.   It is not attorney-client privilege that

21   you signed this.  You signed this document.

22      A.   Yes, I signed the document.

23      Q.   It has nothing to do with discussions you

24   had with Mr. Wier.



WILCOX & FETZER LTD.
Registered Professional Reporters

A46

Mark Farley

6

1        I got a call from -- I don't remember who

2   it was from, I believe it was from someone in the college

3   of business, that there was -- that Tammy was upset, or

4   you know, wanted to complain.

5        I called her back that same night, and

6   we, I believe, met the next morning.  During the course

7   of that meeting, she said that she wanted to, you know,

8   just tell us about it, but that she didn't want anything

9   done.

10        And so, I encouraged her, that if she --

11   that she ought to at least put it on record that she had

12   a concern about the things he was saying.  And she said

13   she would do that.

14        The next thing I heard in the whole

15   matter was in January, when she sent the letter to the

16   president.

17   Q.   Based on your understanding of university

18   policy, does a student have to make a formal complaint in

19   order for the university to do something?

20   A.   No.  A student can make an informal

21   complaint.  But I was -- that's really to the

22   satisfaction of both parties.  She wanted to make an

23   informal complaint.  She wanted to send him an e-mail,

24   that she did.  And that was it.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

A47

Mark Farley

7

1      Q.    Now, based on your understanding of

2  university policy, if a student places the university on

3  notice about potential harassment or discrimination, but

4  refuses to make a formal complaint, is the university

5  still required to do something?

6              MR. WIER:  I'm sorry, are you asking

7  for a legal conclusion?

8              MR. CASARINO:  I was going to say,

9  I'm going to object to the extent it asks for a

10  legal conclusion.

11     Q.    They can object but you still have to answer

12  the question.

13     A.    I think it depends on the nature of things.

14  What Tammy was telling me, that Derek has something for

15  you, and that he was inquiring into her dating life,

16  wasn't so egregious, necessarily, especially in light of

17  the fact that she didn't want me to do anything, that I

18  wouldn't have initiated any further action.

19              She was going to tell him.  And I gave

20  her my cell phone number, and I told her, if there was

21  something else you need me to do, you know where I am.

22  She knew where my office was.  I asked her to get in

23  touch with me.

24              And she didn't, until she sent a letter

Mark Farley

8

1    to Dr. Sessoms.

2        Q.    Now, as you understood, pursuant to -- let me

3    rephrase that.   In your conversation with Tammy in

4    January, you understood her complaint to be a generalized

5    complaint that Dr. Panda had engaged in a

6    sexually-charged conversation with her that made her feel

7    uncomfortable?

8        A.    Whether or not it was sexually charged is

9    probably open for interpretation.   I mean your complaint

10   lists -- and if I may give an example, "Derek had

11   something big for you."  You tack onto that in your

12   Complaint that it was with regard to his penis.  I didn't

13   know that at the time, nor did I have any reason to

14   believe that was the case.

15            Maybe she was talking -- maybe he was

16   talking about, you know, has a -- has a big desire to

17   date you.   I really didn't know what he was talking

18   about.

19       Q.    Did you follow up to see what he was

20   referring to?

21       A.    Tammy told me that she didn't want to take

22   this further; that she was going to send him an e-mail.

23   She described working as a -- she worked with people in

24   the public, I think she was a waitress or something, and

Mark Farley

10

1    her that made her feel uncomfortable."

2                Is that a correct representation of what

3    happened?

4        A.    I think she felt it was sexual, yes.

5        Q.    So at that point in time she wanted to put

6    you on notice of this sexually-charged conversation?

7        A.    She wanted to put me on notice of the

8    conversation.  She told me she didn't want anything

9    further done.  And that she would send him an e-mail.

10       Q.    Now, just previously, you stated that you had

11   followed up.  And you talk about actions in March; is

12   that correct?

13       A.    Yeah.  Because I didn't hear from her again.

14   Although I had given her -- she knew where my office was,

15   I had given her my cell phone number, I didn't hear from

16   her again until she sent a letter to the president.

17       Q.    But nothing stopped you, after having that

18   conversation on January 3, 2005, from following up on

19   this generalized complaint about this sex --

20       A.    She --

21       Q.    Let me finish my question, then you can

22   answer.

23       A.    Sure.

24       Q.    About this generalized complaint concerning a

Mark Farley

14

1    Q.    And that included sexual harassment against

2    Tammy Hurd?

3    A.    Yes.

4    Q.    Why do you believe that?

5    A.    In January, when I first heard from Tammy, I

6    don't know that I would have agreed.   In March, when we

7    learned -- when Tammy gave the other string of things

8    that are in your Complaint, I found there to be merit to

9    a lot of her complaints, and followed up on them,

10   interviewed every single person that she recommended that

11   we talk to, and kept her informed that we had interviewed

12   the other people.

13   Q.    Did you, throughout your investigation, did

14   you find Tammy Hurd credible?

15   A.    I found it odd that Tammy Hurd conducted her

16   own investigation.

17   Q.    Did you believe, at the end of your

18   investigation, did you believe Tammy Hurd's charges, the

19   charges she made against Dandeson Panda?

20   A.    About the things toward her personally?   Is

21   that what you're asking me?

22   Q.    Yes, that's what I'm --

23   A.    Yes.

24   Q.    So you did believe her, at the end of the

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Mark Farley

20

1    harassment and discrimination, yes.  In terms of the

2    depth of the investigation, I -- I did what she asked me

3    to do.  That appeared to be satisfactory to her, since it

4    was what she asked for, and the complaint policy provides

5    that where it can be worked out informally to the mutual

6    satisfaction of both parties -- and I assumed that

7    Dr. Panda would, frankly, modify his behavior if it was

8    offensive, once she sent him the e-mail.

9        Q.   Did you ever follow up with Tammy Hurd after

10    viewing that e-mail to Dr. Panda?

11        A.   No.  She said what she wanted to say, and

12    that seemed fine.  I never heard anything again, until

13    the letter to Dr. Sessoms.

14        Q.   And you also didn't bother to follow up and

15    call her to see how everything was going?

16            MR. CASARINO:  Objection.

17        A.   I did -- I had provided her with my cell

18    phone number.  She knew where to reach me.  I

19    encouraged -- gave her a copy of the policy and

20    encouraged her to contact me if there was any form of

21    concern, anything for --

22        Q.   Did you contact -- excuse me.

23        A.   I did not call her, that's correct.

24        Q.   If I can mark this as Exhibit 2.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

A52

Mark Farley

26

1    A.   I guess it would depend.  But is it a

2  concern?  Certainly it was a concern to Tammy when she

3  came in in March and she laid all that out.

4    Q.   What exactly did Tammy Hurd say to you in

5  January?

6    A.   She said that -- she said that Dr. Panda --

7  she had been in class; that there were other students in

8  class, and that Dr. Panda had told her something to the

9  effect of, "Derek has something for you, and has

10  something big for you."

11    Q.   I'm going to mark this --

12    A.   This -- of all the things that you've

13  detailed in the Complaint, that is the only thing that I

14  can remember she said to me in January.

15    Q.   Could there have been other things she said

16  to you that you just don't remember?

17    A.   I remember this pretty distinctly,

18  Mr. Poliquin.  That's what she told me, and why I was

19  comfortable with her sending the e-mail to Dr. Panda.

20           If he was talking about a booty call,

21  like is characterized in this complaint, that would

22  have -- I would have gone into that.

23    Q.   I'm going to mark this as an exhibit.

24         (Farley Exhibit 4 marked)

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

A53

1   harassment -- I mean people could make a complaint that

2   might not meet the standards of sexual harassment under

3   the law, but it is their complaint, nonetheless.

4           In the end, whether something is sexual

5   harassment is -- could only be identified after you

6   received a formal complaint, or followed up on something

7   that was -- that you had to follow up on.

8           In January, what Tammy was describing was

9   something she felt was sexual.  Again, she asked, and

10  wanted to send the e-mail.  She didn't want me to do

11  anything further.

12      Q.   And she made clear that this conversation was

13  unwelcome by her?

14      A.   No.  I don't know that she made it clear.  In

15  fact, she -- she gets into banter.  I mean she -- it was

16  clear to me that she exchanged a lot of banter in the

17  classroom, and it was difficult to tell.

18          You know, in fact, she said she hadn't

19  made it clear to him that it was unwelcome or unwanted,

20  and that was, in part, why we discussed her sending the

21  e-mail.

22      Q.   She made it clear that she felt uncomfortable

23  by the conversation?

24      A.   She said it made her uncomfortable, yes.

35

1    MR. CASARINO:  Objection.

2    A.   Well, I got this call at probably 5:00 or

3  5:30.  I called her that same night, from home.  I

4  listened to her, helped her understand that we take these

5  allegations very seriously.  We set up the meeting for, I

6  believe it was the next day.  Other than that, no.

7    Q.   Now, in your meeting on January 3, 2005, you

8  were the one that suggested to Tammy Hurd that she send

9  an e-mail to Dr. Panda to document that his comment was

10  unwelcome?

11    A.   Actually, as we discussed, I had asked her

12  whether she had told him that his comment was unwelcome

13  or unwanted.  I believe I did suggest that, as a way for

14  her to get it on record that she -- that she found his

15  comments unwelcome.  Yeah.

16    Q.   So you were the one that suggested that to

17  Tammy Hurd?

18    A.   As a way, yes.

19    Q.   Did you also tell Tammy Hurd that you would

20  look into the matter?

21    A.   No.

22    Q.   If I can direct you to Interrogatory Number

23  4, the answer is continued on the next page.  The second

24  sentence states, "Mr. Farley expressed that he would look

Mark Farley

37

1     A.   I don't know -- sometimes I might have gotten

2  a call from the provost who said this was it.  I mean I

3  heard from Dr. Viswanathan, and whether I spoke with him

4  myself immediately, I don't recall.

5     Q.   Do you recall him saying something to you

6  about Tammy?

7     A.   Well, I met with him other times, as well.

8  Obviously, in March, as a follow-up.

9     Q.   I am specifically referring to this time on

10  or about January 3, 2005.

11     A.   I don't --

12     Q.   Who was the first person that contacted you

13  concerning a complaint the plaintiff had against

14  Dr. Panda?

15     A.   I don't remember.

16     Q.   And you don't remember what that person said

17  to you?

18     A.   I only remember that I felt there was some

19  sense of urgency in getting right to her.

20     Q.   And your discussion with Tammy Hurd occurred

21  over the phone?

22     A.   Yes.

23     Q.   And was there any other follow-up, any

24  discussions after that?

Mark Farley

38

1 A. Yes.  I think we met the next day.

2 Q. Did you meet with anybody else?

3 A. No.

4 Q. And no one else was present at that meeting?

5 A. No.

6 Q. And how long was that meeting?

7 A. I would guess 20, 30 minutes.

8 Q. And what exactly did you say to Tammy Hurd?

9 A. Well, first I listened.  I don't remember
10 exactly what I said, but I asked her whether -- you know,
11 what was her complaint, take me through it.  She did.

12    I asked her whether she had ever told him
13 that his comments were unwelcome.  She said no, but she
14 dealt with people like that in her work.  And I said
15 well, I think you ought to tell him that his comments are
16 unwelcome.  And I think I suggested that she send him an
17 e-mail.

18    It went on to -- you know, to listening
19 about, you know, how she felt about those complaints, or
20 about the comments, and why she felt that way.

21 Q. Did you ask her what exactly occurred?

22 A. Yes.

23 Q. Did you ask her when it occurred, and was it
24 still ongoing?

Mark Farley

39

1 A. Yes.  She told me about one incident that

2 happened, I believe it was in December.

3 Q. Did you ask her if the harassment was still

4 ongoing?

5 A. I don't recall.

6 Q. Did you ask her where it occurred?

7 A. Yes.

8 Q. Did you ask her how often it occurred?

9 A. She described one incident.

10 Q. Did you ask her if it occurred more than this

11 one incident?

12 A. I asked her any number of ways and she said

13 no.  She described one incident.

14 Q. Did you specifically ask her if there were

15 any additional incidents?

16 A. Yes.

17 Q. And what was her response?

18 A. She didn't describe any other incidents in

19 response to that prompt.

20 Q. Do you recall her saying no, there was no

21 other incidents that had occurred?

22 A. She -- when I asked her, she said that that

23 was what she was complaining about, that incident, and

24 she didn't describe any other incidents.  I don't know

Mark Farley

40

1  how many other ways to say that.

2      Q.   Do you have a set of questions you ask

3  somebody that complains about sexual harassment, that you

4  routinely ask?

5      A.   No.

6      Q.   In all your training and seminars, you never

7  received a set of -- excuse me.  Let me rephrase that.

8  Do you have any manuals concerning, suggesting questions

9  to ask concerning when someone comes to you about a

10  complaint of sexual harassment?

11          MR. CASARINO:  Objection.

12      A.   There are manuals.  I did not use a manual.

13      Q.   Did you ask her how the harassment affected

14  her?

15      A.   Yes.  She said she was upset by his comments.

16      Q.   And did she appear upset?

17      A.   No.

18      Q.   How did she appear?

19      A.   Calm.

20      Q.   Did she appear angry?

21      A.   No.

22      Q.   Did you ask her if her education had been

23  affected in any way by this incident?

24      A.   No.



**WILCOX & FETZER LTD.**

Registered Professional Reporters

Mark Farley

41

1      Q.    Did you ask her if there was any other

2   persons who have relevant information concerning this

3   allegation?

4      A.    She said Derek was there.

5      Q.    Did you ever follow up with Derek?

6      A.    No.  Not at that time.

7      Q.    Did you ask her if there was any other

8   persons who had relevant information?

9      A.    I assume we're just talking about January?

10      Q.    I'm referencing the January 3.

11      A.    Okay.  I'm not trying to be smart, I'm

12   just --

13      Q.    No.  I understand.

14      A.    Okay.  Could you repeat your question,

15   please.

16      Q.    Did you ask if there was any other persons

17   who had relevant information concerning her allegation

18   against Dr. Panda?

19      A.    She provided that Derek would have known

20   about this.  So, I may or may not have asked.  I don't

21   remember exactly.

22      Q.    Now, after you viewed the e-mail, when is the

23   next time you hear about an allegation of any harassment

24   concerning Dr. Panda?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

A60

Mark Farley

42

1      A.    When the letter was sent to Dr. Sessoms.

2      Q.    And what was your reaction to that letter?

3      A.    I was surprised by it.

4      Q.    And why were you surprised?

5      A.    I was surprised, because it seemed to me to

6 suggest that -- I had seen the e-mail from Tammy to

7 Dr. Panda, but never heard another peep about it, and all

8 of a sudden it was a letter to the president.

9          And then when I -- you know, I called her

10 right away and asked her to come in and meet with me.

11 And it appeared that she had been sort of gathering

12 information and evidence, ever since -- I mean for some

13 time, probably since we met last time.

14          She told me about a lot of things I'd

15 never heard about. Other people to talk to, who she had

16 never mentioned anything about. So, yeah, it caught me

17 by surprise.

18      Q.    Is there anything inaccurate that you read in

19 the letter?

20      A.    I'd have to look at it again.

21      Q.    If you look at Exhibit 1, the Complaint, it's

22 enclosed as Exhibit A.

23      A.    I would say that a number of things in here

24 that I wouldn't agree with.

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

A61

Mark Farley

43

1    Q.    And which are those?

2    A.    That as a Caucasian, Tammy is vulnerable;

3  that she was putting herself in a position of being

4  targeted by the faculty in general.

5           The purpose for her e-mailing Dr. Panda

6  had nothing to do with the syllabus.  That if something

7  came from me, it would subject her to retaliation.

8    Q.    Is there anything else?

9    A.    In the second to the last paragraph, you

10  know, where it says that "The incidents have become more

11  and more frequent, as well as uncomfortable," I'd given

12  Tammy my number, I had asked her to follow up with me if

13  there was anything.

14           So, it surprised me that she was now

15  describing in a letter to Dr. Sessoms things beyond what

16  she had described to me in January.  And I haven't

17  finished the letter, if I may have just another moment.

18           I had no knowledge or information that

19  there were other women who were alleged to have been

20  harassed.  She did say that she had planned to take

21  another class with him, and that's why she -- she didn't

22  want me to do anything.

23           And this was a real surprise to me, this

24  "I have spoken to previous students of Dr. Panda's, and

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

A62

Mark Farley

44

1  have discovered that this happens more often than I

2  expected."

3      Q.   Are you contending that's not a true

4  statement?

5      A.   No.  I'm just saying it was new information

6  to me, so I was surprised by it.

7      Q.   I think you mentioned that her letter to

8  Panda had nothing to do with the syllabus?

9          MR. CASARINO:  E-mail to Panda, do

10  you mean?

11     Q.   E-mail to Panda, excuse me.

12     A.   The reason that she was going to send the

13  e-mail to Dr. Panda was to tell him that his comments

14  were unwelcome and unwanted.  I didn't remember there

15  being any link to a syllabus.

16          (Farley Exhibit 5 marked)

17  BY MR. POLIQUIN:

18     Q.   Looking at that first paragraph of Exhibit 5,

19  I believe that Tammy Hurd does mention a syllabus

20  concerning his class in international

21  management/international marketing.

22     A.   She does.

23     Q.   So the letter does have something to do with

24  the syllabus?

Mark Farley

45

1          A.    It does.  The e-mail.

2          Q.    The e-mail, excuse me.

3                MR. CASARINO:  I'm sorry.  Maybe I

4    misunderstood.  I thought your question was directed

5    to when they were meeting, was there a discussion

6    whether she was going to put that in there.  She may

7    have done that after the fact.  I thought your

8    question was directed to during the conversation

9    during their meeting in January.

10         Q.    During your meeting with Tammy Hurd in

11   January, are you contending she never talked about a

12   syllabus?

13         A.    Yes.

14         Q.    Is that what you were referencing?

15         A.    Yes.  That's correct.

16         Q.    And you also said that you also had problems

17   with her saying that there was concern that Dr. Panda

18   would retaliate against her if you approached him?

19         A.    Yes.  That's not something that we discussed.

20         Q.    I believe in your Interrogatories, and I'll

21   look at them, and reference back to that same response in

22   4.  It states that "the plaintiff expressed being uneasy

23   about Mr. Farley sending such a correspondence to

24   Dr. Panda, as it would be obvious that she had discussed

46

1   Dr. Panda with Mr. Farley, and that she was uncertain

2   that she wanted to pursue her complaint at the time."?

3        A.   It was -- what I'm trying to say is that it

4   was Tammy who was concerned that she send the e-mail.

5   She made it clear that she had other classes with him,

6   and wanted the opportunity to handle it.

7        Q.   Did you --

8        A.   So -- so I didn't bring up that he was --

9   that he might retaliate against her.  It was her concern

10  about her relationship with her professor.

11       Q.   Was there a concern by her that if she had --

12  if he found out she made this complaint to you, that he

13  would, in fact, retaliate against her?  Did she express

14  that concern?

15       A.   She never used those words, but she said that

16  she had another class with him.  And so, she wanted to

17  just leave it at this.

18       Q.   Now, during your investigation, you

19  interviewed several students.  And I'm talking about

20  concerning your investigation after the Sessoms letter of

21  March 21 of 2005.

22       A.   Uh-huh.

23            MR. CASARINO:  Is that a yes?

24       A.   Yes.  Sorry.



A65

Mark Farley

47

1      Q.   How did you know who to interview?

2      A.   She -- Tammy told me the people to interview.

3      Q.   Are you stating that all the individuals that

4 you interviewed were names given to you by Tammy Hurd?

5      A.   No.  But I did interview everyone who was

6 given to me by Tammy Hurd.

7      Q.   Did you interview Derek Batton?

8      A.   By telephone.  I don't believe he was

9 available at the time.

10     Q.   And what did Derek Batton tell you?

11     A.   That he was in class with Tammy, and that --

12 from memory, something to the effect of they were joking

13 around, Dr. Panda would joke around.  I don't remember

14 exactly what he said.

15     Q.   Did you take any notes concerning this

16 interview with Derek Batton?

17     A.   I -- I don't recall.

18     Q.   Did you take any notes throughout this whole

19 investigation?

20     A.   Yes.  I did receive some written material.

21     Q.   When you say -- did you personally take notes

22 concerning this investigation?

23     A.   With -- when I was meeting with counsel, yes.

24     Q.   Did you take notes when you were interviewing

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mark Farley

48

1    students?

2        A.    I received some -- generally, they would give

3    some sort of statement, like Tracye Berry wrote

4    something.  I did not take notes, that I recall, when I

5    talked with Derek by telephone.

6            I did get something in writing from

7    Tracye Berry.  There were other people that I spoke to.

8    Germaine Cheatham, Dr. Awadzi.  If they said something

9    that was relevant, I asked them to provide it to me.

10        Q.    Did you take any notes when you were

11    interviewing these individuals?

12        A.    I don't specifically remember whether or not

13    I took notes.

14        Q.    Can you check to see if you have any notes

15    concerning interviews you took?

16        A.    I did, actually, check to see if I had any

17    notes, and I don't have any notes.

18        Q.    Would you find it unusual that you wouldn't

19    take notes during your interviews with individuals

20    concerning this complaint?

21        A.    I typically would, but I don't have any,

22    so -- yes.  I --

23        Q.    So you don't remember taking any notes when

24    you interviewed Derek Batton?

Mark Farley

49

1    A.    No.

2    Q.    And Tammy Hurd forwarded Derek Batton's name

3    to you?

4    A.    She told me about Derek in our first

5    discussion.

6    Q.    And did Derek confirm some of Tammy's

7    allegations?

8    A.    He just said there was -- you know, sort of

9    joking around.

10    Q.    Did he say anything else?

11    A.    No.

12    Q.    Did you request a written statement from

13    Derek Batton?

14    A.    No.

15    Q.    Did you feel that Derek saying there was just

16    joking around confirmed, or excuse me, substantiated

17    Tammy Hurd's allegations against Dr. Panda?

18    A.    The allegations against Dr. Panda were far

19    more pervasive than just what Tammy had alleged.  So, I

20    felt that the allegations against Dr. Panda were

21    substantiated in totality.

22        (Farley Exhibit 6 marked)

23    BY MR. POLIQUIN:

24    Q.    This is a March 24th, 2005 letter to

Mark Farley

50

1   Dr. Panda from Dr. Allen Sessoms.   Do you recognize this

2   letter?

3         A.    Yes.

4         Q.    In the second paragraph, second sentence, it

5   says, "A subsequent telephone interview with another

6   student who was alleged to have been present when

7   comments were made confirmed the allegation."

8               Do you know what student is being

9   referenced in that second sentence?

10        A.    I believe it was Tracye Berry.   But I don't

11  exactly remember.

12        Q.    So Tracye Berry confirmed some of Tammy

13  Hurd's allegations?

14        A.    Tracye Berry said that he made inappropriate

15  comments.

16        Q.    Do you know that that's the student being

17  referenced in that second sentence, or is that just your

18  best guess?

19        A.    That's just my best guess.

20        Q.    Is there any way for you to find out who was

21  being referenced in that second sentence?

22        A.    Other than to ask Dr. Sessoms.

23        Q.    In the second sentence, it says "Confirm the

24  allegation."   Is that allegation being referred to, do

1    you believe, is that referencing allegations made by

2    Tammy Hurd?

3          A.    Yes.

4          Q.    In the first sentence in the second

5    paragraph, it says, "Although you admitted during our

6    meeting to some aspects of these allegations, you denied

7    them in substantial part."

8                What exactly did Dr. Panda admit

9    concerning aspects of the allegations?

10         A.    I don't recall exactly.

11         Q.    Did you take any -- do you have any

12   documentation concerning what he admitted during this

13   meeting?

14         A.    I don't.

15         Q.    Was anyone taking notes during this meeting

16   that is referenced on March 23, 2005?

17         A.    Was anyone taking notes who is referenced,

18   like in the carbon copy area?

19         Q.    There was a meeting on March 23, 2005,

20   between Dr. Patrick Liverpool, Dr. Nanda Viswanathan,

21   yourself, and Dr. Panda.  It's referenced in the first

22   sentence of the letter.

23         A.    I don't recall who was taking notes.

24         Q.    Do you recall if anyone was taking notes?

Mark Farley

52

1    A.    I probably helped Pat out, but I don't recall

2    who was taking notes.  The meeting occurred late in the

3    day at like 6:00 in Dr. Liverpool's office, and Dr. Panda

4    came to that meeting, but I don't remember who was taking

5    notes.

6    Q.    And do you know, I apologize if I just asked

7    you this, but do you know what allegations that Dr. Panda

8    admitted in that meeting?

9    A.    I don't remember.  This was three years ago.

10   Q.    I understand it's three years ago.

11   A.    Okay.

12   Q.    But you remember the conversation you had

13   with Tammy Hurd in January pretty clearly.

14   A.    I do.

15   Q.    But it seems like your memory is not as well

16   during some of these other meetings.

17   A.    Not purposeful.

18   Q.    It references a Dr. Mark Farley in this

19   letter.  Are you a doctor?

20   A.    I have my law degree.  I do teach class, so

21   sometimes people who have their law degree are referenced

22   at doctor when they teach.

23   Q.    So it's your position that people who have

24   law degrees are referenced as doctors?

Mark Farley

53

1        A.    They have juris doctorates, yes.

2        Q.    Is that a common title you go under, Doctor?

3        A.    I don't understand your question.

4        Q.    I mean do people reference you as

5   Dr. Farley --

6        A.    Some do, yes.

7        Q.    -- at Delaware State University?

8        A.    Yes.

9        Q.    You interviewed a Delano Hunter?

10       A.    Yes.

11       Q.    Who gave you Delano Hunter's name?

12       A.    I don't remember exactly.  I think it was

13   Tracye Berry.  But I don't remember exactly.  And --

14       Q.    And what did Delano Hunter say to you

15   concerning this investigation?

16       A.    I don't remember exactly what he said.

17       Q.    Do you know why he was interviewed?

18       A.    Because someone gave me his name as someone

19   who had information.

20       Q.    Do you know what questions you asked him?

21       A.    I would have asked him whether or not he was

22   aware of any inappropriate comments in the classroom, or

23   behavior by Dr. Panda.

24       Q.    Are you just saying that you remember

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

A72

Mark Farley

54

1   specifically asking those questions, or are you saying

2   you would have asked him?

3        A.   I'm saying I would have.  I don't have before

4   me the specific questions I asked him.

5        Q.   Did you take any notes with your interview

6   with Delano Hunter?

7        A.   I don't recall.  I don't have any notes of my

8   interview with Delano Hunter.

9        Q.   And you believe Tracye --

10       A.   Berry.

11       Q.   -- Berry forwarded you his name?

12       A.   I don't remember exactly who did.  I believe

13   that's who did.

14       Q.   You also interviewed Kafi Martin?

15       A.   I don't remember interviewing Kafi Martin.

16   Kafi Blay?

17       Q.   I'm looking at your Interrogatories, Number

18   10.  And there is a reference to a Kafi Martin.

19       A.   It's a woman.  Yes.

20       Q.   Why did you interview Kafi Martin?

21       A.   I believe that's someone that Tammy provided

22   us her name.

23       Q.   And what did you ask her in your interview?

24       A.   I don't remember exactly what I asked her in

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mark Farley

55

1     the interview.

2         Q.    You don't remember anything she said during

3     that interview?

4         A.    No.

5         Q.    You interviewed Tracye Berry?

6         A.    Yes.

7         Q.    And who forwarded you her name?

8         A.    I believe it was Tammy who gave me her name.

9         Q.    You interviewed a Wayne Holmes?

10        A.    Yes.

11        Q.    Who gave you his name?

12        A.    Tammy.

13        Q.    And you interviewed a Talisha Murphy?

14        A.    I did.

15        Q.    And who forwarded you her name?

16        A.    Tammy.

17        Q.    And Tracye Berry, Wayne Holmes and Talisha

18    Murphy have written statements.  Is there a reason why

19    they have written statements and Delano Hunter and Kafi

20    Martin don't?

21        A.    I believe that Delano Hunter and Kafi Martin,

22    neither provided substantive input as to the allegations.

23        Q.    But you have no documentation to --

24        A.    That's correct.

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Mark Farley

56

1       Q.    You also interviewed Drexel Ball.

2       A.    Yes, I did.

3       Q.    Who is Drexel Ball?

4       A.    He was the former EEO officer for the

5  university.

6       Q.    And why did you interview him?

7       A.    To determine whether or not there were any

8  prior allegations or written documentation related to

9  allegations against Dr. Panda.

10      Q.    And what did you find out?

11      A.    That he had no such records.

12      Q.    Did you get a written statement or anything

13  from Drexel Ball?

14      A.    I did not.

15      Q.    Why did you interview Dr. Winston Awadzi?

16      A.    Because I was interested in anyone who would

17  have been there a long time.  I believe Dr. Awadzi had

18  been there the longest time.

19      Q.    Why in particular this professor, did you

20  interview?

21      A.    Same college, college of business.  And he

22  would have had any information, any historical

23  information, since Drexel Ball didn't have it.

24      Q.    What information, did you receive any

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

A75

57

1    information from Dr. Awadzi?

2         A.    I don't remember whether it was him who

3    referred me to Germaine Cheatham.   But Dr. Awadzi had

4    been there some time, had nothing specific.   I believe he

5    had sort of some vague recollections, I recall, but I

6    don't recall exactly what it was.

7         Q.    What vague recollection did he have?

8         A.    That there had been other rumors about

9    someone who had complained, or had a problem with

10   Dr. Panda.

11        Q.    So, he had told you that there was rumors

12   that someone else had complained about Dr. Panda?

13        A.    Or had a problem with Dr. Panda, yes.

14        Q.    And was that concerning sexual harassment?

15        A.    Yes.

16        Q.    Did he provide any other details, other than

17   that?

18        A.    No.

19        Q.    And I assume you didn't take any notes

20   concerning your interview with Dr. Winston Awadzi or have

21   any documentation?

22        A.    I don't recall.

23        Q.    And who is Germaine Cheatham?

24        A.    Germaine Cheatham is the director of

Mark Farley

58

1   admissions who was a secretary at a time.

2       Q.   And why did he provide you with her name?

3       A.   I don't remember that he did, but I think he

4   did.

5       Q.   Did you interview her?  I'm sorry, I --

6       A.   She was -- yes.

7       Q.   And how come she is not referenced in this

8   response to Interrogatories?

9       A.   I don't know.  She should be.

10      Q.   Is there anyone else not referenced here that

11  was interviewed?

12      A.   I don't think so.

13      Q.   Did you provide most of the answers to these

14  Interrogatories?

15      A.   Yes.

16      Q.   And did you review them prior to them being

17  sent to the plaintiff?

18      A.   I spoke with Mr. Casarino about them, yes.

19      Q.   And what did Germaine Cheatham have to say?

20      A.   I don't remember exactly, but she did provide

21  something to us, that I came across as we were working on

22  files just the other day, actually.

23      Q.   And what's that?

24      A.   It's something to the effect of that there

Mark Farley

59

1    was a student who had come to her, upset by Dr. Panda's

2    conduct.

3           Q.    And when did that happen?

4           A.    I don't remember exactly when that was.

5    Sometime -- some many years ago.  I don't remember the

6    exact date.

7           Q.    What is Germaine Cheatham's position?

8           A.    She's the director of admissions.  Or

9    executive director, I don't remember which.

10          Q.    She's a director of admissions?

11          A.    Yes.

12          Q.    Is she still there?

13          A.    Yes.

14          Q.    Is she still the director of admissions?

15          A.    Yes.  Although at the time apparently when

16   this happened, she was serving the university as a

17   secretary.

18          Q.    So she was formerly director of admissions?

19          A.    No.  She's director of admissions now.  But I

20   think this is like -- you know, ten years ago or

21   something.  I mean it's some substantial time.  She's

22   progressed in her career.

23          Q.    I understand.

24          A.    Okay.

Mark Farley

60

1       Q.   So, at the time the student complained to

2   her, you believe she was a secretary?

3       A.   Yes.

4       Q.   Did you get any kind of written statement

5   from Germaine Cheatham?

6       A.   Yes.   I told you, I came across that the

7   other day.

8       Q.   Okay.   So that has not been provided yet?

9       A.   I don't believe so.

10          MR. CASARINO:   That will be, though.

11      Q.   What exactly was the nature of this complaint

12  against Dr. Panda to Germaine Cheatham?

13      A.   That -- again, exactly, I don't remember

14  exactly, but --

15      Q.   The best of your recollection.

16      A.   That he sexually harassed her; that he

17  actually came in contact with her, as they were passing

18  through some small area, and that the student went to

19  Germaine, and was upset.

20          Because Drexel Ball, who was the EEO

21  officer at the time, had no record of it, I followed up,

22  nonetheless.   I was really following up on rumor.

23      Q.   And what happened after Germaine Cheatham

24  received this information?

Mark Farley

61

1      A.    She said that she talked to Drexel Ball, but

2    Drexel Ball didn't remember that.

3      Q.    So she said that she actually informed

4    Mr. Ball of this incident?

5      A.    Yes.

6      Q.    And Mr. Ball told you that he never received

7    that information?

8      A.    He said he had no record of it.

9      Q.    Did he say anything about receiving the

10   information?

11     A.    I don't remember exactly what he said.

12     Q.    So you don't recall him saying he did not

13   know about the incident?

14     A.    I don't remember exactly what he said.  I

15   just --

16     Q.    And you didn't get a written statement from

17   Drexel Ball; is that correct?

18     A.    Correct.

19     Q.    Dr. Winston Awadzi --

20     A.    Awadzi, yes.

21     Q.    Awadzi, excuse me.  Is that a male?

22     A.    Male, yes.

23     Q.    Why was he interviewed?

24     A.    Because he was the longest-term employee in

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

A80

Mark Farley

62

1    the college of business.

2        Q.    I think I just asked you -- did I just ask

3    you about that?

4        A.    You did.

5        Q.    James H. Williams.  Who gave you his name?

6        A.    I believe it was Tammy.

7        Q.    And why did she give you his name?

8        A.    She had interviewed a number of people, or

9    spoken with a number of people, and who she felt could

10   provide additional information.

11            And so, I asked her who those people

12   were, and I told her I would follow through with them,

13   and I did.

14       Q.    And what did James H. Williams have to say?

15       A.    Actually, I have to take that back.  I

16   believe that James H. Williams was the former dean at the

17   time that there was other information -- I believe that

18   James Williams had moved on.  I called him at another

19   institution, and asked him whether he had any knowledge

20   of prior allegations.

21       Q.    And what did he say?

22       A.    He said that he did not.

23       Q.    Did he say anything else?

24       A.    No.



WILCOX & FETZER LTD.
Registered Professional Reporters

A81

Mark Farley

63

Q.   Martha Smith.   Who gave you her name?

A.   I think Martha Smith was a secretary.   This
is, again, based on the allegation that there had been
some history.   I followed up with people who have left
the institution, I believe Martha Smith was Dr. Williams'
secretary, if memory serves.   And I called her to see if
she had any information.

          And she suggested -- and I think she was
even in touch with Dr. Williams, may have told me where
to reach him.

Q.   What did she say?

A.   I don't remember exactly what she said.

Q.   Did she say that she remembered any
allegations, previous allegations against Dr. Panda?

A.   I don't remember exactly what she said.

Q.   Do you remember her saying that she didn't
remember any allegations, previous allegations against
Dr. Panda?

A.   No.   I don't remember what she said.

Q.   Okay.   Looking back on it, do you think you
maybe should have documented your investigation a little
better?

          MR. CASARINO:   Objection.

A.   Well, I typically -- I typically do take

Mark Farley

66

          A.    I don't recall what his exact response was.

          Q.    Did he deny the allegations by Tammy Hurd?

          A.    The meeting was pretty early.  He denied them
in part.  But exactly which part of that is, right now, I
don't recall.

          Q.    And you don't recall what he admitted, also?

          A.    Correct.

          Q.    What was the outcome of your investigation?

          A.    The outcome of my investigation was that in
speaking with Dr. Sessoms, that Dr. Panda would be
disciplined, and that we would follow through on the
disciplinary process as articulated in the collective
bargaining agreement.

          Q.    Why were you interested, why were you
interviewing -- let me rephrase that.  Let me try to
rephrase this in the best way possible, so as not to jump
ahead.

                Why did you think it was important to
find out if there were prior complaints about Dr. Panda?

          A.    Because Tammy said there were.

          Q.    And that's why you were interviewing Germaine
Cheatham?

          A.    Because that was a follow-up on someone else,
referenced by someone else, yes.

1    setting or in an individual setting, anything that I

2    noticed.  So I was a little surprised, and shocked.

3        Q.    So in all your experience with Dr. Panda, you

4    never saw any evidence of this type of behavior, as

5    alleged by Tammy Kent?

6        A.    No.

7        Q.    And did you believe that Tammy Kent was making

8    allegations of sexual and racial harassment against

9    Dr. Panda, after you read this document?

10        A.    Yes.

11        Q.    After you read the document, did you believe

12    Tammy Kent's allegations, or did not believe them?

13        A.    Well, we also had, I think, a meeting with

14    Dr. Panda, and as far as I recall, as far as I recall,

15    he was -- well, he had denied, you know, these

16    allegations.  But he wasn't very specific.

17              But anyway, we wanted to get both sides

18    of the story, so we talked with -- we requested Mark

19    Farley to talk to Derek Batton, because he was there on

20    many of these things.

21        Q.    So you believed that, you wanted to talk to

22    Dr. Panda and you wanted to talk to Derek Batton?

23        A.    Uh-huh.

24        Q.    And after speaking with both Dr. Panda and

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

A84

1      A.    No.

2      Q.    And after the conversation occurred, what

3   happened?

4      A.    I think if I remember right, Mark Farley

5   mentioned that we would have to make a determination.

6   And I don't know whether there was a decision made,

7   that we would be, you know, whether we would have to

8   make a substitution or not.  I don't know that there

9   was a decision made.  I don't think it was made that

10  day.

11     Q.    So Mark --

12     A.    I believe it was made later.

13     Q.    So Mark Farley said to the two of you at this

14  meeting -- you were the only three present?

15     A.    Right.

16     Q.    That we would have to make a determination?

17     A.    I think so.  Something along those lines.

18     Q.    And when he said "we," he was referring to

19  yourself and Dean Liverpool?

20     A.    My impression was that it was a human resource

21  matter at that point, and that -- because the

22  university also has a collective bargaining agreement,

23  and you know, faculty are all members of the union, as

24  well.  So, my impression was that, really, it was going



WILCOX & FETZER LTD.
Registered Professional Reporters

A85

```
 1         Q.    Do you have any recollection if there was

 2    students petitioning to keep Dr. Panda in his position

 3    as a professor?

 4         A.    There might have been.  But I can't recall

 5    anything to that effect.

 6         Q.    No students ever talked to you about that?

 7         A.    No.  Not to me.  The only time, you know, was

 8    when I went into his class with the continuing -- the

 9    class itself, that's the only time I --

10         Q.    When did you go into the class?

11         A.    Pretty soon after, you know, after he couldn't

12    go in anymore.

13         Q.    And what class are you referring to?

14         A.    I think I did one of the classes, which was in

15    international marketing.  There was another class where

16    we hired an adjunct, I think, if I can remember, to

17    complete the class.  But I just explained to them, for

18    reasons I couldn't go into, that there would be a

19    change in faculty.

20         Q.    And was Tammy Hurd or Tammy Kent a student in

21    that class?

22         A.    Yes.  She was in a couple of classes, and we

23    decided to, given that she would not be comfortable

24    coming back to the classroom with all the other
```



Allen Sessoms, Ph.D.

38

1    harassment by a student should be taken seriously by the

2    university?

3                    MR. CASARINO:  Objection; asked and

4    answered.

5         A.    Every complaint of every kind is taken

6    seriously by the university, whether by students, whether

7    by faculty, whether by staff.

8         Q.    Once a student comes to the university with

9    the complaint of sexual harassment, the university is on

10   actual notice that that harassment may be ongoing?

11                   MR. CASARINO:  Objection.

12        A.    Is that a question or a statement?

13        Q.    I'm asking a question.  Would you agree with

14   that statement?

15        A.    I don't know what you mean by you're on

16   notice.  I have no idea what -- everything depends on the

17   nature of the complaint.  If a student simply stands up

18   and sees a faculty member in the hallway, and says, "I

19   have a complaint," without further suggesting what that

20   complaint is, it is not anything to the university.

21        Q.    If a student --

22        A.    The only way a university receives a

23   complaint is through formal channels that are actionable

24   by the university.  A student can go and talk to a

Allen Sessoms, Ph.D.

39

 1   faculty member, talk to a chair, say this is a problem I

 2   have.  It goes, then, through the proper channels.

 3              I received a letter from this young

 4   woman.  I immediately sent it to the counsel, general

 5   counsel for investigation.  That's the formal channel.

 6   That's the way we proceed.  We don't proceed on hearsay.

 7        Q.   If a student comes to Mr. Farley concerning a

 8   complaint of sexual harassment against a professor,

 9   should that complaint be investigated --

10        A.   Mr. Farley --

11        Q.   -- by Mr. Farley?  If you would let me finish

12   my question.

13        A.   Absolutely if a student comes to Mr. Farley

14   with a complaint, Mr. Farley immediately actions on that.

15   I know that to be a fact.

16        Q.   And how do you know that to be a fact?

17        A.   Because Mr. Farley tells me that he gets

18   complaints all the time and he looks into every

19   situation, every one of them, and I have no reason not to

20   believe him.

21              MR. CASARINO:  Off the record for a

22   second.

23              (Brief discussion off the record)

24              (Sessoms Exhibit 3 marked)



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A88

258 North Old Mill Road
Dover, DE  19901
302-270-6684

Dr. Allen L. Sessoms
1200 North DuPont Highway
Dover, DE  19901
302-857-6001

Dear Dr. Sessoms,

My name is Tammy Kent, I am currently enrolled at the Delaware State University as a senior.  I am striving for my Bachelors in Management as well as Marketing.  In the fall I hope to begin the Masters in Arts and Teaching program so that I can begin my career as a high school educator.

I am writing in reference to an instructor at Delaware State.  I am currently in Dr. Panda's International Marketing as well as his International Management class.  Last semester I was enrolled in his Buyer Behavior class and that is when the first incidents occurred.  I regretfully have to inform you that Dr. Panda is sexually as well as racially harassing me.  Comments made by Dr. Panda are always in a sexual manner whether I am talking to him one on one or in front of others in the class.  While attending a predominantly African-American college I feel that I am in an even more vulnerable position as I am Caucasian.  I am easily targeted by much of the student body and do not want to put myself in the position of being targeted by the faculty as well.

After much thought as well as the advice of other instructors at Delaware State University I scheduled an appointment with Mark Farley.  I took the initiative to make the appointment so that someone at the University was aware of what was going on.  After the meeting with Mr. Farley we both agreed that I would e-mail Dr. Panda and remind him that I was in need of his syllabus for his classes as well as to inform him that I was uncomfortable with his remarks towards me.  Mr. Farley and I agreed that if it were to come from him, that it could subject me to some form of retaliation from Dr. Panda.

I am now writing you because these incidents have become more and more frequent as well as uncomfortable.  I am finding it hard to go to class for fear of another conversation with Dr. Panda in this manner.  I see that this is also happening to other girls in his class and it concerns me as they are much younger than I am and are not as strong willed to defend themselves.  I find it hard to defend myself as well, I know that Dr. Panda holds my grades in his hands, as he has made it very clear to all of us.  I am also concerned, as I am to take another class by Dr. Panda in the fall.  I know that I can not take another semester of this abuse by Dr. Panda.

I would like to see this situation brought to an immediate stop.  I am not sure what the best method to achieve this goal is, but it does need to stop.  I have spoken to previous students of Dr. Panda's and have discovered that this happens more often than I expected.  Dr. Panda should not be allowed to communicate to his students in this manner.

Sincerely,


Tammy Kent
Student

A89



casinobrats@comcast.net
01/04/2005 09:19 AM

To   dpanada@desu.edu
cc
bcc
Subject   Tammy Kent/Int MKT and INT MGT

Dr. Panda,

Happy New Year!!! I am so excited to start this new semester. I am going to see what I can do to finish up my degrees and begin teaching ASAP. I am just reminding you that I am still in need of the syllabus for International Management and International Marketing. I want to begin my notes early so that I may be able to focus more in class instead of steady writing notes from the book.

I also wanted to mention quickly that I was uncomfortable with our last conversation the last day of class regarding my dating life. I very much enjoy your class and your teaching methods, however of we could just avoid conversations such as the one we had the day of finals I would really appreciate it.

I am going to finish checking up on a few things regarding the alternative program through the state of Delaware for teaching. If it looks like something that I can accomplish then I may be in need of a couple more classes of yours this semester. I will let you know by the end of the week. I may need your help in getting in because they are already booked in the system.

Thank you for your time and patience,

--
Tammy Kent
270-6684



DEPOSITION
EXHIBIT
Farley 5
4-18-08

Confidential
Information

March 24, 2005



Professor Dandeson Panda
Delaware State University
1200 North Dupont Highway
Dover, Delaware 19901

Dear Dr. Panda,

Yesterday evening, you met with Dr. Patrick Liverpool, Dean of the School of Management, Dr. Nanda Viswanathan, Department Chair, and Dr. Mark Farley, Vice President of Human Resources at Dr. Liverpool's written request. The purpose of the meeting was to inform you of specific allegations of sexual and racial harassment. During the course of the meeting, you were informed of (and given a copy of) these allegations/complaints and informed that disciplinary action could result from the allegations if further substantiated.

Although you admitted (during our meeting) to some aspects of these allegations, you denied them in substantial part. A subsequent telephone interview with another student (who was alleged to have been present when comments were made) confirmed the allegation. I am moving forward with an investigation that will lead to a conclusion as to whether, or not, these behaviors represent Adequate Cause for dismissal for your failure to discharge your professional responsibilities (please see collective bargaining agreement paragraphs 10.4.2 and 10.4.3 (a)(d) and (e).

Given the nature of the allegations, and the degree to which they have already been substantiated, I have elected to take immediate action to suspend you from employment (with pay) and to direct that you remove yourself and your personal property from the University campus immediately (in accordance with paragraph 10.4.7 of the collective bargaining agreement). It is my judgment that your continued presence on University property would seriously disrupt operations or place students in jeopardy. Your presence on campus will be expected upon specific request by the Vice President of Human Resources and for any required meetings.

Sincerely,

Dr. Allen Sessoms

cc:    Dr. Mark Farley
       Dr. Oriaku Nwosu

DSU0001

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

**C**McKay v. Delaware State University
D.Del.,2000.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Margaret MCKAY, Plaintiff,
v.
DELAWARE STATE UNIVERSITY, Dr. William
B. DeLauder, Henry Tisdale, Dr. Johnny Tolliver, Dr.
Tossie Taylor, and Dr. William Flayhart, Defendants.
No. CIV.A. 99-219-SLR.

Sept. 29, 2000.

Laurence V. Cronin, Esquire of Smith, Katzenstein,
& Furlow, Wilmington, Delaware. Counsel for
Plaintiff. Of Counsel: Mark B. Frost, Esquire of Frost
& Zeff, Philadelphia, Pennsylvania.
John D. Balaguer, Esquire and Marc S. Casarino,
Esquire of White & Williams, Wilmington,
Delaware. Counsel for Defendants.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Dr. Margaret McKay filed this action on
April 7, 1999 against defendant Delaware State
University [FN1] ("DSU"), its President, Dr. William B.
DeLauder ("DeLauder"), its Vice President of
Academic Affairs until 1994, Henry Tisdale
("Tisdale"), its Dean of the School of Arts and
Sciences, Dr. Johnny Tolliver ("Tolliver"), its Vice
President of Academic Affairs from 1994 to 1996,
Dr. Tossie Taylor ("Taylor"), and Chairman of its
History, Political Science and Philosophy
Department, Dr. William Flayhart ("Flayhart").
Plaintiff alleges disparate treatment, discriminatory
discharge and retaliation under 42 U.S.C. §§ 1981,
1983 and 1985, Title VII of the Civil Rights Act of
1964, 42 U.S.C. §§ 2000(e), et seq., the Age
Discrimination in Employment Act and the Delaware
Discrimination in Employment Act.[FN2]Plaintiff also
alleges breach of contract, civil conspiracy and
violation of the Delaware Constitution. (D.I.22) The
court has jurisdiction over plaintiff's federal claims

pursuant to 28 U.S.C. §§ 1331 and 1343. The court
has supplemental jurisdiction over plaintiff's state
claims pursuant to 28 U.S.C. § 1367. Currently
before the court is defendants' motion for summary
judgment on all counts of the complaint. (D.I.74) For
the reasons that follow, the court will grant in part
and deny in part defendants' motion for summary
judgment.

> FN1. Prior to the fall of 1993, DSU was
> known as Delaware State College.

> FN2. Plaintiff filed an Amended Complaint
> on September 13, 1999 in which she added
> claims under the Civil Rights Act of 1964,
> the Age Discrimination in Employment Act,
> and the Delaware Discrimination in
> Employment Act. (D.I.22)

II. BACKGROUND

This is a case of alleged employment discrimination
brought by a former tenured professor against DSU
and several members of its administration and faculty
in their individual and official capacities. Plaintiff
contends that she was discriminated against based on
her race, gender, age and perceived disability in
connection with her performance as a faculty
member, her repeated requests for promotion and
tenure, and her ultimate dismissal from DSU. In
order to assess plaintiff's claims, a review of the facts
is necessary.

A. The Early Years of Employment

Plaintiff is a 71-year old Caucasian female. She was
first employed in August 1983 as an Assistant
Professor of Political Science by DSU, a
predominantly African-American educational
institution. Shortly after arriving at DSU, plaintiff
received critical evaluations from her peers. On
October 25, 1983, Associate Professor of Political
Science Dr. Joseph Spina ("Spina") expressed his
"extreme ... disappoint[ment]" in plaintiff's
performance, including her failure to begin
developing the Political Science Internship Program
("Internship Program"), neglect in preparing a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))**

requested brochure for the Political Science curriculum, and her failure to post office hours and to spend sufficient time on campus. (D.I. 75 at A1) Spina also noted that the two classes plaintiff taught, Introduction to Political Science and Contemporary Political Ideologies, covered the same subject matter, and students had complained about plaintiff's disorganized teaching methods. (D.I. 75 at A2) Plaintiff received similar critical evaluations from Flayhart and Dr. James Valle ("Valle"), the Department Chair at that time. (D.I. 75 at A4-A10) Valle placed plaintiff on probationary status and postponed a recommendation for reappointment until the next scheduled evaluation in light of plaintiff's short time at DSU. (D.I. 75 at A10) In an October 31, 1983 letter, Valle informed plaintiff of the negative evaluation and provided her with suggestions on how to correct the deficiencies.[FN3](D.I. 75 at A11)

> FN3. Valle also informed plaintiff that "some of our disquiet is clearly rooted in intangible eccentricities of behavior, missed and cancelled appointments, apparent inability to grasp the importance of the cooperative efforts we are asking of you, bare minimum adherence to office hours, and a general lack of the professional maturity and self-starting abilities that we had expected of a person of your experience and qualifications."(D.I. 75 at A12)

**B. Promotion to Associate Professor and First EEOC Complaint**

**\*2** In the fall of 1985, plaintiff sought promotion from Assistant to Associate Professor. On November 15, 1985, the Promotion and Tenure Committee of the History and Political Science Department ("Tenure Committee") recommended plaintiff for promotion to Associate Professor. In its report, the Tenure Committee, composed of Valle, Spina, Flayhart, and Chairman Dr. John Gardner ("Gardner"), noted that plaintiff is "willing to work with students far beyond her required office hours,""unusually vigilant in enforcing academic standards on such matters as plagiarism,""quite innovative in her teaching methods," and "interacts with her colleagues [and is] well-liked by members of the department."(D.I. 75 at A37-38) However, the Tenure Committee also cited three weaknesses: plaintiff's need to publish, her lack of organizational

ability in the classroom, and her need to pursue long-term projects such as the Internship Program. (D.I. 75 at A38) The Tenure Committee concluded that plaintiff's strengths "substantially outweigh[ed]" her weaknesses and thus recommended her for a promotion. (*Id.*) Despite this recommendation, plaintiff's application for promotion was rejected by the DSU Board of Trustees in the spring of 1986 because of the negative teaching evaluations in her file. (D.I. 75 at A40)

Plaintiff reapplied for promotion in the fall of 1986. On November 10, 1986, plaintiff filed an EEOC complaint against DSU alleging age and sex discrimination in connection with the denial of her 1985 application. (D.I. 75 at A41) On November 14, 1986, then-Department Chair Dr. James Hartnett ("Hartnett") and the Department Personnel Committee ("Personnel Committee") consisting of Flayhart, Gardner and Spina, recommended plaintiff for promotion to Associate Professor pursuant to her 1986 request. (D.I. 75 at A43) The Board of Trustees agreed and promoted plaintiff to Associate Professor beginning on September 1, 1987. (D.I. 75 at A44)

In July of 1987, plaintiff added the charge of race discrimination to her EEOC complaint, alleging that some of her black colleagues had received tenure or promotion even while having negative evaluations in their files or not fulfilling the necessary requirements. (D.I. 75 at A46) On November 27, 1987, the EEOC issued its decision on the complaint, finding no evidence of discrimination surrounding the denial of plaintiff's 1985 request for promotion.[FN4](D.I. 75 at A54) This decision was later upheld by the EEOC upon review. (D.I. 75 at A57)

> FN4. The EEOC found that during the same academic year, four others were considered for promotion: two black females over age 40 were promoted; one white male much younger than plaintiff was denied promotion for reasons of merit; and one white female under 40 was denied a promotion on technical grounds but was later granted the promotion on appeal. (D.I. 75 at A53-54)

**C. Tenure Application, First Federal Lawsuit and Second EEOC Complaint**

In the fall of 1987, plaintiff applied for tenure. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

Personnel Committee recommended that plaintiff be denied tenure, as did Hartnett, who cited plaintiff's lack of organizational ability [FN5] and combative temperament. (D.I. 75 at A52) Similarly, the Tenure Committee voted not to recommend plaintiff for tenure because of deficiencies in teaching and scholarly publication.[FN6] (D.I. 75 at A58) In response, plaintiff submitted a lengthy statement to Tisdale, who was then Vice President and Dean of Academic Affairs, rebutting the negative evaluation by Hartnett.[FN7] (D.I. 75 at A60) On June 9, 1988, an Ad Hoc Appeals Committee of plaintiff's peers ("Appeals Committee") voted to uphold the Tenure Committee's decision not to recommend her for tenure.[FN8] (D.I. 75 at A76) On July 7, 1988, the DSU Board of Trustees rejected plaintiff's tenure application. (D.I. 75 at A77)

> FN5. Specifically, Hartnett referred to problems with students due to lack of communication and classroom organization, poor handling of the Internship Program, and failure to meet deadlines in administrative matters, such as textbook orders and submission of course syllabi. (D.I. 75 at A51-52)

> FN6. The Tenure Committee specifically referred to Section 8.5.2a of the DSU Collective Bargaining Agreement ("CBA"), which states in part, "Competence in teaching is an absolute necessity for promotion or tenure," and Section 8.5.2b of the CBA, which states in part, "[P]ublication of scholarly books, monographs, and articles in publications recognized by and within the discipline ... are worthy of professional recognition."(D.I. 75 at A59)

> FN7. Plaintiff claimed that Hartnett directly contradicted his March 1987 chair evaluation, in which he gave plaintiff high scores in these areas. (D.I. 75 at A60)

> FN8. The Appeals Committee, however, noticed many "disturbing" administrative factors, including a lack of department leadership to make plaintiff formally aware of inadequacies, poor counseling to assist plaintiff in remedying any deficiencies, an unwillingness by the Personnel Committee

to share its reasons for a negative recommendation, and a conflict between written and verbal recommendations by the chair and faculty. (D.I. 75 at A76)

*3 Meanwhile, on March 18, 1988, plaintiff filed a pro se lawsuit in federal court against DSU and several administrators and professors, claiming discrimination based on race, age and sex surrounding plaintiff's 1985 request for promotion. (D.I. 75 at A67) On February 2, 1989, plaintiff voluntarily withdrew the lawsuit. (D.I. 75 at A101) Plaintiff also filed a union grievance under the CBA regarding her denial of tenure. (D.I. 75 at A71)

In June 1988, plaintiff filed a second EEOC complaint, alleging that she was denied tenure in retaliation for filing her first EEOC complaint. (D.I. 75 at A78) The EEOC found this complaint also to be without merit.[FN9] (D.I. 75 at A79)

> FN9. The EEOC determined that during the year in which plaintiff applied for tenure, there were eleven applicants for tenure, and only three, all white females and two over the age of 40, were granted tenure. Those who did not get tenure included 4 blacks and 3 whites (including plaintiff), and ten of the eleven were over age 40. (D.I. 75 at A79)

On January 9, 1989, plaintiff wrote a letter to President DeLauder requesting an alternate evaluation panel due to the allegedly "prejudicial" nature of the Personnel Committee. (D.I. 75 at A84) Plaintiff requested guidance on how to remedy the situation of "silence" from the Dean, "inactivity" from the Chair, and "hostility" from the Personnel Committee. (D.I. 75 at A84) On March 21, 1989, the Personnel Committee's vote on whether to recommend plaintiff for reappointment resulted in a tie, but Department Chair Frederick Lauter supported reappointment so plaintiff remained on the faculty.[FN10] (D.I. 75 at A88)

> FN10. Valle and Flayhart submitted negative evaluations, to which plaintiff offered rebuttal statements. Plaintiff characterized Valle's criticisms as conclusory, vague and in contradiction of good evaluations he gave her in prior years. (D.I. 75 at A90-93) Plaintiff also stated that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

her request for clarification from Valle was met with a repeat of the vague criticisms he already submitted. (D.I. 75 at A90) Plaintiff directly contradicted most of Flayhart's account of the class that he evaluated and attributed his criticisms to "the inappropriateness of having a historian assess the pedagogical and disciplinary substance of a political scientist's work."(D.I. 75 at A94)

D. Second Federal Lawsuit

In April 1989, plaintiff filed a second pro se lawsuit alleging discrimination in connection with the denial of her application for tenure. This lawsuit was dismissed in October of that year. (D.I. 75 at A103) On November 3, 1989, DeLauder found that technical procedural violations occurred in plaintiff's tenure review, so he ordered the process to be repeated in the fall of 1990.[FN11] (D.I. 75 at A105) Plaintiff's Union appealed this decision to binding arbitration as provided for in the CBA, but subsequently withdrew its request for arbitration. (D.I. 75 at A107) Plaintiff reapplied for tenure in 1991 and received it in 1992. (D.I. 78 at B112)

> FN11. DeLauder determined that the chairperson's evaluation was not provided in a timely fashion, the Tenure Committee chairperson did not notify plaintiff that the file was in the office and it contained negative comments, and the Department did not develop criteria for promotion or tenure prior to considering all applications that year. (D.I. 75 at A105)

E. Initial Applications for Promotion to Full Professor

In the fall of 1992, plaintiff applied for promotion to full professor. The Personnel Committee (Department Chair Valle, Flayhart and Professor Jean Smith) supported the application, as did the Tenure Committee. (D.I. 75 at A110-A111) However, neither the Acting Dean of the School of Arts and Sciences, Warren Rhodes, nor Tisdale recommended plaintiff for promotion.[FN12] (D.I. 75 at A112, A116) On March 21, 1994, plaintiff's request for promotion was rejected by DeLauder, who cited lack of an "outstanding record in both teaching and

research."(D.I. 75 at A118)

> FN12. Rhodes specifically cited plaintiff's deficiency in scholarly publication. (D.I. 75 at A112)

Plaintiff applied again for promotion in the fall of 1993 and was again recommended by the Personnel Committee. (D.I. 75 at A119) Flayhart disagreed because of deficiencies in research, stating that "[f]ailure to provide specific evidence of this has blocked consideration for promotion for other members of the faculty."(D.I. 75 at A120) Although the Appeals Committee recommended promotion, the Tenure Committee, Tolliver and DeLauder agreed with Flayhart, and plaintiff was not promoted to professor that year. It was also at this time that Flayhart recommended plaintiff for an award for meritorious research for the 1992-93 academic year and, as a result, plaintiff was given a salary increase. (D.I. 75 at A122-A123)

*4 Plaintiff applied for promotion to full professor again in fall 1995. The Personnel Committee supported her promotion,[FN13] as did the Appeals Committee upon review, but the Tenure Committee, Flayhart, Tolliver, Taylor and DeLauder disagreed, once again citing a lack of outstanding research. (D.I.A128-A139) On May 21, 1996, Flayhart sent plaintiff a memo explaining his reasons for not recommending her, specifically, his view that the CBA requirement of outstanding research for promotion refers to articles that are already published, not articles that are merely accepted for publication, like those plaintiff cited in her application. (D.I. 75 at A135)

> FN13. The Personnel Committee lauded plaintiff's strengthening of the political science curriculum, especially as Pre-Law and Internship Coordinator, her "stimulating and challenging" teaching, her research that has led to "widespread professional recognition" and her "extensive" community involvement. (D.I. 75 at A128)

In June of 1995, plaintiff was awarded a parity salary increase, and on January 16, 1996, plaintiff was awarded professional development funds in support of her project, "Sexual Harassment in the Workplace." (D.I. 75 at A132, A138)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

F. The Internship Program and Union Grievances

Since the fall of 1993, Flayhart periodically encouraged plaintiff to accelerate development of the Internship Program. (D.I. 75 at A140-A145) In particular, Flayhart requested plaintiff to place an intern in Senator Biden's Washington office, which she was unable to do because of the expense of living in Washington and time that the intern would spend away from school. (D.I. 78 at B103) In the fall of 1995, Flayhart permitted a student who was the grandson of a former president of DSU to retroactively receive Internship Program credit for a summer internship, and plaintiff rejected this arrangement as against the policy of the Internship Program. (D.I. 75 at A146, D.I. 78 at B123) On November 28, 1995, Flayhart requested that all student files be submitted to him by the following day for review. (D.I. 75 at A147) Plaintiff failed to do this [FN14] and Flayhart removed her as director of the Internship Program on November 29, 1995. (D.I. 75 at A148)

> FN14. Plaintiff alleges that upon receipt of the request for the documents, she sought guidance from the DSU grievance officer, who suggested that plaintiff ask for clarification of Flayhart's request. Plaintiff claims she sent a memorandum to Flayhart, but was removed from her position the next day and never received a response. (D.I. 78 at B125)

Flayhart then requested plaintiff to provide him with all grades for students in the Internship Program, and plaintiff did so in a memorandum in which she addressed herself as "Internship Coordinator." (D.I. 75 at A150) On January 2, 1996, Flayhart sent a letter to the DSU Office of Records stating that he was the only professor authorized to enter grades for the Internship Program and that "illegal" grades had been recorded into the system by plaintiff. [FN15] (D.I. 75 at A152)

> FN15. According to Flayhart, plaintiff submitted grades for her students as well as students supervised by other professors. (D.I. 75 at A174) These grades were inconsistent with those she provided to Flayhart. (D.I. 75 at A155) Plaintiff alleges

that other professors supervised interns while she was on sabbatical and would expect her to submit grades for those students when she returned. (D .I. 78 at B119-120)

In April 1996, plaintiff filed two union grievances over her removal as Internship Director and her claim that Flayhart substituted grades. These grievances were denied at both levels of review. (D.I. 75 at A158-159) In October of 1996, the Union's Executive Committee denied plaintiff's request to advance the grievances to arbitration. (D.I. 75 at A161)

G. Annual Reports, Student Complaints and Alleged Verbal Abuse

DSU publishes annual reports in which department chairs list the achievements and development of their academic programs and faculty. Plaintiff alleges that Flayhart included false statements in the Department's annual reports, including that plaintiff was very ill during the 1993-1994 academic year which resulted in many incomplete grades, cancellation of over one-third of her classes, and numerous student complaints. [FN16] (D.I. 78 at B301, B306) Flayhart also included that plaintiff was removed as Internship Director and resigned as Pre-Law Advisor, and characterized her grants and research from Queen's University in Ireland as not recognized by DSU. (D.I. 78 at B306, B310)

> FN16. In his deposition, Gardner states that he did not recall plaintiff having any more student complaints than her peers. (D.I. 78 at B57)

*5 Plaintiff also alleges that Flayhart publicly berated her on several occasions. For instance, plaintiff claims that Flayhart ordered her to alphabetize the law catalogs, a job she felt was appropriate for a student worker, scolded her for cancelling a field trip at which only one student showed up, and humiliated her during departmental meetings by criticizing her for raising issues for discussion. (D.I. 78 at B185, B193, B298) Plaintiff described Flayhart's "pattern of discrimination, harassment and deliberate interference with [her] professional responsibilities" in a letter to DeLauder on December 18, 1996. [FN17] (D.I. 78 at B431) These alleged events were also brought to the attention of Tolliver and the DSU

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))**

Page 6

Affirmative Action Officer, Drexel Ball. (D.I. 78 at B434, B453)

> FN17. In addition to the aforementioned incidents, plaintiff described Flayhart's refusal to recommend her for merit pay two years in a row (while recommending her peers), improperly informing personnel of her sick days when she was not sick, forcing her to teach an overload of courses in order to accommodate his administrative error, scolding her in front of her students, refusing to meet with her to discuss his evaluations of her performance, demanding that she pay for incoming fax usage while not requiring her peers to do the same, and refusing to honor her requests for course preferences while doing so for other faculty members. (D.I. 78 at B431-432)

**H. 1996 Request for Promotion to Full Professor**

Plaintiff applied again for promotion to Professor in fall 1996. As part of the application process, classroom evaluations were performed by plaintiff's peers. Although the evaluations by Dr. Samuel Hoff ("Hoff") and Gardner were favorable, Flayhart gave the plaintiff very low scores and did not recommend her for tenure, promotion or reappointment on the faculty. (D.I. 75 at A164) This evaluation was never placed in plaintiff's tenure file. (D.I. 75 at A192)

On October 9, 1996, the Personnel Committee recommended plaintiff for promotion, but without notice of Flayhart's negative recommendation. (D.I. 78 at B381) On October 14, 1996, Flayhart wrote to both the Tenure Committee and Tolliver, recommending against promotion. (D.I. 75 at A183)

On October 16, 1996, Flayhart met with the Union to discuss pending grievances, and the next day he composed two letters-one to plaintiff and one to DeLauder-outlining his intention to seek plaintiff's dismissal. (D.I. 75 at A172, A175) After consultation with the DSU attorney, however, the letters were never sent. (D.I. 75 at A178)

On November 20, 1996, the Tenure Committee informed plaintiff that it had voted not to recommend her for promotion. (D.I. 75 at A191) The Appeals Committee upheld the decision, and Tolliver agreed.

(D.I. 75 at A193)

In late January 1997, DeLauder determined that certain procedural violations had occurred in plaintiff's 1996 promotion application process,[FN18] so he directed Flayhart to meet with plaintiff and review his classroom evaluation with her and then for the Tenure Committee to reconsider the matter.[FN19](D.I. 75 at A196) On March 4, 1997, plaintiff and Flayhart met for 1.5 hours to discuss the evaluation pursuant to DeLauder's request, and plaintiff subsequently expressed her dissatisfaction with the meeting and the entire process to the Union President and DSU's Contract Administrator. (D.I. 75 at A218) On April 10, 1997, plaintiff provided the Tenure Committee with a lengthy rebuttal to Flayhart's evaluation, repeatedly stating that his criticisms lacked "specific, concrete details." (D.I. 75 at 219)

> FN18. The CBA violations included: Flayhart's failure to review the fall evaluation with plaintiff or provide her with a copy; Flayhart's failure to consult with plaintiff before making a negative recommendation; and failure of the Tenure Committee to inform plaintiff that she received a negative recommendation and to allow her to submit a rebuttal. (D.I. 75 at A196)

> FN19. Flayhart attributes not speaking to plaintiff to her request on April 1996 that he never speak to her again because he was the source of her work-related stress. (D.I. 75 at A192)

In response to plaintiff's objection to the reconsideration process, on September 30, 1997, the Union President advised plaintiff to either accept the process as is, or to appear directly before the DSU Board of Trustees. (D.I. 75 at A255) Plaintiff rejected both options and instead suggested recusal of those Tenure Committee members who were involved in the prior evaluations. (D.I. 75 at A265) The Union President rejected the suggestion of recusal without specific evidence of bias, and the reconsideration process continued as before. (D.I. 75 at A267)

**I. Events Leading to Dismissal**

*6 On September 24, 1997, plaintiff removed two

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

female students from her Introduction to Political Science class, allegedly due to their repeated disruptive behavior. The students were sent to counseling with Vice President of Student Affairs, Ms. Lowan Pitt ("Pitt"). The students were instructed to return to class on October 3, but when they did, plaintiff required them to make an apology and they refused.[FN20] After giving a quiz, plaintiff cancelled the remainder of the class. When class met again on October 6, plaintiff summoned a campus security officer and asked him to remove the two students, but he did not do so. The next day, plaintiff requested assistance from Tolliver in addressing the disciplinary problem because her "effort ... to resolve this problem through an informal process has failed" and she "fear[ed] for [her] own personal safety."(D.I. 78 at B471) Flayhart sent a memo requiring plaintiff to hold class, but when at least one of the two students arrived at the next class, she cancelled class again. (D.I. 75 at A269) Flayhart sent plaintiff another memo removing her from the class and reassigning it to Hoff. (D.I. 75 at A269) Plaintiff replied to Flayhart, challenging his authority to remove her as professor.[FN21] Flayhart wrote to Tolliver, then Acting Provost, recommending plaintiff's dismissal for cause. (D.I. 75 at A288) The class met again on October 10, 1997, and after plaintiff refused to leave the class, Flayhart directed a security officer to move the students to another classroom where Hoff continued teaching the class. (D.I. 75 at A291)

> FN20. Plaintiff was under the mistaken impression that the students were required to apologize before returning to class as was the case with prior students whom she had removed from her class. This apparently was not the arrangement that Pitt made with the students here. (D.I. 75 at A296)

> FN21. Plaintiff informed Flayhart that she intended to continue teaching the class since he, as a department chair/administrator, did not have the authority to remove instructors from classes, and would continue to teach until she received "written notification from a University administrator to the contrary."(D.I. 78 B476-477)

On October 7, 1997, Flayhart sent a memorandum to DeLauder regarding plaintiff's alleged deterioration,

stating that "beyond a shadow of a doubt ... the health of [the plaintiff] continues to deteriorate ... [The plaintiff] represents a 'clear and present danger' to the Delaware State University academic community."(D.I. 75 at A256) On October 16, 1997, Tolliver wrote a letter to DeLauder recommending McKay's immediate suspension from DSU pending a hearing before the Ad Hoc Dismissal Committee ("Dismissal Committee") composed of fellow professors from throughout the University. (D.I. 75 at A292) On October 17, 1997, DeLauder suspended plaintiff with pay, pending appearance before the Dismissal Committee. (D.I. 75 at A293)

On November 24, 1997, plaintiff filed a union grievance alleging a violation of academic freedom which was later denied. (D.I. 75 at A295-297) On April 29, 1998, plaintiff filed a complaint with the Delaware Department of Labor and the EEOC alleging race and gender discrimination surrounding her suspension. (D.I. 75 at A298) On August 27, 1999, she filed a supplemental complaint with the EEOC expanding her allegations to include claims under the ADEA and ADA. (D.I. 75 at A300)

The hearing before the Ad Hoc Dismissal Committee was conducted over a period of four days on March 22-24 and March 29, 1999. In January 2000, the Committee issued a 51-page opinion recommending that plaintiff be dismissed from employment. (D.I. 75 at A303) On March 16, 2000, the DSU Board of Trustees accepted the Ad Hoc Dismissal Committee's recommendation and dismissed plaintiff from the faculty.[FN22] (D.I. 75 at A349)

> FN22. DeLauder stated in a deposition that plaintiff was the first tenured professor suspended or terminated during his presidency, which began in 1987. (D.I. 78 at B213) Plaintiff's brief cited letters documenting alleged incidents where other professors physically assaulted students or yelled threats of bodily harm at their peers and were not ultimately terminated. (D.I. 78 at B420-428)

III. STANDARD OF REVIEW

*7 A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

Page 8

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986)."Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is " 'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." ' *Revis v. Slocomb Indus.,* 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting *Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987)).

## IV. DISCUSSION

As a preliminary matter, the court agrees that defendants Taylor and Tisdale were not served within 120 days of the filing of the complaint in this case, and dismisses them from this action pursuant to Federal Rule of Civil Procedure 4(m).[FN23]

FN23.Federal Rule of Civil Procedure 4(m) provides that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate procedure."To this date, plaintiff has neither served Tolliver and Tisdale nor requested additional time for service from the court.

A. Title VII Claims

Plaintiff alleges that defendant DSU [FN24] discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964.

FN24. Although defendants argue, and plaintiff concedes, that there is no individual liability under Title VII, plaintiff has brought her Title VII claims against only DSU, making this issue moot. *See Dici v. Commonwealth of Pa.,* 91 F.3d 542, 552 (3d Cir.1996) (holding that there is no individual liability under Title VII).

1. Race and Gender Discrimination [FN25]

FN25. The anti-discrimination provision of Title VII provides: "It shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."42 U.S.C. §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))**

2000e-2(a).

Claims of discrimination brought pursuant to Title VII are analyzed under a burden-shifting framework, the particulars of which depend on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of race or gender discrimination and plaintiff does not purport to assert such, the court will analyze plaintiff's discrimination claim using the burden-shifting framework for "pretext" suits set forth in _McDonnell Douglas Corp. v. Green_, 411 U.S. 792 (1973) and _Tex. Dep't of Cmty. Affairs v. Burdine_, 450 U.S. 248 (1981).See _Krouse v. Am. Sterilizer Co._, 126 F.3d 494, 500 (3d Cir.1997).

**\*8** Under this framework, plaintiff must first establish a prima facie case of race or gender discrimination under Title VII. In order to state a case based on discrimination, plaintiff must prove: (1) that she is a member of a protected class; (2) that she suffered some form of adverse employment action; and (3) that this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly-situated person not of the protected class is treated differently. See _Boykins v. Lucent Techs., Inc._, 78 F.Supp.2d 402, 409 (E.D.Pa.2000) (citing _Jones v. Sch. Dist. of Phila._, 198 F.3d 403, 410 (3d Cir.1999)). The Third Circuit recognizes, however, that the elements of a prima facie case may vary depending on the facts and context of the particular situation. See _Pivirotto v. Innovative Sys. Inc._, 191 F.3d 344, 352 (3d Cir.1999).

Once a plaintiff has established a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection."_McDonnell Douglas_, 411 U.S. at 802. If the defendant carries this burden, the presumption of discrimination drops from the case, and the plaintiff must "cast sufficient doubt" upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. _Sheridan v. E.I. DuPont de Nemours & Co._, 100 F.3d 1061, 1072 (3d Cir.1996) (en banc).See also _Olson v. Gen. Elec. Astrospace_, 101 F.3d 947, 951-52 (3d Cir.1996) (citations omitted) (stating that a plaintiff can demonstrate "sufficient doubt" by showing "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence").

Defendant at bar concedes that plaintiff has established a prima facie case of discrimination regarding her disparate treatment on the job, her applications for promotion and tenure, and her dismissal from DSU. (D.I. 74 at 29) Thus, the burden shifts to defendant, who has cited "legitimate" reasons for its actions, including numerous student complaints, plaintiff's disorganized teaching methods, neglect of the Internship Program, lack of scholarly research, a combative temperament, and the dispute over allegedly disruptive students that ultimately led to plaintiff's suspension and dismissal from DSU. (D.I.75) Plaintiff has countered with evidence that casts doubt upon the legitimacy of these reasons. For instance, plaintiff received merit awards for her research at the same times she was denied promotion and tenure for deficiencies in that area. (D.I. 75 at A122, A132, A138) At every request for promotion or tenure, plaintiff received contradicting evaluations from various DSU faculty and at least twice, technical procedural violations occurred during the review process. (D.I. 75 at A105, A196) Plaintiff also alleges that other tenured DSU professors committed more egregious behavior and were never terminated. (D.I. 78 at B420-428)

**\*9** The court concludes, therefore, that there exist genuine issues of material fact as to whether DSU disparately treated and terminated plaintiff because of her race or gender. Accordingly, the court shall deny defendants' motion for summary judgment as to the Title VII discrimination claims.

2. Retaliation [FN26]

> FN26. The anti-retaliation section of Title VII provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."42 U.S.C. § 2000e-3(a).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

Claims of retaliation brought pursuant to Title VII are analyzed under the same burden-shifting framework described above. In the present case, plaintiff has presented only indirect evidence of retaliation, thus, the *McDonnell-Douglas* pretext framework applies.

As with a discrimination claim, a plaintiff claiming retaliation must first establish a prima facie case for retaliation under Title VII. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence: (1) that she engaged in protected activity; [FN27] (2) that the defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1999). Once a plaintiff has established a prima facie case, the burden shifts to the defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. *Burdine,* 450 U.S. at 254-55. If the defendant successfully rebuts the plaintiff's prima facie showing, the presumption of discrimination drops from the case, and plaintiff must present sufficient evidence for a reasonable factfinder to conclude "that the proffered reason was not the true reason for the employment decision." *Id.* at 256. *See also Bray v. Marriott Hotels,* 110 F.3d 986, 990 (3d Cir.1997) ("The plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination.").

> FN27. Title VII defines a "protected activity" as an instance when an employee has "opposed any practice made an unlawful employment practice by this subchapter, or ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

In the instant action, defendant argues that plaintiff has not established a prima facie case of retaliation because she did not engage in any protected activity after the late 1980s, nor has she established a link between the protected activity and defendant's adverse employment action. (D.I. 74 at 29-30) On the

contrary, the record indicates that plaintiff filed union grievances, an EEOC charge, a complaint with the Delaware Department of Labor, and various informal complaints in the late 1990s. (D.I.75) Furthermore, plaintiff has sufficiently stated a causal link between her protected activities and her termination by DSU. According to the Third Circuit, this causal link is "not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir.2000). Plaintiff alleges numerous instances of harassment, procedural violations and inconsistent evaluations by defendant after she filed her various complaints; therefore, a causal link can reasonably be inferred. Plaintiff has sufficiently stated a prima facie case of retaliation.

**\*10** The remaining analysis is similar to that of Title VII race and gender discrimination as stated above. The court concludes that there is sufficient evidence for a reasonable jury to find that the proffered reason for discharge was pretextual and that retaliation was the real reason for plaintiff's dismissal. Defendants' motion for summary judgment on the Title VII retaliation claim is denied.

**B. Sections 1981, 1983, 1985 and Civil Conspiracy Claims**

As an initial matter, the Eleventh Amendment limits the following claims against states and state officials to prospective injunctive relief. *See Edelman v. Jordan,* 415 U.S. 651 (1974). Since DSU is a state institution, [FN28] the following claims against DSU and defendants in their official capacities are limited to prospective injunctive relief.

> FN28. DSU is a corporation created and funded by the Delaware General Assembly, whose Board of Trustees is appointed by and includes the Governor. *See* Del.Code Ann. tit. 14, § 6501, *et seq.* Thus, DSU is an instrumentality of the State of Delaware for 11th Amendment purposes. *See also Chapman v. Trs. of Del. State Coll.,* 101 F.Supp. 441, 444 (D.Del.1951) (dismissing complaint because "a Federal Court should not interfere with The Trustees of Delaware State College, a state agency, which is a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

body corporate of the <u>State of Delaware</u>"); <u>Lewis v. Del. State Coll.,</u> 455 F.Supp. 239, 245 (D.Del.1978) (Delaware State College's personnel decisions "constituted state action within the meaning of the Fourteenth Amendment" to the United States Constitution).

1. <u>Section 1981</u> Claim

<u>Section 1981</u> prohibits race-based discrimination in the making and enforcement of contracts.[FN29] Claimants are required to prove intentional discrimination under the same burden-shifting framework used in Title VII cases. Therefore, plaintiff must first establish a prima facie case of discrimination by demonstrating that: (1) plaintiff is a member of a racial minority; (2) defendants intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in <u>Section 1981.</u> See <u>Lewis v. J.C. Penney Co.,</u> 948 F.Supp. 367, 371 (D.Del.1996). Upon a prima facie showing by plaintiff, the burden shifts to defendants to assert a "legitimate, nondiscriminatory" reason for their actions, which plaintiff may rebut with evidence of pretext. See <u>McDonnell Douglas,</u> 411 U.S. at 802.

FN29. <u>Section 1981,</u> as amended by the Civil Rights Act of 1991, provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."<u>42 U.S.C. § 1981(a).</u> The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."<u>42 U.S.C. § 1981(b).</u> These rights are protected from encroachment by both private and state actors. See<u>42 U.S.C. § 1981(c).</u>

As a member of a racial minority at a predominantly African-American university, plaintiff satisfies the first prong of the prima facie case. In order to show intentional discrimination under the second prong, plaintiff "must point to facts of record which, if proved, would 'establish that defendants' actions were racially motivated and intentionally discriminatory,' or, at least, 'support an inference that defendants intentionally and purposefully discriminated' against her on the basis of her race."<u>Ackaa v. Tommy Hilfiger Co.,</u> No. 96-8262, 1998 WL 136522, at *3 (E.D.Pa. Mar. 24, 1998) (citations omitted). Plaintiff's allegations that her black colleagues were treated differently, combined with defendants' inconsistent reasons for their denials of promotion and tenure, sufficiently support an inference of intentional racial discrimination. Finally, plaintiff satisfies the third prong of the prima facie showing because defendants' alleged discrimination resulted in plaintiff's dismissal from her tenured position at DSU.

The remaining analysis is similar to that under Title VII, thus, the court denies defendants' motion for summary judgment with regard to plaintiff's <u>Section 1981</u> claim.

2. <u>Section 1983</u> Claims

<u>Section 1983</u> imposes liability on any person who, under color of state law, deprives another of any rights secured by the Constitution or the laws of the United States. See<u>42 U.S.C. § 1983.</u> Specifically, plaintiff asserts that defendants' discriminatory actions violated her rights under the First Amendment and Equal Protection Clause of the Fourteenth Amendment. (D.I. 20 at A16)

*11 As an initial matter, the Eleventh Amendment bars <u>Section 1983</u> claims against state entities and state officials sued in their official capacities. See <u>Will v. Mich. Dep't of State Police,</u> 491 U.S. 58, 71 (1989). The court therefore grants summary judgment with respect to the <u>Section 1983</u> claims against DSU and defendants in their official capacities.

As for the claims against defendants in their individual capacities, the test for discriminatory intent under <u>Section 1983</u> is the same as that under Title VII. See <u>Stewart v. Rutgers, The State Univ.,</u> 120 F.3d 426, 432 (3d Cir.1997) (citation omitted). The court finds that there exist genuine issues of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

material fact as to whether defendants unconstitutionally discriminated against plaintiff so as to deprive her of her Fourteenth Amendment right to equal protection. Similarly, there is a genuine dispute as to whether defendants deprived plaintiff of her First Amendment right to petition by interfering with her right to file lawsuits and other grievances against defendants. Therefore, summary judgment is denied with respect to plaintiff's Section 1983 claims against defendants in their individual capacities.

3. Section 1985 and Civil Conspiracy Claims [FN30]

> FN30. Plaintiff asserts a claim under 42 U.S.C. § 1985 and a separate "civil conspiracy" claim which the parties later characterize in their briefs as pursuant to Sections 1983 and 1985. For efficiency purposes, the court considers these claims together.

Defendants argue that plaintiff has insufficiently pled her conspiracy claims and, therefore, they should be dismissed. To plead a cognizable Section 1985(3) claim, a plaintiff must allege facts to show a conspiracy for the purpose of depriving a person or class of persons of equal protection of the laws or equal privileges and immunities, and an act in furtherance of the conspiracy whereby a party is injured in his person or property or is deprived of a right or privilege of a citizen of the United States. See United Brotherhood of Carpenters & Joiners v. Scott, 463 U.S. 825, 829 (1983). Section 1985(3) prohibits only conspiracies predicated on "racial, or perhaps otherwise class-based, invidiously discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

In her complaint, plaintiff alleges that defendants perpetrated an unlawful scheme to "fabricate false claims and poor teaching against [her]; ... dismiss [her] due to her reporting the harassment by defendants; and ... terminate [her] in retaliation for having opposed defendants' practice of harassment."(D.I. 20 at A19) To support these claims, plaintiff states that her requests for review of her denial of promotion were ignored by several of the defendants, that the many enumerated instances of harassment by Flayhart were "administratively sanctioned," and that the acts of retaliation against her were "known, authorized, and approved by ...

DeLauder, Tisdale, Taylor, Tolliver and Flayhart."(D.I. 20 at A7-9). In alleging the various instances of harassment by Flayhart and the indifference of the DSU administration that ultimately led to her termination, plaintiff's complaint sufficiently states a claim for conspiracy under Section 1985(3). The court, therefore, denies summary judgment with respect to plaintiff's conspiracy claims.

C. Eleventh Amendment Immunity Against the ADEA and ADA Claims [FN31]

> FN31. Although the parties argue the merits of an Eleventh Amendment bar of the ADA claim, the court finds no such claim in the Complaint or Amended Complaint. Since both parties address the issue in their briefs, the court will address it as well.

*12 Plaintiff has conceded that her claims under the ADEA are barred by the Eleventh Amendment pursuant to the Supreme Court's decision in Kimel v. Florida Board of Regents, 120 S.Ct. 621 (2000). Although the issue of whether claims under the ADA against a state entity are barred by the Eleventh Amendment was not directly addressed by the Supreme Court, the Third Circuit has recently decided that they are so barred. See Lavia v. Pennsylvania Dept. of Corrections, No. 99-3863, 2000 WL 1121553, at *11 (3d Cir. Aug. 8, 2000) (holding that Congress did not abrogate states' Eleventh Amendment sovereign immunity when enacting the ADA). Therefore, the court grants defendants' motion for summary judgment with respect to both the ADEA and the ADA claims. [FN32]

> FN32. Plaintiff has conceded that there is no individual liability under the ADEA or the ADA. These claims are also barred against defendants in their official capacities pursuant to the Eleventh Amendment. See Hafer v. Melo, 502 U.S. 21, 26 (1991) (holding that when state official is sued in official capacity, real party in interest is government entity of which official is an agent).

D. State Law Claims

Plaintiff also alleges state law claims of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 13
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.))

discrimination based on race, gender and age in violation of the Delaware Discrimination in Employment Act, Del.Code Ann. tit. 19, § 710, *et seq.,* violation of the Delaware Constitution,[FN33] and common law breach of contract. Pendent state law claims against state entities and officers are barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984). Plaintiff may still bring these claims against defendants in their individual capacities, however. *See Lloyd v. Mich. Dep't of State Police,* 53 F.Supp.2d 643, 680 (D.Del.1999) (holding that Eleventh Amendment sovereign immunity is no defense to state law claims brought against state officials in their individual capacities). Therefore, the court grants summary judgment as to plaintiff's state law claims against DSU and the remaining defendants in their official capacities.

> FN33. Plaintiff mistakenly alleges a violation of Article XVI, Section 10 of the Delaware Constitution, which is a non-existent provision. The court assumes that plaintiff is alleging a violation of Article XV, Section 10, which provides, "No citizen of the State of Delaware shall be disqualified to hold and enjoy any office, or public trust, under the laws of this State, by reason of sex."

E. Statute of Limitations

Defendants argue that several of plaintiff's claims are barred by their respective statutes of limitations.[FN34] Although defendants are technically correct, the Third Circuit recognizes a continuing violation exception to the timely filing requirement. *See West v. Phila. Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995). Under this exception, a plaintiff may pursue a discrimination claim for "conduct that began prior to the filing period if [plaintiff] can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant."*Id.*"To successfully argue a continuing violation theory, the plaintiff will have to show a present violation, i.e., one within the statute of limitations period, that is reasonably related to previous discriminatory acts that, standing alone, would be barred by the statute of limitations."*Cuffy v. Getty Ref. & Mktg. Co.,* 648 F.Supp. 802, 810 (D.Del.1986).

> FN34. Defendants argue that certain of plaintiff's claims arising under Sections 1981 and 1983, Delaware's Discrimination in Employment Act, and Title VII are barred by their statutes of limitations. (D.I. 74 at 35) Specifically, defendants contend that plaintiff's claims based on her failure to be promoted to full professor in 1993, 1994, 1995 and 1996, as well as her failure to receive merit pay in 1995 and 1996, are time-barred. (*Id.*)

Plaintiff's termination on March 16, 2000 falls within the statute of limitations. That decision was based on a 51-page report by the DSU Ad Hoc Dismissal Committee that discussed plaintiff's entire fourteen-year history at DSU. (D.I. 75 at A349) Moreover, at every denial of promotion or tenure, defendants have cited the same reasons for their decisions. It is fair to say that plaintiff's alleged disparate treatment was continuous and ongoing during her employment at DSU. The court concludes that plaintiff's claims are sufficient to constitute a "pattern of discrimination" and are not barred by any statute of limitations.

V. CONCLUSION

*13 For the reasons stated, defendants' motion for summary judgment is denied in part and granted in part. An appropriate order shall issue.

D.Del.,2000.
McKay v. Delaware State University
Not Reported in F.Supp.2d, 2000 WL 1481018 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d               Page 1
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
**(Cite as: 2002 WL 335309 (D.Del.))**

**H**Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Dr. Kathleen CARTER, Plaintiff,
v.
DELAWARE STATE UNIVERSITY, Dr. William
B. Delauder, President, Dr. Johnny
Tolliver, Dean Jacquelyn W. Gorum, Dr. Aleta
Hannah and Delaware State
University Board of Trustees, Defendants.
**No. CIV.A.99-642 GMS.**

Feb. 27, 2002.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 On September 28, 1999, Dr. Kathleen Carter filed a complaint alleging that her employer, Delaware State University ("DSU"), and the above named defendants improperly denied her application for tenure at the university. Carter's complaint asserts various causes of action. Count One alleges race and gender discrimination under Title VII, 42 U.S.C. § 2000(e), *et seq.* Counts II and III allege causes of action under 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Count IV asserts claims under 42 U.S.C. §§ 1985 and 1986, as well as civil conspiracy. In Count V, Carter alleges that the defendants violated the Delaware Discrimination in Employment Act. Count VI asserts a violation of Fourteenth Amendment, based on a lack of due process in the tenure decision. Count VII alleges violations of the Delaware Constitution. Count VIII asserts breach of contract based on Carter's allegation that the defendants failed to adhere to the procedures in the collective bargaining agreement ("CBA"). Count IX alleges intentional infliction of emotional distress against all defendants. Finally, Count X requests punitive damages against all defendants.

Presently before the court are two motions--Carter's motion for partial summary judgment on Count VIII and the defendants' motion for summary judgment on all claims. In her motion for partial summary judgment, Carter asserts that the CBA clearly states that only "documented" evidence may be considered in granting or denying tenure. Carter argues that the defendants violated the terms of the CBA by considering oral, hearsay evidence in making their tenure decision. The defendants argue that Carter's claim is barred by the Eleventh Amendment's prohibition of pendent state law claims, or alternatively, that the CBA permits the consideration of oral evidence.

In their motion for summary judgment, the defendants assert that the remaining claims should be dismissed for various reasons. First, they argue that Count I should be dismissed because there is no direct evidence of racial or gender animus on the part of the university. Moreover, the defendants assert that there were valid, non-discriminatory reasons for the denial of tenure, such as Carter's deficiencies on certain projects. Second, the defendants assert that the Eleventh Amendment limits the claims under sections 1981, 1983, 1985, and 1986 to prospective injunctive relief against the individual defendants. The defendants further argue that the § 1983 claims should be dismissed because state officers cannot be sued in their official capacity under § 1983. Moreover, the defendants assert that the civil conspiracy claims under § 1985 and § 1986 should be dismissed because there is no racially motivated conspiracy, and a conspiracy cannot exist where only one state agency is implicated.

The defendants also assert that Counts V and VII are legally invalid. [FN1] The defendants defend Count VI by noting that there was no due process violation because Carter was not guaranteed tenure, and the tenure process is inherently subjective. The defendants argue that the court should dismiss the intentional infliction of emotional distress claim in Count IX because pendent state law claims against state entities are barred by the Eleventh Amendment. Finally, the defendants argue there is no malice present that would justify the award of punitive damages.

FN1. In her answering brief, the Plaintiff concedes that the claims under Counts V

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                      Page 2
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
(Cite as: 2002 WL 335309 (D.Del.))

and VII are invalid. (D.I. 107 at 33, 37.) Thus, summary judgment for the defendants is appropriate on these claims. The court will not, therefore, discuss these claims.

**\*2** Upon review of the briefs, the record, and the law, the court agrees with the defendants that certain of the claims should be dismissed. The court will, therefore, grant the defendants' motion for summary judgment for DSU on all claims. However, the court will only grant summary judgment for the individual defendants on Count I and Counts IV-X. Summary judgment is not appropriate for Counts II and III as to the individual defendants. Nevertheless, the court accepts the view of both parties that the § 1981 and § 1983 claims in Counts II and III must be limited to prospective injunctive relief. [FN2] Thus, after the grant of summary judgment, all that will remain are § 1981 and § 1983 claims against the individual defendants in their official capacities for prospective injunctive relief. The court will now explain the reasoning for its ruling.

> FN2. The plaintiff concedes that the claims under § 1981 and § 1983 are not viable against DSU and must be limited to prospective injunctive relief against the individual defendants. (D.I. 107 at 33 .)

## II. FACTS

In 1993, Dr. Kathleen Carter was hired as an Associate Professor of Education at DSU. DSU is a land grant college. It is, therefore, a public university operated by the State of Delaware. DSU is also a Historically Black College or University ("HBCU"). Thus, the majority of the administrators, faculty, and students at DSU are African American. Carter is white.

In 1995, Carter was appointed as chair of the DSU Education Department. According to Carter, several of her African American colleagues did not appreciate the fact that she, a white woman, was appointed to that position. Carter claims that she was told she was "usurping black persons' rights to govern themselves," and that she was "trying to make the black people [in the department] look bad." (D.I. 107 at 4.) Carter also alleges that Dr. Aleta Hannah accused her of polarizing the department along racial lines. Hannah alleges that during one department

meeting, Carter told all of the professors-- African American and white--that they should put everything in writing. Although Carter denies she made the statement, all parties agree that Hannah felt there was a racial overtone to the statement.

In September of 1995, Carter evaluated Hannah and the other professors in her department. Using a 1 to 5 scale, Carter gave Hannah a score of 3. Carter alleges that Hannah felt there was a racial bias involved in the evaluation.

At some point after the meeting and the evaluation, the six African American faculty members met and decided that Dr. Hannah should be chair. Dr. Hannah prepared an anonymous memo--"Concerns about the Chair." The memo listed several concerns about Carter's leadership. Carter's race is not mentioned in the memo. However, the memo does note the faculty's belief that Carter "fostere[d] dissension within the department, something along the lines of race." Soon after, Carter met with the dean of her school, Dr. Jacquelyne Gorum, who told Carter that she did not believe she was racist. The department then had a meeting to remove Carter as chair. Although Carter won the "no-confidence" vote, she resigned shortly thereafter.

**\*3** After a brief time with an interim chair, Hannah was appointed as chair. On October 15, 1997, with Dr. Hannah as chair, Carter filed her initial application for tenure. Hannah recommended Carter for tenure and promotion. Her application was then forwarded to the Departmental Promotion and Tenure Committee, which also recommended her for tenure, but not promotion. The application was then forwarded to Dean Gorum for review. Dean Gorum also recommended Carter for tenure. The application was then forwarded to Provost Johnny Toliver, who added his positive recommendation. The application was finally given to President DeLauder.

According to Carter, Hannah then met with President DeLauder multiple times, and gave the president negative information about Carter. Carter alleges that Hannah told DeLauder that Carter was difficult to work with and had said negative things about the university and the department to her students while class was in session. (Carter admits that statements were made regarding course scheduling and registration.) Additionally, Dr. Tossie Taylor told

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                          Page 3
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
(Cite as: 2002 WL 335309 (D.Del.))

DeLauder that Carter was perceived to be racist by some members of the department. DeLauder did not investigate these allegations, defendants state, because he felt there was no basis for the allegations. DeLauder maintains that the unfounded allegations of racism in no way influenced his review of Carter's application.

Also during this time, Dr. Tolliver told DeLauder that Carter's performance on the National Council for Accreditation of Teacher Education program ("NCATE") was insufficient. The NCATE committee was required to prepare an accreditation report for review. Dr. Tommy Frederick was the chair of the NCATE committee. Carter admits that the entire report--including her portion--was heavily criticized by a mock review board. Although Carter asserts that her portion received fewer criticisms, Frederick noted that Carter's portion of the accreditation report was inadequate and needed to be rewritten. Carter does not refute this fact.

DeLauder admits that he considered the statements of Frederick, Tolliver, Taylor, and Hannah. According to section 8.1.2 of the CBA, however, although value judgments are permissible in the tenure process and persons other than the candidate may be consulted, "documented evidence" must be used to support the decision. (D.I. 99, Ex. A at 22.) None of the statements DeLauder considered were placed in writing. Section 8.2.4 of the CBA further states that "where oral testimony contradicts written evaluations, the affected [tenure applicant] shall be informed of the unit testimony and given an opportunity to respond to it." (*Id.* at 24.) Carter was apparently not given an opportunity to respond to the statements of the other three professors.

In light of all of the evidence, including the oral statements of the three professors, DeLauder remanded--but did not deny--Carter's application for tenure. Upon remand, Hannah, Tolliver, and Gorum all reversed their positive recommendations, based in part on DeLauder's assurance that they could consider the totality of their experience with Carter. Carter was subsequently denied tenure. When Carter met with DeLauder, he informed her that his decision was based upon ineffective service as chair of her department, ineffective service on the NCATE committee, and the fact that she was rated as a "3" on her evaluation. Although these are the official

reasons, Carter alleges that DeLauder told Tolliver that tenure was denied because Carter said negative things about the university. Carter further asserts that the "3" she received on her evaluation was a direct product of Dr. Hannah's racism. Carter exhausted her appeals process at the university, and the decision to deny tenure was upheld. Carter subsequently filed this lawsuit.

III. STANDARD OF REVIEW

*4 Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir.1993)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir.1999).* The nonmoving party, however, must demonstrate the existence of a material fact--not mere allegations--supplying sufficient evidence for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir.1996)* (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir.1993)* (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson, 477 U.S. at 249-50.*

IV. DISCUSSION

The facts related above are either undisputed, or where disputed, the non-moving party's (Carter) verison of the facts. Nevertheless, the court concludes that, even accepting plaintiff's version of the facts as true, she cannot prevail as a matter of law on Count I or Counts IV-X. The court will discuss each of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
**(Cite as: 2002 WL 335309 (D.Del.))**

remaining claims in turn.

A. Count I--Title VII Racial and Gender Discrimination

Carter claims disparate treatment under Title VII. A case for racial discrimination under Title VII can be made in one of two ways. In the *PriceWaterhouse* analysis, a plaintiff must produce direct evidence that race was a motivating factor in the employment decision. *See Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Nixon v. Runyon,* 856 F.Supp. 977, 983 (E.D.Pa.1994).

Carter has not proven that race was directly involved in her tenure decision. Although Carter alleges that she has direct evidence to prove that both Hannah and DeLauder were racist, the record does not support her contention. Carter urges that the court should find DeLauder was racist because he believed Hannah--an African American woman--over Carter and because he failed to investigate the allegations by Dr. Taylor that Carter was racist. Carter maintains that had he investigated, he would have discovered that Hannah was the true racist. First, as noted above, direct evidence does not permit inferences. It is a large leap of logic to conclude that DeLauder believed Hannah simply because she is African American. There are a number of reasons why a person might believe another person, and there is scant evidence in this record to support the conclusion that race was the only factor--if it was a factor at all--in DeLauder's decision to credit Hannah's statements. Moreover, the fact that DeLauder did not investigate the allegations of racism against Carter does not prove that he is a racist. He simply could have believed that the allegations were unfounded. [FN3] Again, direct evidence does not permit speculation, and there are any number of non-racial reasons why DeLauder might have declined to investigate. [FN4]

> FN3. In fact, if DeLauder wanted to show true racial animus, he could have used the allegations of racism as a slim excuse to launch into a wholesale investigation of Carter, discredit her, and dredge up reasons to deny her tenure, if that was his goal. Rather, DeLauder wisely decided to take

with a grain of salt allegations from faculty that apparently had difficult experiences with Carter.

> FN4. Moreover, even if DeLauder had investigated the allegations as Carter suggests he should have, there is no guarantee that he would have "uncovered" Hannah's racism as Carter suggests. His focus would have been on *Carter's* alleged racism, not Hannah's. Any discovery of bigotry on Hannah's part would likely have been fortuitous, at best.

*5 Carter has similarly failed to present direct evidence of Hannah's racism. The gist of Carter's allegation against Hannah rests on the fact that Hannah interpreted Carter's alleged statements regarding "putting things in writing" as racist. Carter alleges that Hannah's interpretation was unreasonable and "shows that Hannah's primary focus when considering Carter was her race." (D.I. 107 at 23.) Hannah's interpretation of Carter's words cannot be considered direct evidence that she harbored racism animus. The court supposes that it is possible that one might infer that simply because an individual identifies a particular trait or tendacy in another, they must also possess that trait or tendancy. Again, however, this would only be an inference--and, perhaps, an unreasonable one at that. Moreover, it seems entirely reasonable that a person might be able to point out the racism of another without being racist herself. Thus, Carter's argument is logically flawed because, if accepted, it would mean that an employer could never take a bigoted employee to task about his or her behavior without running afoul of Title VII. This is a result that the court is unwilling to sanction. [FN5]

> FN5. The court notes that Carter's brief focuses solely on racial discrimination and that the record is completely devoid of any facts that would permit the court to conclude that gender was implicated here. For instance, Carter has not alleged that white men or other non-African American men were promoted while she was not. (The only man she mentions is also African American.) Carter has also failed to provide one shred of evidence that would permit the court to properly conclude that any of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
(Cite as: 2002 WL 335309 (D.Del.))

parties involved considered gender in their decision making process. Therefore, summary judgment on the gender discrimination claims under Title VII is appropriate.

Finally, Carter asserts that the fact that four white women left the department during Hannah's term as chair is direct evidence of Hannah's racism. The record contains no testimony from any of these women regarding their relationship with Dr. Hannah. The only evidence on this point is Carter's affidavit. However, in her own affidavit, Carter acknowledges that one of the professors retired, another professor was denied tenure, and another did not want to accept the assignment Hannah gave her upon return from sabbatical. (D.I. 108 at B-120.) Carter has failed to adduce any evidence of record that demonstrates that any of these women's decisions were directly influenced by Hannah in any way whatsoever--proper or improper. Thus, Carter is essentially asking the court to assume that Hannah was motivated by racism and that these white professors left as a result of that racism. The court is not permitted to, and will not, assume that Hannah's actions were racist in the absence of direct evidence, which Carter has failed to provide. For all of the foregoing reasons, Carter has failed to demonstrate direct evidence of racial animus. [FN6]

FN6. The court further notes that Carter's brief is completely devoid of authority that would permit the court to find that either DeLauder or Hannah's actions were racially motivated.

Alternatively, under the *McDonell-Douglas* analysis, the plaintiff can attempt to demonstrate, through indirect evidence, that the defendants' actions were racially motivated. Under the *McDonell-Douglas*, or "pretext" framework, Carter must first establish a prima facie case of disparate treatment. To prove a prima facie case, Carter must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) she was subject to an unfavorable employment action "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Industries, Inc.,*56 F.3d 491, 494 (3rd Cir.1995). Once Carter has established this, "the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory

reasons for its employment decision." *Id.* If the DSU defendants can offer such a non-discriminatory reason, "the presumption of discrimination created by establishment of the prima facie case is dispelled, and the plaintiff must prove that the employer's proffered reason or reasons were pretextual--that is, that they are false and that the real reason for the employment decision was discriminatory." *Id.*

*6 The Court will assume that Carter can make out her prima facie case. Thus, the burden shifts to DSU to demonstrate non-discriminatory reasons for the decision. At least four reasons were given for the denial of Carter's tenure; her ineffectiveness as department chair, her unfavorable classroom commentary on the university, her ineffectiveness on the NCATE committee, and her neutral evaluation. These reasons have nothing to do with Carter's race in particular, and would be relevant to the tenure of a candidate of any race. Thus, DSU has provided non-discriminatory reasons for its decision.

Since DSU has provided non-discriminatory reasons, Carter must demonstrate that DSU's explanations were false, and the decision was actually improperly motivated by racial considerations. Carter has failed to do so. Carter alleges that pretext can be found based upon: (1) the fact that DeLauder inappropriately considered her service as department chair; (2) DeLauder's conflicting reasons for denying tenure; (3) the fact that African Americans were tenured with performance evaluations similar to hers; (4) the fact that Dr. Hannah acted with racial animus in evaluating her; and (5) the fact that the president lauded her for her participation on the NCATE committee, and then "reversed himself."

First, the court will accept Carter's contention that DeLauder could not consider her service as chair. [FN7] The court might be concerned if this were the only basis for the denial of tenure. However, DeLauder considered at least three other factors in making his decision. Second, the mere fact that DeLauder asserted three reasons for the denial of tenure to Carter and allegedly added another in a conversation Tolliver will not--standing alone--create pretext. This is so because Carter has yet to prove that any of the reasons are related to her race, or that these factors could not properly be taken into consideration when evaluating an African American candidate.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
(Cite as: 2002 WL 335309 (D.Del.))

FN7. The court will accept this contention although it is based upon deposition testimony and not a written university policy. (D.I. 108 at B-77.)

Third, Carter's contention that African Americans with similar evaluations were tenured is without merit. Assuming that Carter's allegations are true, the fact that an equally qualified candidate--or even a less qualified candidate-- was promoted while she was not is insufficient to support a finding of pretext. See e.g., Odom v. Frank, 3 F.3d 839, 845 (5th Cir.1993) ("Generally, a court's belief that an unprotected applicant who has been promoted is less qualified than a protected applicant who has been passed over, will not, in and of itself support a finding of pretext for discrimination."); Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir.1988) (same). Moreover, as defendants point out, tenure is not an entirely objective process. Both parties agree that the tenure process also contains a subjective element. Indeed, the CBA clearly states that judgmental factors may be considered. (D.I. 99, Ex. A at 24.) The CBA further states that "[p]romotion and tenure are not automatic." (Id. at 23). Thus, assuming Carter met all of the objective criteria, DSU was not obligated to grant her tenure. It was free to base its decision on subjective criteria.

*7 Fourth, there is no reason to believe that Dr. Hannah's evaluation of Dr. Carter was racially motived. If Carter was given an exceedingly poor evaluation, a "1" or a "2" perhaps, the court might be inclined to consider whether racial animus was involved. However, all parties agree that an evaluation of "3" is considered neutral. An evaluation is an inherently subjective mechanism, and Carter has failed to demonstrate that DSU evaluations were based on objective criteria. Moreover, Carter has failed to demonstrate why the "3" was deserved or undeserved. The court did not work with Dr. Carter on a daily basis. Thus, in the absence of some evidence to suggest that the "3" was clearly unwarranted, and therefore may have been racially motivated, the court will not second guess Hannah's assessment. Most important, Carter herself admits that persons with neutral, "3" evaluations were tenured. In light of this fact, Hannah's neutral evaluation cannot be considered as a deliberate attempt to hinder Carter's career at the university

based on her race.

Finally, the fact that President DeLauder commended Carter on her NCATE efforts does not outweigh the fact that her end product was apparently inadequate. If DeLauder's letters had expressly commented on the quality of Carter's work, or if he had supervised her on the project, the court might take his "reversal" more seriously. However, the facts do not indicate that DeLauder worked with, supervised, or otherwise had reason to know of the allegedly defective nature of the plaintiff's work product. At the time he was writing his note of thanks, he had no reason to know that Dr. Frederick had to re-write Carter's portion of the project. Once DeLauder was made aware of this information, he changed his recommendation. Thus, DeLauder's changed assessment was based upon newly acquired--and relevant--information, rather than racial bias . [FN8]

FN8. The court notes that Dr. Hannah's work on the NCATE project was also criticized, as was the work of the entire NCATE committee. However, what distinguishes Carter from Hannah is that there is no record evidence indicating that Hannah's portion had to be completely rewritten as was Carter's.

In sum, the court concludes based on the record before it, there is no direct evidence of racial animus. Furthermore, DSU has provided non-discriminatory reasons for its tenure decision. Carter has failed to prove that these reasons were a mere pretext. Thus, she has also failed to prove indirect racial animus. Therefore, the court will grant summary judgment for the defendants on this claim.

B. Counts II, III, and IV--Section 1981, Section 1983, Section 1985, Section 1986 and Civil Conspiracy

The plaintiff concedes that the Eleventh Amendment prevents her from suing DSU on any of the statutory claims. The court will, therefore, grant summary judgment for DSU on these claims. However, the Eleventh Amendment will not prevent Carter from obtaining prospective, injunctive relief against the individual defendants in their official capacity. The court must therefore determine whether the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-00117-MPT    Document 77-2    Filed 05/30/2008    Page 50 of 74

Not Reported in F.Supp.2d                                          Page 7
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
**(Cite as: 2002 WL 335309 (D.Del.))**

individual defendants are entitled to summary judgment on any of these claims. [FN9]

> FN9. The individual defendants have not moved for summary judgment on the section 1981 claims. Thus, the court will not discuss this claim or grant summary judgment for the defendants on this claim.

1. Section 1983

The § 1983 claims are not barred. The Eleventh Amendment bars § 1983 claims against state entities and state officials sued in their official capacity. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). This is because only "persons" can be sued under § 1983, and the state is not considered a person. However, where the plaintiff is seeking prospective injunctive relief against defendants in their official capacities, the defendant will be considered a person. *See id.* n. 10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State."). In the present case, the parties agree that the § 1983 claim is for prospective injunctive relief against the defendants in their official capacity. Thus, according to the Supreme Court's reasoning in *Will*, those claims should be allowed to proceed. The court will, therefore, deny summary judgment on this claim.

2. Section 1985, Section 1986 & Civil Conspiracy

*8 The defendants are entitled to summary judgment on the § 1985, § 1986, and civil conspiracy claims. At the outset, the court notes that if there is no violation of § 1985, there can be no violation of § 1986. *See* 42 U.S.C. § 1986 (limiting liability to those who fail to prevent any of the wrongs "mentioned in section 1985 of this title."). *See also Boykin v. Bloomsburg University of Pennsylvania*, 893 F.Supp. 409, 418 (M.D.Pa.1995) (noting that § 1986 violation is premised on violation of § 1985). Similarly, if neither of these statutes are implicated, the claim for civil conspiracy must be dismissed because civil conspiracy claims cannot stand alone without some independent statutory violation. *See Phoenix Canada Oil Co. Ltd. v. Texaco Inc.*, 560 F.Supp. 1372, 1388 (D.Del.1983) ("Delaware courts do not recognize independent actions for civil conspiracies."); *Parfi*

*Holding AB v. Mirror Image Internet, Inc.*, 2001 WL 1671441, at *18 (Del.Ch. Dec 20, 2001) ("Civil conspiracy is not an independent cause of action, but requires proof of underlying wrong that would be actionable absent conspiracy."). Since the viability of all three claims turns on the validity of the § 1985 claim, the court will focus on that issue.

The § 1985 claim is not viable for two reasons. First, assuming that Carter could prove that a conspiracy took place, "a conspiracy claim [under § 1985] requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals." *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1370 (W.D.Pa.1977). Additionally, that intentional discrimination must occur on the basis of an impermissible criterion such as race or gender. *See id.* (noting that gender is an acceptable form of animus). For the reasons discussed above, however, Carter has failed to clearly demonstrate that racial animus motivated the defendants' decision. Since Carter cannot meet this burden, her claim must fail.

Additionally, assuming Carter could prove a racially motivated conspiracy, in order to be actionable under § 1985, a conspiracy must involve more than one state or private agency. *See id.* ("[A] person cannot conspire with himself and therefore for the agents of a single corporation to conspire among themselves and not with outsiders does not state a cause of action under 1985(3).") *Id.* In the present case, each of the defendants is a member of the same institution--DSU. There are no allegations that other state officials or private persons were involved in this alleged conspiracy. Therefore, the court finds that the defendants are entitled to summary judgment on the § 1985 claim, as well as the § 1986 and civil conspiracy claims.

C. Count VI--Fourteenth Amendment/Due Process

The gist of Carter's claim is that DSU failed to follow established procedure, and in so doing deprived her of constitutional due process rights. Again, Carter's claim must fail. As the Carter notes, in order to establish a procedural due process violation, she must prove that she was objectively entitled to tenure and did not merely have an expectation of promotion. Carter cites *Gronowicz v. Pennsylvania State University*, No. 97-656, 1997 WL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
**(Cite as: 2002 WL 335309 (D.Del.))**

799438 (E.D.Pa.1997), in support of her argument.

**\*9** The record does not reveal that Carter was objectively entitled to tenure. The defendants point out that the *Gronowicz* court also stated that a plaintiff must demonstrate that "the procedures at issue so limit the University's discretion that he was objectively entitled to tenure and did not merely subjectively expect a promotion." *Id.* at *5. As previously noted, the DSU tenure process permitted subjective, judgmental decisions. Again, the CBA specifically mentions judgmental factors and notes that "promotion and tenure are not automatic." (D.I. 99, Ex. A at 23). Thus, the court cannot conclude that the DSU tenure process was so objective as to give plaintiff more than a mere, subjective expectancy of tenure. The court will, therefore, grant summary judgment on this issue.

D.  Count VIII--Breach of Contract Count IX--Intentional Infliction of Emotional Distress

Counts VIII and IX will be considered together because they present the same issue--namely whether state law claims such as breach of contract and intentional infliction of emotional distress are barred by the Eleventh Amendment. The court concludes that they are. As the defendants note, "**pendent state law claims against state entities and officers are barred by the Eleventh Amendment.**" *McKay v. Delaware State University, C.A.No. 99-219, 2000 WL 1481018, at \*12 (D.Del. Sept. 29, 2000)*. The claims for intentional infliction of emotional distress and breach of contract clearly arise under state law. Although plaintiff asserts that the Eleventh Amendment will not bar prospective injunctive relief on these claims, a district court may only order prospective injunctive relief for claims arising under the Constitution or a federal statute. *See Halderman v. Pennhurst State School & Hospital, 673 F.2d 647, 656 (3d Cir.1982)*, rev'd on other grounds, 456 U.S. 89 (1984) ("[The] Eleventh Amendment is no bar to the prospective injunctive relief which was ordered by the district court insofar as that relief is predicated on *constitutional* or *federal statutory* claims.") (emphasis added). As previously mentioned, these claims do not arise under federal statutory or constitutional law, and therefore do not fit into this narrow exception. Thus, the court will grant summary judgment for all defendants on both claims. [FN10]

FN10. The court notes that Carter suggests that there has been insufficient discovery and therefore, the defendants' motion for summary judgment is premature. Although a court can reserve judgment on a motion for summary judgment under Federal Rule of Civil Procedure 56(f), the party seeking such relief must request present affidavits to the court explaining why further discovery is necessary. *See Mid-South Grizzliesv. National Football League, 720 F.2d 772, 779 (3d Cir.1983)* ("Where Rule 56(f) affidavits have been filed, setting forth specific reasons why the moving party's affidavits in support of a motion for summary judgment cannot be responded to, and the facts are in the possession of the moving party, we have held that a continuance of the motion for purposes of discovery should be granted almost as a matter of course."). In the present case, Carter has failed to submit affidavits demonstrating why more discovery is necessary. Thus, the court sees no bar to the grant of summary judgment.

E.  Count X--Punitive Damages

Carter is not eligible for punitive damages. As the defendants noted, in order to recover punitive damages, Carter must show that DSU and the defendants "acted with malice or reckless indifference to [her] federally protected rights." *Lafate v. Chase Manhattan Bank (USA), 123 F.Supp.2d 773, 784 (D.Del.2000)*. The record is devoid of any facts that would permit the court to find that the defendants acted maliciously. In fact, Carter did not brief this issue, and therefore has failed to direct the court to facts that would support a finding of malice. A careful review of the record shows that it does not support a finding that the defendants acted with racial animus, and thus purposefully deprive Carter of her constitutional rights. Therefore, Carter cannot recover punitive damages.

V. CONCLUSION

**\*10** For all of the foregoing reasons, Carter's motion for summary judgment is denied. The court will, therefore, grant summary judgment for all defendants

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 335309 (D.Del.)
(Cite as: 2002 WL 335309 (D.Del.))

Page 9

on Count I and Counts IV-X. Although DSU is also entitled to summary judgment on Counts II and III, the court will deny summary judgment on those claims as to the individual defendants. Nevertheless, the § 1981 and § 1983 claims in Counts II and III will be limited to prospective injunctive relief against the individual defendants in their official capacities.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. The plaintiff's Motion for Partial Summary Judgment (D.I.98) is DENIED;

2. The defendant's Motion for Summary Judgment (D.I.95) is GRANTED in part and DENIED in part;

3. Summary Judgment BE AND HEREBY IS ENTERED in favor of the defendant Delaware State University on all claims;

4. Summary Judgment BE AND HEREBY IS ENTERED in favor of the defendants DeLauder, Tolliver, Hannah, and Gorum, the Board of Trustees on all claims EXCEPT the section 1981 claims stated in Count II of the complaint and the section 1983 claims stated in Count III of the complaint;

5. The claims in Count II and Count III will be limited to prospective injunctive relief.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

65 Fed.Appx. 397                                                          Page 1
65 Fed.Appx. 397, 2003 WL 1879258 (C.A.3 (Del.))
**(Cite as: 65 Fed.Appx. 397, 2003 WL 1879258 (C.A.3 (Del.)))**

**H**Carter v. DelawareStateUniversity
C.A.3 (Del.),2003.
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please use
FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
Dr. Kathleen CARTER, Appellant.
v.
**DELAWARESTATEUNIVERSITY; Dr. William
B. Delauder, President; Dr. Johnny Tolliver; Dean
Jacqueline W. Gorum; Dr. Aleta Hannah; and
DelawareStateUniversity Board of Trustees.**
**No. 02-1918.**

Submitted under Third Circuit LAR 34.1(a) Jan. 16,
2003.
Decided April 16, 2003.

On Appeal from the United States District Court for
the District of Delaware. (C.A. No. 99-cv-642).
District Judge: The Honorable <u>Gregory M. Sleet</u>.

Before <u>ROTH</u>, FUENTES and <u>ALDISERT</u>, Circuit
Judges.

OPINION OF THE COURT

<u>ALDISERT</u>, Circuit Judge.
**\*\*1** Dr. Kathleen Carter appeals from summary
judgment    entered    in    favor    of
**DelawareStateUniversity** ("DSU") and several of its
officers including its President, its Dean and the
members of the Board of Trustees. In her complaint,
Dr. Carter asserted race discrimination claims under
Title VII, <u>42 U.S.C. §§ 1981</u>, <u>1983</u>, <u>1985</u> and <u>1986</u>.

The parties are familiar with the facts and the district
court proceeding.

**\*398** Accordingly, we will primarily address the
legal issues presented.

I.

DSU is a land-grant college and therefore a public
university operated by the state. It is a historically
black institution, and thus the majority of
administrators, faculty and students are African
Americans. Dr. Carter, a white female, was hired in
1993 as Associate Professor of Education and
Director of the Vocational and Teacher Education
Program in the Education Department at DSU. In
1995, she accepted an appointment as Chair of the
DSU Education Department. She alleges that several
of her African American colleagues in the Education
Department did not appreciate this appointment and
the subsequent racial tension led to the denial of her
tenure application. It is the denial of tenure that
undergirds her complaint against the University.

It appears that when Dr. Carter's application for
tenure was originally considered by the University's
President, Dr. William H. DeLauder, it was not
summarily denied but rather remanded to various
stages of the tenure application process for further
consideration. Upon remand, Professors Aleta
Hannah and Jacqueline W. Gorum, along with
University Provost and Vice President for Academic
Affairs Johnny Tolliver, reversed their previous
favorable recommendations, which had been based
upon a mistaken belief that they were not permitted
to consider their personal judgments of what they
considered to be Dr. Carter's ineffective service to
DSU.

Dr. DeLauder's later reconsideration resulted in a
denial of her application for tenure based upon
ineffective service as chair of her department,
ineffective service in pursuit of accreditation by the
National Conference on Accreditation of Teacher
Education ("NCATE") and deficient results of
performance evaluations. Dr. Carter, however,
alleges that her tenure application was denied
because of her ethnicity and that Dr. DeLauder's
stated reasons were pretextual. Dr. Carter exhausted
University grievance procedures before filing this
lawsuit.

She concedes that the Eleventh Amendment prevents
her from suing DSU on any of the statutory claims.
App. at 34a; *see also*<u>*Will v. Mich. Dep't of State*</u>

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

65 Fed.Appx. 397                                                    Page 2
65 Fed.Appx. 397, 2003 WL 1879258 (C.A.3 (Del.))
**(Cite as: 65 Fed.Appx. 397, 2003 WL 1879258 (C.A.3 (Del.)))**

*Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

## II.

In granting summary judgment in favor of the Defendants on the Title VII racial and gender discrimination claim, the district court concluded:

Carter has not proven that race was directly involved in her tenure decision. Although Carter alleges that she has direct evidence to prove that both Hanna and DeLauder were racist, the record does not support her contention. Carter urges that the court should find DeLauder was racist because he believed Hanna-an African American woman-over Carter and because he failed to investigate the allegations by Dr. Taylor that Carter was racist ... It is a large leap of logic to conclude that DeLauder believed Hanna simply because she is an African American. There are a number of reasons why a person might believe another person, and there is scant evidence in this record to support the conclusion that race was the only factor-if it was a factor at all-in DeLauder's decision to credit Hannah's statements. Moreover, the fact that Delauder did not investigate the allegations of racism against Carter does not prove that he is *399 a racist. He simply could have believed that the allegations were unfounded.

* * * * * *

**\*\*2** Carter has similarly failed to present direct evidence of Hannah's racism ... The Court is not permitted to, and will not, assume that [any of] Hannah's actions were racist in the absence of direct evidence, which Carter has failed to provide.

*Carter v. Del. State Univ.,* No. 99-642, 8-10 (D.Del. Mar. 21, 2001) (Memorandum and Order), *reprinted in* App. at 28a-30a.

The court then applied the *McDonnell Douglas* paradigm in dismissing Dr. Carter's attempt to utilize indirect evidence to illustrate Defendants' actions were racially motivated. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court understood Dr. Carter to make out a prime facie case. Once Dr. Carter was deemed to have established this, the burden shifted to DSU to

"articulate one or more legitimate, non-discriminatory reasons for its employment decision." *Waldron v. SL Indus.,* 56 F.3d 491, 494 (3d Cir.1995).

The court properly held that DSU provided several non-discriminatory reasons for its decision-all of which would be relevant to the tenure application of a candidate of any race. Dr. Carter refutes these reasons with a claim of pretext based upon contentions that: (1) Dr. DeLauder inappropriately considered her service as department chair; (2) Dr. DeLauder's conflicting reasons for denying tenure; (3) African Americans were tenured with performance evaluations similar to hers; (4) Dr. Hannah acted with racial animus in her evaluations; and (5) Dr. DeLauder had previously lauded her for her participation on the NCATE committee and then reversed himself. The district court determined that Dr. Carter failed to prove racial animus. Our review of the record persuades us that the district court did not err and we will affirm that portion of the judgment relating to Title VII.

## III.

**\*\*3** The parties have agreed that the § 1981 claim is not viable in light of the court's ruling-and now our affirmance-of the Title VII claim.

## IV.

Defendants were properly granted summary judgment on the § 1983 claim. To establish that Dr. Carter was denied tenure in retaliation for exercising her First Amendment rights, she must demonstrate that: (1) her speech was protected; and (2) her protected speech was a substantial or motivating factor behind the alleged retaliation. *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.1997). If these two elements are satisfied, the burden will shift to the Defendants to demonstrate that the same action would have been taken if the speech had not occurred. *Id.*

The court found that Dr. Carter's speech-criticism of DSU's scheduling policies-was both entitled to First Amendment protection and a substantial or motivating factor in the Defendant's decision to deny tenure. The court then found that Defendants carried their burden of demonstrating by a preponderance of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

65 Fed.Appx. 397                                                                    Page 3
65 Fed.Appx. 397, 2003 WL 1879258 (C.A.3 (Del.))
(Cite as: 65 Fed.Appx. 397, 2003 WL 1879258 (C.A.3 (Del.)))

the evidence that they would have taken the same action in the absence of the protected conduct.

Dr. Carter did not provide any facts to rebut the assertions that her evaluations were neutral and that her performance on the NCATE committee was inadequate. Therefore, we conclude there was no impediment to the court's granting of summary judgment in favor of the Defendants on this claim.

*400 V.

The Defendants were entitled to summary judgment on the §§ 1985, 1986 and civil conspiracy claims. The court properly noted that if there is no violation of § 1985, there can be no violation of § 1986 because both claims turn on allegations contained in § 1985. Similarly, if neither of these statutory claims are implicated, the claim for civil conspiracy must be dismissed because civil conspiracy claims cannot stand alone without some independent statutory violation. Accordingly, the court properly focused on the § 1985 claim.

The § 1985 claim fails for two reasons. First, assuming Dr. Carter could prove a conspiracy took place, "a conspiracy claim [under § 1985] requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals." *Robinson v. McCorkle,* 462 F.2d 111, 113 (3d Cir.1972). For the reasons stated above, however, Dr. Carter has failed to clearly demonstrate that racial animus motivated the Defendants' decision. Second, under § 1985 a conspiracy must involve more than one state or private agency. *Johnson v. Univ. of Pittsburgh,* 435 F.Supp. 1328, 1370 (W.D.Pa.1977). In the present case, each of the Defendants is a member of the same institution-DSU.

VI.

Dr. Carter's claim of deprivation of procedural due process turns on a showing that she was objectively entitled to tenure and did not merely have an expectation of promotion. The record does not support such a finding and the summary judgement was properly granted in favor of the Defendants.

VII.

**4 Dr. Carter's claims for breach of contract and intentional infliction of emotional distress were properly barred by the Eleventh Amendment. *McKay v. Del. State Univ.,* No. 99-219-SLR, 2000 WL 1481018, at *12 (D.Del. Sept. 29, 2000).

* * * * * *

We have considered all of the arguments advanced by the parties and conclude that no further discussion is necessary.

The judgment of the district court will be affirmed.

C.A.3 (Del.),2003.
Carter v. Delaware State University
65 Fed.Appx. 397, 2003 WL 1879258 (C.A.3 (Del.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2008 WL 691694                                                    Page 1
--- F.Supp.2d ----, 2008 WL 691694 (D.Conn.)
**(Cite as: 2008 WL 691694 (D.Conn.))**

**C**Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
David LEVARGE, as next friend on behalf of T.L.,
Plaintiff,
v.
PRESTON BOARD OF EDUCATION, Janet
Robinson, Anna Sobanski, Defendants.
**No. 3:05 CV 262(CFD).**

March 11, 2008.

John R. Williams, Katrena K. Engstrom, Williams &
Pattis, New Haven, CT, for Plaintiff.

Andrew M. Dewey, Claudia A. Baio, James A.
Mongillo, Baio & Associates, Rocky Hill, CT, for
Defendants.

*RULING ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT*

CHRISTOPHER F. DRONEY, District Judge.

**\*1** The plaintiff, David LeVarge, brings this action
on behalf of his son, T.L., a former student at the
Poquetanuck School __[FN1]__ in the Preston School
District. LeVarge alleges that the defendants, the
Preston Board of Education, Superintendent of
Schools Janet Robinson, and Principal Anna
Sobanski discriminated against T.L. on the basis of
gender in violation of Title IX of the Educational
Amendments of 1972, 20 U.S.C. § 1681, et seq., and
brings a claim for denial of due process and equal
protection under 42 U.S.C. § 1983. LeVarge also
alleges state law claims of negligent and intentional
infliction of emotional distress and failure to protect
T.L. from bullying. The defendants move for
summary judgment.

*I. Background*

On March 4, 2004, T.L., then nine years old, said to
another boy at his school lunch table "Do you love
me? I love you. __[FN2]__" According to Principal
Sobanski, she learned that T.L. said this repeatedly
and refused to stop at the other child's request. In

response, the child threw food at T.L. According to
Sobanski, T.L. reported the food-throwing to adults
who moved the child to another table. Sobanski
maintains that T.L began laughing and boasting that
he had gotten the other child in trouble. According to
Sobanski, the other child responded by calling T.L.
"gay" and encouraging another student to do the
same. According to Sobanski, both of these children
went to her office and were punished by being "sent
to the fence" during recess.

After she learned of the incident, Sobanski spoke
with all of the children involved. T.L. reported two
versions of the incident during his meeting with
Sobanski. According to Sobanski, T.L. initially
reported that he had been talking to himself and had
not directed his words to the other child. Sobanski
maintains that T.L.'s first account "would have put
blame on the other children for something that was
not true." According to Sobanski, she instructed T.L.
to write a note to his parents explaining that he had
not been forthright with her. T.L. wrote the following
note:

> Dear Mom and Dad,
> Today I said on perpis [sic] I said "Do you love me
> Connor." And it was very bad and I hope that you
> will forgive me. And you can punish me if you
> want to.
> from
> [T.L.]

Sobanski added the following note:

> [T.L.]'s verbal actions caused others to tease him.
> He then laughed for getting someone into trouble
> and did not tell me the truth the first time--he tried
> to blame the other child.

Sobanski denies that she had any conversation with
T.L. about homosexuality, __[FN3]__ or that T.L was
asked to write the note for any reason other than to
explain that he was not immediately forthright.

After this incident, LeVarge kept T.L. home from
school until March 22. When he returned to school,
Jeff Thimms, the school psychologist, checked on
T.L., but provided no counseling. According to
Sobanski, T.L. never sought out Thimms for
counseling.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2008 WL 691694                                                                                                          Page 2
--- F.Supp.2d ----, 2008 WL 691694 (D.Conn.)
**(Cite as: 2008 WL 691694 (D.Conn.))**

LeVarge also objects to a claimed Preston School policy concerning adult supervision of the school restrooms. LeVarge claims that boys and girls are escorted to the restrooms differently: that female teachers enter the boys' rooms with the students, but male teachers do not enter the girls' rooms. According to Sobanski however, all students are accompanied to the restroom by both male and female faculty. Faculty members wait outside of the restroom for students, but knock and open the door if needed to address students who are "playing around." [FN4]

**\*2** The complaint also contains allegations concerning an incident in November 2003. According to the complaint, T.L. was suspended after three female classmates complained that he had sexually molested them. The complaint further alleges that in April 2004 the female students admitted that they had lied because they "wanted to get T.L. in trouble." Neither party has submitted any evidence concerning this incident. [FN5]

## II. *Standard of Review*

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *accord Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. *Celotex,* 477 U.S. at 323-25; *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 95 (2d Cir.1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving

party must provide enough evidence to support a jury verdict in its favor. *Anderson,* 477 U.S. at 248; *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). A plaintiff may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Similarly, a plaintiff, as the nonmovant, may not rest "upon the mere allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex,* 477 U.S. at 323. When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir .1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d at 982.

## III. *Discussion*

### A. *Discrimination*

**\*3** LeVarge argues that the November 2003 and March 2004 incidents, and the policy concerning supervision of the restrooms created a sexually hostile educational environment in violation of Title IX. [FN6] LeVarge also argues that he was treated differently as a result of his gender and perceived sexual-orientation in violation of the Equal Protection clause of the Fourteenth Amendment. [FN7]

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ." 20 U.S.C. § 1681(a). " 'Discrimination' for purposes of Title IX liability, is not limited to disparate provision of programs, aid, benefits or services or inequitable application of rules or sanctions. It has, instead, been recognized as also encompassing teacher-on-student [and student-on-student] hostile educational environment sexual harassment." *Hayut v. State University of New York,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

352 F.3d 733, 750 (2d. Cir.2003) (internal citation omitted); *see also* Franklin, 503 U.S. at 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (holding that teacher's sexual harassment of student constitutes "discrimination" on the basis of sex).

Hostile educational environment claims, whether brought under Title IX or § 1983, are governed by traditional Title VII "hostile environment" jurisprudence. [FN8]*Hayut v. State University of New York*, 352 F.3d 733, 744 -745 (2d Cir.2003); *see also* Lovell v. Comsewogue School Dist., 214 F.Supp.2d 319, 323 (E.D.N.Y.2002) (holding that harassment based on sexual orientation is a basis for an equal protection claim under Section 1983). As a result, surviving summary judgment on a hostile educational environment claim "**requires evidence not only that the victim subjectively perceived the environment to be hostile or abusive, but also that the environment was objectively hostile and abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions**" of the victim's educational environment. *Hayut v. State University of New York*, 352 F.3d at 744 -745 (internal quotation marks and alterations omitted); *see also* Davis ex. rel. LaShondaD. v. Monroe County Bd. of Educ., 526 U.S. 629, 631, 119 S.Ct. 1661, 1665, 143 L.Ed.2d 839 (1999) (a plaintiff "must show harassment that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities").

"In the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among students, even where these comments target differences in gender. Damages are available only where the harassment constitutes such severe gender-based mistreatment that it denies a victim the equal access to education that Title IX is designed to protect." Doe ex. rel. A.N. v. East Haven Bd. of Educ., 430 F.Supp.2d 54, 59 (D.Conn.2006)*aff'd*200 Fed. Appx. 46.

**\*4** For a school district to be liable for student-on-student harassment under Title IX, a plaintiff must also show that the district was deliberately indifferent to known acts of harassment by other students, the school district had substantial control over the alleged harasser and the context in which the harassment occurred, and that the district's response to the harassment was clearly unreasonable in light of the known circumstances. Davis v. Monroe County Bd. of Educ., 526 U.S. at 645;Doe v. East Haven Bd. of Educ., 430 F.Supp.2d at 63 ("defendant must respond to acts of known peer harassment in a manner that is not clearly unreasonable").

*1. March 2004 Incident*

It appears that LeVarge claims that the March 2004 incident could support a claim of harassment based on (1) the school's failure to protect T.L. from teasing by other students, or (2) Sobanski's response to the incident.

*a. Student-on-Student Harassment*
During the March 2004 incident, T.L. was subjected to thrown food and homophobic teasing in the school cafeteria after his statement to the other male student. The only evidence presented concerning the incident indicates that school officials responded by separating T.L. from the other students and requiring those students to forfeit their recess period. Sobanski, the school principal, investigated the incident immediately after learning of it. Construing the evidence in the light most favorable to the plaintiff, [FN9] no reasonable jury could conclude that the other students' conduct was so severe, pervasive, and objectively offensive that T.L. was effectively denied equal access to the school. [FN10] Further, no reasonable jury could conclude that the school officials--who acted to protect T.L. by separating him from the other students, and disciplining those students--were clearly objectively unreasonable in their response to the incident or in requiring T.L. to write a note to his parents, failing to call T.L.'s parents, and failing to refer T.L. for counseling.

*b. Harassment by Sobanski*
LeVarge has failed to present evidence that Sobanski required T.L to write the March 2004 note to his parents because of his gender or perceived sexual orientation. Even assuming that Sobanski required LeVarge to write the note because he told another boy that he loved him--and not because T.L. failed to provide a forthright account of the incident as

2008 WL 691694                                                    Page 4
--- F.Supp.2d ----, 2008 WL 691694 (D.Conn.)
**(Cite as: 2008 WL 691694 (D.Conn.))**

Sobanski claims--LeVarge has failed to present evidence suggesting that a female student would have been treated differently, or that LeVarge would have been treated differently if he had addressed himself to a female classmate in a similar manner. Similarly, LeVarge has failed to present evidence supporting an inference that the remainder of Sobanski's response to the incident--in particular, her failure to request the intervention of the school psychologist or nurse, to call T.L's parents to inform them of the incident, or to otherwise offer T.L. comfort or counseling--was the result of gender discrimination.

### 2. *Restroom Policy*

**\*5** A gender-based classification will violate the equal protection clause of the Fourteenth Amendment unless it can be "established at least that the challenged classification serves important governmental objectives and ... the discriminatory means employed are substantially related to the achievement of those objectives." *See, e.g., Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 60-61, 121 S.Ct. 2053,2059, 150 L.Ed.2d 115 (2001) (internal quotation marks and alteration ommitted).

LeVarge has failed to present any admissible evidence that the girls' restrooms were supervised differently than the boys' restrooms, i.e. that there was a gender-based classification.

### 3. *November 2003 Incident*

The complaint alleges that T.L. was wrongfully suspended from school after being falsely accused of molesting three female classmates. According to the complaint, the girls' accusations were never properly investigated. As noted above, neither party has presented evidence concerning this incident. [FN11] Unsigned letters, apparently from T.L.'s parents to the school, do not constitute evidence of the circumstances described by the letters for the purposes of summary judgment or trial. [FN12]

### B. *Due Process*

The complaint alleges that Sobanski denied T.L. due process by suspending him in November 2003 without giving him an opportunity to be heard concerning the incident. As discussed above, neither party has presented evidence related to these allegations. Further, LeVarge did not discuss his due process claims in his memorandum in opposition to the motion for summary judgment. Accordingly, summary judgment is granted as to the due process claims.

### C. *State Claims*

As a result of the Court's rulings on LeVarge's discrimination and due process claims, he is left with two state-law claims. While it is true that the Court may exercise supplemental jurisdiction over LeVarge's state-law claims under 28 U.S.C. § 1367, the Second Circuit has advised district courts that " 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims.' " *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir.2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). This is the "usual case" envisioned in *Valencia*. All that remains in this case are two state law claims. Therefore, in the interests of judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Counts Three and Four.

### IV. *Conclusion*

The motion for summary judgment [Doc. # 52] is GRANTED, and judgment is entered for the defendants. The clerk is ordered to close this case.

SO ORDERED.

> FN1. The parties seem to disagree about whether the name of the school T.L. attended is "Poquetanuck" or "Preston Veterans' Memorial School."

> FN2. The LeVarges admit only that T.L. said "Do you love me?"

> FN3. The plaintiff submitted two unsigned letters apparently written by Tara and David LeVarge to the defendants. One of these

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2008 WL 691694                                                                Page 5
--- F.Supp.2d ----, 2008 WL 691694 (D.Conn.)
**(Cite as: 2008 WL 691694 (D.Conn.))**

states that Sobanski "admonish[ed T.L.] against the evils of homosexuality and how inappropriate it was to ask another boy if he loved him."

The evidence proffered by a party in opposition to a motion for summary judgment must be admissible at trial. *See, e.g., Caputo v. Pfizer, Inc.,* 267 F.3d 181, 188 (2d Cir.2001) (stating that summary judgment is appropriate only if admissible evidence establishes that there is no genuine issue of material fact).

The unsigned letters submitted by the LeVarges are hearsay and do not constitute admissible evidence of the matters contained therein for the purposes of summary judgment or trial. See Fed. R. Evidence 802; *see also* Fed.R.Civ.P. 56(e) (requiring papers submitted in opposition to a motion for summary judgment to be sworn or certified); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985) (a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment ... absent a showing that admissible evidence will be available at trial"). Even if the letters had been submitted in the form of, or as attachments to, affidavits they would likewise be largely inadmissible. It is not apparent that much of the letters are based on personal knowledge, and they do not show affirmatively that the LeVarges would be competent to testify on the matters stated therein. Fed.R.Civ.P. 56(e); *H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2d Cir.1991) ("hearsay testimony ... that would not be admissible if testified to at ... trial may not properly be set forth in [a Rule 56] affidavit." (internal quotation marks omitted)).

FN4. The unsigned letters submitted by the plaintiff say that "little boys were escorted into the toilet by adult women," and that according to Sobanski "there is a fundamental difference in the two genders in regard to policy and privacy." The letters also say that "Ms. Sobanski assured us that she would *never* allow a man to escort a female student into the bathroom."

FN5. The unsigned letters submitted by the plaintiffs contain a description of the November 2003 suspension. According to these letters, Sobanski called the LeVarges in November 2003 to inform them that "three parents had formally complained to her that [T.L.] had intentionally touched their daughters' breasts while on the playground. She assured us that she had thoroughly investigated the allegations and found them to be true." According to the letters, the LeVarges also believed the accusations. However, in April 2004, they "learned that these girls had made up the story in an effort to get our son in trouble."

FN6. The Court notes that LeVarge has also failed to present sufficient evidence to sustain a gender discrimination case based on disparate treatment. LeVarge has not presented evidence suggesting that T.L was subjected to discipline or offered services differently on account of his gender. LeVarge also has failed to present evidence suggesting that the restroom supervision policy was implemented differently for male and female students.

FN7. LeVarge did not brief his Equal Protection claim in opposition to the motion for summary judgment. Based on LeVarge's previous brief in opposition to the defendant's motion for judgment on the pleadings, it appears that LeVarge claims discrimination based on perceived sexual-orientation, and/or gender-based discrimination, and not "class of one" discrimination, as the defendants assume.

FN8. A " § 1983 claim [against a school district] based on the Equal Protection Clause is subsumed by Title IX." *Bruneau ex rel. Schofield v. South Kortright Cent. School Dist.,* 163 F.3d 749, 758 (2d Cir.1998)*cert. denied*526 U.S. 1145, 119 S.Ct. 2020, 143 L.Ed.2d 1032 (1999). However, Title IX does not provide a private right of action against individual school employees, and thus does not subsume an Equal Protection claim against Sobanski and Robinson.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2008 WL 691694                                                                                Page 6
--- F.Supp.2d ----, 2008 WL 691694 (D.Conn.)
**(Cite as: 2008 WL 691694 (D.Conn.))**

FN9. Assuming for the purposes of summary judgment that the other students' conduct constituted gender-based harassment.

FN10. Under the circumstances, T.L.'s parents' decision to keep him out of school is not evidence that T.L was denied equal access to the school.

FN11. The defendants admit in their answer that "contact was made with plaintiff's parents regarding an alleged incident at school."

FN12. However, even if the plaintiff had submitted the contents of the letters in the form of affidavits, they would fail to raise a genuine issue of material fact concerning the November 2003 incident. Notably, the letters do not describe circumstances suggesting that the incident was investigated poorly, or that T.L. was punished differently because of his gender.

--- F.Supp.2d ----, 2008 WL 691694 (D.Conn.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AMY KRAUS, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 06-975 |
| HOWROYD-WRIGHT EMPLOYMENT AGENCY, INC., CINGULAR WIRELESS, LLC, NEW CINGULAR WIRELESS, PCS, LLC, CINGULAR WIRELESS EMPLOYEE SERVICES, LLC, and JOSEPH RUIZ, | : | |
| Defendants. | : | |

MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                        **JANUARY 8, 2008**

This is a sexual harassment employment discrimination action brought by Amy Kraus ("Kraus") against her former employer, Defendants Cingular Wireless, LLC, New Cingular Wireless, PCS, LLC, and Cingular Wireless Employee Services, LLC (collectively "Cingular"), and one of Cingular's former managers, Defendant Joseph Ruiz ("Ruiz"). Presently before this Court are the Motions for Summary Judgment filed by Cingular and Ruiz, and for the following reasons, the Motions will be granted.

**I.      BACKGROUND**

Kraus graduated from the Pennsylvania State University in May, 2004, and, like many college graduates, sought temporary employment in order to make money quickly. She contacted the Howroyd-Wright Employment Agency ("Apple One") to help her with this endeavor. In June 2004, Apple One arranged for Kraus to interview with Cingular as that company had an

immediate need for an administrative assistant for six months. Kraus interviewed with Cingular, was offered the job, and began working at the Bensalem office on June 10, 2004.

Kraus performed administrative functions for Cingular's engineering group, of which Ruiz was a manager, and was supervised by Ruiz and another person. However, Ruiz assigned the majority of the work Kraus performed, and supervised her a majority of the time. Beginning in October, 2004, Ruiz began making suggestive comments to Kraus, indicating to her that he was sexually interested in her. She stated that initially the comments were innocent, but Ruiz intensified his pursuit of her over the next two months. Kraus left her job on December 3, 2004, after she told Apple One that she could not endure Ruiz's conduct any longer. Ruiz's conduct forms the basis of her action.

The sexually suggestive conduct Kraus complains of began in October, 2004. The initial incident involved Ruiz telling Kraus about a sexual dream he had about her. He mentioned his dream while the two of them were in the office break room during their morning break. Ruiz just briefly discussed the dream in the break room, after which he and Kraus returned to their desks. Once at his desk, Ruiz initiated an online conversation with Kraus via America Online's Instant Messenger ("IM"), an online communication tool analogous to real-time email, and he and Kraus discussed his dream in detail.

The IM is reprinted below in an unaltered state. Amk257 is Kraus's screen name, and jruizFSA2 denotes statements made by Ruiz. The text reads as follows:

| jruizFSA2: | so was that a weird dream or what |
|---|---|
| Amk257: | hm |
| Amk257: | yes |
| Amk257: | but like i said |
| Amk257: | still very funny |

2

**A124**

| Amk257: | it probably made more sense than any dream ive ever had |
| Amk257: | there was a story line and everything |
| jruizFSA2: | Yeah but I still have some questions in my mind |
| Amk257: | about what |
| jruizFSA2: | Um...that I should probably keep to myself...maybe crossing a line on that one |
| jruizFSA2: | ya know what i mean....? |
| Amk257: | did you opt out of sharing part of the dream with me or something |
| Amk257: | is this like a, why was i in it in the first place kinda question |
| jruizFSA2: | the first one you mentioned |
| jruizFSA2: | i made the dream more PG if you know what i mean |
| jruizFSA2: | less R |
| Amk257: | hahahaha |
| Amk257: | it happens |
| jruizFSA2: | yes.....i mean it wasn't totally R...maybe PG-13 |
| Amk257: | haha. Well that isnt so bad then |
| Amk257: | at least its no NC-17, ya know? |
| Amk257: | then thered REALLY be questions |
| jruizFSA2: | i am lying...just back peadling |
| Amk257: | haha |
| jruizFSA2: | so I am not telling you unless you twist my arm |
| Amk257: | yea, peoples minds do weird things when theyre sleeping.  It doesnt mean much |
| Amk257: | should i twist it then?  I cant help but be curious now that you made a big stink about it |
| jruizFSA2: | the twisting is up to you.... |
| jruizFSA2: | the amount of twisting |
| Amk257: | im curious what the questions are |
| jruizFSA2: | the ones i have ....you mean? |
| Amk257: | right |
| Amk257: | if im in it, don't you suppose i have a right to know? |
| jruizFSA2: | i was wondering why you were just in your panties in my dream... |
| Amk257: | well yea, thatd be the obvious question |
| Amk257: | i couldve figured that out |
| jruizFSA2: | and y would you think |
| Amk257: | well, thats one of my own questions |
| Amk257: | i don't know the answer to that |
| Amk257: | so was it more R cause there was more nakedness or something? |
| jruizFSA2: | kind of |
| jruizFSA2: | but more twisting will only get that info |
| Amk257: | ok ok, im twisting |
| jruizFSA2: | hold on |
| jruizFSA2: | please |

3

A125

| | |
|---|---|
| jruizFSA2: | so what do you want to know |
| Amk257: | what im missing |
| jruizFSA2: | well you seem in distress in the dream.. |
| jruizFSA2: | and needed my help... |
| Amk257: | because i stole the clothes, or because im half naked? |
| jruizFSA2: | both... |
| Amk257: | got it |
| Amk257: | im with ya so far |
| jruizFSA2: | are you interested in any more details? |
| Amk257: | well yea, that didnt clear anything up |
| jruizFSA2: | well....depends on how much you want to know |
| Amk257: | you might as well tell me it al |
| jruizFSA2: | r u sure.... |
| jruizFSA2: | may get a bit graphic |
| Amk257: | im sure its nothing i havent seen or heard before |
| Amk257: | i can handle graphic |
| jruizFSA2: | can i ask y you r interested? |
| Amk257: | sure.  Because Im a highly inquisitive person |
| Amk257: | and i hate not knowing things |
| jruizFSA2: | well to say the least..i took advantage of you being half naked |
| Amk257: | ok |
| jruizFSA2: | do you want details? |
| Amk257: | if you don't care about telling me |
| Amk257: | im not trying to make you uncomfortable |
| jruizFSA2: | well we made use of the table in my office....... |
| jruizFSA2: | and you fought at first...then you submitted |
| Amk257: | uh huh |
| jruizFSA2: | would you like to know exactly what we did on that table? |
| Amk257: | shoot |
| jruizFSA2: | well your panties were off...and I thing I took them off with my mouth... |
| jruizFSA2: | by the way...this is between you and i right? |
| jruizFSA2: | speechless? |
| Amk257: | of course |
| Amk257: | a little |
| jruizFSA2: | you wanted to know...... |
| Amk257: | I know |
| jruizFSA2: | are you now wishing you did not? |
| Amk257: | nah |
| jruizFSA2: | so what are you thinking |
| Amk257: | i did tell you i wanted to know |
| Amk257: | I don't know....and here i originally thought you just killed me or something |

4

**A126**

| | |
|---|---|
| jruizFSA2: | ha |
| Amk257: | but i can see where that question arises |
| jruizFSA2: | nope, shoudl have told you that it was more sexual in nature |
| Amk257: | I assumed |
| Amk257: | i just meant my original reaction when you mentioned it a few days ago |
| jruizFSA2: | oh.... |
| Amk257: | was that the only question you had? |
| jruizFSA2: | actually...i kind of understand the dream... |
| jruizFSA2: | why what happened, happened in the dream... |
| Amk257: | you understand it how |
| jruizFSA2: | why you were in the dream...and why you were in that state...and why we did what we did |
| jruizFSA2: | and i am sure you can figure out why |
| Amk257: | so iguess i shouldnt ask then, huh |
| jruizFSA2: | unless you really want to know |
| Amk257: | is that why you're telling me about it? |
| jruizFSA2: | no, i was gonna leave it until you asked for the details |
| Amk257: | oh |
| Amk257: | well yea...I always want details |
| jruizFSA2: | y in this case? |
| Amk257: | im not entirely sure |
| jruizFSA2: | do you know what i am getting at? |
| Amk257: | again, im not entirely sure |
| jruizFSA2: | ok, good.... |
| jruizFSA2: | what would your guess be? |
| Amk257: | that this all stemmed from my wearing inappropriate shirts |
| Amk257: | haha |
| Amk257: | or cause youd want it to happen |
| jruizFSA2: | .......no on number one...maybe on number two.... |
| jruizFSA2: | now that you know that.....what r u thinking? |
| Amk257: | well its more wondering |
| jruizFSA2: | like what? |
| Amk257: | like, why me |
| jruizFSA2: | r u kidding..... |
| Amk257: | not at all |
| jruizFSA2: | do you not think that you are attractive? |
| Amk257: | well, yea I mean i think im alright |
| jruizFSA2: | i am sure most would say better than all right... |
| Amk257: | i don't know if this is going to come across wrong...but have you said anything like this to anyone before me? |
| Amk257: | and thank you |
| Amk257: | thats a big compliment |

5

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  The conversation continued with Ruiz

telling Kraus that he found her very attractive, and Kraus responding that she was "beyond

flattered" by his compliments.  A break in the dialogue occurred when Ruiz went to lunch.

After returning from lunch, Ruiz resumed the conversation by asking Kraus via IM if she

wanted to know anything else.

| | |
|---|---|
| jruizFSA2: | so you don't want to know anything else? |
| Amk257: | well I was expecting to be questioned.  I hadnt really thought up questions myself |
| Amk257: | what else should i know? |
| jruizFSA2: | just wanted to knwo what you thought about my dream and conversation? |
| Amk257: | well...it was totally flattering and um, i dunno kinda hot and surprising all at the same time |
| Amk257: | but at the same time, your still very much my boss. |
| jruizFSA2: | hot is what way? |
| Amk257: | i guess in the, i can see where you're coming from, way..if that makes sense |
| jruizFSA2: | no. u lost me? |
| Amk257: | ok. |
| Amk257: | hmm |
| jruizFSA2: | what do you mean exactly....did you like the story line? |
| Amk257: | well yea it was a good story |
| Amk257: | and i can empathize with your fidgetyness to some degree |
| jruizFSA2: | now everytime you knock on my door i will wonder if you have pants on! |
| Amk257: | haha |
| jruizFSA2: | and if you don't i will know what you want...... |
| Amk257: | well chances are, i will..unless it's a skirt |
| Amk257: | yea.  Might freak out the rest of the office though, huh? |
| Amk257: | haha |
| jruizFSA2: | well.... you could come in with them on then take them off... |
| jruizFSA2: | ... |
| Amk257: | true |
| jruizFSA2: | i shouldnt hold my breath...though? |
| Amk257: | but like i said...Your're still my boss.  At least for another month or whatever |
| jruizFSA2: | what do you mean ...when you say...you are still my boss? |
| Amk257: | i mean until December, you're my boss |

6

A128

| jruizFSA2: | i know....ao when I am not your boss you will feel differently? |
| Amk257: | well the other thing that throws me tho is..you know i like you and respect you a lot as a person...and you've got a whole life that im not trying to ruin |
| jruizFSA2: | did u ever think about it? answer honestly |
| Amk257: | it might have crossed my mind |
| jruizFSA2: | really...now i am flattered... |
| Amk257: | well thats good |
| Amk257: | you should be. |
| Amk257: | but i attempt to maintain some form of professionalism..as best i can at least |
| jruizFSA2: | so what were you thinking ...when you did think somethign? |
| Amk257: | honestly it was just a brief what-if kinda thought |
| jruizFSA2: | you have a better imagination then that |
| Amk257: | maybe... |
| jruizFSA2: | oh..i can tell you are artistic |
| Amk257: | yea, it amazes me that you can tell that at all |
| Amk257: | apparently im oblivious to a lot, b/c i didnt think i came across like that either |
| jruizFSA2: | i am very perceptive |
| Amk257: | i see that |
| jruizFSA2: | so...no more details on your fleeting notion |
| Amk257: | no...nothing that wouldnt get me in trouble |
| jruizFSA2: | come on...i am already in trouble...and we are both adults |
| jruizFSA2: | please.... |
| Amk257: | similar to yours though.. |
| jruizFSA2: | give me an idea |
| jruizFSA2: | some details |
| Amk257: | ok...think your dream, but subtract the whole damsel in distress thing.  And of coruse i don't show up half dressed. |
| jruizFSA2: | so you come to my office...?  i guess no one is around.....and who makes the first move? |
| Amk257: | i dunno..i generally just skip ahead |
| jruizFSA2: | to what? |
| Amk257: | the hook up part |
| jruizFSA2: | ah...anywhere specific....in my office? |
| Amk257: | not really |
| jruizFSA2: | who is taking the lead....u or me? |
| Amk257: | me |
| jruizFSA2: | nice...is that how you usually are? |
| jruizFSA2: | take control... |
| Amk257: | sometimes |
| Amk257: | it depends on my mood |

7

A129

> jruizFSA2:    you look like you would take control.....
> Amk257:    well then you are perceptive

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  As the conversation proceeded, Ruiz and

Kraus discussed whether either of them would like to initiate a relationship.  To that end, Ruiz

asked Kraus to rate her desire to act on her feelings.

> jruizFSA2:    so on a scale of 1-10 (10 being really want it to happen) what
>     would you rate your feelings....
> jruizFSA2:    not factoring in anything else...
> Amk257:    so not factoring in whether or not it SHOULD, then?
> jruizFSA2:    right
> Amk257:    oh boy
> Amk257:    hm
> jruizFSA2:    be honest
> Amk257:    i dunno..see its hard for me to separate everything else
> jruizFSA2:    sure you can....
> Amk257:    let me think
> Amk257:    ill brb
> jruizFSA2:    k
> Amk257:    ok...um...6.5?

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  Ruiz was displeased that Kraus's desire to

act on her feelings rated so low, so he asked her again.  Kraus replied the second time that her

desire was more like 7.5-8 out of ten, and with that their conversation about Ruiz's dream

concluded.

Kraus testified that in the weeks following the dream discussion, Ruiz began verbally

harassing her almost daily, and she has provided specific examples of the sexual comments Ruiz

made.  On one occasion, Ruiz told Kraus that he wanted to see her naked, and that he wanted to

kiss her.  He twice told her about his desire to bend her over his desk, and one time he asked her

to have oral sex with him.  There was also an instance where Ruiz, while on a business trip,

called Kraus at home, and told her that he wished she was with him so they could have sex in the

8

A130

shower.  Kraus also stated that Ruiz implied that if she had sex with him, he could help her find a

permanent position.

On November 5, 2004, about a month after the dream conversation with Ruiz, Kraus

talked with a friend via IM about whether she should engage in a relationship with Ruiz.  That

IM reads as follows:

| | |
|---|---|
| Koveypants: | well |
| Koveypants: | i mean we both know that its bad to do it |
| Koveypants: | cause of steve, the wife, the kids, and the job |
| Koveypants: | right.....so its bad |
| Koveypants: | ........but u still wanna do it |
| Amk257: | well yea, sorta, but now im freaked out |
| Amk257: | and fear it wont be enjoyable |
| Koveypants: | i know it will be enjoyable and an exciting experience |
| Koveypants: | .....a story to tell generations to come |
| Koveypants: | hahahhahhaha |
| Koveypants: | i mean its real scary.....but thats what makes it super kinky |
| Amk257: | right |
| Amk257: | I have to go to church... |
| Koveypants: | hahahhaa no |
| Koveypants: | that wont make u feel better about it |
| Amk257: | i know |
| Amk257: | maybe itll convince me otherwise |
| Koveypants: | or maybe it will make u wanna do it more |
| Amk257: | well maybe |
| Amk257: | but if thats the case |
| Amk257: | then at least it was gods will |
| Koveypants: | hahahahhahha |

(Cingular's Mot. Summ. J., Ex. M.)  After a brief change of topic, the conversation returned to

the topic of whether Kraus wanted a sexual relationship with Ruiz.

| | |
|---|---|
| Amk257: | i need another opinion...not that yours isnt good...buti have no one to tell |
| Koveypants: | oooooooooooo |
| Koveypants: | who else u gonna tell? |
| Amk257: | theres only abby |
| Koveypants: | kelly? |

9

A131

| | |
|---|---|
| Amk257: | i don't know! |
| Amk257: | i was thinking about that |
| Amk257: | but shes my sister |
| Amk257: | and thats kinda gross |
| Koveypants: | well i dunno |
| Koveypants: | abby would be funny....shed tell u no though |
| Amk257: | i know |
| Amk257: | i don't know |
| Amk257: | theres no one! |
| Amk257: | except a priest |
| Amk257: | but i cant be like...but itd be so HOT |
| Amk257: | to him |
| Koveypants: | hahhaa no he wouldnt appreciate it |

(Cingular's Mot. Summ. J., Ex. M.)

On November 14, 2004, Kraus's boyfriend, Steven Kane, found a text message on her

phone from Ruiz, and questioned her about it. After Kane found the message, Kraus contacted

Ruiz via IM to discuss the situation. The unaltered IM reads:

| | |
|---|---|
| jruizFSA2: | i bother you because i like you...alot...havent you got that yet goof ball |
| Amk257: | well yea, I have |
| jruizFSA2: | then stop asking sill girl... |
| jruizFSA2: | maybe you can borrow my eyes...and see what i see |
| Amk257: | i didnt mean it that way |
| jruizFSA2: | i know |
| jruizFSA2: | just breaking you chops |
| jruizFSA2: | what about the hug... |
| jruizFSA2: | i liked that your hands ran across my back... |
| jruizFSA2: | tired of talking.already? |
| Amk257: | sorry |
| Amk257: | i was on the phone |
| jruizFSA2: | no problem.. |
| jruizFSA2: | just reading some articles.. |
| Amk257: | ok |
| Amk257: | yea |
| Amk257: | the hug |
| Amk257: | but it was just a hug |
| jruizFSA2: | but your arms and hands took a trip....no? |
| Amk257: | thats kinda how i hug |

10

A132

| jruizFSA2: | i wanted another but you already left for the night... |
| jruizFSA2: | :-P |
| Amk257: | ha |
| Amk257: | yea...that should probably be the last one anyways |
| jruizFSA2: | really....was it getting your mind into trouble? |
| Amk257: | no |
| Amk257: | i just think it should be alook but don't touch thing, ya know? |
| jruizFSA2: | then y no more? |
| jruizFSA2: | nah...that wouldnt be fun...or bad:-) |
| Amk257: | no it wouldnt |

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.) Kraus then told Ruiz that she no longer

wanted to pursue him. She said that because her boyfriend found out about their conversations,

she was forced to pick one of them, and she did not want to do anything that could get her in

trouble with Kane. Ruiz responded by telling her he felt like he had been strung along. Kraus

then said:

| Amk257: | i cant and I don't want to |
| jruizFSA2: | wow |
| jruizFSA2: | that is the first time that you said that... |
| Amk257: | what, that i didnt want to |
| jruizFSA2: | yes |
| Amk257: | well, yea I dont want to get in trouble with anyone |
| jruizFSA2: | up to this point it seemed possible |
| jruizFSA2: | answer me this |
| Amk257: | hm |
| jruizFSA2: | is it that you don't want to ....or you dont want to get in trouble....which are 2 things.. |
| Amk257: | its like this |
| Amk257: | my boyfriend happen to hear/find a few of the messages you texted/left on my phone |
| Amk257: | so now.....im in some shit.....and Im swearing up and down that i wont fuck around |
| jruizFSA2: | when did this happen? |
| jruizFSA2: | today? |
| Amk257: | yesterday...but its continuing |
| Amk257: | hence my long ass phone call |
| Amk257: | getting yelled at |
| jruizFSA2: | why didn you tell me today... |

11

| | |
|---|---|
| Amk257: | i was trying not to have to |
| Amk257: | but since it doesnt seem like i can get around that fact |
| Amk257: | im telling you |
| jruizFSA2: | and what did i text you...dont remember anything |
| jruizFSA2: | most have been voicemails |
| Amk257: | there was at text about the dream or something |
| Amk257: | i dont really remember |
| Amk257: | but yea |
| jruizFSA2: | ? |
| Amk257: | so..yea.  Now i don't want anything because I don't want to be caught lying when i say im not going to do anything. Ive always been honest with him m not about to become a liar. |
| Amk257: | and i feel like the queen of all bitches right now |
| Amk257: | but its just too important to me |
| jruizFSA2: | and you are coming across that way as well |
| Amk257: | im very sorry |
| Amk257: | well i thought so...and then i realized i didnt so much and that when i retreated-after I rethought things |
| Amk257: | im just trying hard not to hurt anyone...and it seems im hurting everyone in the process |
| jruizFSA2: | dont even know what to say |
| Amk257: | me either |
| Amk257: | i am sorry...im not even making any sense |
| Amk257: | Im gonna go now.. |
| jruizFSA2: | dont |
| Amk257: | why |
| Amk257: | i must have just confused the shit out of you |
| jruizFSA2: | dont want you to |
| jruizFSA2: | yea... |
| Amk257: | i really do apologize |
| jruizFSA2: | not sure i want to accept that....right now |
| Amk257: | i had to do what was right for me and this time, being bad isnt it, it seems.  Im sorry if i strung you along...if I did, I had no idea I was doing it |
| Amk257: | i understand |
| jruizFSA2: | i didnt think this conversation was going to put me in a foul fucking mood......boy was i wrong |
| Amk257: | i didnt think so at first either. |
| Amk257: | how mad are you |
| jruizFSA2: | very, very fucking mad |
| jruizFSA2: | does that explain it |
| Amk257: | yea |
| Amk257: | why.. |

| | |
|---|---|
| Amk257: | cause you think i strung you along |
| jruizFSA2: | bingo..... |
| jruizFSA2: | you win a cigar |
| Amk257: | hmm..and here i thought i was losing everything |
| jruizFSA2: | not in a joking mood...so u wont get any laughs from hert |
| jruizFSA2: | here |
| Amk257: | i know |
| Amk257: | i wasnt trying to string anything.  I meant what I said when I said it...and I told you, i rethought things |
| Amk257: | I meant that too |
| Amk257: | I know that i didnt say i didnt want anything |
| jruizFSA2: | yea...i know...but you went along for that ride...and i didnt |
| Amk257: | thats a hard thing for me to say. And honestly, i didnt know what I wanted, so i would be lying if i had said that.  But I know I don't want to hurt people i really care about (which includes you), which is why its better for me and you and everyone to end it as much as possible now before you get really attached or something |
| jruizFSA2: | what is wrong with getting attached....dont you think that i would take care of you. |
| jruizFSA2: | as much as possible |
| Amk257: | What can come from you getting attached?  I think youd try to take care...but i dont think you can the way id need to be.  We couldnt have a real relationship and you know that |

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  Ruiz, upset by this turn of events, then

asked why Kraus had gone along for the ride in the first place.  Kraus responded by telling him

that she liked his attention, and ended by saying at the time she was not technically with her

boyfriend and had a loophole to talk to other people.

The next day, November 15, 2004, Kraus and Kane engaged in an IM discussion where

she told Kane about her conversation with Ruiz the night before.  The IM reads:

| | |
|---|---|
| fast94m: | what did you say to him? |
| Amk257: | i said things need to be look but don't touch, i said my bf knows what going on...i said i dont want to get in trouble with anyone, that i dont want to do anything that would hurt hium.  I cant and i don't want to |
| Amk257: | and he said, thats the first time you flat out said i don't want to |
| Amk257: | and i said ya |

13

A135

(Cingular's Mot. Summ. J., Ex. O.)  Kane focused on Kraus's failure to inform Ruiz prior to that

exchange that she did not desire a sexual relationship with him.  Kane then added:

| | |
|---|---|
| fast94m: | and now do you realize how YOU can string ppl along sometimes? Cause i think this isn't the first person you've done this too, though hes def not left off the hook for multiple reasons cause of it |
| fast94m: | you both failed |
| fast94m: | but you both get it it seems |
| fast94m: | so better late then nevef |
| fast94m: | and if he thinks youre a bith, its just to save his own pride for getting let down by THE MOST BEAUTIFUL THING TO EVER TOUCH THIS FUCKING EARTH |
| fast94m: | so there |
| fast94m: | i have a headache |
| fast94m: | eagles better not lose, too much stress for one say to begin with, thank god i don't own a gun |
| fast94m: | bye |
| Amk257: | ......:'( |
| Amk257: | yea. I lose |
| fast94m: | how do you lose? |
| Amk257: | because I FUCKING LOS |
| Amk257: | lose* |
| Amk257: | I lose it all |
| Amk257: | i have nothing |
| Amk257: | i feel like shit |
| Amk257: | i wanna go die |
| Amk257: | thank you and good night |
| fast94m: | you have your pride and self respect back |
| fast94m: | you no longer take shit |
| fast94m: | and have shown it |
| fast94m: | and shown me how much you care |
| fast94m: | both of which are good things |
| Amk257: | i DO CARE |
| Amk257: | I care so FUCKING MUCH |
| fast94m: | i know |
| Amk257: | and you make me do this to prove it |
| fast94m: | you just showed it |

(Cingular's Mot. Summ. J., Ex. O.)  Kraus concluded by stating that she felt bad for acting the

way she did with Ruiz, but Kane assured her it was the right thing for her to do.

14

On November 16, 2004, Ruiz and Kraus had a conversation about her decision to end

what had been developing between them.  The IM reads:

| | |
|---|---|
| Amk257: | no.  I dont care that you're telling me you dont want to talk about this anymore |
| Amk257: | but youre acting like someone who didnt get their way and now theyre gonna be pouty |
| Amk257: | i didnt promise you anything |
| jruizFSA2: | no, i am acting like someone who is feeling a bit fucked over and I ma fucking pissed..... |
| jruizFSA2: | you would too.... |
| Amk257: | i didnt fuck you over |
| jruizFSA2: | ok, how about led me to believe... |
| jruizFSA2: | is that easier to swallow? |
| Amk257: | i tried to correct that many times, and if youd think back, youd see it |
| jruizFSA2: | yes, but even as of yesterday you were still not telling me....that came out last night...especially since I asked point blank....and you still waffeled |
| Amk257: | i was certainly telling you we shouldnt and you shouldnt |
| jruizFSA2: | but i was asking you if you wantedme to stop...and you never said yes |
| Amk257: | i didnt realize that wasnt strong enough to understand |
| jruizFSA2: | well when i asked 3-4 times...i figured you got the hint |
| Amk257: | i had a hard time answering.  Ill take responsibility for that |

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  Ruiz also told Kraus he hated her, but

assured her that the feeling would eventually pass.

The final event that Kraus complains of occurred on Friday, December 3, 2004.  Ruiz

called Kraus into his office to discuss work-related matters.  The meeting began professionally,

but quickly devolved into a sexually charged situation.  Kraus testified that Ruiz made faces at

her, raised his eyebrows, told her that he wanted to kiss her and smell her hair, asked her to sit on

his lap, and licked his lips in a provocative manner.  In response, Kraus told Ruiz again that she

was not interested.  When she got up to return to her desk, Ruiz rose as well and tried to hug her,

15

and Kraus pushed him away.  He persisted, and grabbed her arms to pull her closer to him.  She

pushed him away again and then exited his office.  During this episode, Ruiz was standing in

front of the doorway, which forced Kraus to shuffle around him to get through the open door.

After she left Ruiz's office, she returned to her desk and finished out the day.

On the following Monday, December 6, 2004, Kraus called Apple One while driving to

work and spoke with Steve Tompkins, an Apple One representative.  She told Tompkins that she

did not want to go to her job because Ruiz's conduct made her uncomfortable.  Tompkins told

her to go home, and he said he would call her out sick for that day.  He also asked her to come to

the office to fill out a sexual harassment complaint form.  Kraus went to Apple One's office on

December 8, 2004, and completed the form.  Apple One faxed the complaint to Cingular, who

conducted an investigation.  Ruiz was not subjected to disciplinary action.

Kraus did not return to Cingular for the remaining weeks of her sixth month assignment.

On December 14, 2004, Ruiz contacted her via IM and asked her why she had not come back to

work.  She told him that he had made her uncomfortable.  Ruiz offered an apology, and again

asked why she had gone along for the ride in the first place.  Kraus responded that she was just

trying to be nice, and she thought it would be cool to talk about the dream.  Ruiz offered her his

apology again, and told her that he knew of some job openings at Cingular.  He offered to put in

a good word for her, which she accepted.  This was the last IM conversation they had.

Kraus filed a charge with the Equal Employment Opportunity Commission and the

Pennsylvania Human Relations Commission on May 3, 2005.  She was thereafter issued a right

to sue letter, and on March 3, 2006, she filed a Complaint in this Court.  On July 7, 2006, Kraus

filed an Amended Complaint against Defendants Cingular, Ruiz, and Apple One.  On September

16

20, 2007, these three Defendants each filed a Motion for Summary Judgment on all counts.  On

October 31, 2007, Kraus voluntarily dismissed Apple One, and with that action disposed of

Count IV in its entirety.  Thus, only the Motions of Ruiz and Cingular are before this Court.

Cingular and Ruiz seek summary judgment on all claims contained in the Amended

Complaint, which was stated in ten counts.  Counts I, II, III, and V state claims against Cingular

for violations of 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981a, 43 P.S. § 951, and for negligent

failure to train.  Counts VI, VII, VIII, IX, and X raise claims against Cingular and Ruiz for

negligent infliction of emotional distress, intentional infliction of emotional distress, assault,

false imprisonment, and punitive damages.  Each count is discussed below.

**II.    STANDARD OF REVIEW**

Summary judgment is proper when "there is no genuine issue as to any material fact and

. . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Hines v.

Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  A court must determine "whether the

evidence presents a sufficient disagreement to require submission to the jury or whether it is so

one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52 (1986).  In the absence of any material factual disputes, summary judgment

must be granted against "a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof

at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

This Court is required, "before the evidence is left to the jury," to determine "whether

there is any [evidence] upon which a jury could properly proceed to find a verdict for the party

producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251.  A "judge's

17

A139

inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]"  Id. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Id.  "[S]ummary judgment should be granted where the evidence is such that it would require a directed verdict for the moving party[.]"  Id. at 251.

## III.     DISCUSSION

### A.     Count I—Sexual harassment

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [the] . . . terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1).  It is well settled that sexual harassment is a form of sex discrimination prohibited by the statute.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  Sexual harassment can take the form of a hostile work environment or quid pro quo harassment, and Kraus alleges both types in Count I of her Amended Complaint.

#### 1.     Hostile work environment

A hostile work environment exists when the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotes omitted).  In order to prove her a hostile work environment claim, Kraus must show five things: (1) that she suffered intentional discrimination

A140

because of her sex, (2) the discrimination was severe or pervasive,[1] (3) it detrimentally affected her, (4) it would have detrimentally affected a reasonable person in like circumstances, and (5) there is a basis for employer liability. Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007) (citing Weston v. Comm'w of Pa., 251 F.3d 420, 426 (3d Cir. 2001)). Cingular believes that Kraus cannot establish that the alleged discrimination was severe or pervasive. Therefore, this Court will focus its analysis on the second element of the test.[2]

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." Harris, 510 U.S. at 21. The lower courts have been given the task of determining whether working environments are sufficiently hostile or abusive to incur Title VII liability. Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998). The Supreme Court has "directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id.

"A recurring point in [the Supreme Court's decisions] is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

_____

[1] The Third Circuit frequently uses the phrase "pervasive and regular" when discussing this element of the test. See e.g. Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990). However, as the Third Circuit has noted, the Supreme Court's formulation is "severe or pervasive," and the use of those words is important. Jensen v. Potter, 435 F.3d 444, 449 n. 3 (3d Cir. 2006) (abrogated in part on other grounds by Burlington N. & Sante Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006)). As the Supreme Court's standard is "severe or pervasive," that formulation will be applied in this case.

[2] While the parties have briefed extensively on the question of whether the defenses promulgated in Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) apply in this case, this issue need not be addressed here as Kraus cannot establish the second element of the test.

A141

changes in the terms and conditions of employment." <u>Id.</u> at 788. Pervasiveness is not shown

without conduct that is "more that episodic; [it] must be sufficiently continuous and concerted in

order to be deemed pervasive." <u>Id.</u> at 787 n. 1. Most importantly, Title VII does not impose a

general civility code on the workplace, and the standards for judging hostility are intentionally

demanding so that complaints attacking the ordinary tribulations of the workplace are filtered

out. <u>Id.</u> at 788. Courts and juries must ensure that they "do not mistake ordinary socializing in

the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory

conditions of employment." <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 81 (1998).

The first step in this analysis is to identify what harassment a reasonable jury could link to

a discriminatory animus. See Jensen v. Potter, 435 F.3d 444, 449-450 (3d Cir. 2006) (abrogated

in part on other grounds by Burlington N. & Sante Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006)).

Kraus has identified five incidents as discriminatory. The first is the discussion she and Ruiz had

concerning his sexual dream about her. The second incident involves comments Ruiz made to

her "about the shower and him wanting to see me naked, comments about kissing . . . about

wanting to bend me over a desk[,]" and talking about engaging in oral sex. (Kraus Dep. at 116-

17.) Third, Ruiz called her once and told her he wished she was with him so they could have sex

in the shower. (Kraus Dep. at 118.) The fourth incident was Ruiz's offers to help her find a

permanent position at Cingular in exchange for sexual favors. (Kraus Dep. at 183-84.) Kraus

claims that the final harassing incident action was Ruiz's conduct in attempting to hug her during

their December 3, 2004, meeting in his office. (Kraus Dep. at 91-95.)

Kraus has not presented evidence showing that she was subjected to an objectively hostile

environment. Regarding the first incident, the text of the IM conversations clearly shows that

Kraus and Ruiz engaged in intersexual flirtation in the office. Kraus willingly discussed the sex dream with Ruiz, and even encouraged him to provide her with details. She also engaged in her own sexual banter by telling Ruiz that she had sexual thoughts about him. Kraus testified at her deposition that she even flirted with Ruiz, and defined flirting to mean that she made statements to Ruiz indicating "some expression of liking." (Kraus Dep. at 273.) She qualified the testimony by saying that while she made flirtatious statements, they did not include "actual liking," and she believes that Ruiz should have interpreted her flirtations only complimentary. (Id.) A reasonable person, viewing the totality of the situation, could not find that the IM conversation between Ruiz and Kraus constituted anything other than intersexual flirtation, which the Supreme Court has stated should not be mistaken with discriminatory conditions of employment. See Oncale, 523 U.S. at 81. Ruiz's conduct may be abhorrent given his marital status, but that fact does not make his action the equivalent of actionable sexual harassment.

In regard to the other events, even assuming that they constitute harassment, they are at best sporadic and isolated incidents, and none are sufficiently severe to rise to the level of a hostile work environment. See Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439-40 (E.D. Pa. 2001) (holding that touching plaintiff's breasts and buttocks, sexual comments, and offer of financial help in return for sex did not create hostile environment); McGraw v. Wyeth-Ayerst Lab., Inc., No. 96-5780, 1997 U.S. Dist LEXIS 20813, at * 17 (E.D. Pa. Dec. 30, 1997) (held that kissing plaintiff and touching her face not severe). Courts have consistently held that "[o]ccasional insults, teasing, or episodic instances of ridicule are not enough; they do not permeate the workplace and change the very nature of the plaintiff's employment." Jensen, 435 F.3d at 451. Sexually charged comments, one sexually explicit phone call, banter about helping

Kraus find a permanent job in exchange for sex, and an attempt to hug her do not show that the workplace was permeated with insults and discriminatory actions. Moreover, the totality of the circumstances shows that Kraus and Ruiz did engage in a sexually flirtatious professional relationship. Kraus cannot establish severe or pervasive harassment, and therefore summary judgment must be granted in Cingular's favor on Count I insofar as it alleges a hostile work environment.

### 2.    Constructive discharge

Kraus also alleges in Count I that she was constructively discharged. This claim must fail because to establish a constructive discharge, a plaintiff must make a further showing than the one required to prove a hostile working environment claim. Pa. State Police v. Suders, 542 U.S. 129, 134 (2004). Since she cannot establish a hostile work environment, she is precluded from establishing a constructive discharge claim. Failure to establish a hostile work environment is fatal to a constructive discharge claim. Konstantopoulus v. Westvaco Corp., 112 F.3d 710, 718-19 (3d Cir. 1997). Thus, Cingular is granted summary judgment on Count I to the extent that the claim alleges constructive discharge.

### 3.    Quid pro quo

Kraus also alleges quid pro quo harassment in Count I. This type of sex discrimination occurs when an employer demands that an employee provide sexual favors to gain employment benefits or avoid adverse action. Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 1306 (C. Geoffrey Weirich ed., 4th ed. 2007). Advances or requests for sexual favors constitute sexual harassment when "(1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to

22

A144

or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual . . .." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997) (abrogated in part on other grounds by Burlington N. & Sante Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006)). To establish a quid pro quo harassment claim, Kraus "must demonstrate either that she submitted to the sexual advances of her alleged harasser or suffered a tangible employment action as a result of her refusal to submit to those sexual advances[.]" Hurley v. Atl. City Police Dept., 174 F.3d 95, 133 (3d Cir. 1999).

It is undisputed that Kraus and Ruiz did not have a sexual relationship, and Kraus was not offered a permanent position at Cingular. (Joint Statement of Undisputed Facts, ¶ 27; Pl.'s Resp. to Joint Statement ¶ 27.) She therefore alleges that her rejection of Ruiz's advances was the basis for Cingular's decision not to consider her for a permanent job. Kraus contends that Cingular failed to promote her, which is a tangible employment action. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). However, Kraus has not provided any evidence showing that Cingular failed to promote her to a permanent position. Most importantly, she has not shown that her temporary position was at any time slated to become a permanent position at Cingular.

Kraus testified that Ruiz said to her on more than one occasion that "[i]f you do this [meaning have a sexual relationship with him], then I will assist in getting you this permanent job thing." (Kraus Dep. at 162.) In support of her claim, she provided the deposition testimony of Steven Tompkins, an Apple One representative. Tompkins said that all temporary jobs can potentially become permanent if an employer chooses to make it permanent. (Tompkins Dep. at 61.) Kraus believes this statement establishes Cingular's failure to promote her to a permanent position. However, Kraus omits that fact that when Tompkins was asked whether her temporary

23

job had the potential to become permanent, he said that it did not. (Tompkins Dep. at 60.) Thus, no evidence has been presented which shows that her position had long-term potential and she was not considered for it. She cannot establish quid pro quo harassment, therefore summary judgment must be granted in favor of Cingular on Count I insofar as it alleges quid pro quo sexual harassment.

**B.     42 U.S.C. § 1981a claim**

In Count II of her Amended Complaint, Kraus alleges that Cingular violated 42 U.S.C. §1981a. Section 1981a states: "[i]n an action . . . against a respondent who engaged in unlawful intentional discrimination . . . prohibited under . . . [42 U.S.C.A. §§ 2000e-2, 2000e-3, or 2000e-16] . . . the complaining party may recover compensatory and punitive damages . . . in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent." 42 U.S.C. § 1981a (a)(1). "[T]he great weight of authority holds that § 1981a does not create an independent cause of action, but only serves to expand the field of remedies for plaintiffs in Title VII suits." Pollard v. Wawa Food Mkt., 366 F. Supp. 2d 247, 251 (E.D. Pa. 2005). Consequently, summary judgment must be granted in favor of Cingular on Count II as this claim cannot be stated as an independent cause of action.

**C.     Pennsylvania Human Relations Act claim**

In Count III, Kraus alleges that Cingular violated the PHRA, which makes it unlawful to discriminate against individuals because of their "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability[.]" 43 Pa. Cons. Stat. § 955(a). Federal courts treat the PHRA and Title VII as embodying identical standards, and the analyses under these statutes are co-extensive, and conduct that is unlawful under Title VII is similarly unlawful

24

A146

under the PHRA. <u>Weston</u>, 251 F.3d at 425 n. 3. Summary judgment must therefore be granted

in favor of Cingular on Count III as this Court granted summary judgment on Count I.

**D.    Failure to supervise claim**

In Count V, Kraus alleges that Cingular was negligent in supervising its employee. The

company argues that Kraus is barred from asserting this claim under the PHRA. That act states:

"as to acts declared unlawful by section five . . . the procedure herein provided shall, when

invoked, be exclusive and the final determination therein shall exclude any other action, civil or

criminal, based on the same grievance of the complainant concerned." 43 Pa. Cons. Stat. §

962(b). Therefore, Kraus's negligent supervision claim is barred by the PHRA, <u>see</u> <u>Murray v.</u>

<u>Commercial Union Ins. Co.</u>, 782 F.2d 432, 437 (3d Cir. 1986), and summary judgment must be

granted in favor of Cingular in regard to Count IV.

**E.    Negligent infliction of emotional distress claim**

In Count VI, Kraus alleges that she suffered severe emotional distress because of the

negligent conduct of both Cingular and Ruiz. The Defendants argue that Kraus's claims are

barred under the Pennsylvania Workers' Compensation Act, which states that "[t]he PWCA

provides the sole remedy for 'injuries allegedly sustained during the course of employment.'"

<u>Moyer v. Kaplan Higher Educ. Corp.</u>, 413 F. Supp. 2d 522, 529 (E.D. Pa. 2006) (citing 77 Pa.

Stat. Ann § 481(a)). The PWCA also states that, "[t]he liability of an employer under this act

shall be exclusive and in place of any and all other liability to such employes . . . on account of

any injury[.]" 77 Pa. Stat. Ann § 481(a). Courts have consistently held that the exclusivity

provision bars negligent infliction of emotional distress claims arising out of an employment

relationship. <u>See</u> <u>Imboden v. Chowns Comm.</u>, 182 F. Supp. 2d 453, 456-57 (E.D. Pa. 2002)

25

(citing <u>Matczak v. Frankford Candy and Chocolate Co.</u>, 136 F.3d 933, 940 (3d Cir. 1997)).

Therefore, summary judgment must be granted in favor of Cingular and Ruiz[3] on Count VI.

**F.     Intentional infliction of emotional distress claim**

Kraus alleges in Count VII that she suffered emotional distress because of the intentional

sexual harassment perpetrated by Ruiz, and since he was acting in the course of his employment,

she names Cingular as a Defendant too.   Ruiz argues that Kraus cannot establish the outrageous

conduct necessary to support this claim, and Cingular raises a scope of employment defense.   For

Kraus to recover on her claim for intentional infliction of emotional distress, she must show that

Ruiz's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

society."   <u>Imboden</u>, 182 F. Supp. 2d at 457.   "It is the court's responsibility to determine if the

conduct alleged in a cause of action reaches the requisite level of outrageousness."   <u>Andrews v.</u>

<u>City of Phila.</u>, 895 F.2d 1469, 1487 (3d Cir. 1990) (disagreement on other ground recognized by

<u>Jensen</u>, 435 F.3d at  449 n. 3).

"At the outset, it must be recognized that it is extremely rare to find conduct in the

employment context that will rise to the level of outrageousness necessary to provide a basis for

recovery for the tort of intentional infliction of emotional distress."   <u>Cox v. Keystone Carbon</u>

<u>Co.</u>, 861 F.2d 390, 395 (3d Cir. 1988).   "As a general rule, sexual harassment alone does not rise

---

[3]Ruiz asserts in his Motion for Summary Judgment that this Court lacks subject matter jurisdiction over him. He alleges that because neither of the federal claims alleged in this action, Counts I and II, are applicable to him, this Court cannot assert supplemental jurisdictional over him regarding the state law claims contained in Counts V–X. This Court finds no merit in his argument.  28 U.S.C. § 1367(a) says that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]" This Court has supplemental jurisdiction over the state law claims, and will exercise it accordingly.

to the level of outrageousness necessary to make out a claim for intentional infliction of emotional distress." Imboden, 182 F. Supp. 2d at 457. "Offensive comments and gestures in the workplace, even though sexually explicit, are not enough" to make out a claim. Id. A plaintiff must prove an extra factor, and "[t]he extra factor that is generally required is retaliation for turning down sexual advances." Andrews, 895 F.2d at 1487.

Kraus has not alleged that Ruiz or Cingular retaliated against her. Regardless, the evidence shows that Ruiz's conduct was nothing more than intersexual flirtation, which cannot be said to go beyond all possible bounds of decency. Kraus cannot establish outrageous conduct, and summary judgment must be granted in favor of Ruiz and Cingular on Count VII. This Court does not need to address the scope of employment defense raised by Cingular.

G.    **Assault claim**

In Count VIII, Kraus alleges that Ruiz, acting in the scope of his employment, placed his hands on her body in an attempt to hug her, which caused her to suffer imminent apprehension of offensive bodily contact. The tort of assault is defined as "an intentional attempt by force to do any injury to the person of another[.]" Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). "In determining what actions constitute assaultive behavior, [Pennsylvania courts] ha[ve] followed a commonsense definition. It requires that the behavior, if it does not involve actual physical harm, must be such that it 'clearly evoke[s] a reasonable apprehension of bodily harm' in the person assaulted." Jackson v. Pa. Bd. of Prob. and Parole, 885 A.2d 598, 601 (Pa. Commw. Ct. 2005).

At her deposition, Kraus stated that: "[Ruiz] kept coming towards me like he was going to hug me. I didn't know if he was going to kiss me. How was I to think that wasn't going to

27

happen? Did I think that he was going to hit me? I have no idea." (Kraus Dep. at 192.) Her testimony shows that she thought Ruiz might hug or kiss her. Hugging and kissing do not involve physical harm, nor do they evoke a reasonable apprehension of bodily harm in people. Moreover, Kraus testified that she had hugged Ruiz before as a sign of friendship. (Kraus Dep. at 104). Pennsylvania courts have held that fear of bodily harm is a necessary element in finding that actions constitute assaultive behavior. Kraus has not presented any evidence showing that she was in fear of bodily harm. Thus, summary judgment must be granted in favor of Ruiz on Count VIII. As Kraus cannot establish this claim, Cingular must also be granted summary judgment on Count VIII.

**H.    False imprisonment claim**

Kraus alleges in Count IX that Ruiz, again acting in the scope of his employment, falsely imprisoned her in his office by standing in front of her and trying to hug her when she got up to leave his office. Ruiz argues that Kraus cannot establish the prima facie elements, and Cingular again raises its scope of employment defense. An actor is liable for false imprisonment if (a) he acts intending to confine the other within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it. Krochalis v. Ins. Co. of. N. Am., 629 F. Supp. 1360, 1370 (E.D. Pa. 1985). "The confinement within the boundaries fixed by the defendant must be complete; if there is a known, safe means of escape, involving only a slight inconvenience, there is no false imprisonment." Id. In this case, Kraus testified that:

> I got up to leave and he walked up in front of the door. We were doing this, like shuffling thing, back and forth. He wasn't letting me leave. He tried to, you know, come in and hug me and I told him that I didn't want to hug him.

28

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMY KRAUS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 06-975 |
| | : | |
| HOWROYD-WRIGHT EMPLOYMENT AGENCY, | : | |
| INC., CINGULAR WIRELESS, LLC, NEW | : | |
| CINGULAR WIRELESS, PCS, LLC, CINGULAR | : | |
| WIRELESS EMPLOYEE SERVICES, LLC, and | : | |
| JOSEPH RUIZ, | : | |
| | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this  8th   day of January, 2008, upon consideration of Defendant

Cingular Wireless, LLC, New Cingular Wireless, PCS, LLC, Cingular Wireless Employee

Services, LLC's Motion for Summary Judgment (Doc. No. 34), Defendant Joseph Ruiz's Motion

for Summary Judgment (Doc. No. 36), and all responses and replies thereto, it is hereby

**ORDERED** that these Motions are **GRANTED**.

BY THE COURT:

/s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Galveston Division.
Dana ALEGRIA, Plaintiff,
v.
The State of TEXAS, Larry Williams, Individually
and in His Official Capacity,
and Eddie Kelly, Individually and in His Official
Capacity, Defendants.
**Civil Action No. G-06-0212.**

Nov. 2, 2007.

<u>Anthony P. Griffin</u>, Attorney at Law, Galveston, TX,
for Plaintiff.

<u>Russ W. Harris</u>, Asst. Attorney General, Austin, TX,
for Defendants.

*MEMORANDUM OPINION AND ORDER*

<u>SIM LAKE</u>, United States District Judge.

**\*1** Plaintiff, Dana Alegria, brings this action pursuant
to <u>42 U.S.C. § 1983</u> and Title IX of the Education
Act Amendments of 1972, <u>20 U.S.C. §1681, *et seq.*</u>,
for sexual harassment and violation of rights
guaranteed by the Fourteenth Amendment to the
United States Constitution against defendants, the
State of Texas and Larry Williams and Eddie Kelly in
both their official and individual capacities. For the
reasons explained below, the court will *sua sponte*
grant summary judgment on the Title IX claims
alleged against Williams and Kelly in their individual
capacities, and the Title IX and <u>§ 1983</u> claims alleged
against the State of Texas and Williams and Kelly in
their official capacities, leaving the <u>§ 1983</u> claim
alleged against Williams in his individual capacity as
the only claim remaining in this action.

**I. *Factual and Procedural Background***
The factual background of this case is summarized in
both the September 7, 2006, Order Granting in Part
and Denying in Part Defendant's Motion to Dismiss,
<u>[FN1]</u> and the September 11, 2007, Memorandum
Opinion and Order. <u>[FN2]</u> On September 7, 2006, the

court dismissed the <u>§ 1983</u> claims for compensatory
damages but declined to dismiss any <u>§ 1983</u> claims
for prospective injunctive relief alleged against
Williams in his official capacity under <u>§ 1983</u>. <u>[FN3]</u>
On December 1, 2006, the court granted plaintiff's
motion to amend (Docket Entry No. 24), and on
December 4, 2006, Plaintiff, Dana Alegria's, Third
Amended Complaint was filed (Docket Entry No.
25). Plaintiff's Third Amended Complaint asserts
Title IX and <u>§ 1983</u> claims against the State of Texas
and against Kelly and Williams in both their
individual and official capacities. On September 11,
2007, the court dismissed the <u>§ 1983</u> claim for failure
to train and supervise asserted against Kelly in his
individual capacity, declined to dismiss the Title IX
claims asserted against the State of Texas and the
individual defendants in either their official or their
individual capacities, and ordered the plaintiff to
show cause "why the court should not *sua sponte*
grant summary judgment or dismiss all of the
remaining claims except for the <u>§ 1983</u> claims for
compensatory damages asserted against Williams in
his individual capacity." <u>[FN4]</u> The court directed
the plaintiff "to file a written description--including
citations to the record and controlling case law--of
the factual and legal bases for the Title IX claims and
for the <u>§ 1983</u> claims for prospective injunctive relief
remaining in this action." <u>[FN5]</u> In response plaintiff
states that her

> <u>FN1.</u> See Docket Entry No. 15, at p. 2.

> <u>FN2.</u> See Docket Entry No. 34, at pp. 2-3.

> <u>FN3.</u> See Order Granting in Part and
> Denying in Part Defendant's Motion to
> Dismiss, Docket Entry No. 15, at pp. 2-4.

> <u>FN4.</u> Memorandum Opinion and Order,
> Docket Entry No. 34, p. 38.

> <u>FN5.</u>*Id.*

Third Amended Complaint does not assert
injunctive relief, therefore there is no need to brief
this issue--however, Plaintiff did request
declaratory relief.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

The briefing herein is directed to citations to the record and controlling case law supporting the factual and legal bases for the Title IX claim directed against the State of Texas. [FN6]

> FN6. Plaintiff, Dana Alegria's, Pleading in Response to Court's Order to Show Cause Showing Factual and Legal Basis for Title IX Claims (Plaintiff's Response to Order to Show Cause), Docket Entry No. 35, p. 2. Although the Clerk's record indicates that on October 22, 2007, plaintiff filed a Supplemental Response to Order to Show Cause, Docket Entry No. 36, the documents docketed as docket entry numbers 35 and 36 appear to be identical.

## II. *Standard of Review*

The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A district court may not generally "grant summary judgment *sua sponte* on grounds not requested by [a] moving party." *Lozano v. Ocwen Federal Bank, FSB,* 489 F.3d 636, 641 (5th Cir.2007). However, an exception exists when the district court gives a party ten days' notice. *Id.* "This requirement places a party on notice that [s]he is in jeopardy of having [her] case dismissed and affords [her] the opportunity to put forth evidence to show precisely how [s]he intends to prove [her] case at trial." *Doe on Behalf of Doe v. Dallas Independent School District (Doe I),* 153 F.3d 211, 220 n. 8 (5th Cir.1998), *cert. denied,* 531 U.S. 1073, 121 S.Ct. 766, 148 L.Ed.2d 667 (2001). Following at least ten days' notice, a district court may grant summary judgment *sua sponte* on grounds not urged in a pending motion. *Lozano,* 489 F.3d at 641 (citing *Judwin Properties, Inc. v. U.S. Fire Ins. Co.,* 973 F.2d 432, 436-37 (5th Cir.1992)). Because on September 11, 2007, the court ordered plaintiff to show cause "why the court should not *sua sponte* grant summary judgment or dismiss all of the remaining claims except for the § 1983 claims for compensatory damages asserted against Williams in his individual capacity," [FN7] plaintiff has been on

notice for more than ten days that summary judgment could be granted on all but one of the claims remaining in this action.

> FN7. Memorandum Opinion and Order, Docket Entry No. 34, p. 38.

## III. *Title IX Claims*
### A. Applicable Law

**\*2** Title IX of the Education Act Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that Title IX is enforceable through an implied right of private action against federal funding recipients, *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and that monetary damages are available in such actions. *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

In *Franklin* a high school student alleged that a teacher had sexually abused her on repeated occasions and that teachers and school administrators knew about the abuse but took no action. *Id .* at 1031. The lower courts dismissed the student's complaint upon concluding that Title IX's implied right of action did not allow recovery of monetary damages. *Id.* at 1032. The Supreme Court reversed the lower courts' dismissals after concluding that Title IX supports a private action for damages, at least "in a case such as this, in which intentional discrimination is alleged." *Id.* at 1037. The Court's holding in *Franklin* established that a federal funding recipient can be held liable in damages in cases involving a teacher's sexual harassment of a student, but did not define the contours of Title IX liability. *Id.* ("when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex.' *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed. 49 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe."). *See also Rosa H. v. San Elizaro Independent School District,*

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

106 F.3d 648 (5th Cir.1997) (holding that "minor students who have been subjected to a sexual relationship with their teachers have a private cause of action for monetary damages" under Title IX).

 The Supreme Court addressed the contours of Title IX liability in *Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).* In *Gebser* the Court affirmed the Fifth Circuit's holding that school districts cannot be held liable for teacher-student sexual harassment unless an employee with supervisory power over the offending employee actually knew of the abuse, had the power to end it, and failed to do so. *Id.* at 1994 (quoting *Doe v. Lago Vista Independent School District,* 106 F.3d 1223, 1226 ("school districts are not liable in tort for teacher-student [sexual] harassment under Title IX unless an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so"). The Court explained that the Fifth Circuit's decision was based in large part on its prior holding in *Rosa H., 106 F.3d at 648,* in which the Fifth Circuit declined to impose strict liability on a school district for a teacher's sexual harassment of a student, and its conclusion in *Canutillo Independent School District v. Leija,* 101 F.3d 393 (5th Cir.1996), *cert. denied,* 520 U.S. 1265, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997), that strict liability is inconsistent with Title IX. *Gebser,* 118 S.Ct. at 1994.

**\*3** The *Gebser* petitioners argued to the Supreme Court that "in light of *Franklin* 's comparison of teacher-student harassment, agency principles should likewise apply in Title IX actions." *Id .* at 1995. Relying on a "Policy Guidance" issued by the Department of Education (DOE), they also argued that school districts should be held

> liable in damages under Title IX where a teacher is "aided in carrying out the sexual harassment of students by his or her position of authority with the institution," irrespective of whether the school district officials had any knowledge of the harassment and irrespective of their response upon becoming aware.

*Id.* Alternatively, the petitioners argued that "a school district should be liable for damages based on a theory of constructive notice, *i.e.,* where the district knew or 'should have known' about harassment but failed to uncover and eliminate it." *Id.*

 Asserting that "[b]oth standards [advanced by the petitioners] would allow a damages recovery in a broader range of situations than the rule adopted by the Court of Appeals, which hinges on actual knowledge by a school official with authority to end the harassment," *id.,* the Court acknowledged that "whether educational institutions can be said to violate Title IX based solely on principles of *respondeat superior* or constructive notice had not been resolved by its citation of *Meritor Savings* in *Franklin.*" *Id.* Then, explaining that *Franklin* 's reference to *Meritor Savings* "was made with regard to the general proposition that sexual harassment can constitute discrimination on the basis of sex under Title IX, the Court rejected the petitioner's reliance on principles of *respondeat superior* and constructive notice because, *inter alia,*

> *Meritor* 's rationale for concluding that agency principles guide the liability inquiry under Title VII rests on an aspect of that statute not found in Title IX: Title VII, in which the prohibition against employment discrimination runs against "an employer," 42 U.S.C. § 2000e-2(a) explicitly defines "employer" to include "any agent," § 2000e(b) ... Title IX contains no comparable reference to an educational institution's "agents," and so does not expressly call for application of agency principles.

*Id.* at 1996. Reasoning that "it would frustrate the purposes of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.,* without actual notice to a school district official," *id.* at 1997, the Court reiterated its "concern ... with ensuring that the receiving entity of federal funds [have] notice that it will be liable for a monetary award." *Id.* at 1998. Accordingly, the Court held that

> in cases like this one that do not involve official policy of the recipient entity ... a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

**\*4** We think, moreover, that the response must amount to deliberate indifference to discrimination. The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference. Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions. Comparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation. *Id.* at 1999.

Applying the actual notice/deliberate indifference framework to the facts before it, the *Gebser* Court characterized the outcome as "fairly straightforward, as petitioners do not contend they can prevail under an actual notice standard." *Id.* The Court explained that

> [t]he only official alleged to have had information about [the teacher's] misconduct was the high school principal. That information, however, consisted of a complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class, which was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student. Lago Vista, moreover, terminated [the teacher's] employment upon learning of his relationship with [the complainant]. Justice STEVENS points out in his dissenting opinion that [the teacher] of course had knowledge of his own actions ... Where a school district's liability rests on actual notice principles, however, the knowledge of the wrongdoer himself is not pertinent to the analysis.

*Id.* at 2000. The Court also rejected the petitioners' attempt to ground liability on the school district's failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims as required by the DOE's regulations because "Lago Vista's alleged failure to comply with the regulations ... does not establish the requisite actual notice and deliberate indifference. And in any event, the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX." *Id.*

Thus, following *Gebser* plaintiffs seeking to recover damages for a teacher's sexual harassment of a student must establish that (1) an employee of the federal funding recipient with supervisory power over the alleged harasser (2) had actual knowledge of the harassment and (3) responded with deliberate indifference. *Gebser,* 118 S.Ct. at 1999. "[T]o qualify as a supervisory employee whose knowledge of abusive conduct counts as the [funding recipient's] knowledge, ... [an] official must at least serve in a position with the authority to 'repudiate that conduct *and* eliminate the [harassment]' on behalf of the [funding recipient]." *Rosa H.,* 106 F.3d at 661 (quoting *Nash v. Electrospace System, Inc.,* 9 F.3d 401, 404 (5th Cir.1993)). Notice of harassment to employees who have no authority beyond reporting the misconduct to other employees is insufficient to expose a federal funding recipient to Title IX liability. *Id.*

*5 "[T]he plaintiff in a Title IX damages suit based on a teacher's behavior must prove actual knowledge of misconduct ... and must also prove that the officials having that knowledge decided not to act on it." *Delgado v. Stegall,* 367 F.3d 668, 674 (7th Cir.2001). The "actual knowledge" requirement is based on the subjective standard that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rosa H.,* 106 F.3d at 658 (quoting *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). An official decision by the school district not to remedy the violation requires that the supervisory employee's response "amount to deliberate indifference to discrimination." *Gebser,* 118 S.Ct. at 1999. *See also Davis v. Monroe County Board of Education,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (defining Title IX deliberate indifference standard for student-to-student harassment as when the "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances").

In *Davis,* 119 S.Ct. at 1676, the Supreme court extended *Gebser* to allow school district liability for deliberate indifference to known acts of student-on-student sexual harassment. In *Davis* the complainant alleged that her daughter had been subjected to repeated, severe, pervasive harassment that was not only verbal but included numerous acts of objectively offensive touching by a fellow student over a five-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

month period, that multiple victims of the alleged wrongdoer's misconduct had sought an audience with the school principal, and that the school board made no effort to investigate the complaints or stop the harassment. *Id.* Applying the *Gebser* standard to the alleged facts, the Court held that the Eleventh Circuit erred in dismissing the case because the alleged facts suggested that the complainant might be able to show both actual knowledge and deliberate indifference on the part of the school board. Reasoning that a federal funding recipient cannot be held directly liable for its deliberate indifference absent the authority to take remedial action, the Court explained that if a funding recipient has not engaged in harassment directly, "it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id. at 1672.* The Court also explained that funding recipients may not be deemed deliberately indifferent to acts of student-on-student harassment unless the funding "recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id. at 1674.*

Federal funding recipients may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, even if the response is unsuccessful. *See Doe v. Dallas Independent School District,* 220 U.S. 380, 384 (5th Cir.2000), *cert. denied,*531 U.S. 1073, 121 S.Ct. 766, 148 L.Ed.2d 667 (2001). What constitutes appropriate remedial action for allegations of discrimination in Title IX cases depends on the particular facts of each case. *Id.*

**B. Individual Capacity Claims**

**\*6** The court's September 11, 2007, Memorandum Opinion and Order stated that

[s]ince liability under Title IX only lies against programs or activities that receive federal financial assistance, the court is ... inclined to dismiss *sua sponte* the Title IX claims that plaintiff has asserted or attempted to assert against Williams and Kelly in their individual capacities as not actionable. *See Smith v. Metropolitan School District Perry Township,* 128 F.3d 1014, 1019 (7th Cir.1997), *cert. denied,*524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998). [FN8]

FN8. Docket Entry No. 34, p. 39.

In *Rowinsky v. Bryan Independent School District,* 80 F.3d 1006 (5th Cir.), *cert. denied,*519 U.S. 861, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996), the Fifth Circuit dismissed a Title IX claim for student-on-student sexual harassment on grounds that Title IX imposes liability only for the acts of federal grant recipients. *Id. at 1012-13* ("As an exercise of Congress's spending power, Title IX makes funds available to a recipient in return for the recipient's adherence to the conditions of the grant. While it is plausible that the condition imposed could encompass ending discriminatory behavior by third parties, the more probable inference is that the condition prohibits certain behavior by the grant recipients themselves."). Although the Supreme Court has since recognized that Title IX liability extends to student-on-student harassment, *Davis,* 119 S .Ct. at 1676, the Court explained there that liability could only be based on the funding recipients' deliberate indifference to known acts of sexual harassment evidenced by its own failure to investigate complaints and eliminate harassment. *Id.* Although *Rowinsky* 's main conclusion that Title IX's implied right of private action did not encompass claims for student-on-student harassment has since been overturned, the Fifth Circuit's conclusion that liability under Title IX lies only for the acts of grant recipients appears to remain sound.

Reasoning that the private right to damages for violation of Title IX recognized by the Supreme Court is based on the theory that recipients of federal funding have acquiesced to suit in federal court, and that recipients of federal funding are not individuals but, instead, educational programs or activities, other circuit courts of appeals that have addressed this issue have held that Title IX does not permit actions against individuals. *See Lipsett v. University of Puerto Rico,* 864 F.2d 881, 884, 901 (1st Cir.1988) ("the separate liability of the supervisory officials at the University must be established, if at all, under § 1983, rather than under Title IX"); *Lillard v. Shelby County Board of Education,* 76 F.3d 716, 730 (6th Cir.1996) (Nelson, J., concurring) ("I do not believe that Title IX can appropriately be read as subjecting anyone other than educational institutions to liability for violation of its terms."); *Smith v. Metropolitan School District Perry Township,* 128 F.3d 1014, 1019 (7th Cir.1997), *cert. denied,*524 U.S. 951, 118 S.Ct.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 6
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

2367, 141 L.Ed.2d 736 (1998) (Title IX allows suits only against institutions; it does not allow suits against individual defendants); *Kinman v. Omaha Public School District,* 171 F.3d 607, 611 (8th Cir.1999) ("Title IX will not support an action against [defendant] in her individual capacity"); *Hartley v. Parnell,* 193 F.3d 1263, 1270 (11th Cir.1999) ("Individual school officials ... may not be held liable under Title IX."). District courts in this circuit have also held that individuals may not be held liable under Title IX. *See Doe v. Hillsboro I.S.D.,* 81 F.3d 1395, 1400 n. 9 (5th Cir.1996) (observing that district courts in the Circuit have all ruled that individuals cannot be sued under Title IX). Because the court is persuaded that the reasoning relied upon by these courts is sound, the court concludes that the Title IX claims that plaintiff has asserted against Williams and Kelly in their individual capacities are not cognizable.

**C. Official Capacity Claims and Claims Against the State of Texas**

**\*7** The court's September 11, 2007, Memorandum Opinion and Order stated that

> liability under Title IX will not lie unless the defendant that has control over the harasser acts with deliberate indifference to the harassment or otherwise fails to remedy it. *See Davis,* 119 S.Ct. at 1671. Based on the current record, the court is inclined to grant summary judgment *sua sponte* on the Title IX claims that plaintiff has asserted against the State of Texas and against Williams and Kelly in their official capacities because the uncontradicted evidence is that neither Kelly nor anyone else at the GCCS & CD knew that Williams was harassing the plaintiff until the Galveston County District Attorney's office informed Kelly of plaintiff's allegations, and that as soon as Kelly learned of those allegations he took remedial action by suspending Williams and initiating disciplinary procedures that caused Williams to resign. [FN9]

> FN9.*Id.* at 38-39.

"[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct.2018, 2036 n. 55, 56 L.Ed.2d 611

(1978). Plaintiff argues that

> [i]n the case at bar, the acts of Larry Williams, other officers and supervisors were known to the [GCCS & CD]; the conduct included the failure of the department to take proactive corrective measures when placed on notice of pervasive sexual comments and actions by its probation officers and supervisors. Even under the withering criticism of state district judges, Edward Kelly refused to inform the board of the offensive conduct, attempted to hide the conduct, and simply told the judges to mind their own business--he hid under the umbrella of being a state employee. According to the judges, the problem with Kelly's logic was that the actions of the supervisors and the probation officers spelled trouble for female employees--and probationers and "not just the pretty ones." [FN10]

> FN10. Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, pp. 18-19.

Plaintiff also argues that

> Kelly had the power to take corrective action with regard to the impermissible conduct that was verbal, physical and/or that bordered on harassment of female employees and probationers. The facts show that Kelly was hostile to input by the district judges, allowed overt offenders to resign, and did not take action unless pushed. The discovery revealed a department that was out of control. [FN11]

> FN11.*Id.* at 21-22.

The gist of plaintiff's argument is that the State of Texas possessed actual knowledge of a sexually charged environment at GCCS & CD through complaints of sexually inappropriate conduct by Williams and by three other individuals-- Miguel Ortega, Travis Scoggins, and Bernardo Almaraz--and that Kelly's failure to implement a policy aimed at protecting probationers demonstrates deliberate indifference to the risk of harm that the sexually charged environment at GCCS & CD posed to plaintiff and other probationers. Plaintiff also argues that "the question of whether summary judgment should be granted turns on the Court's interpretation of deliberate indifference as either the indifference relating only to the 'individual complainer' or deliberate indifference relating to the entire record."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

[FN12]

FN12.*Id.* at 3.

*8 Assuming without deciding that plaintiff's Title IX claims for monetary damages against the State of Texas and against Williams and Kelly in their official capacities are not barred by sovereign immunity, [FN13] the court concludes that these defendants are entitled to summary judgment because plaintiff has failed to present summary judgment evidence from which a reasonable trier of fact could conclude that any state official with supervisory power over Williams had actual knowledge of the alleged harassment and responded thereto with deliberate indifference.

FN13. Defendants have not disputed plaintiff's assertions that the probation services provided by the GCCS & CD qualify as an "educational program or activity" under Title IX, or that Williams and Kelly are agents of the State of Texas because GCCS & CD is "an arm of the state." Instead, the defendants have argued that they cannot be held liable under Title IX because GCCS & CD does not receive federal funds. However, in its September 11, 2007, Memorandum Opinion and Order, the court concluded that whether the GCCS & CD is an operation of the Texas Department of Criminal Justice (TDCJ), which undisputedly receives federal funds, poses a genuine issue of material fact for trial. See Docket Entry No. 34, pp. 33- 37. Although a finding that GCCS & CD is an operation of the TDCJ might make TDCJ a necessary party to this action, the court needs to reach this issue to conclude that the plaintiff's evidence is insufficient to hold whichever governmental entity Williams and Kelly represent liable under Title IX.

1. *Knowledge of Williams' Harassment of Plaintiff*

Plaintiff acknowledged in her deposition that she did not tell anyone at the GCCS & CD about Williams' harassment; plaintiff chose instead to complain first to family members and then in January of 2006 to the Galveston County District Attorney's office. [FN14] Plaintiff does not argue that once the District Attorney's office notified Kelly about her allegations that Kelly failed to investigate them, or failed to stop Williams from harassing her. Instead, plaintiff argues that Kelly's reaction to her complaint was unreasonable because instead of firing Williams, he allowed Williams to resign. [FN15] Because courts all measure the reasonableness of a funding recipient's response to actual notice of sexual harassment in terms of whether an investigation was conducted and the harassment stopped, and because the undisputed evidence in this case is that once Kelly received actual notice of plaintiff's allegations he confronted Williams and stopped the plaintiff's harassment, the court is not persuaded that plaintiff has raised a genuine issue of material fact regarding the reasonableness of Kelly's response to actual notice of Williams' harassment of plaintiff.

FN14. See Deposition of Dana M. Alegria, Exhibit B attached to Docket Entry No. 30, pp. 31-32 (stating that in January of 2006 the plaintiff reported Williams' conduct to the Galveston County District Attorney's office but that she never reported Williams' conduct to Kelly or to anyone else at GCCS & CD). See also Affidavit of Dana Alegria, Attachment 4 to Docket Entry No. 32 (stating that plaintiff reported Williams' conduct to the Galveston County District Attorney's office in January of 2006 and that she only talked to Kelly about it afterwards).

FN15. Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 22 (asserting that Kelly "allowed overt offenders to resign").

2. · *Knowledge of Williams' Prior Harassment of Others*

Plaintiff argues that Williams' conduct was not isolated to Plaintiff. Under Attachment 11, the Court will find an internal memorandum directed to Eddie Kelly dated February 9, 2006. The Memorandum explained that another probationer had complained of Williams as early as December 2003. [FN16]

FN16.*Id.* at 11.

Plaintiff also argues that "[u]nder Attachment 12, the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

Court will find a letter from Kelly Bozeman who conveyed information [to Kelly about harassment by Williams] from another probationer, Karen Walton ." [FN17]

FN17.*Id.* at 13.

(a) Bozeman Letter

The Bozeman letter is dated January 26, 2006. It states that at about 1:30 that afternoon Shirley Shaw came to Bozeman's office to report a phone call that she had received from a defendant named Karen Walton who had once been supervised by Williams. According to Shaw, Walton stated that Williams always "talked 'dirty' " to her, but that she had never reported his comments to anyone other than her current counselor. [FN18] Since Bozeman testified that she was Williams supervisor when he resigned, that he resigned during the first two weeks of January of 2006, [FN19] and that she had "never had a complaint made to [her] until after Mr. Williams left ... [the] department," [FN20] her letter of January 26, 2006, does not support plaintiff's contention that Kelly or any other state official with supervisory power over Williams had actual notice of Williams' misconduct prior to notice of plaintiff's allegations. At best, Bozeman's letter evidences only that at some unidentified time prior to the disclosure of plaintiff's allegations, defendant Karen Walton reported to her counselor that Williams talked "dirty" to her. Because plaintiff fails to present any evidence from which a reasonable trier of fact could conclude that Walton's counselor was a state official with supervisory power over Williams who responded with deliberate indifference to knowledge of Williams' misconduct, the court concludes that the Bozeman letter is insufficient to raise a genuine issue of material fact for trial.

FN18. Bozeman Letter of January 26, 2006, Attachment 12 to Docket Entry No. 35.

FN19. See Deposition of Kelly Bozeman, Attachment 6 to Docket Entry No. 32, p. 16.

FN20.*Id.* at 11.

(b) Ellis-Henry Internal Memorandum

*9 The internal memorandum is dated January 26, 2007, and written by Robin Ellis-Henry, a probation officer, who states that around December of 2003 a probationer under her supervision named Rebecca Alaniz told her that she had been sexually harassed by Williams. Ellis-Henry states that Williams told Alaniz that if she would perform sexual favors for him, he would have her probation fees waived. [FN21] Ellis-Henry states that after receiving this report, she gave Alaniz the number to the Office of Inspector General (OIG) and advised Alaniz to contact them with her complaint. Ellis-Henry explained that she gave Alaniz the OIG's number because Alaniz was too afraid to tell Ellis-Henry's then supervisor, Magdalene Sanchez, about Williams' conduct because Alaniz feared jeopardizing her probation discharge. [FN22] Plaintiff argues that

FN21. See Attachment 11 to Plaintiff's Response to Order to Show Cause, Docket Entry No. 35.

FN22.*Id.* See also Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, pp. 11-12.

[i]nstead of the probation officer and then the supervisor reporting the information to others in authority and/or taking action, they put the burden on Ms. Alaniz to report the same to the Office of the Inspector General. It should be noted that Ms. Sanchez is a person of authority who could have taken action on the complaint. [FN23]

FN23.*Id.*

Plaintiff argues that the failure of Ellis-Henry and/or Sanchez to report the complaint to Kelly and/or to take other corrective action shows "that the deliberate indifference[ ] as to the conduct in the department created [a sexually charged] atmosphere." [FN24]

FN24. Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 12 n. 17.

The Supreme Court's holding in *Gebser* that federal funding recipients cannot be held liable under Title IX unless they have actual knowledge of harassment left open the question of whether the federal funding recipient must have had actual knowledge that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                          Page 9
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

plaintiff herself was subjected to sexual harassment, or whether knowledge that other individuals had been subjected to harassment is sufficient to support liability. *See Johnson v. Galen Health Institutes, Inc.,* 267 F.Supp.2d 679, 687 (W.D.Ky.2003) (recognizing that the Court's analysis in *Gebser* left this question open). Although the Fourth Circuit has interpreted *Gebser* 's requirement of "actual knowledge of discrimination in the recipient's programs" to require "a showing that ... [appropriate] officials possessed actual knowledge of the discriminatory conduct in question," *Baynard v. Malone,* 268 F.3d 228, 237-38 (4th Cir.2001), *cert. denied,* 535 U.S. 954, 122 S.Ct. 1357, 152 L.Ed.2d 353(2002), district courts have held that the funding recipient need only **"have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment" upon which plaintiff's legal claim is based."** *Johnson,* 267 F.Supp.2d at 687 (quoting *Folkes v. New York College of Osteopathic Med.,* 214 F.Supp.2d 273 (E.D.N.Y.2002)).

Asserting that **"[a]ctual knowledge of intentional discrimination and actual knowledge of the actual plaintiff's experiences are two different things,"** *id.* at 688, the *Johnson* court reasoned that the *Gebser* notice standard does not require actual notice of previous acts of harassment committed against the plaintiff by the alleged wrongdoer before a funding recipient may be held liable for the wrongdoer's misconduct. *Id.* Instead, the court concluded that "the actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse ... based on prior complaints by other [s]." *Id.* An "appropriate official" is one who serves in "a position with the authority to repudiate ... [the harassing] conduct and eliminate the discrimination on behalf of the [funding recipient]." *Rosa H.,* 106 F.3d at 661. *See also Gebser,* 118 S.Ct. at 1994 (affirming the Fifth Circuit's holding that Title IX liability attaches when an official who has been invested with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so).

**\*10** Assuming without deciding that plaintiff may satisfy *Gebser* 's actual notice standard by presenting evidence from which a reasonable trier of fact could conclude that an appropriate official had actual knowledge of a substantial risk of abuse to probationers based on prior complaints by others, the court is still not persuaded that plaintiff has presented evidence capable of raising a genuine issue of material fact for trial. Although plaintiff has presented evidence that in 2003 Ellis-Henry communicated Aluniz's complaints about Williams' conduct to her supervisor, Sanchez, and has asserted that "Sanchez is a person of authority who could have taken action on the complaint," [FN25] plaintiff has failed to present any evidence from which a reasonable fact finder could conclude that in 2003 (when Aluniz complained to Ellis-Henry) Sanchez had supervisory power over Williams, or that Sanchez's response to Ellis-Henry's report was unreasonable under the known circumstances. Instead, plaintiff asserts that

FN25.*Id.*

[f]rom the factual record before this Court, Kelley clearly had authority to take corrective measures. Plaintiff contends that the Supervisor Officer Sanchez once informed about Larry Williams' conduct in 2003 had authority to address the grievance (Aluniz complaint) and institute corrective measures-- include reporting to Kelley. By way of example, a current Community Supervision Supervisor explained that her role is to manage employees, ensure office policy and procedures are followed, to deal with Human Resource issues and to supervise case load management.
In the case of *Murrell v. School District No. 1, Denver, Colorado,* 186 F.3d 1238 (10th Cir.1999), the Tenth Circuit when addressing the question of job titles declined to limit its analysis to a particular job title or positions (that would constitute the authority to address the alleged discrimination and to institute corrective measures). The Court explained that "deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry." *Id.* at 1247. [FN26]

FN26.*Id.* at 18 n. 20.

Plaintiff's argument appears to be that at all times relevant to this case Kelly possessed the authority to investigate and correct Williams' conduct, but that as a supervisor, Sanchez possessed the authority to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
**(Cite as: 2007 WL 3256586 (S.D.Tex.))**

address Alaniz's complaint about Williams' misconduct and take corrective measures by reporting the complaint to Kelly. However, since the Fifth Circuit has held that notice of teacher-student harassment to employees who have no authority beyond reporting the misconduct to other school district employees is insufficient to expose a federal funding recipient to Title IX liability, _Rosa H., 106 F.3d at 661_, and since plaintiff has failed to present any evidence from which a reasonable fact finder could conclude that Sanchez possessed any authority beyond the ability to report Alaniz's complaint to Kelly, the court is not persuaded that evidence that Ellis-Henry reported Alaniz's complaint to Sanchez is sufficient to expose the State of Texas and/or the official capacity defendants to Title IX liability.

**\*11** Moreover, even if notice to Sanchez were sufficient to impose Title IX liability on these defendants, the court concludes that plaintiff has failed to present any evidence from which a reasonable fact finder could conclude that Sanchez responded to this notice with deliberate indifference.

In her letter to Kelly, Ellis-Henry stated that she
> told Mrs. Sanchez to come speak to defendant [Alaniz] in regards to allegations that P.O. Williams had been making sexual advances toward her. Mrs. Sanchez did speak to the defendant. When I returned I asked the defendant if she told Mrs. Sanchez and she replied no because she was afraid [of] Mrs. Sanchez. I encouraged the defendant to contact O[ffice of] I[nspector] G[eneral] and report the situation. [FN27]

> FN27. Attachment 11 to Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 2.

Thus, the undisputed evidence is that when Sanchez learned of Alaniz's complaint she did not fail to take any action but, instead, met with Alaniz to investigate the complaint. When Alaniz refused to verify the complaint to Sanchez, Sanchez took no further action. Although Sanchez's response to Alaniz's complaint did not succeed at correcting Williams' misconduct, in light of Alaniz's refusal to verify the complaint and absent any evidence that Sanchez had received any other complaints about Williams' misconduct, the court is not persuaded that Sanchez's response to Alaniz's complaint was unreasonable

under the known circumstances. _See Doe, 220 F.3d at 384_ (officials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, even if the response is unsuccessful).

### 3. _Knowledge of Sexually Charged Environment_

Arguing that "[d]efendant State of Texas should remain in this action and Plaintiff should be allowed to proceed on her Title IX claim," [FN28] plaintiff asserts that "[d]efendant's agent" subjected probationers and employees alike to a "sexually charged environment ... [that] has to be viewed contextually and not isolated to the acts directed to Alegria." [FN29] Plaintiff argues that "[a] contextual view imports knowledge. An isolated restricted view would prevent one from seeing Alegria as a byproduct, victim and/or subject of [a] dysfunctional system." [FN30] As additional evidence that Kelly and the State of Texas possessed knowledge of other complaints of sexual harassment in the GCCS & CD, plaintiff cites the deposition testimony of the Honorable Susan Criss, presiding judge of the 212th Judicial District Court who serves together with other district judges on the board that oversees the GCCS & CD. Plaintiff asserts that when questioned about the state's knowledge of other complaints of sexual harassment in the GCCS & CD, Judge Criss testified that inappropriate sexual conduct was extensive at the GCCS & CD and that Kelly's reaction to complaints of inappropriate sexual conduct was "tantamount to indifference." [FN31] Although the list of examples of inappropriate sexual conduct compiled by plaintiff from Judge Criss's testimony is over five pages long, [FN32] the examples are all related to the actions of three individuals: Bernardo Almaraz, Miguel Ortega, and Travis Scoggins.

> FN28. Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 22.

> FN29._Id._ at 23.

> FN30._Id._

> FN31._Id._ at 6.

> FN32._Id._ at 6-11

(a) Bernardo Almaraz

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                   Page 11
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
(Cite as: 2007 WL 3256586 (S.D.Tex.))

**\*12** Almaraz was a probation officer at the GCCS & CD. Asserting that Almaraz attempted to assault a Galveston probationer during a home visit, and that Kelly failed to report the incident to the judges on the GCCS & CD's governing board, [FN33] plaintiff argues that Kelly "concealed the criminal charges against Almaraz" [FN34] from the judges on GCCS & CD's board, and that Kelly's concealment of these charges evidences deliberate indifference to the sexually charged environment at GCCS & CD.

> FN33. *Id.* at 8.

> FN34. *Id.*

The summary judgment evidence establishes that on July 1, 2003, a probationer complained to Kelly about inappropriate conduct of a sexual nature between her and her probation officer, Almaraz, that Kelly immediately contacted the Pasadena Police Department to initiate an investigation, that the detectives investigating the complaint asked Kelly to let them complete their investigation before he initiated disciplinary action, that on July 10, 2003, the detectives contacted Almaraz for his statement, whereupon Almaraz resigned by leaving a message on his supervisor's office telephone and placing a letter of resignation dated July 11, 2003, in her office mail box. [FN35] The evidence also establishes that Almaraz was subsequently indicted for official oppression and placed on community supervision for that offense. [FN36] Although plaintiff argues that Kelly responded with deliberate indifference to Almaraz's conduct because he did not report the incident to GCCS & CD's board until several months after it had occurred and, then, only in response to questioning from the board, [FN37] plaintiff has failed to present any evidence contradicting the defendants' evidence that Kelly took effective remedial action immediately upon learning of Almaraz's misconduct. Moreover, plaintiff has failed to present any evidence from which a reasonable fact finder could conclude that Almaraz's misconduct placed defendants on actual notice that Williams posed a threat to plaintiff or the other probationers that he supervised, that Kelly had a duty to report Almaraz's misconduct to GCCS & CD's board earlier than he did, that Kelly's failure to report the incident earlier was unreasonable under the circumstances, or that it caused the plaintiff to undergo harassment at Williams' hands, or made plaintiff liable or vulnerable to such harassment. *See Gebser,* 118 S.Ct. at 1999-2000 (evidence that the defendant failed to comply with DOE regulations was insufficient to satisfy the requisite standards for actual notice and deliberate indifference).

> FN35. Kelly Affidavit, Exhibit A attached to Docket Entry No. 31, second unnumbered page.

> FN36.*Id.*

> FN37. See Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 8 (citing Deposition of Judge Susan Criss, Attachment No. 2 to Docket Entry No. 32, pp. 40-42).

(b) Miguel Ortega

Ortega was a probation officer at the GCCS & CD. Plaintiff argues that Judge Criss's testimony establishes that Ortega sexually harassed court staff and prosecutors by making sexual noises and gestures, and inappropriately touching some of them. [FN38]

> FN38. Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 6.

The summary judgment evidence establishes that in early 2004, Ortega was acting in unspecified "sexually inappropriate [ways] in the 122nd District Court towards female employees in the court and the DA's office in the courthouse." [FN39] Judge Criss testified that GCCS & CD employees complained that Ortega would harass "women in the lobby by sitting next to them and saying things like, 'Can I kiss you, Cupcake?' and making sexual noises that ... upset[ ] people." [FN40] In response, Ortega was transferred to a job that did not require his regular presence in the courthouse. Unsatisfied with Ortega's reassignment, the judges on the GCCS & CD board ordered Kelly to prohibit Ortega from supervising women. [FN41] Judge Criss testified that Kelly first ordered Ortega not to supervise pretty women, and only upon further direction reluctantly agreed to order Ortega not to supervise any women. Judge Criss testified that instead of following Kelly's order,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
(Cite as: 2007 WL 3256586 (S.D.Tex.))

Ortega had women who reported to him for community service sign waivers indicating their agreement to be supervised by him. [FN42] Judge Criss also testified that by the time the board learned of Ortega's practice of obtaining waivers from women, Ortega had already been fired. [FN43]

> FN39. Deposition of Judge Susan Criss, Attachment 2 to Docket Entry No. 32, p. 45.

> FN40.Id. at 46.

> FN41.Id.

> FN42.Id. at 47.

> FN43.Id. at 49.

*13 Judge Criss's testimony shows that GCCS & CD employees complained that Ortega was verbally abusive to others, and that his verbal abuse included sexually laden comments made to probationers in the GCCS & CD's lobby. However, none of the complaints about Ortega evidence sexually assaultive conduct or fear of sexually assaultive conduct like that to which Williams allegedly subjected the plaintiff. Moreover, Judge Criss's testimony establishes that neither Kelly nor the GCCS & CD board stood idle in the face of the complaints about Ortega's conduct but, instead, initially took measures aimed at curbing Ortega's ability to engage in such conduct and, when those failed, terminating Ortega's employment. Although Judge Criss disagreed with Kelly's management of Ortega, plaintiff fails to present any evidence from which a reasonable fact finder could conclude that Ortega's misconduct placed defendants on actual notice that Williams posed a threat to plaintiff or the other probationers that he supervised, caused the plaintiff to undergo harassment at Williams' hands, or made plaintiff liable or vulnerable to such harassment. See Doe v. Taylor Independent School District, 15 F.3d 443, 458 (5th Cir.) (en banc), cert. denied sub nom, Lankford v. Doe, 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994) (superintendent who had actual notice of a pattern of inappropriate sexual behavior was not deliberately indifferent where he took some steps in response to that knowledge even though his steps were ineffective).

(c) Travis Scoggins

Scoggins was a supervisor at the GCCS & CD. Plaintiff argues that Judge Criss's testimony and GCCS & CD records reveal that Scoggins harassed probation officers and other members of the GCCS & CD staff by yelling, cursing, and making sexually explicit gestures, [FN44] and that despite having both actual knowledge of repeated complaints against Scoggins and supervisory authority over Scoggins, Kelly failed to take corrective action against Scoggins.

> FN44. Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 7. See also Deposition of Judge Susan Criss, Attachment 2 to Docket Entry No. 32, pp. 24-25, 74-75.

The summary judgment evidence establishes that beginning as early as July of 2000 and continuing until September of 2003 when Scoggins retired, Kelly received complaints from men and woman alike about Scoggins' violent outbursts and frequent use of profanity. [FN45] The evidence also establishes that from time to time Scoggins was subjected to disciplinary action, but that Judge Criss and others decried those disciplinary actions as insufficient to remedy Scoggins' abusive conduct. The complaints against Scoggins all express fear of his violent temper, verbal abuse, and lack of anger management skills. [FN46] None of the complaints against Scoggins evidence sexually assaultive conduct or fear of sexually assaultive conduct like that to which Williams allegedly subjected the plaintiff. Because in Gebser, 118 S.Ct. at 2000, the Supreme Court held that complaints "charging only that [the alleged wrongdoer] had made inappropriate comments ... [were] plainly insufficient to alert the [federal funding recipient] to the possibility that [the alleged wrongdoer] was involved in a sexual relationship," the court concludes that evidence that Scoggins displayed a violent temper and engaged in verbal abuse that included profanity was insufficient to alert Kelly or any other supervisory official at the GCCS & CD to the possibility that Williams was sexually abusing the plaintiff.

> FN45. See Chronology of Complaints Against Travis Scoggins, Attachment 10 to Docket Entry No. 32.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 13
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
(Cite as: 2007 WL 3256586 (S.D.Tex.))

FN46. *Id.*

(d) Collective Knowledge

**\*14** For the reasons explained above, the court concludes that the evidence of sexual misconduct attributable to Almaraz, Ortega, and Scoggins is insufficient to raise a genuine issue of material fact for trial because that evidence would not allow a reasonable trier of fact to conclude that an official with supervisory power over Williams knew about his sexual misconduct, had the power to end it, and unreasonably failed to do so. Nor is the court persuaded that when viewed collectively, the evidence of sexual misconduct attributable to Almaraz, Ortega, and Scoggins, is capable of raising a genuine issue of material fact for trial on grounds that their conduct collectively created a sexually hostile environment.

There are arguably two ways in which sexual harassment in the educational context can constitute gender-based discrimination actionable under Title IX. See *Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir.2002)*. Liability can be based upon "quid pro quo" harassment (i.e., receipt of a benefit conditioned on submission to sexual conduct) or on "hostile environment" harassment (i.e., sexual conduct which, *inter alia,* creates an intimidating environment). *Id. See also Leija, 101 F.3d at 397*. Although plaintiff argues that "the facts herein reflect both a *quid pro quo* and a persistent and pervasive harassment," [FN47] plaintiff testified that apart from the time she spent with Williams, she never felt harassed or uncomfortable at the probation office because she was a woman, and never observed any behavior by any of the other probation officers that she considered inappropriate towards women. [FN48] Moreover, plaintiff's allegations that Williams subjected her to unwanted sexual acts constitute allegations of *quid pro quo* as opposed to hostile environment sexual harassment. Plaintiff has not cited and the court has not found any authority for the proposition that actual notice of a sexually charged (or hostile) environment constitutes actual notice of *quid pro quo* sexual harassment. *See Gebser, 118 S.Ct. at 2000* (holding that complaints charging only that an alleged wrongdoer made inappropriate comments were insufficient to alert a federal funding recipient to the possibility that the alleged wrongdoer

was involved in a sexual relationship); *Johnson, 267 F.Supp.2d at 679* (reasoning that actual knowledge of sexually offensive environment did not place school district on actual notice of *quid pro quo* sexual harassment).

FN47. Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 5 n. 10.

FN48. See Deposition of Dana Alegria, Exhibit B attached to Docket Entry No. 30, pp. 22-23. Although plaintiff argues that Williams made one sexual comment to her before he became her probation officer, one comment by a non-supervising probation officer does not create a sexually hostile environment. While abhorrent, the lone comment made by Williams to plaintiff prior to becoming her probation officer cannot constitute a sexually hostile environment because it is not pervasive or persistent.

Even if the court were to conclude that the evidence plaintiff has presented of Almaraz's, Ortega's, and Scoggins' misconduct is sufficient to show that the GCCS & CD suffered from a sexually charged environment, that evidence would not be sufficient to establish liability under Title IX absent evidence that an official with supervisory authority over the GCCS & CD was both aware of facts from which an inference could be drawn that the sexually charged environment at GCCS & CD posed a substantial risk that plaintiff and/or other probationers would be subjected to sexually abusive *quid pro quo* conduct and that the official actually drew that inference. *See Rosa H., 106 F.3d at 658*.

**\*15** Because plaintiff has failed to present evidence capable of establishing that anyone other than Kelly possessed supervisory power over the GCCS & CD employees, or that when notified of sexual misconduct committed by Almaraz, Ortega, Scoggins, or Williams, Kelly failed to take corrective measures that in all but one of the cases (Scoggins) succeeded in stopping the misconduct, the court is not persuaded that plaintiff has presented evidence from which a reasonable trier of fact could conclude that Kelly responded with deliberate indifference to any known acts of sexually abusive *quid pro quo* conduct. Moreover, because Scoggins' misconduct involved comments and verbal abuse as opposed to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)
(Cite as: 2007 WL 3256586 (S.D.Tex.))

Page 14

the *quid pro quo* type of sexual harassment of which the plaintiff complains, the court is not persuaded that plaintiff has presented evidence from which a reasonable trier of fact could conclude that actual knowledge of Scoggins' conduct could have placed the GCCS & CD on notice that plaintiff faced a substantial risk of being subjected to *quid pro quo* sexual abuse.

### IV. *Section 1983 Claims for Prospective Injunctive Relief*

In response to Williams' motion to dismiss the § 1983 claims asserted against him in his official capacity, plaintiff acknowledged that she could not recover damages for past constitutional violations, but argued that she could seek and properly obtain prospective injunctive and declaratory relief from the State. Noting that "[i]t is somewhat unclear exactly what injunctive relief Plaintiff is seeking," [FN49] and that "Plaintiff generally describes her desire for a 'policy to protect females' in her Complaint," [FN50] the court initially declined to grant Williams' motion to dismiss plaintiff's claims for prospective injunctive and declaratory relief in "hopes that the relief sought by Plaintiff and the legal authority allowing such relief will be more fully hashed out in future dispositive motions and responses thereto." [FN51]

> FN49. Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Docket Entry No. 15, p. 3 & n. 4.

> FN50.*Id.*

> FN51.*Id.*

In its September 11, 2007, Memorandum Opinion and Order, the court stated that

[s]ince it is undisputed that Williams is no longer employed by the GCCS & CD, and since the court has already concluded that Kelly is entitled to summary judgment based on qualified immunity, the court is also inclined to grant summary judgment *sua sponte* on the § 1983 claims for prospective injunctive [and declaratory] relief that plaintiff has asserted against Williams and Kelly in their official capacities because the plaintiff has failed to demonstrate a pattern of similar violations arising from lack of training or supervision that is so clearly inadequate as to be obviously likely to result in a future constitutional violation. *See*

*Henschen v. City of Houston, Tex.,* 959 F.2d 584, 588 (5th Cir.1992 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 675-76, 38 L.Ed.2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, [ ] if unaccompanied by any continuing, present adverse effects.")). [FN52]

> FN52. Docket Entry No. 34, pp. 39-40.

**\*16** In response plaintiff asserts that her Third Amended Complaint does not assert injunctive relief, therefore there is no need to brief this issue--however, Plaintiff did request declaratory relief (see paragraph 41). [FN53]

> FN53. Plaintiff's Response to Order to Show Cause, Docket Entry No. 35, p. 2.

The court construes plaintiff's statement that she is no longer seeking prospective injunctive relief as an abandonment of those claims.

### V. *Conclusions and Order*

For the reasons explained above, the court *sua sponte*GRANTS defendants summary judgment on the Title IX claims alleged against Williams and Kelly in their individual capacities, and the Title IX and § 1983 claims alleged against the State of Texas and against Williams and Kelly in their official capacities. Since the court has already dismissed the § 1983 claims for monetary damages asserted against the State of Texas and against Kelly and Williams in their official capacities and against Kelly in his individual capacity, the only claim remaining in this action is the § 1983 claim for monetary damages alleged against Williams in his individual capacity.

Discovery against Williams will be completed by December 21, 2007. The joint pretrial order will be filed by January 4, 2008. Docket call will be on January 11, 2008, at 4:00 p.m., in Court Room 9-B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas.

Not Reported in F.Supp.2d, 2007 WL 3256586 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))

**H**Babiker v. Ross Univ. School of Medicine
S.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Nasir Abdalla BABIKER, Plaintiff,
v.
ROSS UNIVERSITY SCHOOL OF MEDICINE,
Defendant.
**No. 98 CIV 1429 THK.**

May 19, 2000.

Nasir A. Babiker, Alexandria, VA.
Leonard A. Sclafani, Esq., Polatsek & Sclafani, New
York.

MEMORANDUM OPINION AND ORDER

KATZ, Magistrate J.
*1 Plaintiff Nasir Abdalla Babiker, brings this action against Ross University School of Medicine, alleging discrimination, breach of contract, negligence, and intentional infliction of emotional distress in connection with his termination as a medical student. The parties have consented to trial before me, pursuant to 28 U.S.C. § 636(c).

Defendant has moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, defendant's motion is granted, and the action is dismissed with prejudice.

BACKGROUND

Plaintiff, a native of Sudan, began medical studies at Ross University School of Medicine in Dominica in July 1991. See Affidavit of Dr. Nancy Perri ("Perri Aff."), at ¶ 3.FN1 Medical education at Ross University consists of basic medical science studies followed by a clinical curriculum consisting of clinical rotations at various hospitals. See Perri Aff., at ¶¶ 11-12. Plaintiff successfully completed the basic sciences portion of his education on October 30, 1992. See Plaintiff's Affidavit in Opposition to Defendant's Motion for Summary Judgment ("Pl.Aff.") at 4; Complaint, at ¶¶ 14, 19; Defendant's

Statement Pursuant to Local Civil Rule 56.1 ("Deft. Rule 56.1 Statement"), at ¶¶ 13-14. On October 30, 1992, plaintiff's medical education was interrupted as a result of his failure to pay $7500 in tuition, and plaintiff resumed his medical studies in the Fall of 1994, after the university agreed to defer plaintiff's obligation to pay the outstanding balance of his tuition. See Pl. Aff., at 6; Complaint, at ¶¶ 33-36; Perri Aff., at ¶ 60; Deft. Rule 56.1 Statement, at ¶¶ 15-16.

> FN1. Ross University is located on the island of Dominica in the West Indies, and has administrative offices in New York. See Answer, at ¶ 4.

The United States Medical Licensing Examination ("USMLE"), a test administered by organizations independent from the medical school, including the Educational Commission for Foreign Medical Graduates ("ECFMG"), consists of three separate examinations (Steps I-III).See Perri Aff., at ¶¶ 15-20; USMLE Bulletin of Information, at ii, attached as Ex. B to Perri Aff.; Deft. Rule 56.1 Statement, at ¶¶ 2-3. Step I covers basic sciences; Step II covers proficiency in clinical sciences; and Step III covers the ability to employ the information learned in both basic and clinical sciences, and is taken after obtaining the M.D. degree. See Perri Aff., at ¶¶ 21-22; USMLE Bulletin of Information, at 2. An individual must pass all three steps in order to be licensed to practice medicine in the United States. See Perri Aff., at ¶ 29. It is a requirement of ECFMG that a person must obtain a certificate of good standing from his medical school in order to sit for the USMLE examination. See Perri Aff., at ¶ 23.

For many years, Ross University required that each student pass Step I of the USMLE in order to receive a medical degree. See Perri Aff., at ¶ 34; Deft.Rule 56.1 Statement, at ¶ 5. Effective January 1995, Ross University adopted a rule requiring each of its students to pass Step I within three attempts, and requiring the expulsion of students from the school for failure to do so. See Perri Aff., at ¶ 35; Ross University Handbook, at 2, attached as Ex. C to Perri Aff.; Deft. Rule 56.1 Statement, at ¶ 6. In August 1995, Ross University adopted another rule requiring

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 2
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))

its students to take and pass Step I before proceeding from the basic science portion of their medical education to the clinical sciences curriculum. *See* Perri Aff., at ¶¶ 37-38; Deft. Rule 56.1 Statement, at ¶ 7. The rule provided that a student was not in good standing at the university and therefore, could not participate in clinical studies (with one exception not applicable here), until he or she passed Step I of the USMLE. *See* Perri Aff., at ¶¶ 37-38; Deft. Rule 56.1 Statement, at ¶ 8. These rules were published throughout the school, a bulletin announcing them was mailed to every student enrolled at the university, and they were included in the student handbook. *See* Perri Aff., at ¶¶ 40-41; Exs. C and D to Perri Aff.; Deft. Rule 56.1 Statement, at ¶¶ 9-10.

*2 In June 1995, plaintiff took and failed Step I of the USMLE. *See* Complaint, ¶ 62; Deft. Rule 56.1 Statement, at ¶¶ 18-19.[FN2] The results of the June 1995 Step I exam were released in July 1995, at which time plaintiff was already participating in a clinical rotation at St. Luke's Hospital in Missouri. *See* Perri Aff., at ¶ 69.[FN3] The university had previously certified plaintiff to take Step I on two different occasions in 1993. *See* Pl. Aff., at 7; Perri Aff., at ¶ 74; Exs. L and M to Perri Aff. Upon learning that plaintiff had failed Step I in June 1995, the university thus assumed that plaintiff had then failed Step I three times, and instructed plaintiff to refrain from participating in clinical rotations until he provided the university with either the test results from the 1993 examinations, or certification from the ECFMG that he had not taken the exam on the earlier occasions. *See* Perri Aff., at ¶¶ 74-86. Plaintiff contends that he did not sit for Step I prior to June 1995, and an August 1998 letter from the ECFMG confirms this. *See* Pl. Aff., at 7; Letter from ECFMG, dated August 25, 1998, attached as Ex. 21 to Pl. Aff. Plaintiff acknowledges, however, that although he requested that ECFMG send the requested certification to the university, they did not do so. *See* Pl. Aff., at 8; Complaint, at ¶ 73; Letters from Plaintiff to ECFMG, dated November 16, 1996 and March 18, 1996, attached as Ex. 20 to Pl. Aff. Plaintiff also acknowledges that the Dean of Clinical Studies, Nancy Perri, contacted him and instructed him to refrain from participating in clinical rotations until he submitted this documentation. *See* Pl. Aff., at 7. Nevertheless, at plaintiff's urging, Perri permitted plaintiff to complete the rotation in which he was already participating, based on his assurance that he had only taken Step I once; she advised him,

however, that he could not participate in further rotations until he submitted the requested documentation. *See* Perri Aff., at ¶¶ 84-86.

> FN2. Although plaintiff alleges that the university and ECFMG conspired to fail him, *see* Pl. Aff., at 7, this conspiracy allegation is not an issue in this case. By Order, dated January 22, 1999, the Court denied plaintiff's motion to amend his complaint to add allegations of fraud, conspiracy, and defamation, holding, *inter alia,* that plaintiff's wholly conclusory allegations of conspiracy and fraud were facially insufficient to state a claim. *See* Order, dated January 22, 1999. Even with the completion of pretrial discovery, plaintiff has failed to adduce any evidence to support his conspiracy theory.

> FN3. The rule requiring that each medical student pass Step I prior to participating in a clinical rotation did not go into effect until August 1995, and thus plaintiff was properly participating in this rotation, even though he had not passed Step I.

In November 1995, without the university's knowledge, plaintiff commenced another clinical rotation at St. Luke's Hospital. *See* Perri Aff., at ¶ 90; Deft. Rule 56.1 Statement, at ¶ 31. When Perri learned that plaintiff was participating in this rotation in violation of the university's regulations, Perri again informed plaintiff that he could not engage in any further clinical rotations until he passed Step I and provided proof to the university that he had not taken and failed Step I three times. *See* Perri Aff., at ¶¶ 93-97.[FN4] Again, Perri permitted plaintiff to complete the rotation he had started, with a warning that he had to obtain the requested certification prior to participating in any further rotations. *See* Perri Aff., at ¶¶ 94-97.

> FN4. In August 1995, the school had enacted the additional requirement that each student pass Step I prior to commencing clinical studies.

Without providing the university with this documentation, plaintiff participated in another rotation at St. Luke's in April 1996. Perri discovered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))

this upon receiving notice from St. Luke's that because plaintiff had been accused of making unwanted sexual advances towards another medical student, he was being dismissed from the rotation. *See* Letter from Dr. Charles Van Way, dated April 26, 1996, attached as Ex. Q to Perri Aff.; Perri Aff., at ¶ 101; Deft. Rule 56.1 Statement, at ¶¶ 34-36. Perri confirmed that plaintiff had been participating in this rotation, and then dismissed plaintiff from Ross University for improperly participating in clinical rotations before passing Step I of the USMLE and for misrepresenting himself as a student in good standing. *See* Letters from Perri to plaintiff, dated April 26, 1996 and April 29, 1996, attached as Exs. R and S to Perri Aff.; Perri Aff., at ¶ 102; Deft. Rule 56.1 Statement, at ¶ 36.

**\*3** Plaintiff appealed his dismissal through the university's administrative process. The university agreed to delay a final determination on the appeal until after plaintiff took Step I again, and the university received the results. *See* Perri Aff., at ¶ 109; Deft. Rule 56.1 Statement, at ¶¶ 39-40. On August 12, 1997, plaintiff failed Step I, *see* Ex. T to Perri Aff., and the university therefore determined that plaintiff's appeal was moot, because he had then failed Step I three consecutive times. *See* Deft. Rule 56.1 Statement, at ¶¶ 41-42.[FN5]

> FN5. It is undisputed that plaintiff took Step I in June 1995 and in June 1996, and had failed the exam both of these times. *See* Perri Aff., at ¶ 110; Ex. 21 to Pl. Aff.

Plaintiff alleges that his dismissal from the university was based on race and national origin discrimination, and that he received less favorable treatment in assignment to clinical courses than white American students. *See* Pl. Aff., at 11; Complaint, at ¶¶ 90-99. Plaintiff alleges that the university breached its contract with plaintiff by wrongly and unjustly dismissing him and by refusing to award him a medical degree. *See* Pl. Aff., at 11; Complaint, at ¶¶ 105-108. He further alleges that the university was negligent in maintaining its business records, which led to his dismissal from the university. *See* Pl. Aff., at 11; Complaint, at ¶¶ 105-108. Finally, plaintiff alleges that defendant intentionally and recklessly dismissed him, thereby intentionally inflicting emotional distress. *See* Pl. Aff., at 11; Complaint, at ¶¶ 100-104.

### DISCUSSION

*I. Summary Judgment Standard*

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. In deciding a motion for summary judgment, the Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor."*American Casualty Co. of Reading, Pennsylvania v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir.1994).* In addition, because plaintiff is acting *pro se,* the Court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest."*Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994); accord Soto v. Walker, 44 F.3d 169, 173 (2d Cir.1995).* Nevertheless, to defeat a motion for summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356. (1986).* A plaintiff must "come forward with enough evidence to support a jury verdict in [his] favor, and the motion will not be defeated merely ... on the basis of conjecture and surmise."*Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir.1992).* A party opposing a motion for summary judgment "may not rest on the pleadings, but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial."*Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir.1996); see also* Fed.R.Civ.P. 56(c) and (e); *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).* Only competent evidence may be considered in determining the outcome of a motion for summary judgment. *See Sheldon v. Barre Belt Granite Employer Union Pension Fund, 25 F.3d 74, 79 (2d Cir.1994); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir.1994); Cordoba v. McElroy, 78 F.Supp.2d 240, 245 (S.D.N.Y.2000).*[FN6]

> FN6. Plaintiff has submitted, as exhibits, a number of purported transcriptions of **conversations** he had tape recorded.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 4
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))

Defendant contends that the tape transcripts are **not** competent evidence, *see* Defendant's Memorandum of Law, at 6-13, and there is no information provided from which the Court could authenticate these transcriptions. The Court need **not** decide, however, whether the transcripts are competent evidence because, having reviewed them, it is apparent that nothing in these tapes **give**rise to an issue of fact that is material to the resolution of defendant's motion.

*II. Discrimination*

\* Plaintiff contends that his rights under <u>42 U.S.C. § 1981</u> and **Title**VI of the Civil Rights Act of 1964, <u>42 U.S.C. § 2000d</u>, were violated, because the university discriminated against him on the basis of his **race** and national origin, both in dismissing him from the medical school and in the manner in which it assigned clinical rotations.

<u>Section 1981</u> provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ....

The elements of a <u>§ 1981</u> claim are:(1) plaintiff's membership in a racial minority; (2) discrimination based on one or more of the activities enumerated in the section; and (3) an intent by the defendant to discriminate on the basis of race. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 210, 109 S.Ct. 2363, 2390 (1989); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993); *Hines v. Port Authority of* <u>New York and New Jersey,</u> <u>No. 94 Civ. 5109(NRB), 2000 WL 420555,</u> at \*5 (S.D.N.Y. Apr. 18, 2000); *Tripp v. Long Island University,* 48 F.Supp.2d 220, 223 (E.D.N.Y.1999); *Dove v. Fordham University,* 56 F. Supp .2d 330, 337-338 (S.D.N.Y.1999)."Mere conclusory allegations of discrimination do not suffice to support a <u>§ 1981</u> claim."*Hines,* 2000 WL 420555, at \*5 (citing *Yusuf v. Vassar College,* 35 F.3d 709, 713 (2d Cir.1994)).<u>Section 1981</u> applies to both private and state actors, including independent academic institutions. *See Yusuf,* 35 F.3d at 714;*Albert v. Carovano,* 851 F.2d 561, 572 (2d Cir.1988); *Odom v. Columbia University,* 906 F.Supp. 188, 194 (S.D.N.Y.1995).

Plaintiff also brings **claims** of discrimination under **Title**VI of the Civil Rights Act of 1964, which provides: "No person in the United States shall, on the ground of **race**, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial assistance."<u>42 U.S.C. § 2000d</u>. To establish a **claim** under **Title**VI, a plaintiff must show both: (1) that the entity involved engaged in racial or national origin discrimination; (2) the entity involved is receiving federal financial aid; and (3) plaintiff was an entitled beneficiary of the program or activity receiving the aid. *See Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 275, 118 S.Ct. 1989, 1992 (1998); *New York Urban League, Inc. v. State of New York,* 71 F.3d 1031, 1036 (2d Cir.1995); *Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 276 (2d Cir.1981); *Commodari v. Long Island University,* 89 F.Supp.2d 353, 377-378 (E.D.N.Y.2000); *Tripp,* 48 F.Supp.2d at 226.

Plaintiff is black and from Sudan, and thus he has met one of the criteria for a **claim** of discrimination under <u>§ 1981</u> and **Title**VI [FN7]Nevertheless, plaintiff has failed to come forward with any evidence, beyond his conclusory allegations, which would allow a rational jury to find any unlawful discrimination by defendant. For example, plaintiff argues that "If I was white, they would have to think twice. They would have to tell me, look, whatever it is you fix it this way. Because, because I'm black and I'm foreigner in this country, they just got rid of me."Plaintiff's Deposition ("Pl.Dep."), at 147, attached as Exs. G and V to Perri Aff. Further, although plaintiff alleges that the university unfairly deprived him of the opportunity to complete certain rotations in New York City, his **claim** of discrimination in the manner of assigning rotations is both conclusory and vague, and plaintiff provides no specific examples to support his **claim**. Rather, he **merely** alleges that "[t]here's [a] black person and other people who get better opportunity than me, most of them were white, specifically, lots of Jewish

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))

too," although he could not identify any individuals, aside from an unnamed person, whom he had heard was getting to do preferred rotations because of his connection with the Dean. *See* Pl. Dep., at 122. These hearsay, conclusory allegations, do not even support plaintiff's **claim** that the preferential treatment was based on **race** and national origin, no less provide any specific evidence supporting his **claim** of racial or national origin animus in assigning clinical rotations. In short, these conclusory allegations are insufficient, as a matter of law, to **give rise** to an inference of discrimination. *See Yusuf,* 35 F.3d at 713 ("A plaintiff alleging ... discrimination by a university must do more than recite conclusory allegations"); *Adams,* 1999 WL 544727, at *2 ("Conclusory allegations do not a cause of action make [under **Title VI** ]"); *cf. Hines,* 2000 WL 420555, at *5 (granting summary judgment on § 1981 **claim** where plaintiff came forward with no evidence of specific actions to demonstrate racial animus); *Tripp,* 48 F.Supp.2d at 224 (granting summary judgment where plaintiff came forward with no evidence beyond conclusory allegations that the grade received was discriminatory, rather than a fair assessment of the work).

> FN7. Defendant does not argue, and the Court need not decide, whether plaintiff has satisfied elements two and three of a **claim** under **Title VI**.

**\*5** Moreover, defendant has come forward with a legitimate, nondiscriminatory reason for plaintiff's termination from the medical school-his participation in clinical rotations in violation of university rules and regulations because he had not passed Step I of the USMLE. Plaintiff has not argued that this requirement was, on its face, discriminatory. Nor has plaintiff come forward with any evidence to suggest either discriminatory intent or impact with respect to this requirement.

Finally, plaintiff has not identified any similarly situated individuals of a different **race** or national origin than himself who were treated more favorably. When pressed at his deposition to identify any individual, plaintiff identified five other medical students-Athelia Balams, Mohammed Al-Amoudi, Abbas Rabiei, Jason Rose, and Paul Lucas-whom he alleged "were allowed to do their training and they failed the exams." Pl. Dep., at 125. The evidence

clearly shows that none of these other individuals were similarly situated to plaintiff. Abbas Rabiei, a white Canadian, had passed Step I in June 1995, before the university enacted the rule requiring that a student pass Step I prior to commencing clinical rotations. *See* USMLE results and Transcript, attached as Ex. Y to Perri Aff.; Perri Aff., at ¶ 138. Jason Rose, a white American, graduated from the university in February 1995, having passed Step I prior to graduation, and having completed his clinical rotations and graduated prior to the enactment of the rules requiring that Step I be passed before participating in clinical rotations. *See* USMLE results and Transcript, attached as Ex. Z to Perri Aff.; Perri Aff., at ¶ 139. Paul Lucas had passed Step I in July 1993, also prior to the enactment of any rules regarding the timing of Step I. *See* USMLE results and Transcript, attached as Ex. AA to Perri Aff.; Perri Aff., at ¶ 140. Finally, two of the individuals identified by plaintiff as being treated more favorably, Balams and Al-Amoudi, were black and from countries other than the United States and Canada. Moreover, these two individuals were not similarly situated to plaintiff. Athelia Balams, a black woman from Cameroon, had passed Step I in 1995. *See* USMLE results and Transcript, attached as Ex. W to Perri Aff.; Perri Aff., at ¶ 135. Mohammed Al-Amoudi, a black man from Saudi Arabia, began his clinical rotations in February 1994, prior to the enactment of the rule requiring that a student pass Step I prior to commencing clinical rotations. He did not participate in any rotations after the enactment of the new Step I rules, until he passed Step I in October 1996. *See* USMLE results and Transcript, attached as Ex. X to Perri Aff.; Perri Aff., at ¶¶ 136-137.

Thus, contrary to plaintiff's contention that these other similarly situated individuals received more favorable treatment, the evidence shows that none of these individuals was similarly situated to plaintiff because, unlike plaintiff, each of them took and passed Step I in accordance with the applicable regulations of the university. Plaintiff was terminated after he repeatedly improperly participated in rotations without passing Step I, and failed Step I on three occasions. There is simply no basis on which a jury could reasonably conclude that plaintiff was treated less favorably because of his race or national origin. Because plaintiff's claim of discrimination rests entirely on conclusory allegations, summary judgment is appropriate. *See Albert,* 851 F.2d at 573 (in order to support a claim of selective enforcement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))

of a school's policy, a plaintiff must show "purposeful and systematic discrimination by specifying instances in which [he was] singled out for unlawful oppression in contrast to others similarly situated"); _Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir.1989)_(plaintiff's "obligation was to identify and relate specific instances where persons situated similarly 'in all aspects' were treated differently); _cf. Adams,_ 1999 WL 544727, at *2 (granting motion to dismiss Title VI claim where it was undisputed that plaintiff was not qualified to receive the athletic scholarship in issue because she had failed mathematics, and there were no allegations that white athletes who failed mathematics received the scholarship); _Odom,_ 906 F.Supp. at 194 (granting motion to dismiss Section 1981 claim where plaintiff did not refer to a single situation where a similarly situated student was treated differently by the university).

_III. Breach of Contract_

*6 Plaintiff alleges that the university unjustly dismissed him, in violation of its rules and regulations, thereby breaching its contract with him. _See_ Pl. Dep., at 289; Pl. Aff., at 11; Complaint, at ¶¶ 109-111.[FN8]

> FN8. Although plaintiff has made an allegation that defendant breached a promise made to him in 1991 with respect to securing him a business visa to return to the United States, he does not base this breach of contract claim on that purported promise. _See_ Complaint, at ¶ 110; Pl. Aff., at 11. Moreover, assuming _arguendo,_ that such a promise could give rise to an enforceable contract, there is no evidence of a breach of that promise. Plaintiff asserts that the school promised to secure him a business visa to allow him to return to the United States to complete his clinical rotations, and that between 1992 and 1994, he was not provided such a visa. _See_ Complaint, at ¶¶ 13, 22-23. There is no dispute that between 1992 and 1994, plaintiff was not permitted to participate in clinical rotations because he was in arrears in his tuition, and was therefore, not a student in good standing. _See_ Perri Aff., at ¶ 55; Complaint, at ¶ 33. Plaintiff did return to the United States with

a tourist visa, and he has come forward with no evidence to demonstrate that the lack of a business visa in any way effected his ability to participate in clinical rotations.

Under New York law, a student can sue his school for breach of contract. _See Gally v. Columbia University,_ 22 F.Supp.2d 199, 206 (S.D.N.Y.1998); _Clarke v. Trustees of Columbia University,_ No. 95 Civ. 10627(PKL), 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23, 1996); _Keles v. New York University,_ No. 91 Civ. 7457(SWK), 1994 WL 119525, at *4 (S.D.N.Y. Apr. 6, 1994), _aff'd,_ 54 F.3d 766 (1995); _Olsson v. Board of Higher Education,_ 49 N.Y.2d 408, 413-414 (1980).[FN9] When a student enrolls at a university, an implied contract arises: if the student complies with the terms prescribed by the university, he will obtain the degree he seeks. _See Gally,_ 22 F.Supp.2d at 206;_Keles,_ 1994 WL 119525, at *5. The terms of the implied contract are supplied by bulletins, circulars, and regulations made available to the student. _See Clark,_ 1996 WL 609271, at *5;_Keles,_ 1994 WL 119525, at *5;_Vought v. Teachers College, Columbia University,_ 511 N.Y.S.2d 880, 881 (1987); _Sweeny v. Columbia University,_ 704 N.Y.S.2d 617, 618 (2d Dept.2000). Implicit in a university's general contract with its students is a right to change the academic degree requirements, provided that such changes are not arbitrary and capricious. _See Keles,_ 1994 WL 119525, at *6.

> FN9. Although neither party has addressed the issue of why New York law governs this case, both parties rely on New York law, and defendant has administrative offices in New York. _See_ Answer, at ¶ 4. In a diversity case, "where the parties have agreed to the application of the forum law, that consent concludes the choice of law inquiry."_American Fuel Corporation v. Utah Energy Development Co., Inc.,_ 122 F.3d 130, 134 (2d Cir.1997); _see also 3Com Corp. v. Banco Do Brasil, S.A.,_ 171 F.3d 739, 743 (2d Cir.1999). Accordingly, the Court applies New York law to plaintiff's common law claims. ·

However, because the decisions that educational institutions make about academic standards involve "the subjective judgment of professional educators," claims regarding such matters are subject to judicial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 7
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))**

review only "to determine whether [the defendants] abided by their own rules, and whether they have acted in good faith or their action was arbitrary or irrational." *Gertler v. Goodgold,* 487 N.Y.S.2d 565, 569 (1985); *see also Clarke,* 1996 WL 609271, at *6; *Keles,* 1994 WL 119525, at *6; *Garg v. Albert Einstein College of Medicine,* 747 F.Supp. 231, 236 (S.D.N.Y.1990); *Sweeny,* 704 N.Y.S.2d at 618. "The issue in determining a motion for summary judgment ... is whether any genuine issue of material fact remains as to whether defendants acted in bad faith or in an arbitrary or irrational manner." *Clarke,* 1996 WL 609271, at *6.

Plaintiff's claim of breach of contract is based on Ross University's April 1996 decision to dismiss plaintiff. It is undisputed that, at the time of his dismissal, plaintiff had participated in two clinical rotations at St. Luke's Hospital, without having first passed Step I of the USMLE. *See* Ex. 11 to Pl. Aff. Defendant's Student Handbook provides that "[s]tudents in the clinical phase of the curriculum are in good standing if they have met all financial obligations to the University, have passed Part One of the USMLE, and have received satisfactory evaluations for all clinical rotations." Ex. C to Perri Aff. The Handbook further requires that, if a student arranges his own clinical rotation, prior to beginning the rotation the student must notify the school's clinical department in writing or by phone, and must request and receive a letter of good standing from the medical school. *See* Ex. C to Perri Aff. Plaintiff has acknowledged that the handbook constituted his contract with the university. *See* Complaint, at ¶ 110; Pl. Dep., at 289-290.

*7 By participating in clinical rotations without notifying the university and without having first passed Step I, plaintiff was not in good standing under the regulations set forth in the student handbook. Moreover, Perri had previously informed plaintiff that he could not participate in clinical rotations until he provided the university with proof that he had passed Step I. Because plaintiff was participating in the clinical rotations at St. Luke's in violation of Ross University rules and regulations, no rational jury could find that the university acted in an arbitrary or irrational manner in dismissing him. *Cf. Keles,* 1994 WL 119525, at *5 (granting summary judgment on a claim of breach of contract in dismissing a graduate student, where plaintiff did not

pass the examinations at the proper stage of his studies, and thus did not fulfill the requirements of the university's regulations); *Benson v. Trustees of Columbia University,* 626 N.Y.S.2d 495, 496 (1st Dept.1995) (dismissing Ph.D. student's claim of breach of contract because the university following its guidelines in evaluating her academic performance, and thus did not act arbitrarily).[FN10]

> FN10. There can be no argument that the university breached any contract with plaintiff by requesting that he submit proof that he had not failed Step I on three occasions. The university's rules and regulations provide that if a student failed Step I three times, he would be dismissed. It was not arbitrary and capricious for the university to raise a question about this issue since plaintiff had secured its certification for the exam on three occasions. In any event, the university permitted plaintiff to continue two separate rotations, even though he did not provide the necessary documentation. He was ultimately terminated because he violated the rule requiring a student to pass Step I prior to participating in clinical rotations, and there is no dispute that by the time his termination became final, he had failed the exam on three occasions.

*IV. Negligence*

Plaintiff alleges in the Complaint that defendant breached its duty of care by failing to adequately maintain its records. *See* Complaint, at ¶¶ 105-107. In his affidavit in response to the instant motion, he suggests that his dismissal was negligent and caused him to lose his future as a physician. *See* Pl. Aff., at 11.

Under New York law, to succeed on a claim of negligence, a plaintiff must prove: 1) that the defendant owed a duty of care to the plaintiff; 2) a breach of this duty of care; and 3) injury to the plaintiff as a proximate cause of the defendant's breach of duty. *See, e.g., King v. Crossland Savings Bank,* 111 F.3d 251, 255 (2d Cir.1997); *Akins v. Glenns Falls City School District,* 53 N .Y.2d 325, 335 (1981).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 8
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))

At his deposition, plaintiff testified that defendant was negligent in failing to properly maintain its documents indicating how many times he took Step I, and in sending a letter addressed to the home of his mother in Sudan. *See* Pl. Dep., at 303. The evidence in the record shows, and plaintiff does not dispute, that ECFMG would only release a student's test scores to the student, and thus the student bore the responsibility of informing the university of his USMLE scores. *See* USMLE Bulletin, attached as Ex. B to Perri Aff.; Perri Aff., at ¶ 27. It is also undisputed that the university's records indicating that plaintiff was certified to take the examination on two occasions in 1993 were accurate. Even assuming that the university did have a duty to maintain records about plaintiff's USMLE results, the university did maintain accurate records that plaintiff had been certified for Step I twice in 1993, and again in June 1995. In response to plaintiff's contention that he did not take the Step I test in 1993, the university repeatedly provided plaintiff the opportunity to submit documentation from ECFMG, and plaintiff did not do so. *See* Perri Aff., at ¶¶ 74-86, 93-97; Pl. Aff., at 7.[FN11] Therefore, there is no basis on which a jury could reasonably conclude that defendant failed to properly maintain records related to plaintiff's USMLE status.

> FN11. The Court is not without sympathy for the plaintiff, who it appears, did attempt on several occasions to obtain this documentation from ECFMG. Nonetheless, plaintiff's inability to obtain this documentation has no bearing on whether defendant was negligent in failing to maintain records which only plaintiff could provide.

**\*8** Moreover, the primary injury suffered by plaintiff-his dismissal from the medical school-was based on the fact that he participated in clinical rotations after he failed Step I in June 1995.[FN12] It is undisputed that plaintiff failed Step I in June 1995 and that he participated in rotations subsequent to failing Step I, in violation of the university's regulations. Thus, his dismissal cannot be attributed to any alleged failure by the university to maintain accurate records.[FN13]

> FN12. Because he had not provided the requested documentation that he had not failed Step I three times, the university

refused to certify him for the exam in the Fall of 1995. It is undisputed that plaintiff took the exam two more times after June 1995, and that plaintiff failed the exam on both occasions.

> FN13. Similarly, plaintiff's appeal of the decision to dismiss him was terminated after plaintiff took, and failed, Step I two times subsequent to June 1995. The fact that plaintiff failed Step I three times is undisputed, *see* Pl. Dep., at 157, and the university regulations provide for expulsion when a student fails Step I three times.

Similarly, plaintiff's claim of negligence based on the university mailing a 1993 letter requesting his results from the September 1993 Step I exam, to his address in Sudan, must fail as a matter of law. *See* Letter, dated November 12, 1993, attached as Ex. 13 to Pl. Aff.[FN14] Assuming, *arguendo*, that the university breached a duty to plaintiff by sending a letter, with a typographical error in the address, to Sudan, no rational jury could find that this purported breach was the proximate cause of any injury to plaintiff. Even if plaintiff never received this 1993 letter, plaintiff does not allege that the university took any action as a result of the absence of his 1993 Step I results until after he had failed Step I in June 1995, and the university had made a direct request to him concerning the 1993 exams. In fact, the policies requiring students to pass Step I prior to participating in clinical rotations, and requiring students to pass Step I within three attempts, were not even enacted until January and August 1995, respectively. Accordingly, no rational jury could conclude that plaintiff suffered any injury as a result of this alleged breach of duty in 1993.

> FN14. Plaintiff does not specifically identify which letter was mailed to Sudan, and defendant assumes that it was one of his letters of dismissal. However, the record shows that both letters of dismissal were mailed to plaintiff in Missouri (where he was doing a rotation), *see* Exs. R and S to Perri Aff., whereas only the 1993 letter was mailed to Sudan.

Finally, plaintiff cannot support a claim that his dismissal by the university was an act of negligence.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.))**

As discussed in the breach of contract section, plaintiff was terminated in accordance with the rules and regulations of the university because he participated in clinical rotations without first having passed Step I. Contrary to plaintiff's belief, defendant did not owe him any duty to retain him as a student regardless of whether or not he adhered to university rules and regulations.

For these reasons, plaintiff's claims of negligence are dismissed.

*V. Intentional Infliction of Emotional Distress*

Defendant argues that plaintiff's claim of intentional infliction of emotional distress must be dismissed because it is time-barred.

New York law requires a claim for intentional infliction of emotional distress to be commenced within one year of the alleged incident. *See*New York CPLR § 215(3); *EEOC v. Die Fliedermaus, LLC,* 77 F.Supp.2d 460, 473 (S.D.N.Y.1999); *Burrell v. City University of New York,* 995 F.Supp. 398, 415-416 (S.D.N.Y.1998); *Forbes v. Merrill Lynch,* 957 F.Supp. 450, 455 (S.D.N.Y.1997); *Spinale v. Guest,* 704 N.Y.S.2d 46, 47 (1st Dept.2000). Under New York law, a cause of action for a tort accrues at the time of the injury. *See Global Financial Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 529 (1999); *Maxon v. Franklin Traffic Service, Inc.,* 689 N.Y.S.2d 559, 561 (4th Dept.1999); *Konigsberg v. State of New York,* 681 N.Y.S.2d 915, 916 (3d Dept.1998).

**\*9** Plaintiff's claim of intentional infliction of emotional distress is based on his allegation that defendant's recklessly and intentionally discharged him from the university, causing him anxiety and emotional distress. Plaintiff was discharged from the university in April 1996.[FN15] Plaintiff did not commence the present action until February 26, 1998, more than eighteen months after the conclusion of the events giving rise to his cause of action. Accordingly, this claim is barred by the applicable statute of limitations.

> FN15. Although plaintiff's appeal of the discharge concluded in August 1997, his purported injury relates to his treatment by defendant while he was a student and in connection with his April 1996 dismissal.

His injury thus arose by no later than April 1996, the date of his termination. *Cf. Edwards v. State,* 407 N.Y.S.2d 804, 806 (Ct. Claims 1978)(statute of limitations for tort accrued on date of the injury, not on date when the administrative appeal became final); *Day v. Moscow,* 955 F.2d 807, 813 (2d Cir.1992)(statute of limitations not tolled for time taken to file notice of claim with municipality because no requirement that such notice of claim be filed prior to commencement of federal § 1983 suit); *King v. New York Telephone Company,* 785 F.2d 31, 33 (2d Cir.1986)(cause of action accrues no later than the time when plaintiff could have first successfully maintained a suit based on that cause of action, even if some possibility of nonjudicial remedy remained); *Halpern v. Bristol Board of Education,* 52 F.Supp.2d 324, 329 (D.Conn.1999) (the limitations period on wrongful termination claim under § 1983 began to run when the employee received notice of the adverse decision, and the pendency of a grievance, or other method of collateral review, did not toll the statute of limitations); *Lewis v. John Hancock Mutual Life Insurance Company,* 6 F.Supp.2d 244, 247 (S.D.N.Y.1998)(ERISA cause of action accrued on date plaintiff's claim for benefits was denied, not on date appeal was denied).

In any event, as a matter of law plaintiff cannot sustain a claim for intentional infliction of emotional distress. In order to prevail on a claim of intentional infliction of emotional distress under New York law, a plaintiff must show "(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."*Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996)(citing *Howell v. New York Post Co.,* 81 N .Y.2d 115, 121 (1993)); *see also Stuto v. Fleishman,* 163 F.3d 820, 827 (2d Cir.1999). In order to satisfy this standard, a plaintiff must show that the behavior to which he was subjected was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."*Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 302 (1983)(quoting Restatement of Torts, Second, § 46, comment d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1965)); *see also Stuto,* 164 F.3d at 827;*Howell,* 81 N.Y.2d at 121.

The Court has already determined that plaintiff's dismissal from the university was not discriminatory, negligent, or in breach of contract. Rather, it resulted because of plaintiff's failure to adhere to university rules and regulations. Thus, there is no basis to conclude that plaintiff's dismissal was extreme or outrageous conduct which could give rise to a claim of intentional infliction of emotional distress. Accordingly, defendant's motion for summary judgment on plaintiff's claim of intentional infliction of emotional distress is granted.

CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted, and this action is dismissed with prejudice.

SO ORDERED.

S.D.N.Y.,2000.
Babiker v. Ross Univ. School of Medicine
Not Reported in F.Supp.2d, 2000 WL 666342 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))**

**C**Langadinos v. Appalachian School of Law
W.D.Va.,2005.
Only the Westlaw citation is currently available.
United States District Court,W.D. Virginia.
Gregory LANGADINOS, Plaintiff,
v.
APPALACHIAN SCHOOL OF LAW, et al.,
Defendants.
No. 1:05CV00039.

Sept. 25, 2005.

Gregory Langadinos, Plaintiff pro se.
Warren David Harless and Nichole Buck
Vanderslice, Christian & Barton, LLP, Richmond,
Virginia, and Thomas R. Scott, Jr., Street Law Firm,
LLP, Grundy, Virginia, for Defendants.

OPINION AND ORDER

JONES, Chief J.
*1 In this pro se action for damages by a former law
student against faculty members, administrative
officials, and the law school, the defendants move for
the dismissal of each of the plaintiff's federal claims
under Federal Rule of Civil Procedure 12(b)(6).
Because the plaintiff's lengthy complaint makes it
clear that he can prove no set of facts in support of
the federal claims, the defendants' motion will be
granted.

I

The plaintiff, Gregory Langadinos, filed this action
on his own behalf against Appalachian Law School
("ASL"), ASL President and Chief Executive Officer
Lucius F. Ellsworth, Interim Dean Paul Eric Lund,
Assistant Dean Wendy B. Davis, and Professors
David T. Butleritchie and Dale Rubin. The plaintiff is
a Greek-American graduate of ASL. He alleges that
while he was a student, the defendants discriminated
against him on the basis of his "Greek ancestry,
Greek race, [and] Greek ethnicity."[FN1](Pl.'s Am.
Compl. ¶ 2.) The plaintiff's 47-page, 166-paragraph
Amended Complaint and attached 22 pages of
newspaper articles, letters, and other materials claim
instances of verbal harassment and resulting mental

distress.[FN2]

> FN1. Although the plaintiff briefly mentions
> that he was discriminated against on the
> basis of his sex and that he has a learning
> disability, the complaint, even liberally
> construed, cannot be seen as alleging claims
> of sex discrimination or violations of the
> Americans with Disabilities Act. (*See* Pl.'s
> Am. Compl. ¶¶ 91, 116.)

> FN2. The plaintiff also submitted a 98-page
> "Offer of Proof/Appendix" with his
> Amended Complaint.

The plaintiff asserts that the defendants'
discriminatory actions constituted violations of
federal civil rights statutes. He also alleges state law
causes of action for breach of contract, infliction of
emotional distress, violation of Virginia's Consumer
Protection Act, Va.Code Ann. § 59.1-196 to 59.1-207
(Michie 2001 & Supp.2005), false imprisonment, and
assault and battery. Jurisdiction is asserted on the
basis of federal subject matter as well as diversity of
citizenship and amount in controversy. 28 U.S.C .A.
§§ 1331, 1332(a) (West 1993 & Supp.2005).

Langadinos initially filed this action in the United
States District Court for the Eastern District of
Virginia. The defendants filed a Motion to Dismiss
the plaintiff's federal claims.[FN3]After receiving a
*Roseboro*[FN4] notice, the plaintiff responded to the
Motion to Dismiss. Following the defendants' reply,
venue was transferred to this court. The Motion to
Dismiss the federal claims is now ripe for
decision.[FN5]

> FN3. The defendants first moved to dismiss
> all claims, but thereafter amended the
> Motion to Dismiss to limit it only to the
> plaintiff's federal claims.

> FN4.*Roseboro v. Garrison,* 528 F.2d 309,
> 310 (4th Cir.1975).

> FN5. I will dispense with oral argument
> because the facts and legal contentions are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                     Page 2
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))**

adequately presented in the materials before the court and argument would not significantly aid the decisional process.

## II

The facts as alleged by the plaintiff are as follows.

First, the plaintiff alleges that Assistant Dean Davis discriminated against him. Davis and the plaintiff were seated together at an April 2002, banquet. The plaintiff claims that Davis made the following comments during dinner:

"Greg do you own a restaurant ... do you know that you look like you are on the television show the SOPRANOS ... Are you related to John Gotti, the Teflon-Don?""Greg are you from Revere, Massachusetts?""Greg do you own an IROC Z28?""Did you ever own a restaurant?"..."Greg you look like a gangster, like somebody that is a member of the Mafia who comes from Revere, Massachusetts."[FN6]

> FN6. The defendants argue that "Langadinos is offended by certain remarks that-although arguably derogatory toward Italian-Americans, Jewish-Americans, and Caucasians-make no mention of Greek-Americans ."(Defs.' Mot. Dismiss at 12 (citations omitted).) The plaintiff may still establish a cause of action under the Civil Rights Act despite the defendant's mistaken belief that his ethnic characteristics are those of a person of Italian, rather than Greek, descent. Plaintiffs do not lose the protection of discrimination laws because they are discriminated against for the wrong reasons. *See, e.g., Estate of Amos ex rel. Amos v. City of Page, Ariz.,* 257 F.3d 1086, 1094 (9th Cir.2001) (white plaintiff mistakenly believed to be a member of a protected class); *LaRocca v. Precison Motorcars, Inc.,* 45 F.Supp.2d 762, 770 (D.Neb.1999) (terms derogatory to Mexican persons used for Italian plaintiff).

(Pl.'s Am. Compl. ¶¶ 29-30.) The plaintiff alleges that Davis laughed at him "while making frequent hostile stares and continuing to repeat the same comments."(*Id.* ¶ 30.)The plaintiff further alleges that this harassment continued for a year and a half, stating that "after the Summer of 2002, Defendant Davis continuously and viciously verbally assaulted the Plaintiff repeating the same bigoted statements, that 'Greeks own restaurants and diners and are not cut out to be lawyers." ' (*Id.* ¶ 31.)He claims that Davis "verbally harassed [him] ... in calling him a 'Vinny' 'Guido' 'Mafia member' and 'John Gotti' amongst numerous other discriminatory remarks and treatment including asking the Plaintiff 'if you own a diner or a restaurant." ' (*Id.* ¶ 89.)

**\*2** Davis allegedly told the plaintiff that he was "not going to graduate ... because you're going to get kicked out of this school," and that he did not "fit in around here" and "should get counseling" because he had "no people skills" and is "a bully." (*Id.* ¶¶ 69-70.)Finally, the plaintiff states that when he decided to appeal the grade he received in a class taught by Professor Kelly, Davis "told Plaintiff[ ] if he appealed the grade he received in Employment [L]aw and if such an appeal sets a precedent that grades can be overturned the Plaintiff would be in a world of hurt."(*Id.* ¶ 38.)

Next, the plaintiff alleges that Professor Rubin discriminated against him at a reception held in Washington, D.C. When the plaintiff told Rubin about his plans to appeal his grade, he alleges that Rubin "began to speak in the same way Defendant Davis had spoken to Plaintiff ... by attempting to talk the Plaintiff out of the idea of appealing his grade.... Defendant Rubin also demanded that Plaintiff must not appeal his grade."(*Id.* ¶ 41.)The plaintiff and Rubin then talked about the September 11, 2001, terrorist attacks on the World Trade Center. The plaintiff alleges that Rubin

stated ... in an extremely irrational manner and loud tone of voice, "I do not believe the Arabs were the pilots that flew the planes into the buildings on 9-11. I think there is a much bigger story behind the attacks. I bet the Jews were involved, because none of the people that died in the buildings were Jews. It was all fixed. The Jews killed ... Jesus; do you really think they would think twice about killing 3000 working class people in New York City."

(*Id.* ¶ 42.)

The conversation between the plaintiff and Rubin

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))

then turned to former ASL student Odighizuma, who murdered ASL's dean, a faculty member, and a student, and injured three others in a January 2002, shooting spree at the law school.[FN7] The plaintiff alleges that Rubin stated, "Dean Sutin got what he deserved from that cat Odighizuma."(*Id.* ¶ 43.)When the plaintiff asked what "cat" meant, he alleges that Rubin, who is African-American, responded, " 'it[']s talk from the hood,' and ...'white people do not understand words like that.'" (*Id.*) The plaintiff alleges that Rubin then asked, " 'Do you know why I have never bothered to visit Europe?... Because of fuckin' white [ ] people. I hate white people....' " (*Id.* ¶ 45.)He states,

> FN7.*See* Francis X. Clines, *3 Slain at Law School; Student Is Held,* N.Y. Times, Jan. 17, 2002, at A18.

Rubin appeared to invite the Plaintiff [to the reception] in order to harass him and shock his conscience from Rubin's continuous bigoted and irrational comments about his hatred toward White people, Jewish people, law students, people from "the North" and numerous other groups of people including people who come from Europe such as the Plaintiff whose parents are both from Greece.
(*Id.* ¶ 45.)Finally, the plaintiff alleges that Rubin told him "to 'shut the fuck up' " when he asked the professor why he attended the reception when white people made up the majority of the crowd. (*Id.* ¶ 46.)

**\*3** Next, the plaintiff alleges that Professors Rubin and Butleritchie discriminated against him at a meeting in Rubin's office. He claims that the professors "forcibly slammed the door shut, locked the door, and ordered the Plaintiff in a very threatening manner to sit [ ] down."(*Id.* ¶ 50.)Rubin then accused the plaintiff of putting soap in a hot tub at the YMCA and of causing problems in a local discount store. (*Id.* ¶ 51.)The plaintiff alleges that Rubin stated, " 'Greg, the whole world doesn't revolve around you. Greg you do not pay attention to people and you are pushy.' " (*Id.* ¶ 52.)Butleritchie then allegedly said, "Greg you will be dismissed from this law school if we want you to be. And you will not get certified to take the Bar exam in whatever State you plan to practice in." ' (*Id.*)

The plaintiff alleges that Butlertichie then began speaking in an "extremely threatening voice" and said,

"You are going to be a dead man soon. You pissed off a bunch of rednecks and we think they have reason to actively hunt you down and kill you."["]You ought to leave Grundy as soon as possible. These rednecks from Hurley, they will kill you, and there is nothing that you or your friends from Boston or the Northeast can do to stop it." Defendant Butleritchie repeated over and over again, "The whole world does not revolve around you asshole, your [sic] going to get what is coming to you."

(*Id.* ¶ 54 (emphasis omitted).) The plaintiff alleges that Rubin made similar statements, warning,
"Greg, you have pissed off a whole bunch of Red Necks in this town. There are people from the town of Hurley, Virginia that are after you and they are going to find you and beat the shit out of you and you will be down under ground a few feet. People from this area are going to kill you. It's that simple. They are going to find you and you will be beaten and left for dead."

(*Id.* ¶ 55 (emphasis omitted).) During this confrontation, the plaintiff alleges that the defendants called him a "white bitch" "on several occasions." (*Id.* ¶ 110.)

The plaintiff also alleges that Rubin and Butleritchie "pitted and put student Robert Meadows up to the task of severely harassing Plaintiff on the basis of his Greek ethnic background."(*Id.* ¶ 66.)During a class meeting, Meadows allegedly said to the plaintiff, "You're a fucking Yankee from Maine, and I should kill you for that reason alone."(*Id.* ¶ 63.)When the plaintiff clarified that he was not a Yankee, but was from Greece, and that he was not from Maine, but from Massachusetts, Meadows allegedly replied, "So your [sic] Euro trash that is what it is."(*Id.*)

The plaintiff next alleges that President Ellsworth discriminated against him by refusing to accept the plaintiff's written complaints about the confrontation with Rubin and Butleritchie, by demanding that the plaintiff not involve the police in the matter, and by ignoring comments he overheard Davis making to the plaintiff. (*Id.* ¶¶ 56, 7.) Further, the plaintiff alleges that Ellsworth and Davis discriminated against him by refusing to punish Meadows, the student who

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))**

Page 4

threatened him. (*Id.* ¶¶ 56, 59, 64-65.)

*\*4* Finally, the plaintiff alleges that Interim Dean Lund discriminated against him by failing to "take any preventative measures" or investigate what happened during the confrontation between the plaintiff, Rubin, and Butleritchie, even though Lund launched an investigation when, in an unrelated event, another student misused an ASL e-mail account. (*Id.* ¶¶ 76, 82.)

### III

A motion to dismiss pursuant to <u>Federal Rules of Civil Procedure 12(b)(6)</u> may be granted only if, accepting all well pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the plaintiff is not entitled to relief. The court may not dismiss a complaint unless the plaintiff can prove no set of facts which would entitle the plaintiff to relief. *See <u>Conley v. Gibson,</u> 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)*. The "issue is not whether plaintiff will ultimately prevail or is likely to prevail but whether claimant is entitled to offer evidence to support claims."<u>*Scheuer v. Rhodes,* 416 U.S. 232, 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)</u>, *overruled on other grounds, <u>Davis v. Scherer,</u> 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)*. It is not necessary to set forth a particular legal theory. Rather, a party is required only to make "a short and plain statement of the claim showing that the pleader is entitled to relief."<u>Fed.R.Civ.P. 8(a)</u>; *see* Charles Alan Wright, *Law of Federal Courts* § 68 (5th ed.1994).

The court is obligated to construe the complaint as asserting "any and all legal claims that its factual allegations can fairly be thought to support."*<u>Martin v. Gentile,</u> 849 F.2d 863, 868 (4th Cir.1988)*. As a general rule, the court is under an even greater duty to construe complaints liberally when a plaintiff proceeds without a lawyer. *See <u>Haines v. Kerner,</u> 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).*<u>FN8</u>

> <u>FN8.</u> Although the plaintiff in this case is a law school graduate, he is **not** yet licensed to practice law. (*See* Pl.'s Am. Compl. ¶ 101.) Accordingly, I will read his complaint as I would that of any other pro se plaintiff.

Nevertheless, the court "need **not** accept as true legal conclusions or unwarranted factual inferences."*<u>Morgan v. Church's Fried Chicken,</u> 829 F.2d 10, 12 (6th Cir.1987)* (internal citations omitted). The court has an affirmative obligation to prevent "factually unsupported **claims**" from proceeding to trial. *<u>Felty v. Graves-Humphreys Co.,</u> 818 F.2d 1126, 1128 (4th Cir.1987)*. In addition, when the complaint contains detailed factual descriptions, the court is **not** required to ignore those facts where it appears beyond doubt that, even considering all inferences in the plaintiff's favor, they cannot support the plaintiff's **claims**. *<u>Lekas v. Briley,</u> 405 F.3d 602, 614 (7th Cir.2005)* (stating the court is "**not** required to ignore facts alleged in the complaint that undermine plaintiff's **claim**").

The defendants have moved to dismiss each of the plaintiff's federal **claims** on various grounds. Because the plaintiff's lengthy complaint makes it clear that he can prove no set of facts in support of his **claims**, that motion will be granted.

### A

The defendants first move for the dismissal of the plaintiff's civil rights **claims** under <u>42 U.S.C.A. § 1981</u><u>FN9</u> and Title**VI** of the Civil Rights Act of 1964.<u>FN10</u>The plaintiff contends that the defendants violated these statutes by discriminating against him on the basis of his Greek ancestry, **race**, national origin, and/or ethnicity. More specifically, the plaintiff alleges discrimination both during interactions with ASL faculty members and as a result of his discrimination complaints. Accordingly, his allegations will be treated as asserting harassment <u>FN11</u> and retaliation **claims**.

> <u>FN9.</u>Section **1981** provides in relevant part that "[a]ll persons shall have the same right to make and enforce contracts as is enjoyed by white citizens."<u>42 U.S.C.A. § 1981(a)</u> (West 2003).

> <u>FN10.</u>Title**VI** provides in relevant part that "[n]o person in the United States shall, on the ground of **race**, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."<u>42</u>

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))

Page 5

U.S.C.A. § 2000d (West 2003 & Supp.2005).

FN11. Harassment **claims** are actionable under both **TitleVI** and § 1981. *See Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1033 (9th Cir.1998)* (citation omitted); *Dennis v. County of Fairfax, 55 F.3d 151, 155 (4th Cir.1995)* (section 1981 racial harassment **claim** in the employment context).

*Title VII provides the appropriate framework for analyzing the plaintiff's **claims**. *Jane v. Bowman Gray Sch. of Med.-N.C. Baptist Hosp., 211 F.Supp.2d 678, 690 (M.D.N.C.2002); see also Middlebrooks v. Univ. of Md., No. 97-2473, 1999 WL 7860 at \*4 (4th Cir. Jan.11, 1999)* (unpublished). Using that framework, the plaintiff's harassment **claim** will be analyzed like a hostile work environment **claim**. *Causey v. Balog, 162 F.3d 795, 801 (4th Cir.1998)*. Although **not** required to allege each element of a prima facie case at this stage of the litigation, the plaintiff ultimately will be required to show that the harassment he complains about was (1) unwelcome; (2) based on **race** (§ 1981) or color or national origin (**TitleVI**); [FN12] (3) sufficiently severe or pervasive to alter the terms and conditions of schooling and create an abusive atmosphere; and as to the **claim** against ASL, (4) imputable to the school. *See Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003)* (citing *Causey, 162 F.3d at 801*). To support his retaliation **claim**, the plaintiff ultimately will be required to show that: (1) he engaged in a protected activity; (2) the defendants took an adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action. *See King v. Rumsfeld, 328 F.3d 145, 150-51 (4th Cir.2003)* (employment context); *see also Williams v. Cerberonics, Inc., 871 F.2d 452, 457-58 (4th Cir.1989)* (stating that a plaintiff may prove ¶ 1981 retaliation **claim** using **Title** VII framework). From the plaintiff's detailed allegations it is apparent, even at this motion to dismiss stage, that his harassment and retaliation **claims** are factually unsupported.

FN12. The defendants contend that the plaintiff is **not** in a class of persons protected under **TitleVI** and § 1981 because he is "an American-born, English-speaking, Caucasian male with Eastern European features."(Defs.' Mot. Dismiss at 11 n. 5.) These facts alone do **not** exclude the plaintiff from a protected class. *See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 610-13, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)* (explaining that "all those who might be deemed Caucasian today were **not** thought to be of the same **race** at the time § 1981 became law" and that "discrimination [against] identifiable classes of persons ... solely because of their ancestry or ethnic characteristics ... is racial discrimination that Congress intended the statute to forbid"). Indeed, § 1981 has been held to encompass claims of discrimination by one Caucasian person against another. *See*15 Am.Jur.2d Civil Rights § 28 (2005) (collecting cases). Although the question of whether Greek-American persons are in a protected class is one of first impression in this circuit, courts in other circuits have held that they are protected. *See Gamas v. Anheuser-Busch, Inc., No. Civ.03-89-PB, 2005 WL 419690, at \*1 (D.N.H. Feb.23, 2005)* (holding that Greek national origin is not protected by § 1981, but Greek ancestry is); *Ress v. Comptroller's Office of Ill., No. 97 C 5569, 2000 WL 28265, at \*6 (N.D.Ill. Jan.12, 2000)* (stating "[h]e is of Greek origin and therefore a member of a protected class"); *Bernhardt v. Interbank of N.Y., 18 F.Supp.2d 218, 224 (E.D.N.Y.1998)* (holding that Greek-American had established prima facie case of national origin discrimination under Title VII.) I will assume, without deciding, that the second generation Greek-American plaintiff is a member of a protected class.

### 1. Individual Defendants.

First, the plaintiff's hostile environment and retaliation claims against the individual defendants under Title VI must be dismissed because Title VI applies only to the recipients of federal funding. *Farmer v. Ramsay, 41 F.Supp.2d 587, 592 (D.Md.1999)* ("The lower federal courts have generally held that 'the proper defendant in a Title VI case is an entity rather than an individual' " (quoting *Jackson v. Katy Indep. Sch. Dist., 951 F.Supp. 1293*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))

(S.D.Tex.1996))). The plaintiff has failed to allege that any of the individual professors or faculty members are the recipients of Title VI funds. Accordingly, his Title VI claim against defendants Ellsworth, Rubin, Davis, Butleritchie, and Lund will be dismissed.

Next, the defendants' individual liability under § 1981 for creating a hostile environment or retaliation requires examination of the specific allegations made against each one of them. Individual defendants are liable under § 1981 only when they "intentionally cause a corporation to infringe the rights secured by" that section. *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1145 (4th Cir.1975). The defendants argue that the plaintiff can prove no set of facts showing the required intent. I will not address this argument because I find that even if the defendants' actions were taken with discriminatory intent, the plaintiff's contention that those actions infringed his rights secured under § 1981 is unsupported by the facts alleged.

**\*6** The plaintiff's numerous factual allegations make it clear that none of the individual defendants' behavior was sufficiently severe or pervasive to state a claim for a racially hostile environment. The "severe or pervasive" element of a harassment claim has both a subjective and an objective component. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To determine whether any of the defendants created an objectively hostile environment at ASL, the court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with the plaintiff's performance, and what psychological harm resulted. *See Harris,* 510 U.S. at 21-23; *Conner v. Schrader-Bridgeport Int'l, Inc.,* 227 F.3d 179, 193 (4th Cir.2000). This standard is a "demanding" one. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

The most disturbing events alleged are attributed to Professors Rubin and Butleritchie. These include Rubin's statements at a Washington, D.C., reception about white and Jewish persons, and Rubin's and Butleritchie's efforts to "pit [ ] and put student Robert Meadows up to the task of severely harassing Plaintiff." The alleged harassment is punctuated by the meeting at which the professors yelled at the plaintiff and told him that "rednecks" wanted to kill him. These allegations, even when viewed in the light most favorable to the plaintiff, reveal that the plaintiff's § 1981 harassment claim against Rubin and Butleritchie is legally insufficient.

Rubin's comments at the D.C. reception, while certainly offensive and inappropriate, were made in a social setting far removed from the school while the plaintiff and defendant were "drinking socially." (Pl.'s Am. Compl. ¶ 41.) The plaintiff does not allege that the behavior in question continued once the two returned to Grundy. Further, the plaintiff's allegations as to Robert Meadows are based upon unwarranted inferences. Meadows approached the plaintiff after a class taught by a professor unconnected to this litigation. (*See* Pl.'s Am. Compl. ¶ 62.) Rubin and Butleritchie were never mentioned in the conversation. The plaintiff simply concludes that Rubin and Butleritchie were behind Meadows' actions "[b]ased on information and belief as well as Plaintiff's conversations with other faculty members and employees of the Law School, who know about the dangerous propensities of Defendants Rubin and Butleritchie."(Pl.'s Am. Compl. ¶ 66.) This gossip and speculation is insufficient to link Meadow's actions with those of the defendants.

Even the August 20, 2002, meeting between the plaintiff, Rubin and Butleritchie-the most obviously severe event alleged both in terms of hostility and physicality-fails to support the plaintiff's claim that these individual defendants violated his rights. The plaintiff's own detailed complaint reveals that his conclusory description of the encounter is not accurate. The plaintiff repeatedly alleges that professors Rubin and Butleritchie threatened to kill him, but he quotes the professors as stating that "rednecks" from Hurley, Virginia wanted to kill him. This was a warning, albeit a frightening one, but not a threat. Similarly, the allegations that the professors "forcibly slammed the door shut, locked the door, and ordered the Plaintiff in a very threatening manner to sit ... down," and that Butleritchie spoke in an "extremely threatening voice" (*id.* ¶¶ 50, 54), certainly created an uncomfortable situation, but not one that rose to the level of violating the plaintiff's rights. Evidence that a plaintiff was subject to callous words or treatment is insufficient to support a hostile

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 7
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))**

environment claim. *See* *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 611 (4th Cir.1999), *abrogation on other grounds recognized by* *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir.2004). Even viewed in the light most favorable to the plaintiff, neither Rubin nor Butleritchie engaged in behavior that created an objectively severe or pervasive environment.

**\*7** The plaintiff alleges that Assistant Dean Davis harassed him for the longest period of time and on the most occasions, but the plaintiff's allegations against Davis demonstrate that the behavior at issue was not sufficiently severe. The comments Assistant Dean Davis allegedly made at the April 2002, law school banquet, including statements such as "you look like you are on the television show the *Sopranos*," were certainly unprofessional, but at most constituted simple teasing. Although the plaintiff alleges that Davis continued calling him "Vinny," "Guido," "Mafia member," and "John Gotti" for a year and half, these comments are more in the nature of nicknames. *See* *Payano v. Fordham Tremont CMHC*, 287 F.Supp.2d 470 (S.D.N.Y.2003) (fellow employees' jokes that the plaintiff looked like an Arab terrorist constituted simple teasing); *cf.* *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297 (4th Cir.2004) (repeatedly calling black employee " 'boy, jigaboo, nigger, porch monkey, Mighty Joe Young,' and 'Zulu warrior' ' raised jury question in hostile work environment claim). Even Davis' most egregious comment, that "Greeks own restaurants and diners and are not cut out to be lawyers," does not rise above the level of a "mere offensive utterance." Plaintiffs are not guaranteed refinement and sophistication in their interactions at work or, in this case, school. *See* *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir.1997) (describing Title VII). Rather, they are protected only from "harassing behavior that is so severe or pervasive as to render the [classroom] objectively hostile or abusive." *Id.* Davis' actions, even when viewed in the light most favorable to the plaintiff, fail to rise to this level.

Each of the remaining individual defendants is alleged to have engaged in behaviors far less offensive and even more infrequent than those alleged against Rubin, Butleritchie, and Davis. Accordingly, I will grant the defendants' motion to dismiss the plaintiff's § 1981 claims against each of the individual defendants.

The plaintiff's final claim against the individual defendants is that they discriminated against him in retaliation for his reports of discrimination. The plaintiff has alleged facts in support of the first element of retaliation-that he engaged in a protected activity. He filed two discrimination complaints with the U.S. Department of Education's Office of Civil Rights ("OCR") and another with the Virginia higher education authorities. (Pl.'s Am. Compl. ¶¶ 73, 78.) However, he fails to allege any facts in support of the second element-that any of the defendants took the equivalent of an adverse employment action against him. In the employment context, an adverse employment action has been described as an "ultimate employment decision[ ] such as hiring, granting leave, discharging, promoting, and compensating."*Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981). No equivalent action is alleged to have taken place here. The plaintiff merely states that "[a]fter the conclusion of the OCR investigation, the hostility toward the Plaintiff by the Law School administration not only continued, but increased," and that he was subject to an "enormous amount of disrespect." (*Id.* ¶¶ 78, 79.)None of the defendants is alleged to have actually done anything adverse to the plaintiff's status as a student. He successfully completed his law school coursework and graduated, though the plaintiff made a personal decision not to attend the graduation ceremony. He even successfully appealed a grade in one course. (*Id.* ¶ 37.)For these reasons, the defendants' motion to dismiss the plaintiff's § 1981 retaliation claims against the individual defendants also will be granted.

### 2. ASL.

**\*8** Next, I will consider the plaintiff's harassment and retaliation claims under Title VI and § 1981 as they are asserted against the law school itself. The facts alleged by the plaintiff, even if taken as true and considered in the light most favorable to him, make it clear that the plaintiff can prove no set of facts in support of several elements of his Title VI and § 1981 hostile environment **claims** against ASL. He has **not** sufficiently stated that the acts alleged were based on his **race**, national origin, or color; that the alleged discrimination was sufficiently "severe or pervasive;" or that the acts of the individual defendants can be imputed to ASL.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A182

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))

First, although the plaintiff has alleged that some of the defendants made specific reference to his Greek features, he also has pled facts that make it clear that much of the conduct about which he complains was not connected to his race or national origin. The plaintiff concludes that virtually anything he found objectionable at his school was tied to race and national origin discrimination. However, his description of the facts contradicts that conclusion. For example, the plaintiff alleges no facts to support his conclusion that Davis and Rubin discouraged him from appealing a grade because of his race or national origin. Rather, the plaintiff quotes Davis as explaining that she did not want him to "set[ ] a precedent that grades can be overturned."(Pl.'s Am. Compl. ¶ 38.) Cf. Settle v. Baltimore County, 34 F.Supp.2d 969, 1003 (D.Md.1999) (refusing to consider allegedly discriminatory acts when "the content of the allegations is racially neutral, and there is no evidence ... that the underlying acts ... occurred because" of the plaintiff's race). The plaintiff makes only conclusory allegations that Lund and other administrators failed to order an investigation into his complaints and otherwise "covered up" misconduct because of his race or national origin.

Even the most egregious allegation-that Rubin and Butleritchie yelled at the plaintiff and told him that "rednecks" wanted to kill him-is not connected to any alleged facts to suggest the plaintiff's race or national origin. The plaintiff does, however, offer several nonracial reasons for the defendants' behavior: they believed he caused problems at a local store (Pl.'s Am. Compl. ¶ 51); they believed he was "pushy" (Id. ¶ 52); and they thought that local people wanted to kill him (Id. ¶¶ 54-55). The few references made to the plaintiff's characteristics included professor Butleritchie's comment about the plaintiff's "friends from Boston or the Northeast" and the professors' use of the term "white bitch." The former does not refer to a protected trait, see Chaplin v. Du Pont Advance Fiber Sys., 293 F.Supp.2d 622, 628 (E.D.Va.2003) ("Confederate-American" not a protected class); Williams v. Frank, 757 F.Supp. 112, 120 (D.Mass.1991) ("Southernness is not a protected trait"), and the latter refers to a trait other than the one under which the plaintiff claims protection.

**\*9** The fact that the plaintiff was "the only fully ethnic, bilingual Greek American full-time law student" (Pl.'s Am. Compl. ¶ 26) does not justify an inference that every action of which he complains occurred because he is Greek. See Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir.2000) ("A plaintiff's subjective belief or speculation that neutral statements are discriminatory does not establish a claim of hostile work environment.") The plaintiff would have been subject to much of the same conduct even if he were not Greek. See Wrightson v. Pizza Hut of Am., Inc., 99 F.3d 138, 142 (4th Cir.1996) (a plaintiff must show that but for her membership in a protected class, she would not have been subjected to harassment).

Next, even if each of the incidents alleged were in fact related to the plaintiff's race or national origin, the plaintiff fails to allege conduct either severe or pervasive enough to support a hostile environment claim. As previously explained, the "severe or pervasive" element has both a subjective and an objective component. Harris, 510 U.S. at 21-22. The plaintiff's complaint makes it clear that he perceived the environment at ASL to be discriminatory and abusive. This perception, and the plaintiff's entire law school experience, was no doubt strongly influenced by the fact that he witnessed the murder of a fellow student just one week after arriving on campus. Indeed, the plaintiff's treating psychiatrist suggests that this trauma, together with the academic pressures of law school, were responsible for increasing the plaintiff's stress level and worsening his attention deficit disorder. (Pl.'s Am. Compl. Ex. 9.) In addition, the plaintiff's perception was influenced by the "culture shock" he experienced upon moving to the small town of Grundy, Virginia. (See Pl.'s Am. Compl. ¶ 85.) However, when viewed from the reasonable person objective standard, the defendants' actions were not severe or pervasive enough to create an abusive environment.

As previously discussed, none of the defendants' individual actions created an objectively severe or pervasive environment. Even when culminated and construed in the most liberal fashion, the alleged actions of the defendants do not and could not satisfy the "very high" standard, Faragher, 524 U.S. at 788, necessary to create the kind of hostile or abusive environment at ASL that is actionable under federal law. At most, the plaintiff describes an ongoing saga of rudeness, insensitivity, and personality clashes. See McGuire v. Va., 988 F.Supp. 980, 991 (W.D.Va.1997) ("Personality conflicts ... are not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))**

equivalent to discrimination or retaliation, even when such conflicts generate antipathy and make an individual's position more difficult") (internal citation omitted), *overruled on other grounds, Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 436 (4th Cir.1998). As he explained in his own words, "a certain amount of friction was probably inevitable at the Defendant Law School, as an experimental law school in the very rural country-side of Virginia, given that conflicting cultures were thrown together."(Pl.'s Am. Compl. ¶ 87).

**\*10** Finally, it is clear that the plaintiff can prove no set of facts establishing liability on the part of ASL for the harassment he suffered. The plaintiff must allege facts that would allow the conduct of the individual defendants to be imputed to ASL. The analysis of this element in the school setting departs somewhat from the Title VII framework. Unlike employers, who can be vicariously liable for the discriminatory acts of their employees, schools can be held liable under Title VI and *§ 1981* only for intentional conduct because those statutes prohibit only intentional discrimination. *See Alexander v. Sandoval,* 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (§ 601 claim); *Murrell v. Ocean Mecca Motel, Inc.,* 262 F.3d 253, 257 (4th Cir.2001) (*§ 1981* claim) (citing *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982)). In other words, a school faces liability only when it intentionally does something wrong, not when it merely sits by and does nothing at all. *See Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 568 (3rd Cir.2002) (rejecting theory that deliberate indifference to plaintiffs' civil rights is actionable in school setting) (citing *Alexander,* 532 U.S. at 279).

The theory of the plaintiff's harassment claims against ASL is that the school is liable for the individual defendants' acts as a result of its "conscious disregard" for the plaintiff's rights. However, he does not allege, except in scattered conclusory statements, that discriminatory animus motivated the school's inaction. In other words, the plaintiff asserts that the school is liable merely because it failed to do anything to help him.

The plaintiff's Amended Complaint is replete with factual allegations against the school and its officers, but all focus on their omissions, rather than on any

intentional decision to discriminate. The plaintiff alleges that: (1) ASL failed to enforce its nondiscrimination policies, failed to alert the sheriff's office about threats made against the plaintiff, refused to punish student Robert Meadows, and failed to discourage the defendants from violating the plaintiff's rights; (2) Interim Dean Lund, President Ellsworth, and Assistant Dean Davis failed to order any investigation into Professors Rubin and Butleritchie; (3) Ellsworth refused to write an affidavit for the local sheriff's office on the plaintiff's behalf, refused to accept the plaintiff's written complaints, and failed to prevent a conspiracy among Rubin, Butleritchie, and Davis; (4) Ellsworth and Davis failed to order a "tribunal to investigate" Meadows; and (5) the Chairman of ASL's Board of Trustees refused to order any investigation into the plaintiff's complaints and failed to do anything to stop the alleged harassment. (*Id.* ¶¶ 19-20, 56-57, 59, 61, 72, 75, 82-85, 103, 111.)

Furthermore, the plaintiff presents an alternate explanation for ASL's inaction, one which was not motivated by the plaintiff's race or national origin. As the plaintiff explains, ASL was undergoing the American Bar Association accreditation process during the time period in question and could not afford to let any misconduct become known. (Pl.'s Am. Compl. ¶ 85.) The plaintiff even gives examples of other conduct the administration was "covering up," including one professor's drunk driving and another one's affair with a student. (*Id.*) These allegations fail to state any actionable basis for institutional liability. Even if true and considered in the light most favorable to him, they show that ASL failed to protect the plaintiff from the defendants' harassment because it wanted to become accredited, not because the plaintiff is Greek-American. Accordingly, I will grant the defendants' motion to dismiss as to the plaintiff's Title VI and *§ 1981* harassment claims against ASL.

**\*11** Furthermore, I will also grant the defendants' motion to dismiss the plaintiff's retaliation claims against ASL. As I have already explained, the plaintiff has failed to allege that any adverse action was taken against him.

B

The defendants next move for the dismissal of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))**

plaintiff's civil conspiracy claim under 42 U.S.C.A. § 1985(3).[FN13] The plaintiff asserts this claim against all defendants in connection with the August 20, 2002, confrontation with professors Rubin and Butleritchie. The plaintiff states that Rubin and Butleritchie acted "separately and in concert" and "conspired together ... by following their custom, practice or usage, of treating a selected few students and Professors 'deliberately indifferent' to their federally protected rights."(Pl.'s Am. Compl. ¶¶ 103, 108-09.) The plaintiff further alleges that ASL, Ellsworth, Lund, and Davis participated in the conspiracy because they knew, or should have known, that Rubin and Butleritchie were injuring him, but they failed to do anything about it. (Id. ¶ 111.)[FN14]

> FN13.Section 1985(3) provides in relevant part:

> > If two or more persons ... conspire ... for the purpose of depriving ... any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages ... against any one or more of the conspirators.

> > 42 U.S.C.A. § 1985(3) (West 2003).

> FN14. The plaintiff also alleges in this claim that the defendants were state actors. (Pl.'s Am. Compl. § 106.) As explained in section IIIC of this Opinion, that argument is rejected. However, this is not fatal to the plaintiff's claim because § 1985(3) does reach private conspiracies in which there is " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." ' Gen. Bldg. Contractors Ass'n, 458 U.S. at 390 n. 17 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

The defendants move for the dismissal of the plaintiff's § 1985(3) claim on the grounds that it is barred by the intracorporate conspiracy doctrine, and that the plaintiff can prove no set of facts establishing a "meeting of the minds" among the defendants. For the following reasons, I agree.

First, the defendants argue that it is legally impossible for the defendants to have engaged in a conspiracy. "It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy."Buschi v. Kirven, 775 F.2d 1240, 1251-52 (4th Cir.1985) (applying this rule in the § 1985 context). Under the intracorporate conspiracy doctrine, "[a] corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."See id. at 1251 (citing Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911, 914 (5th Cir.1952)). Although this doctrine arose in the antitrust context, it consistently has been applied in the Fourth Circuit to actions brought under §§ 1983 and 1985. See Veney v. Ojeda, 321 F.Supp.2d 733, 748 (E.D.Va.2004). Exceptions to the intracorporate immunity doctrine exist for an agent's unauthorized acts or when an agent "has an independent personal stake in achieving the corporation's illegal objective."Buschi, 775 F.2d at 1252-53 (quoting Greenville Publ'g Co., Inc. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir.1974) and citing Hodgin v. Jefferson, 447 F.Supp. 804, 807 (D.Md.1978)).

In this case, the complaint itself makes clear that the intracorporate conspiracy doctrine applies. The defendants are ASL, which is a corporation, and certain ASL administrators and professors, who are agents of the corporation.[FN15]See, e.g., Rothman v. Emory Univ., 828 F.Supp. 537, 543 (N.D.Ill.1993) (holding dean, assistant dean, and others at private law school to be protected by intracorporate conspiracy doctrine). Furthermore, the plaintiff has failed to allege facts that would place any of the defendants within an exception to the doctrine. Each of the defendants is alleged to have engaged only in authorized acts falling within the scope of his or her employment and is not alleged to have obtained any personal benefit from their interactions with the plaintiff. See Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir.1978) (affirming dismissal of § 1985(2) claim where "[e]very one of the defendants who was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 11
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))**

involved in the so-called conspiracy was either a trustee or faculty member of the Brooklyn Law School-which is admittedly an educational corporation-and was acting in that capacity"). I hold that the intracorporate conspiracy doctrine prevents the plaintiff from stating a claim under § 1985(3).

> FN15. The plaintiff has sued the individual defendants in both their official and individual capacities. Naming the agents in their individual capacities does not destroy their immunity under the intracorporate conspiracy doctrine. *Buschi,* 775 F.2d at 1252.

**\*12** In addition, the defendants argue that the plaintiff can prove no set of facts establishing the prima facie element of a "meeting of the minds" among them. It is "well settled" that "a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights" in order to prove a § 1985(3) conspiracy. *Simmons v. Poe,* 47 F.3d 1370, 1377 (4th Cir.1995) (citations omitted). The plaintiff fails to allege that ASL, Ellsworth, Lund, and Davis reached any such agreement. Rather, he states that those defendants knew that Rubin and Butlerithcie "were incompetent, immoral, racist, selfish, power-hungry, childish, and severely under[-]qualified to be employed as professors of law;" that they knew or should have known Rubin and Butlerithcie had injured the plaintiff, other students, and professors; and that they "took no steps or efforts to halt ... this course of conduct, nor to make redress to Plaintiff or other Professors and other students that have complained and have been injured by Defendant[ ]s Rubin and Butlerithcie."(Pl.'s Am. Compl. ¶¶ 107, 111.) The plaintiff fails to allege any specific agreement, meeting of minds, or mutual understanding among these defendants. Furthermore, even if the defendants had together agreed not to take action against Rubin and Butleritchie, the plaintiff has failed to allege that impermissible considerations of race or national origin played any part in that agreement. *See Griffin,* 403 U.S. at 102 (defendants must act with "class-based, invidiously discriminatory animus"); *Simmons,* 47 F.3d at 1376-77 (same).

The plaintiff does allege that there was meeting of the minds between Rubin and Butleritchie to deprive him of his rights, but he does so only in a conclusory

manner. He states,

> Plaintiff believes from personally experiencing and being victimized ... that on August 20, 2002 Defedant[ ]s Butlerithcie, and Rubin, conspired together to destroy the mental well being of the Plaintiff, by following their custom, practice or usage, of treating a selected few students and Professors 'deliberately indifferent' to their federally protected rights to be free from arbitrary deprivations of life, liberty, and the pursuit of happiness.

(Pl.'s Am. Compl. ¶ 109.) The Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts."*Simmons,* 47 F.3d at 1377;*see also Lewin v. Cooke,* 95 F.Supp.2d 513, 525 (E.D.Va.2000) ( "Because of the high threshold that a[p]laintiff must meet to establish a prima facie case under section 1985, courts often grant motions of dismissal."). It is true that the plaintiff alleged that Rubin and Butleritchie together met with him on August 20, 2002, and that the defendants made similar statements during this meeting. However, this circumstantial evidence is probative of a conspiracy only through speculation. For these additional reasons, the plaintiff's claims under § 1985(3) must be dismissed as to all defendants.

### C

**\*13** Finally, the defendants move to dismiss the plaintiff's claims under 42 U.S.C.A. § 1983 [FN16] on the ground that he can prove no set of facts establishing that any of the defendants acted under "color of state law."

> FN16.Section 1983 provides in relevant part:
>
> > Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 12
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))

42 U.S.C.A. § 1983 (West 2003).

Section 1983 protects individual rights only from government action, not private action. "[M]erely private conduct, no matter how discriminatory or wrongful,'" does not fall within the ambit of § 1983. Blum v. Yaretsky, 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (quoting Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)). Accordingly, a plaintiff asserting a claim under § 1983 must be able to show "that the defendant deprived him of [a] constitutional right 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." ' Haavistola v. Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214-15 (4th Cir.1993) (quoting § 1983). This requirement is equivalent to the "state action" requirement under the Fourteenth Amendment. Id.

A private entity may be considered a state actor for purposes of a constitutional challenge if its conduct is "fairly attributable to the state." Blum, 457 U.S. at 1004. In this case, the plaintiff acknowledges that ASL is not a public entity, but a private corporation. (Pl.'s Am. Compl. ¶¶ 5, 8.) However, he alleges that the defendants' conduct is fairly attributable to the state for the following reasons:

(a). The Law School received approximately Five Hundred Thousand Dollars ($500,000) from a quasi-Federal-State Agency known as the "Appalachian Regional Commission."

(b). The Law School receives Federal Financial Aid and is a Title IV institution pursuant to the Higher Education Act of 1965 ... and the law school [ ] allows student loans borrowed under [the] Stafford Loan Program to suffice as tuition money for over 300 students per semester.

(c). The Buchanan County Board of Supervisors[ ] controls the majority of the Law School's Board of Trustees, electing 10 out of the 19 members of the Defendant Law School's Board of Trustees....

(d). The Defendant Law School has sufficient personal involvement with the Commonwealth of Virginia's Buchanan County Board of Supervisors.

(Pl.'s Am. Compl. ¶ 22.)

Even assuming these facts could establish that ASL is a state actor,[FN17] the ultimate issue in this case is whether the plaintiff has alleged that the school's action in harassing him can fairly be seen as state action. See Rendell-Baker, 457 U.S. at 838; Robinson v. Davis, 447 F.2d 753 (4th Cir.1971). The plaintiff must allege by more than mere conclusions that the state participated in, coerced, or significantly encouraged ASL's conduct. See Jackson v. Metro. Edison Co., 419 U.S. 345, 357 n. 17, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

> FN17. Courts have consistently found that private universities are not state actors. See Allen v. Tulane Univ., No. 92-4070, 1993 WL 459949, at *2 (E.D.La. Nov.2, 1993) (collecting cases). On the infrequent occasions when private schools have been held to be state actors, it is because their actions satisfied one of three tests: (1) the public function test, (2) the regulation/public funding test, or (3) the symbiotic relationship test. See Haavistola, 6 F.3d at 215. None of the reasons cited by the plaintiff individually or collectively appear to fulfill any of these tests. Private law school education is not a "public function" making operation of a school attributable to the state. Grafton v. Brooklyn Law Sch., 478 F.2d 1137, 1140 (2d Cir.1973). The receipt of federal and state funds does not make ASL's actions attributable to the state. See Blum, 457 U.S. at 1011 (holding private nursing home did not engage in state action despite extensive regulation by state and receipt of 90 percent of its income from state); Rendell-Baker v. Kohn, 457 U.S. 830, 841-43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (holding that private school receiving at least ninety percent of its operating budget from state funds pursuant to state contracts was not engaged in state action within the meaning of § 1983); Hicks v. S. Md. Health Sys. Agency, 737 F.2d 399, 403 (4th Cir.1984) ("It is well-settled that the receipt of federal funding, by itself, will not establish federal action."). Nor is participation in federal student loan programs any indication that ASL is a governmental actor. See Fischer v. Driscoll,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.))

546 F.Supp. 861, 867 (E.D.Pa.1982) (collecting cases). The fact that the Buchanan County Board of Supervisors appoints some members of ASL's board would be significant only if their involvement makes the county capable of influencing board decisions, which the plaintiff has not alleged. *See Kerr v. Enoch Pratt Free Library of Baltimore City*, 149 F.2d 212, 214 (4th Cir.1945) (stating that "to make a corporation a public one its managers must not only be appointed by public authority, but subject to its control."); *Braden v. Univ. of Pittsburgh*, 552 F.2d 948, 960 (3rd Cir.1977); *cf. Downs v. Sawtelle*, 574 F.2d 1, 8 (1st Cir.1978) (finding state action where town appointed entire board of hospital, regulated the hospital, had a right to receive hospital profits and, on dissolution, assets).

Although the plaintiff has alleged that the county and school are connected in several ways, he has not alleged any facts to show that the state acted to deprive him of his rights. The fact that the Buchanan County Board of Supervisors elected several individuals, who are not named in connection with any of the discriminatory acts the plaintiff allegedly experienced, to serve on ASL's board does not support an inference of state action on the part of the school with respect to that discrimination. *See Robinson, 447 F.2d at 757-58* (holding that the fact that several individuals served simultaneously as college and as municipal officials and that campus security officers also served as town police officers and wore their town uniforms on campus did not support a finding of state action with respect to certain disciplinary proceedings). Likewise, the fact that the chairman of the Board of Trustees may have had knowledge of the defendants' discriminatory actions does not make those actions attributable to the state merely because, as the plaintiff asserts, the chairman is also a state court judge. (Pl.'s Resp. at 6.) There has been no allegation, aside from the plaintiff's conclusory statement that the "Law School's policymakers" followed "policies and customs ... 'deliberate [ly] indifferen[t]' ' to his rights (Pl.'s Compl. ¶ 126), that the chairman or any other county-appointed official encouraged, condoned, or participated in the plaintiff's harassment. Without a sufficient connection between the acts of the defendants and the allegedly discriminatory activity, the plaintiff fails to state a claim under § 1983.

**\*14** Finally, the plaintiff has also failed to allege that the individually named faculty members and professors ever acted under color of state law. In order to state a claim, the plaintiff must allege that these individuals are clothed with the authority of state law so as to be state actors themselves, acted together with state actors, or engaged in conduct otherwise chargeable to the state. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). In his complaint, the plaintiff repeatedly alleges that Davis, Rubin, Batlertichie, Ellsworth, and Lund violated his rights, but he fails to allege any facts that would tie those violations to authority of the state. Accordingly, the plaintiff's claims under § 1983 must be dismissed as to all defendants.

IV

For these reasons, it is ADJUDGED AND ORDERED as follows:

1. The defendants' Motion to Dismiss is GRANTED; and

2. Causes of Action One through Four of the plaintiff's Amended Complaint are DISMISSED.

W.D.Va.,2005.
Langadinos v. Appalachian School of Law
Not Reported in F.Supp.2d, 2005 WL 2333460 (W.D.Va.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 544727 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1999 WL 544727 (S.D.N.Y.))

**H**Adams v. Andrews
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Eugene ADAMS, Najah Adams, Plaintiffs
v.
Mary Ann ANDREWS, Administrative Assistant for
Certification at Kansas State University, Defendant
**No. 99 CIV 3316 RO.**

July 27, 1999.

Eugene Adams, pro se, for plaintiffs.
Mary Ann Andrews, pro se, for defendant.

MEMORANDUM AND ORDER

OWEN, District J.

*1 Plaintiffs Eugene Adams and his daughter, Najah
Adams, African-Americans, brought this action, 99
CIV 3316, for race discrimination in violation of
Title VI of the Civil Rights Act of 1964, 42 U.S.C. §
2000d, against defendant Mary Ann Andrews in her
official capacity as Administrative Assistant for
Certification at Kansas State University ("KSU").See
Complaint, ¶ 6. Plaintiffs claim that Andrews
intentionally discriminated against Najah Adams "by
treating her differently from others" in determining
whether she satisfied the admission and eligibility
requirements for the National Collegiate Athletics
Association ("NCAA") track scholarship which KSU
initially offered Najah, and then withdrew after the
NCAA Initial-Eligibility Clearinghouse failed to
certify Najah "because she was a nonqualifier."
Plaintiffs have sued KSU and various other school
officials on breach of contract and fraud claims, as
well as violations of 42 U.S .C. § 1983 twice before
in this court; I granted defendants' motion to dismiss
on sovereign immunity grounds both times. See
Adams v. Kansas State University, 27 F.Supp.2d 469
(S.D.N.Y.1998) [Adams I ]; Adams v. Kansas State
University, No. 98 Civ. 8737, 1999 WL 165691,-F.
Supp.2d-(S.D.N.Y. March 25, 1999) [Adams II ].
This case was initially assigned to Judge Pauley, but
it was transferred to me after it appeared that it
should have come to me as related to 98 Civ. 5198
and 98 Civ. 8737.

Essentially, plaintiffs allege that Najah was a high
school track star who was heavily recruited by
various colleges and chose to attend KSU based on
the approved NCAA track scholarship which KSU
offered. This scholarship, for August 1995 to May
1996, covered tuition, fees, room, board and books,
and was to be renewed each year for up to five years.
The scholarship was subject to the NCAA Division I
initial eligibility criteria for financial aid, practice and
competition which are applicable to all freshman
student-athletes. (Letter from Darrell Gordon of the
NCAA dated July 20, 1998, attached as Exhibit 2 of
the Complaint) ("Gordon Let."). The four conditions
are: (1) graduation from high school; (2) successful
completion of a required core curriculum consisting
of a minimum number of courses in specified
subjects; (3) a minimum grade-point average in the
core curriculum of 2.0; and (4) a minimum SAT
score of 700 or ACT composite score of 17. Id. There
is no dispute that Najah did not meet the second
requirement because she failed Sequential Math III in
her final semester of high school.[FN1](Transcript of
Najah Adams from Brooklyn Tech attached as
Exhibit 4 to Complaint) ("Transcript").
Unfortunately, the official NCAA clearinghouse
report which stated that Najah did not qualify for an
NCAA scholarship was not received by KSU until
October 24, 1995, after Najah's initial enrollment at
KSU. (Gordon Let.). When KSU learned that Najah
did not qualify, it revoked all financial aid and
charged Najah $11,000 for tuition and expenses
incurred during the fall 1995 semester.

> FN1. Najah also failed American Studies II
> in her senior year of high school. The
> Gordon letter cites this as another reasons
> Najah was a "nonqualifier."

*2 Plaintiffs allege that this demand for payment
constitutes discrimination because it was made in a
"different manner" and "without an opportunity for a
hearing."Complaint, ¶ 8b. According to plaintiffs,
Najah was the only student athlete who had to repay
her "scholarship." Plaintiffs contend that KSU will
not release Najah's transcript until her tuition is paid
and that "this is how school officials discriminate
against Najah, by getting kickbacks while

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 544727 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1999 WL 544727 (S.D.N.Y.))

administering federal grants; they withheld the official transcripts any time they want, until they get a payoff."Complaint, ¶ 19. Defendant moves to dismiss the complaint on the grounds of *res judicata,* collateral estoppel, sovereign immunity under the Eleventh Amendment and Fed. R. Civ. Pro. 12(b).[FN2]

> FN2. The court files indicate that plaintiffs made a cross-motion for summary judgment; however, since that motion was not properly served upon defendant and the record does not contain a certificate of service, the Court will not consider that motion. In any event, the Court need not reach that issue as it finds for the defendant on her motion to dismiss.

As I noted in *Adams II,*"the case law has some divergence on whether a dismissal for sovereign immunity under the Eleventh Amendment constitutes a final judgment on the merits, [so] it is not clear that *res judicata* is applicable here."1999 WL 165691 at *1. Unlike plaintiffs' earlier claims, this claim pursuant to 42 U.S.C. § 2000d is not barred by the Eleventh Amendment because of an express Congressional override, even though defendant Andrews is sued in her official capacity such that the suit is deemed to be a suit against KSU, an alter ego of the state. *See Adams I,* 27 F.Supp.2d at 472. 42 U.S.C. § 2000d-7(1) states in relevant part that: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.]..."*See Papasan v. Allain,* 478 U.S. 265, 276-77, 106 S.Ct. 2932, 2939-40, 92 L.Ed.2d 209 (1986) ("absent consent, or an express congressional override, the Eleventh Amendment prohibits suit in federal court for retrospective relief against a state or an agency of the state.").

Although this claim passes the initial jurisdictional bar of the Eleventh Amendment, it still fails for failure to state a claim under 42 U.S.C. § 2000d:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits or, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

A plaintiff alleging a violation of Title VI "must make a *prima facie* showing that the alleged conduct has a disparate impact."*New York Urban League, Inc. v. State of New York,* 71 F.3d 1031, 1036 (2d Cir.1995). This showing can be made by demonstrating the same elements as a Title VII violation, *see id.,* namely: (I) that plaintiff belongs to a racial minority; (ii) that she applied and was qualified for the position in question; (iii) that, despite her qualifications, she was rejected; and (iv) that, after her rejection, the position remained open and the defendant continued to seek applicants from persons of complainant's qualifications. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Here, plaintiffs cannot meet this burden because it is undisputed that Najah was not qualified to receive the scholarship because she had failed mathematics. There are no allegations that white athletes who failed mathematics were treated differently, and plaintiffs do not allege any facts to support their conclusory allegations of "kickbacks", "illegal payoffs" and "intentional discrimination." Conclusory allegations do not a cause of action make. Instead, the evidence attached to the Complaint clearly shows that the scholarship was revoked because Najah did not meet the academic conditions of the scholarship. See Gordon Let., Transcript.[FN3]

> FN3. Plaintiffs' reliance on *Cureton v. National Collegiate Athletic Ass'n,* 37 F.Supp.2d 687 (E.D.Pa.1999), is misplaced. The *Cureton* court, whose decision is not binding upon this Court in any event, found that the NCAA's requirement that students "achieve a minimum score on either of two standardized tests as a condition of eligibility to participate in intercollegiate athletics and/or receive athletically-related financial aid during their freshman year" had an unjustified disparate impact against African-Americans. 37 F.Supp.2d at 689. However, the "Court expressed no opinion on the propriety of ... using a core-GPA cutoff in formulating an initial eligibility rule.... As it currently reads, the order does not preclude the NCAA from utilizing grade-point averages and/or course requirements as a component in an initial eligibility rule."*Id. at 716.*The instant case involves a course requirement, rather than a standardized test.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 544727 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 1999 WL 544727 (S.D.N.Y.))

Page 3

**\*3** While I am not without sympathy for the plight of these plaintiffs, these facts do not rise to the level of a federal civil rights action. It is unfortunate that KSU did not discover that Najah did not qualify for the scholarship until after she had matriculated at the University and after she had received aid; it is equally unfortunate that Najah, knowing she had failed mathematics and thus did not qualify for the scholarship, did not inform KSU of that fact beforehand.<u>FN4</u>While it is not clear on this record exactly how the fault should be apportioned, the fact remains that before she matriculated, Najah was not qualified to receive the scholarship. Therefore, defendant's motion to dismiss plaintiffs' complaint is GRANTED.

> <u>FN4.</u> I do not reach the merits of plaintiffs' allegations of negligence on the part of KSU, because that is a state law issue which is barred by the Eleventh Amendment. *See Adams I,* 27 F.Supp.2d at 472. Once again, this Court makes no finding on how a Kansas state court might address a negligence claim brought in Kansas state court by plaintiffs.

The foregoing is so ordered.

S.D.N.Y.,1999.
Adams v. Andrews
Not Reported in F.Supp.2d, 1999 WL 544727 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A191

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.))**

**C**Aoutif v. City University of New York
E.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Zerrad AOUTIF, Plaintiff,
v.
CITY UNIVERSITY OF NEW YORK, York
College, Defendant.
**No. 05-CV-496 (ILG).**

Dec. 8, 2005.

Vernita Charles, Law Office of Vernita Charles,
Brooklyn, NY, for the Plaintiff.
Kathryn Carter Spann, Steven Leon Banks, NYS
Office of the Attorney General, New York, NY, for
Defendant.

*MEMORANDUM AND ORDER*

GLASSER, United States District Judge.
**\*1** In this action Zerrad Aoutif ("plaintiff") alleges
that the City University of New York, York College
("defendant" or "CUNY") improperly withdrew her
from an elementary French class as a result of her
**race**, color, or national origin. Plaintiff asserts a sole
cause of action under the **TitleVI** of the Civil Rights
Act ("**TitleVI**" or the "Act"), 42 U.S.C. § 2000(d).
Plaintiff originally asserted additional causes of
action under 42 U.S.C. § 1983 and 42 U.S.C. §
1985(3). Those **claims** are considered abandoned.
*See Pl. Mem. in Opp. to Def. Mot. to Dismiss,*
("Pl.Mem.") at 1 ("The Amended Complaint lists
several causes of action, two of which will be
withdrawn under separate filing. This present
memorandum focuses on 42 U.S.C. § 2000(d)."").
Pending before the Court is defendant's motion to
dismiss the **TitleVIclaim** under Rule 12(b)(6).

*FACTS*

The facts are cast in the light most favorable to
plaintiff, as is required on a motion to dismiss.
Plaintiff is a woman of Arabic descent, born in
Morocco, who enrolled at CUNY as a freshman
during the fall semester of 2001. (*Am. Compl.,* ¶¶
1,2).[FN1] During that fall semester, plaintiff enrolled in

a French class in order to fulfill credits towards her
degree. (¶ 3).

FN1. All paragraph references ("¶ ") refer to
the Amended Complaint.

In the shadow of the "tumultuous upheaval"
associated with September 11, 2001, a time in which
plaintiff asserts that "most people questioned the
motives of most Arabs in America," plaintiff states
she was "severely mistreated" by Homini Bahia, her
French professor. (¶¶ 4, 5). The complaint alleges
that Professor Bahia prevented plaintiff from
obtaining credit for attendance, discouraged plaintiff
from participating in class, pushed plaintiff, refused
plaintiff entrance to the classroom, refused plaintiff's
attempt to take the final exam, and issued a failing
grade as a result. (¶ 5).

After being denied access to the classroom, Plaintiff
"did everything in order to resolve the situation,
meaning, [she] did everything just to have the
opportunity to take the French exam and avoid a
negative grade."(¶ 6). She spoke to Dr. Dephillipine,
the Department Chair of Languages, who "did not
permit her to return to class," and threatened that
"security would escort [her] out of class."(*Id.*)
Plaintiff "could not understand why [she] was treated
in such a harsh manner," as, in her opinion, she "had
not done anything to warrant expulsion from the
class."(*Id.*). Plaintiff was also "devastated" that there
was "no French class available to which [she] could
transfer, and [she] did not want any negative record
on [her] transcript."(¶ 7).

After telling plaintiff she could not return to class or
complete the final exam, Dr. Dephillipine allegedly
told plaintiff "You're from Morocco, you're Arab, An
Arabic student who frightens a French Professor, can
go to jail."(sic)(¶ 8). This statement "puzzled"
plaintiff. (¶ 8).

Plaintiff "pleaded to several authorities within the
College to allow [her] to take the final exam even if
[she] was barred from ... class."(¶ 9). At various
times, plaintiff complained to Ms. Morin, from the
Foreign Language Coordinator's Department;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.))

Stephanie Cooper, Assistant to the Provost; Dr. Schreiner, Dean of Student Support and Counseling; Abdelhamid Kherief, Coordinator and Professor of the English Program; Dr. Avis Hendrickson, Dean of Student Development; Dr. Charles C. Kidd, President of the College; Ms. Santiago, Member of the Committee of Academics; and Dean Avis Hendrickson, of the Student Development and Enrollment Management. No relief was obtained.(*Id.*).

**\*2** On one occasion, Plaintiff spoke to an assistant of Dr. Schreiner, who "inquired as to how [she] knew French."(¶ 14). When plaintiff said that she was from Morocco, one of the assistants in the office said "Oh My God, Arab," and said to another secretary, "Bin Laden is here," indicating the plaintiff.(*Id.*). The assistant then displayed a poster stating "Bin Laden-Wanted Dead or Alive." (*Id.*).

"As a result of not being allowed to take the class final exam, the University issued a failing grade for that class in February 2002, affecting [plaintiff's] grade point average, and having a negative impact on [her] overall transcript."(¶ 10). Plaintiff's grades "began to suffer" because she "spent so much effort" attempting to repair the situation. (¶ 11).

After talking to a "plethora" of people, plaintiff was ultimately promised "removal of the failing grade from [her] transcript and a refund of the moneys paid for taking that class."(¶ 12). She never received a refund, but defendant did convert the "WU" (unofficial withdrawal) to a "W" (withdrawn) (¶ 13). Both "W" and "WU" "are not favorable grades, and could be perceived unfavorably when applying for acceptance in a graduate school program."(¶ 13).

As a result of defendant's refusal to "complete[ly] remov[e] ... any record pertaining to this class," plaintiff believed that her "dream of obtaining a degree in Medical Lab Technology would not be fulfilled at [the] University."(*Id.*)."After receiving no help from any of the authorities of the University," and because she felt "ostracized," "uncomfortable," and "unsafe," [she] became clinically depressed" and has been "under the treatment of several doctors" who have diagnosed her "with several disorders." (¶¶ 13, 15, 17).

It appeared to plaintiff that "all of the departmental

heads agreed to not to help [her] get the grade dropped even though many had [her] attend appointments, follow "procedures" and policies to obtain relief, with no results."(¶ 16)."No final determinations, no internal hearings were ever made."(*Id.*). In **conversations** with "several departmental heads," "some **mention** of [her] Arabic heritage was made."Moreover, it appeared to plaintiff that "all had a united front, **not** to allow [her] to take the exam, and [to fail her] because they forbid her to take the exam."(*Id.*).

*DISCUSSION*

Plaintiff brings her cause of action under **TitleVI** of the Civil Rights Act, 42 U.S.C. § 2000(d), which provides that "No person in the United States shall, on the ground of **race**, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

A court must **not** dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his **claim** which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). When deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court takes the facts as alleged in the complaint to be true, and must draw all reasonable inferences from those facts in favor of the plaintiff. *See e.g., Chosen Intern., Inc. v. Chrisha Creations,* 413 F.3d 324, 327 (2d Cir.2005). Both parties have submitted materials outside of the pleadings to the court along with their memoranda of law in support of and opposing the motions to dismiss. "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint alone," or "convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material."*Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). This conversion requirement is strictly enforced whenever there is a "legitimate possibility" that the district court relied on material outside the complaint in ruling on the motion. *Amaker v. Weiner,* 179 F.3d 48, 50 (2d Cir.1999). This court has been careful not to commit error by considering affidavits or exhibits

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.))**

Page 3

submitted by either party or relying on factual allegations contained in the briefs and memoranda. *See Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999).

### I. Statute of Limitations

**\*3** The parties do not dispute that the claim is subject to a three-year statute of limitations. *See Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir.2004) (federal courts look to state statutes of limitations for analogous federal discrimination claims); *Folkes v. New York College of Osteopathic Medicine of New York Institute of Technology*, 214 F.Supp.2d 273, 292 ("Title VI claims are time-barred pursuant to the applicable three year statute of limitations ...").

Rather, they dispute the accrual date for the claim. Defendant contends that because plaintiff's injuries all arose out of actions which took place during the fall semester of 2001, this claim, which was filed on January 27, 2005, is time-barred. Plaintiff submits two theories on which the claim is not barred: First, she alleges that CUNY did not issue the grade until February 2002. Second, she argues that in addition to the actions which prevented her from attending class and taking the final exam, independent discriminatory acts occurred after January 27, 2002 while she appealed her grade.

"Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Cullen v. Margiotta*, 811 F.2d 698, 725 (2d Cir.1987). In the specific case of a discrimination claim, "the proper focus is on the time of the *discriminatory act,* not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (emphasis in original).

Any claim based on plaintiff's receipt of a failing grade must be barred by the statute of limitations, because any allegedly discriminatory act which resulted in the failing grade must have taken place during the fall semester of 2001. Plaintiff's assertion that the fact that she didn't receive her grade until February, 2005, is unavailing; the receipt of a failing grade is a quintessential example of a consequential, as opposed to a causal, act. Plaintiff acknowledges that she was precluded from taking the final exam, and that her failure to take the exam resulted in the

failing grade. Even if the preclusion of her from the exam was a result of discriminatory acts, those acts necessarily occurred prior to the exam in December 2001. There is simply no inference available that Aoutif did not know of those acts prior to January 27, 2002, and more than three years before filing the complaint. Any claim based on those acts must therefore be barred by the statute of limitations. *Cf. Putkowski v. Warwick Valley Central School District*, 363 F.Supp.2d 649, 655 (S.D.N.Y.2005) (date of notice of intent to demote, as opposed to actual date of demotion, held to be the accrual date for purpose of disability discrimination **claim**).

### II. Failure to State a **Claim** Under **Title VI**

Plaintiff's alternate theory of liability rests on the assertion that she was denied access to appeal her grade, and that the denial of such access constituted a **Title VI** violation. This action is **not** time-barred because a reasonable inference of plaintiff's complaint is that she continued her efforts to appeal the grade beyond February 2002.

**\*4** In order to state a **claim** based on **Title VI**, the plaintiff must allege, *inter alia,* 1.) that the defendant discriminated against her on the basis of **race**; 2.) that that discrimination was intentional, and 3.) that discrimination was a substantial and motivating factor for defendant's actions. *See Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir.2001). Moreover, the Supreme Court has held that in a claim such as this, that does not implicate the official policy of the defendant, "a damages remedy will not lie ... unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Independent School Dist.*, 524 U .S. 274, 290, (1998). Plaintiff has not stated any facts on which one could infer discriminatory intent or motivation on the part of CUNY in responding to her appeal. Furthermore, because she never notified CUNY of any alleged discrimination, CUNY has not had an opportunity to respond to any discrimination, if it exists. For those reasons, the claim cannot survive a motion to dismiss.

First, plaintiff's allegations do not amount to allegations of discriminatory intent or motivation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.))

The only allegations in the complaint that could possibly relate to discrimination are as follows: an allegation that after September 11, 2001, "most people questioned the motives of most Arabs in America," (¶ 4); an allegation of the "puzzling" statement made by the department chair, "You're from Morocco, you're Arab, An Arabic student who frightens a French Professor can go to jail," (¶ 8); an allegation of two racially insensitive statements made by administrative assistants to a Dean, "Oh My God, Arab," and "Bin Laden is here," (¶ 14); and an allegation that it was plaintiff's "overall experience" that "some **mention** of [her] Arabic heritage was made" during the course of her appeal. (¶ 16). Such conclusory, isolated, and unspecified statements cannot provide a rational basis for inferring discriminatory intent or motivation, and a **claim** based on such allegations cannot survive a motion to dismiss. *See* *Yusuf v. Vassar College,* 35 F.3d 709, at 713, (2d Cir.,1994) (dismissing racial discrimination **claim** against university for failing to "specifically allege the events **claimed** to constitute intentional discrimination as well as circumstances **givingrise** to a plausible inference of racially discriminatory intent.").

Moreover, while plaintiff has detailed her grievances for being barred from class, for example that she "pleaded to several authorities within the College to allow [her] to take the final exam" and that she "did everything just to have the opportunity to take the French exam and avoid a negative grade," she does not allege that she notified CUNY authorities of any alleged racial discrimination, or that those authorities knew of the alleged discrimination and failed to respond. In the absence of such notice, plaintiff has not provided an opportunity for an adequate response by the university, and her Title VI claim cannot survive a motion to dismiss. *See* *Crandell v. New York College of Osteopathic Medicine,* 87 F.Supp.2d 304, 320 (S.D.N.Y.2000) ( "institution must have actual knowledge of at least some incidents of harassment in order for liability to attach.") (citing *Gebser,* 524 U.S. at 274).

### CONCLUSION

**\*5** The court concludes that the plaintiff's claim, alleging discriminatory acts which took place during the fall semester of 2001, is barred by the statute of limitations. Additionally, because plaintiff has failed to allege discriminatory motivation or intent, or that CUNY knew of the discrimination and failed to take corrective action, the claim fails under Title VI of the Civil Rights Act. Defendant's motion to dismiss is therefore granted. The Clerk of the Court is directed to close the case.

SO ORDERED.

E.D.N.Y.,2005.
Aoutif v. City University of New York
Not Reported in F.Supp.2d, 2005 WL 3334277 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.