IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TAMMY HURD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 07-117 |
| | : | |
| DELAWARE STATE UNIVERSITY | : | |
| and DANDESON PANDA, individually | : | |
| and in his official capacity, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S ANSWERING BRIEF TO DEFENDANT
## DELWARE STATE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT

YOUNG, MALMBERG & HOWARD, P.A.

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
30 The Green
Dover, DE 19901
Supreme Court I.D. 4447
302-672-5600
*Attorney for Plaintiff*

DATED: June 24, 2008

# TABLE OF CONTENTS

PAGE

CITATIONS………………………………………………………………………..5

NATURE AND STAGE OF
PROCEEDINGS…………………………………………………………………….6

SUMMARY OF
ARGUMENTS………………………………………………………………………7

STATEMENT OF
FACTS…………………………………………………………………………….8-28

ARGUMENT………………………………………………………………..…29-45

I. Standard of Review…………………………………………………………….29

II. THE PLAINTIFF SUFFERED SEXUAL HARASSMENT FROM DEFENDANT
BECAUSE SHE WAS SUBJECTED TO A HOSTILE ENVIRONMENT BASED UPON HER
SEX. …………………………………………………………………..…………29-35

   A. Plaintiff suffered intentional discrimination based upon her gender……………….29-34

   B. The harassment detrimentally affected the Plaintiff and would detrimentally affect a
reasonable woman in Plaintiff's
position…………………………………………………………………………..34-35

III. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS WHETHER THE
DEFENDANT IS LIABLE BECAUSE DSU HAD ACTUAL NOTICE OF PANDA'S PAST
HARASSMENT
………………………………………………………………………………..35-44

   A. The Plaintiff contends that DSU had actual notice of Panda's Past Sexual Assault which
occurred at DSU's campus………………………………………………………...36-37

   B. The Plaintiff contends that DSU had actual notice of previous complaints of sexual
harassment against Panda as of the January 2005 Meeting…………………………...37

   B. The Plaintiff contends that DSU's responded with deliberate indifference considering
their knowledge of Panda's past incidents of sexual assault and harassment………..37-42

3

IV. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS WHETHER THE PLAINTIFF
SUFFERED RACIAL DISCRIMINATION BECAUSE SHE WAS SUBJECTED TO A
HOSTILE ENVIRONMENT BASED UPON HER RACE.........................................41-44

V. THERE ARE GENUINE ISSUES OF MATERIAL FACT AS WHETHER THE PLAINTIFF
IS ENTITLED TO A CLAIM WARRANTING THE IMPOSITION OF PUNITIVE DAMAGES
...................................................................................................................44

CONCLUSION............................................................................................44

# TABLE OF CITATIONS

Page No.

Cases:

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir.1996)...............42

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)...............................29

Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001)....................................41

Davis v. Monroe County Board of Education, 526 U.S. 629 (1999) .................Passim

 Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir.1999)........................42

Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998) ............... 38

Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)...42

Herbert v. Lando, 441 U.S. 153, 162 n. 7, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).......43

In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993)...........................29

Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996).....................29

Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999) ........................................29

Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)..
.................................................................................................29

Say. Bank, FSB v. Vinson, 477 U.S. 57, 65-68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)....30-35

Williams v. Paint Valley Local School District. 400 F.3d 360 (6th Cir.) ..................30.35-36

## NATURE AND STAGE OF PROCEEDINGS

On February 26, 2007, plaintiff Tammy Hurd ("plaintiff Hurd") filed this complaint against defendants Delaware State University ("defendant DSU") and Dandeson Panda ("defendant Panda"), in his official capacity only. The action arises to remedy discrimination on the basis of sex and race in the terms, conditions, and privileges of plaintiff Hurd's education under provisions of Title IX of the Education Amendments of 1972, and Title VI of the Civil Rights Act of 1964 and 42 U.S.C. §1983.

On March 27, 2007, defendant DSU filed their answer to the complaint. Defendant Panda filed a Motion to Dismiss on May 4, 2007 in lieu of filing an answer to the complaint. Defendant Panda's motion to dismiss was granted in part and denied in part. Plaintiff voluntarily dismissed all claims that defendant Panda could be held liable in his individual capacity and the claim against him for punitive damages The Court decided that whether the defendant Panda is in fact liable in his official capacity is a question of material fact for a jury to decide. Defendant Panda filed an Answer in this case on May 7, 2008.

This is plaintiff Hurd's answering brief in support of denying defendant DSU's motion for summary judgment.

## SUMMARY OF ARGUMENT

1.      Plaintiff concedes that as a matter of law, DSU is a state entity immunized by the Eleventh Amendment of the United States Constitution from liability concerning Plaintiff's 42 U.S.C. §1983 claim.

2.      Plaintiff has demonstrated that there are genuine issues of material fact creating a genuine issue for trial concerning whether Tammy Hurd suffered from a hostile environment sexual harassment while a student at DSU pursuant to her Title VI claim.

3.      Plaintiff has demonstrated that there are genuine issues of material fact creating a genuine issue for trial concerning whether DSU was deliberately indifferent after receiving actual notice that Tammy Hurd was suffering from a hostile environment sexual harassment while a student at DSU pursuant to her Title VI claim.

4.      Plaintiff has demonstrated that there are genuine issues of material fact creating a genuine issue for trial concerning whether DSU intentionally harassed or discriminated against Plaintiff on account of her race pursuant to her Title VII claim.

5.      Plaintiff has demonstrated that there are genuine issues of material fact creating a genuine issue for trial concerning whether Tammy Hurd is entitled to Punitive Damages pursuant to her Title VII claim.

## STATEMENT OF FACTS

### A. The Parties

Delaware State University (hereinafter "DSU"), the second-largest university in the state of Delaware, is a historically black university. DSU is a fully accredited, comprehensive university which receives federal and state funds with a main campus and two satellite sites that encompass six colleges and a diverse population of undergraduate and advanced degree students. Diversity plays an important role in academic life at DSU. (Rodriguez Dep. p. 17-18 at B196 – B221)

The Plaintiff, Tammy Hurd (hereinafter "Hurd"), is a 38 year old, married white female, and was a non-traditional transfer student who previously earned a Marketing Degree at Delaware State University. (Hurd Dep. p. 6-7 at B1 –B33) Hurd is married to Jason Hurd who works as a Bailiff for the State of Delaware Courts in Kent County. (B-335) (Hurd Dep. p. 11 at B1 –B33) While seeking her degree, she also cared for two minor children and financially supported them by working as a bartender and cocktail server at Dover Downs. (Hurd Dep. p. 6, 12-15 at B1 –B33)

Hurd was a good and responsible student while at DSU. (Rodriguez Dep. p. 28-29 at B196 –B221) (Panda Dep. p. 44-46 at B34 –B94) Hurd was required to enroll in Panda's classes because of the degree that she was seeking. (B-333)

Defendant Dr. Dandeson Panda (hereinafter "Panda"), an African-American male, was a professor employed at DSU from January 1989 through June 30, 2005. During his employment with DSU, Panda never received any training for sexual, racial, and gender discrimination (Panda Dep. p. 16-18 at B34 –B94) He was not knowledgeable about DSU's policy concerning sexual

8

harassment. (Panda Dep. p. 16-18 at B34 –B94) Panda was a popular professor heavily involved with a number of activities on campus. (Panda Dep. p. 71-73 at B34 –B94) Particularly, Panda served as a former advisor to Alpha Ph Alpha, a high profile Greek fraternity on campus (Panda Dep. p. 71-73 at B34 –B94) Panda shared a special bond with the fraternity as he was fellow brother during his undergraduate days. (Panda Dep. p. 73-74 at B34 –B94) He was also involved in the Black Executive Exchange Program (BIG) which lots of students participated in. (Panda Dep. p. 77 at B34 –B94) He was also active during homecoming and attended DSU basketball games. (Panda Dep. p. 78 at B34 –B94) Previously, Panda was the chairman of his department but was removed in 2003. (Viswanathan Dep. p.27 at B127 –B164)Nanda Viswanathan was elected as the new chair by a large majority vote. (Viswanathan Dep. p.39 at B127 –B164)

The faculty was not happy with Panda's performance because he was not around enough. (Viswanathan Dep. p.34 at B127 –B164) In addition, Panda's application to be a permanent professor was turned down around 2004 or 2005. (Viswanathan Dep. p.30 at B127 –B164) Panda was upset about the rejection since being a full-time professor is more prestigious than an associate professor. (Viswanathan Dep. p.30 at B127 –B164)

**B. <u>DSU's Policy and Procedure concerning Sexual Harassment</u>**

DSU's policy recognizes its obligation under Delaware Code and Title VII of the Civil Rights Act to protect students and employees from sexual harassment. Admirably, DSU's policy goes even further and implements a sexual harassment policy higher than that required by federal law1.

_____

1 This policy prohibits sexual harassment of others even when the conduct does not rise to the level of creating a hostile work environment under

(DSU Policy- Sexual Harassment)

 DSU's policy- sexual harassment states:

"This policy prohibits sexual harassment of others even when the conduct does not rise to the level of creating a hostile work environment under federal law." (DSU Policy- Sexual Harassment)

DSU has an obligation to investigate all complaints of harassment. (Farley Dep. p.19 at B95 –B126) DSU's procedures require the University President to play a prominent role in the handling the disposition of such complaints. Under DSU policy, the President of DSU shall establish a procedure to handle complaints made about sexual or any other forms of harassment or discrimination protected in the Non-discrimination Policy. (DSU Policy – Sexual Harassment)2 (DSU Policy – Sexual Harassment)3 (B280-281 and B282-B283) Further, if the

---

federal law. Conduct of a sexual nature that can be sexual harassment may include, but is not limited to the following examples

1.  verbal harassment or abuse of a sexual nature
2.  pressure for sexual activity;
3.  repeated communications to a person, with sexual or demeaning implications;
4.  unwelcome touching;
5.  suggestive or demeaning sexual involvement accompanied by implied or explicit threats concerning one's grades, job, etc.

DSU Policy- Sexual Harassment

2 The President of the University will implement this policy by establishing a procedure to handle complaints made about sexual or any other forms of harassment or discrimination
protected in the Non-discrimination Policy. The procedure will provide:

1. that the right to confidentiality for the complainant and the accused will be respected consistent with the University's legal obligations, and with the necessity to investigate allegations of misconduct and take into corrective actions when this conduct has occurred; and

2. that persons filing complaints of sexual or other forms of harassment or discrimination will be protected against reprisals, but that the deliberate filing of false accusations of harassment or discrimination will be condemned and may lead to possible disciplinary action.

(DSU Sexual Harassment Policy)

3 The President of the University will implement this policy by establishing a procedure to handle complaints made about sexual or any other forms of harassment or discrimination
protected in the Non-discrimination Policy. The procedure will provide:

1. that the right to confidentiality for the complainant and the accused will be respected

Vice-President is unable to resolve a complaint, the President is in charge with holding "an information conference with the parties and making a finding and decision of whether there has been a violation of University policy and the action to be taken." (DSU Procedure-Discrimination Complaint Resolution Procedure) (B280-B281 and B282-B283) If the University receives any complaint of sexual harassment, an investigation is conducted. (Sessoms Dep. p.50 at B127 –B164) The University believes that sexual harassment seriously damages the integrity of our academic institution, destroys the institution's positive work and educational atmosphere, and causes psychological and/or physiological damage to the victim. (B280-281 and B282-B283)

Harassment by a faculty member against a student is to be taken more seriously because of the professor's position of power. (B-127) Faculty members are in position of power and authority compared to students (Viswanathan Dep. p.11 at B127 –B164)A professor or (person of power) has a duty to prevent hostile work environment. (Viswanathan Dep. p.12 at B127 –B164) A professor has the ability to influence grade outcomes for students. (Viswanathan Dep. p.11 at B127 –B164) That authority of a professor is to be taken carefully. (Viswanathan Dep. p.13 at B127 –B164)

The professor-student relationship also raises concerns that a student might be apprehensive about reporting a complaint of harassment against a professor. When you have two people in unequal positions of power- person not so powerful might be apprehensive about

---

consistent with the University's legal obligations, and with the necessity to investigate allegations of misconduct and take into corrective actions when this conduct has occurred; and

2. that persons filing complaints of sexual or other forms of harassment or discrimination will be protected against reprisals, but that the deliberate filing of false accusations of harassment or discrimination will be condemned and may lead to possible disciplinary action.

(DSU Sexual Harassment Policy)

confronting someone in power. (Viswanathan Dep. p.13 at B127 –B164)

DSU investigates complaints whether they are formal or informal. (Farley Dep. p.33 at B95 –B126) If it's an informal complaint, Human Resources speaks with the complainant. Then, the investigator follows up directly with the  person who's been alleged to be the harasser.  And then HR moves through the process in order to remediate the problems, whether those be in accordance with the collective bargaining agreement, or the disciplinary policies….. (Farley Dep. p.33 at B95 –B126)

It is uncertain whether DSU has a policy or procedure concerning documentation of harassment complaints. President Sessoms testified that that DSU does have such a policy and procedure in the employee handbook- although no such handbook or policy was ever provided to the plaintiff in response to its Request for Production of Documents. (Sessoms Dep. p. 12-13 at B165–B195) In addition, there apparently are complaint forms for sexual harassment which have never been provided to the plaintiff in responses to its Request for Production of Documents. (Sessoms Dep. p. 12, 58 at B165–B195)

According to University President Allen Sessoms, a professor asking a student if she received a phone call soliciting sex constituted sexual harassment. (Sessoms Dep. p.48 at B165–B195) In addition, a professor's act of continually inquiring into student relationships could constitute sexual harassment. (Sessoms Dep. p.47-48 at B165–B195) Another example of sexual harassment would be a professor telling a female student that a male student has "something really big for her" – referencing genital constitute sexual harassment if the student was uncomfortable with the remark. (Sessoms Dep. p.49 at B165–B195) A professor telling a female

12

student they shouldn't hook up because she would scream his name constitute sexual harassment if the student was uncomfortable with it would rise to the level of sexual harassment. (Sessoms Dep. p.49-50 at B165–B195)

In 1992, defendant Panda was the Chair of DSU's Business department. That same year, Germaine Scott- Cheatham (African-American female) was hired as a secretary for the department of accounting. (Cheatham Dep. p 5 at  B261 –B279)

A temporary worker (white female) was hired to support the Department of Business and Economics. (Panda Dep. p. 79 at B34 –B94) The temporary worker specifically worked as a secretary under defendant Panda. (Cheatham Dep. p 17 at  B261 –B279) One day, the temporary worker came to Cheatham "red-faced", "visibly shaken", and really upset. (Cheatham Dep. p 20-22 at  B261 –B279) Cheatham recalls the temporary worker being particularly young. While walking across campus, Panda offered to show the young woman a well-known short-cut between the Price Building that staff members used in the wintertime to avoid the cold. (B-308) Panda then molested and sexually assaulted her by digging his hands into her pockets. (Cheatham Dep. p 18-22 at  B261 –B279) (Panda Dep. p. 79 at B34 –B94) Cheatham will never forget the encounter as the secretary was "shaking like a leaf". (Cheatham Dep. p 17 at  B261 –B279) After listening to  the young lady, Cheatham directed that she report it and escorted her to the Office of Human Resources ("HR"). (Cheatham Dep. p 18-19 at  B261 –B279) In fact, Cheatham was adamant that Panda's secretary report the incident to HR. (Cheatham Dep. p 18-19 at  B261 –B279)

After being questioned by Farley concerning the Hurd allegations, Cheatham thought it was important to disclose the facts concerning the 1992 incident to HR . (Cheatham Dep. p 24 at

B261 –B279) Upon HR's request, Cheatham drafted a memorandum of the assault on April 12, 2005 and gave it to Farley.4

### DSU would have a record of the 1992 Complaint against Panda

At the time of the incident, Drexel Ball ("Ball") was the Executive Assistant to the President. (Cheatham Dep. p 35 at B261 –B279) (Ball Dep. p. 7, 17 at B222 –B260) As part of that position, Ball also assumed the position of affirmative action officer. (Ball Dep. p. 7 at B222 –B260) During Ball's tenure, records of all sexual harassment complaints were kept in a file at his office 5 and in the employee's personnel file. (Ball Dep. p. 8-10, 20-21, 66 at B222 – B260) (Sessoms Dep. p.8-9 at B165–B195) (Sessoms 8-9) A record of the complaint would have also been kept in Panda's personnel file. (Ball Dep. p. 22 at B222 –B260)

 The affirmative action officer was in charge of handling sexual harassment and racial harassment complaints. (Ball Dep. p. 8 at B222 –B260) Ball also led seminars on sexual harassment. (Ball Dep. p. 7 at B222 –B260)During Ball's tenure, there was a set procedure on handling complaints of sexual and racial harassment6. (Ball Dep. p. 9, 56 at B222 –B260) Even if a complaint was verbal, DSU would always follow through with a hearing. (Ball Dep. p. 80 at B222 –B260) (Farley Dep. p.23 at B95 –B126)Verbal complaints are just as important as written complaints. (Farley Dep. p.24 at B95 –B126) Specifically, the University could not trivialize any complaints. (Ball Dep. p. 80 at B222 –B260) Even with an informal complaint, Ball would

---

4 Although DSU was in possession of this memorandum since April 12, 2005, it was only produced to Counsel during Mark Farley's April 18, 2008 deposition. Plaintiff's Request for Production of Documents was sent on September 20, 2007.

5 Ball testified unequivocally that he always kept a record concerning any complaint of sexual or racial harassment. In addition, a written notification to Panda concerning a time and place of a hearing would have been retained.

6 Ball clearly recalled the policy and procedures concerning the handling of sexual harassment complaints at the time he received the complaint against sexual harassment by the temporary worker against Panda in 1992. (Ball, 56, 58)

contact the professor concerning the complaint. (Ball Dep. p. 82 at B222 –B260) DSU had an

obligation to tell the professor that the behavior inappropriate. (Ball Dep. p. 82-83 at B222 –

B260)Once a complaint came to his desk, an investigation would be conducted in the form of

appointing a committee. (Ball Dep. p.8 at B222 –B260)The committee would be composed of a

five-member panel, which included members of the faculty and staff. During Ball's tenure,

records of all sexual harassment complaints were kept in a file at his office7 and in the

employee's personnel file. (Ball Dep. p. 8-10, 20-21, 66 at B222 –B260) (Sessoms Dep. p.8-9 at

B165–B195) A record of the complaint would have also been kept in Panda's personnel file.

(Ball Dep. p. 22 at B222 –B260) In fact, it was his duty to keep a record of all complaint. (Ball

Dep. p. 86 at B222 –B260) Notifications of all complaints were memorialized in writing. (Ball

Dep. p. 88 at B222 –B260) As a matter of policy, Ball would always retain a copy of any

complaint of sexual or racial harassment. For his file and then send a copy to human resources.

(B331-B332)

　　Upon receiving a complaint of sexual harassment, Ball would **definitely** consider any

previous complaints against the employee. (Ball Dep. p. 90 at B222 –B260) Prior complaints

against an employee could demonstrate a "pattern of behavior". (Ball Dep. p. 90 at B222 –B260)

After the investigation, the President of DSU would inform the respondent concerning the

committee's decision.

　　Ball received the complaint of sexual harassment by the temporary worker against Panda

---

7 Ball testified unequivocally that he always kept a record concerning any complaint of sexual or racial harassment.
In addition, a written notification to Panda concerning a time and place of a hearing would have been retained.

in 1992 8. (Ball Dep. p. 11 at B222 –B260) After receiving the complaint, Ball formed a

committee and a Mrs. Braxton chaired the investigation 9. (Panda Dep. p. 84 at B34 –B94) (Ball

Dep. p. 12 at B222 –B260) A written complaint was requested to the complainant.  (Panda Dep.

p. 80-82 at B34 –B94) In addition, Dr. Nwosu was also part of the committee.  (Panda Dep. p. 81

at B34 –B94) Ball informed Panda that a complaint was filed against him and that the university

would investigate the complaint. (Panda Dep. p. 80 at B34 –B94) Panda would have been

informed both verbally and in writing. (Ball Dep. p. 813-14, 16 at B222 –B260) The written

notice would also have stated that there was a complaint against him and there would be an

investigation, and there would be a hearing scheduled. (Ball Dep. p.14 at B222 –B260)

The written notice would have been kept in Panda's file in Ball's office. (Ball Dep. p. 8-

10, 20-21, 66 at B222 –B260) A record of the complaint against Panda would have been kept in

Ball's file. (Ball Dep. p. 12-13 at B222 –B260) A meeting was scheduled to deal with the

complaint, but the complainant never showed up. According to Ball, all procedure were followed

with respect to informing the respondent and setting up a hearing. (Ball Dep. p. 55 at B222 –

B260)

After resigning his position at DSU, Ball transferred his files to Mark Farley on

December 30, 2005 10. (Ball Dep. p. 71 at B222 –B260)The files would have included the

---

8 It should be noted that much of Ball's recollection of the events concerning the sexual harassment complaint were refreshed by Germaine Cheatham's April 2005 Memorandum and portions of the Dandeson Panda's deposition transcript. However, Ball recalls receiving the complaint "very clearly" because of Panda's unusual request that he bring his wife with him to the hearing. In addition, Ball independently recalls appointing Mrs. Braxton as the chair of the committee.

9 Braxton is now deceased. (Panda, 88)

10 Ball's employment with DSU ended on December 30, 2005. After his employment with DSU, Ball began employment at Lincoln University in Lincoln, Pennsylvania in January 2006 as Director of Public Relations. Prior to resigning his position with DSU, Ball set forth an informal complaint against DSU concerning age discrimination.

records concerning the sexual harassment complaint by the temporary employee against Panda. (Ball Dep. p. 23 at B222 –B260) Based on the nature of the sexual harassment charges by the temporary employee against Panda, the policy of DSU concerning the retention of those records and the fact that a committee was formed and a meeting was scheduled to investigate those charges, Ball believes there would be some kind of records retained by DSU concerning these type of charges. Ball was never interviewed by Farley concerning a complaint by Tammy Hurd even though he was employed by DSU at the time of the investigation concerning Hurd's complaint. (Ball Dep. p. 19 at B222 –B260)

## C. Defendant Panda's Continuing Harassment against the Plaintiff Hurd

Panda's ongoing harassment against Hurd began in September 2004. (B-333) It occurred within the first few weeks of class. (Hurd Dep. p. 18 at B1 –B33)

Specifically, Panda asked Hurd if she received a **"booty call"**11. (Hurd Dep. p. 16-17 at B1 –B33) (B-333) During a break in the class, Hurd noticed that she received a voice mail message on her cell phone. (B-333) (Hurd Dep. At 16) The voice message she received was from her children's' school, so Hurd stepped out of the class room to see if she needed to pick up the children. (B-333) (Hurd Dep. At 16-17) When retrieving the message, Panda said:

---

According to Ball, President Allen Sessoms announced at a Board of Trustees meeting that "I am moving Drexel Ball, because I want to hire a younger person." The move was part of President Sessoms' reorganization of the President's office. A complaint was filed with the EEOC and through an agreement between DSU and Ball. According to Ball, his resignation had nothing to do with his complaint of age discrimination. (Ball, 31, 32, 33. 34, 35, 54,55, 55, )

11 Definition of "Booty Call":

1.    a telephone call, usually the sole purpose of which is to elicit a spontaneous and/or casual sexual encounter with the person so contacted.

2.    a sexual encounter that ensues from such a call.

3.    the recipient of such a call " usually used of a person who accepts or typically accepts the caller's invitation.

http://www.allwords.com/word-booty+call.html

17

**"What is that, a booty call?"** A surprised Hurd did not respond. The statement made Hurd feel extremely uncomfortable. (Hurd Dep. p. 18 at B1 –B33) The comment was sexual in nature and Hurd was offended by it. (B-333)

Throughout the semester (the semester lasted three (3) months), Panda continually (over and over again) inquired as to whether Hurd and another male student named Derek Batton were a "couple" or if they were on a "hot date". (B-333) (Hurd Dep. At 20-23) Both Batton and Hurd were firm that they were not a couple and attempted to ignore Panda's continuing comments. (B-333) (Hurd Dep. p. 20 at B1 –B33) Both Hurd and Batton attempted to thwart the remarks by firmly and clearly asserting that they were both in relationship. (Hurd Dep. p. 23 at B1 –B33) (B-333)

Panda behavior escalated just after Hurd turned in her final exam for Panda's class. (Hurd Dep. p. 25 at B1 –B33) (B-334) While turning in her final exam, Panda engaged Hurd in the following conversation12: (B-334)

**"Derek has something for you.  Derek says he has something really <u>big</u> for you"** **several times."** Knowing Panda was in charge of her academic grade, Hurd attempted to deflect Panda's remarks by stating Derek has a girlfriend. Panda continued saying **"Derek** **says he has something that will be <u>really</u> <u>big</u> for you."** (Hurd Dep. p. 25 at B1 –B33) (B-334)

Attempting to diffuse Panda's remarks, Hurd firmly responded:

---

12 Despite Hurd's representations that the comments by Panda were unwelcome and made her uncomfortable, Farley minimized the conversation as "banter". (Farley, 29-30)

Hurd told him again that Derek and I were not a couple. (B-334) We both had significant others that we lived with. And he made another remark that **we should date or get together.** (B-334) I told him that I was living with my boyfriend, that if Derek was interested, he would have to get in line with the rest of them.. (B-334) And Dr. Panda then inquired **"how he could get in line?"** (B-334) A perplexed Hurd then asked him, "You want to get in line?" (B-334) Then Panda said:

> **"Yes, I want to get in line. What do I have to do to get in line?"** I said, "You have **to be patient, like everyone else." And he says, "You are right. You are right. We shouldn't have sex, because if we had sex, you would be screaming my name when you are with your boyfriend."** (Hurd Dep. p. 24-25 at B1 –B33) (B-334)

During the conversation, Panda's remarks continued :

> **"....if we hooked up you would be with your boyfriend and scream my name. You would be making love to your boyfriend and you would scream out, Panda, Panda! Then your boyfriend would wonder what you were screaming."** (Hurd Dep. p. 25 at B1 –B33) (B-334)

Hurd's response told Panda to stop being "bad" as a rebuttal to his advances. (B-334) (Hurd Dep. p. 27 at B1 –B33) She was attempting to diffuse Dr. Panda's sexual advances. (B-334 thru B-335) Hurd did not intend to engage him in any "joking banter". (B-334 thru B-335) (Hurd Dep. p. 27 at B1 –B33) Panda's comments were clearly sexual to Hurd. (Hurd Dep. At 26) Any nervous joking during the conversation by me was an attempt (abet failed) to diffuse Dr. Panda's sexual advances. (B-335) Dr. Panda's sexual advances and sex talk during that and future conversations were unwelcome and humiliating. (B-335)

Deeply upset about Panda's remarks, she confided to her husband what happened. (B-335) (Hurd Dep. p. 29 at B1 –B33) After that event, Hurd kept a chronological diary concerning Panda's harassment. (B-326-B-330) Hurd  so distraught by the conversation that she felt her future at DSU was in jeopardy because of Panda's behavior. (B-335)

She was nervous about going back to DSU that next semester. (B-335) (Hurd Dep. p. 29 at B1 –B33) She feared taking another class with Panda and that his behavior would continue to escalate. (B-335) (Hurd Dep. p. 29 at B1 –B33) However, because of Hurd's major, she was required to enroll in future classes with Dr. Panda. (B-335)

## C. Hurd's First Report of Panda's Sexual Harassment to DSU

Hurd directly reported the incident of sexual harassment to Mark Farley, Vice-President of Human Resources 13. (B-335)  Under DSU policy, Farley was the appropriate person for Hurd to complain to. (Hurd Dep. p. 24-25 at B1 –B33) Hurd and Farley met on January 3, 2005.14 (Hurd Dep. p. 28 at B1 –B33) (B-335) Prior to meeting with Farley, Hurd spoke with another professor, Dr. Pitts, who encouraged her to see Farley about the incident. (B-335) The purpose of the meeting with Farley was to stop Dr. Panda's sexually harassing behavior. (B-335) Hurd also wanted to place Delaware State University on notice as to Dr. Panda's sexually harassing

_____

13 Hurd's assertion that she directly contacted Farley is consistent with the testimony of Nanda Viswanathan who has no recollection of Hurd mentioning to him that Dr. Panda had made any inappropriate comments to her. (Visawathan Dep. p.42 at B95 –B126)  In fact, Viswanathan was "shocked and "surprised" when he read DSU's Responses to Plaintiff's Requests for Interrogatories #4 which states that on or about January 3, 2005, Plaintiff apparently mentioned to Dr. Nanda Viswanathan that Dr. Panda had made inappropriate comments. (B-296) Viswanathan goes even further in his testimony- "Did not happen, that's right." (Visawathan Dep. p.43 at B95 – B126)

14 In DSU's Statement of Facts, they assert that Hurd only reported an uncomfortable conversation with Panda, however, in DSU's Responses to Plaintiff's Requests for Interrogatories, they concede that Hurd was reporting Panda engaging in a "sexually charged" conversation with the Plaintiff.

behavior. (B-335) (Farley Dep. p.9 at B95 –B126) After hearing about Hurd's complaint 15,

Farley was left with the impression that the matter was urgent. (Farley Dep. p.24,37 at B95 –

B126)

During the meeting , Farley never offered Hurd any documentation to fill out. (B-335)

During the meeting, Hurd communicated to Farley the details of Dr. Panda's harassment as

described in paragraph seven (7) of her affidavit. (B-336) She also relayed information  to Farley

that student Derek Batton was present during the sexually harassing behavior. (B-336) However,

Farley never followed up with Batton to confirm any of the allegations. (Farley Dep. p.41 at B95

–B126) Farley has no set list of questions to ask a complainant when receiving a sexual

harassment complaint and does not use any sort of manual in conducting such an interview.

(Farley Dep. p.40 at B95 –B126) During the meeting, it was clear to Farley that Hurd was upset

about Panda's comments. (Farley Dep. p.40 at B95 –B126) Farley never asked if Panda's

conduct was affecting her education. (Farley Dep. p.40 at B95 –B126) Farley took no notes

concerning the meeting. (Farley Dep. p.19 at B95 –B126) Farley never issued any type of report

or any type of investigation. (Farley Dep. p.19 at B95 –B126)

After hearing the complaint during the January meeting, DSU concedes that Hurd was

making a generalized complaint that Panda engaged in a "sexually-charged" conversation with

her that was unwelcome. (Farley Dep. p.8, 27 at B95 –B126) (B-336)

Hurd made it clear to Farley that I wanted an end to Dr. Panda's harassing behavior. (B-

336) During the approximately (1) hour meeting, Farley informed Hurd that he had previously

received sexual harassment complaints against Panda from other female students. (B-336) (Hurd

Dep. p. 57 at B1 –B33) However, none of the women would file a "formal" complaint. (B-336)
Despite his knowledge of these other complaints, Farley never encouraged Hurd to file a
"formal" complaint of sexual harassment against Dr. Panda. In addition, Farley never asked Hurd
as to whether she experienced any other incidents with Dr. Panda constituting sexual harassment.
(B-336) During the January 2005 meeting, Farley only gave Hurd two options concerning
Panda's harassment:

   a) File a "formal" complaint against Dandeson Panda with the understanding that she would
      have to continue attending his classes during the investigation period or;

   b) Send an email to Dr. Panda notifying him that his comments were unwelcome.

   (B-336)

      Farley never gave Hurd the option of not taking any further classes with Panda. (Hurd
Dep. p. 123 at B1 –B33) Farley emphasized to Hurd the possibility of retaliation by Panda
(through the lowering of her grades) if she filed a formal complaint and Farley were to directly
contact Dr. Panda concerning the charge. (B-336) Based on Farley's advice and the fact that she
would have to continue attending Dr. Panda's classes during an investigation of any "formal"
complaint, Hurd decided to send the email to Dr. Panda rather than have Farley directly contact
Panda concerning the allegations. (B-336) After choosing not to file a "formal" complaint, Hurd
made it clear to Farley that she did not want Panda to interact with her in a fashion creating a
hostile environment. (Hurd Dep. p. 92 at B1 –B33)

      Prior to sending the proposed email to Dr. Panda, Hurd sent a copy to Mark Farley for his
review. (B-336) After sending Farley the email, he approved the draft. (B-336)
However, Farley never followed up on whether the email sent to Dr. Panda curbed the

harassment. (B-336)

Farley represented to Hurd that sending an email as an initial matter would ensure that Panda knew his comments were unwelcome. Then Farley promised to "look into the matter"16. (B-297) (Farley Dep. p.36 at B95 –B126) Despite Farley's promise, he did nothing. (Farley Dep. p.18-19 at B95 –B126) He didn't interview any witnesses nor did he engage in any further fact finding. . (Farley Dep. p.22 at B95 –B126) Despite promising Hurd that he would "look into the matter", Farley believed that it was Hurd's duty to contact him and that he had no duty to follow up on the matter. (Farley Dep. p.7, 20 at B95 –B126)

Following Farley's suggestion, Hurd sent an email to Panda on January 4, 2005. (Panda Dep. p. 94 at B34 –B94) (1-04-05 Email from Tammy Hurd to Dandeson Panda) Panda received the email on or around January 2005. (Panda Dep. p. 99 at B34) After receiving the email in January 2005, Panda and Farley never spoke about the contents it. (Panda Dep. p. 94, 101 at B34 --After the email was sent, Farley simply assumed that Panda would modify his behavior and never "looked in the matter." (Farley Dep. p.18-20 at B95 –B126)

Upon receiving the email, Panda never changed any of his behavior. (Panda Dep. p. 95-96 at B34) Panda never followed up with Hurd concerning the referenced conversation she emailed him about. (Panda Dep. p. 103 at B34) In addition, Farley did nothing after the initial email was sent. (Farley Dep. p.22 at B95 –B126) In addition, there is no evidence that Farley review any prior complaints against Panda even though he was aware that DSU kept records of all complaints concerning prior acts of sexual harassment. (Farley Dep. p.23 at B95 –B126)

---

16 "Mr. Farley expressed that he would look into the matter and that as an initial matter and email or letter should be sent to Dr. Panda to document that his comment was unwelcome."
Supplemental Responses to Plaintiff's First Set of Interrogatories Directed to Delaware State University (B-297)

### D. Panda's Harassment Escalates After Hurd's Email

Panda's harassment escalated after Hurd's email. (B-336) During the first class of the next semester, Panda threatened Hurd by saying, "Derek is not here to protect you this time." (B-337) On or around February 1, 2005, while heading to class in the parking lot, Dr. Panda said **"Derek has something for you."** (B-337) Hurd said nothing and just walked to class." (B-337) During class, Dr. Panda approached Derek Batton and her and said **"I know you got something she needs." You should give it to her**." (B-337) Then he stared at me and said "Derek has **something that will hurt you."** (B-337)

Around February 8, 2008, after an exam, Hurd approached Dr. Panda with her test and he began saying **"Derek has <u>something</u> for you."** (B-337) After Derek Batton turned in his test that same day, Panda engaged Derek Batton in a conversation regarding a possible trip to Las Vegas with Hurd. Panda said, **"If she takes me to Vegas, I would tear that pussy up."** (B-337)

During a class lecture on or around February 10, 2005, Dr. Panda was discussing cultural differences. (B-337) Suddenly, Panda approached Hurd and asked, "If I ask you to show me some skin what would you do for me?" (B-337) Hurd did not have time to reply and he said, "You would give me a high five right?" (B-337) He then looked at Derek Batton and said, **"You need to hook a brother up. What they don't know, you know."** (B-337)

On or around February 15, 2005, Panda was giving a lecture on different cultures and what powers women have in each culture. (B-337) Suddenly, Panda's talks turned to the subject of sexual harassment. (B-337) In discussing sexual harassment, Dr. Panda announced **"You cannot get me for sexual harassment. You cannot get a dime. Sexual harassment is not clearly defined."** (B-337)

Finally, on or around February 17, 2005, Panda announced in class that Hurd was **filing a sexual harassment suit against all the black men at the school.** (B-337) During that same class, he also said that a…**"black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that."** (B-338)

After hearing the above February 17, 2005 remarks, Hurd was deeply fearful that Dr. Panda knew about her complaint to Farley concerning sexual harassment as Mark Farley was the only individual I discussed the matter with. (B-338) Specifically, she was concerned about retaliation by Panda. (B-338) The remarks about sexual harassment prompted Hurd to email Mark Farley as to whether anything had been done based on her complaint against Dandeson Panda during their January meeting. (B-338) Hurd sent the email between February 17, 2005 and March 21, 2005. (B-338) Farley replied to her email stating that another female student had come forward but she was still not willing to file a "formal" complaint. (B-338)

Prior to her second class that day, Dr. Panda approached Hurd saying he hoped she was not offended by his earlier remarks. (B-338) Derek Batton then asked him if the two of them (Hurd and Panda) had something going on that he didn't know about. (B-338) Panda then curtly asked Derek, **"If he wanted to fail?"** Derek was directed to mind his own business by Dr. Panda. (B-338) Panda's class scheduled on February 22, 2005, was particularly uncomfortable to Hurd as Dr. Panda displayed obvious animosity towards her. (B-338)

On or around March 1, 2005, Dr. Panda noticed that Hurd was "down" and asked her if she was mad at him. (B-338) She told him that she had a lot going on at the time. (B-338) Panda then attempted to give an up lifting speech about not letting things get to her and to focus on her

25

education. (B-338) Just following the speech and during the second class, Panda approached

Hurd again and told her that should talk to a minister. (B-338) Upon Panda's inquiry, Hurd

disclosed that she was having relationship problems. (B-339 ) Dr. Panda then replied **"Don't**

**worry about it, you are a girl you can get dick anywhere. Men are dogs, you can get dick**

**anywhere."** (B-339)

On March 21, 2005, Hurd emailed Mark Farley asking to file a "formal" complaint against

Panda. (B-339). In addition, Hurd sent a certified mail letter to Dr. Allen Sessoms on March 20,

2005 outing her complaint of racial and sexual harassment. Afterward, Farley instructed  Hurd

not come back on campus. (Hurd Dep. p. 98 at B1 –B33) A committee was formed to handle the

complaint. It consisted of  Dr. Patrick Liverpool, Dr. Nanda Viswanathan, and Mark Farley. (B-

284) Viswanathan was Panda's immediate supervisor. (Viswanathan Dep. p.19 at B127 –B164)

The committee met with Hurd, Derek Batton, and Dandeson Panda. After meeting with Hurd,

Derek Batton, and Dandeson Panda, the committee ultimately believed Hurd's allegations.

(Viswanathan Dep. p.21 at B127 –B164) Batton's statement confirmed Hurd's allegations.

(Viswanathan Dep. p.21, 71 at B127 –B164)Viswanathan viewed Batton as a mature individual.

(Viswanathan Dep. p.71-76 at B127 –B164)Although a committee was formed, it appears that

Viswanathan and Liverpool were only present for the interviews with Derek Batton and

Dandeson Panda. Panda did not respond in detail but rather gave a general denial of the charges.

(Viswanathan Dep. p.52 at B127 –B164) The committee's consensus was that Hurd's case was

strong. (Viswanathan Dep. p.78 at B127 –B164)Given the substantiation and nature of the

charges, Panda was suspended from employment on March 24, 2005. (B-284) Although Panda

was suspended, Viswanathan believed that he was only suspended for the semester.

(Viswanathan Dep. p.89 at B127 –B164) President Allen Sessoms was not involved with the investigation. (Viswanathan Dep. p.81 at B127 –B164)

It appears that Farley orchestrated the remaining investigation entirely himself. After being prompted by Hurd, Farley learned that Panda's acts were far more pervasive then he thought. (Farley Dep. p.49 at B95 –B126) Three additional students submitted written statements verifying other students who were harassed by Panda. (B-320) (B-321) (B322-B324) Student Wayne Holmes stated that Panda once stuck his tongue down another female student's mouth-uninvited. (B-320) Student Tracye R. Berry experienced Panda's sexual harassment first hand in the Spring of 2004 when he requested that they meet off campus and engage in "adult activities". She also stated that Dr. Panda making sexual remarks to female students such as, "that ass if fat", "you on the patch", and making gestures with his finger referring to intercourse. She described his advances as "unwanted" and "unwarranted". (B-321) Talisha Murphy described how Panda sexually harassed her from 2001 through February 2005. Panda would make comments about her chest size, legs, butt, and what she does with her boyfriend in bed. (B-322-B-324) In April 18, 2004, Panda asked Murphy to walk with him when he leaned attempting to stick his tongue down her throat. (B322-B324) Murphy was fearful that she would get a bad grade because he used lots of essays. (B322-B324) Panda informed her that he gave her boyfriend a good grade because he was my boyfriend, even though he didn't deserve it. (B-322-B-324) She also reported that a Hispanic student told her that she received a better grade if she showed Panda her chest. (B322-B324)

After his investigation, Farley found merit in a lot of her complaints. (Farley Dep. p.14 at B95 –B126) He concluded that Panda violated DSU's policy concerning sexual harassment and

27

committed sexual harassment against Hurd. (Farley Dep. p.13-14 at B95 –B126) Ultimately, Farley believed in the validity of Hurd's complaints. (Farley Dep. p.65 at B95 –B126) However, Farley doesn't have any documentation concerning the investigation. (Farley Dep. p.65 – B126). In fact, he didn't take any notes or fill out any forms concerning the outcome of the investigation. (Farley Dep. p.64 at B95 –B126) As of April 4, 2005, Hurd was unaware of the investigation results so she sent a letter to Farley inquiring as to what the status of investigation was. (B-319) Hurd never received a response to the letter. Panda eventually separated from DSU as of June 1, 2005

## ARGUMENT

### I. STANDARD OF REVIEW:

Summary judgment is appropriate when there are no genuine issues of material fact and the

moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P 56(c). A fact is

material if it might affect the outcome of the case, and an issue is genuine if the evidence is such

that a reasonable factfinder could return a verdict in favor of the nonmovant. See In re

Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993) (citing Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986) When deciding a motion for summary judgment, the court must

evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable

inferences in that party's favor. See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999). The

nonmoving party, however, must demonstrate the existence of a material fact — not mere

allegations — supplying sufficient evidence for a reasonable jury to find for the nonmovant. See

Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996) (citation omitted). To raise a

genuine issue of material fact, the nonmovant "need not match, item for item, each piece of

evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence]

standard." Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d

Cir. 1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a

reasonable jury to find in favor of the party, given the applicable burden of proof. See Anderson,

477 U.S. at 249-50.

## II. THE PLAINTIFF SUFFERED SEXUAL HARASSMENT FROM DEFENDANT BECAUSE SHE WAS SUBJECTED TO A HOSTILE ENVIRONMENT BASED UPON HER GENDER.

### A. Plaintiff suffered intentional discrimination based upon her gender

Title IX provides that "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Title IX of the Education Amendments of 1972.

Under Title [IX], a recipient of federal funds may be liable for the sexual harassment of a student if the Plaintiff demonstrates by a preponderance of the evidence each of the following elements:

(1.) Plaintiff was subjected to a hostile environment based on her gender;

(2.) An official with authority to institute corrective measures had actual notice that the harasser posed a substantial risk of sexual harassment to students in the school district; and

(3.) The school district was deliberately indifferent to a substantial risk of sexual harassment posed to the students of the school district. Williams v. Paint Valley Local School District.

In Davis, the Supreme Court's definition of hostile environment is consistent with the definition found in employment litigation. Under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program. In determining whether harassment is actionable, Davis instructs courts to look at the "constellation of surrounding circumstances, expectations, and relationships" (526 U.S. At 651 (citing Oncale )

Here, Plaintiff Tammy Hurd was subjected to a hostile environment based on her gender. Panda's harassment began in September 2004, within the first few weeks of class. Panda's

30

ongoing harassment against Hurd lasted from September 2004 until March 21, 2005.

Panda's behavior created a hostile work environment based on the totality of the circumstances. Panda's acts of sexual harassment ranged from just generally annoying behavior to outright threatening. The first incident occurred within the first few weeks of class when Panda asked if Hurd received a **"booty call"** Hurd interpreted the comment as sexual in nature and she was deeply offended by it. Then, throughout the semester (the semester lasted three (3) months), Panda continually inquired as to whether Hurd and Batton were a "couple" or if they were on a "hot date". Although these incidents are relatively mild in severity, the Court should balance that with the frequency of the acts and the other more severe acts.

The defendant DSU attempts to characterize the incident concerning Hurd turning in her final exam as classroom banter. Whether the incident is banter or not is an issue of material fact for a jury to decide. Hurd represents that any joking was an attempt to deflect Panda's sexual remarks. In addition, the language used by Panda seems more suitable for a pornographic movie then common classroom banter: **"Derek says he has something that will be <u>really big</u> for you." (Panda said this several times)** In addition, Pandas' remarks escalated as the conversation went on:

> "....if we hooked up you would be with your boyfriend and scream my name. You would be making love to your boyfriend and you would scream out, Panda, Panda! Then your boyfriend would wonder what you were screaming." In addition, Panda continued saying **"Derek says he has something that will be <u>really big</u> for you."**

Hurd told Panda to stop being "bad" in an attempt to rebut his advances. Her response was an attempt to diffuse Dr. Panda's sexual advances. Hurd did not intend to engage in any "joking banter". Panda's comments were clearly sexual and offensive to Hurd. Dr. Panda's sexual advances during this and future conversations were unwelcome and humiliating.

Certainly, Hurd's actions after the incident show no indication that she was engaging in common banter. Demonstrating how serious she took the incidents, she reported the incident to Mark Farley and began to keep a chronological diary concerning Panda's acts of harassment. Farley described Hurd as upset during their meeting. Hurd reported Panda's conduct to stop his behavior. Unfortunately, the email sent to defendant Panda as suggested by Farley seemed to only escalate the hostile environment. Upon receiving the email, Panda never changed any of his behavior. In addition, Farley took no actions after the initial email was sent out.

Panda's harassment included threats, during the first class of the next semester, Panda informed Hurd that "Derek is not here to protect you this time."

In February 1, 2005, Dr. Panda continued his previous remarks and told Hurd that "Derek has something for you." During that class, Dr. Panda approached Derek Batton and her and said **"I know you got something she needs." You should give it to her**." Then he stared at Hurd and said **"Derek has something that will hurt you."** Clearly these incidents are frequent and severe. Later, Panda's statements continued to escalate in crudeness. After an exam, Hurd approached Dr. Panda with her test and he began saying **"Derek has something for you."** Then Panda said to Derek Batton **"If she takes me to Vegas I would tear that pussy up."**

Some of Panda's statements were acts of intimidation targeted at anyone who would dare file a complaint to him. During one lecture,. Panda was discussing sexual harassment and

announced to the class" **You cannot get me for sexual harassment. You cannot get a dime. Sexual harassment is not clearly defined."** On February 17, 2005, Panda announced to his class that Hurd was **filing a sexual harassment suit against all the black men at the school**. The only possible purpose for Panda's statement was to create a hostile environment for Hurd. Obviously, the statement was meant to harm Hurd's reputation on campus. During that same class, he also said **"black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that."**

After hearing the above February 17, 2005 remarks, Hurd was deeply fearful that Dr. Panda knew about her complaint to Farley concerning sexual harassment as Mark Farley was the only individual she discussed the matter with. She was concerned about retaliation by Panda. The remarks about sexual harassment prompted Hurd to email Mark Farley as to whether anything had been done based on her complaint against Dandeson Panda during their January meeting. Hurd sent the email between February 17, 2005 and March 21, 2005. Farley replied to her email stating that another female student had come forward but she was still not willing to file a "formal" complaint.

On or around March 1, 2005, at a time when Hurd was emotionally distraught, Panda told her **"Don't worry about it, you are a girl you can get dick anywhere. Men are dogs, you can get dick anywhere."**

In sum, the acts of discrimination were consistent from September 2005 until through March 21, 2005. The incidents varied in severity but all were intended to intimidate Hurd. Based on the totality of the circumstances, Hurd suffered in a hostile environment- both sexual and racial.

The sexual harassment detrimentally affected the Plaintiff. For example, after Panda spoke of

33

the Hurd screaming his name while having sex with her boyfriend on the last day of class,  she

became deeply upset and confided with her husband what happened that day. Hurd was

distraught about her future at DSU due to Panda's behavior. In addition, she was nervous about

going back to DSU that next semester. She feared taking another class with Panda and that his

behavior would continue to escalate. Unfortunately, because of Hurd's major, she was required to

enroll in future classes with Dr. Panda

In addition, Hurd suffered emotional distress after filing her second complaint against Panda.

It was well known on campus that Hurd filed the complaint against Dr. Panda which led to his

suspension. Dr. Panda was a popular professor on campus and active in the Greek fraternity,

Alpha Phi Alpha (along with other activities- he had a prominent presence on campus). Hurd was

also well aware that a petition drive in support of Dr. Panda was signed by over 200 students.

Hurd also received 5-6 phone calls from a fellow student,."Alvin", who warned her not to come

back on campus as students on campus were "gunning for the white girl who took down  Dr.

Panda".. Hurd was the only white female in that particular class so it was obvious as to whom

those students were "gunning" for. It was decided by Farley that Hurd would not physically

attend classes because of the turmoil that the complaint and suspension caused on campus. After

leaving DSU, Hurd was treated medically for emotional distress as a result of Panda's actions..

## B.  Panda's acts of sexual harassment constitute both a subjective and objective Hostile Environment

The sexual harassment that Hurd experienced would detrimentally affect any reasonable

women in her position—as many women were the victims of Panda's harassment.. In deed, three

additional students submitted written statements verifying that they were harassed by Panda.

34

Student Wayne Holmes stated that Panda once stuck his tongue down another female student's mouth- uninvited. Student Tracye R. Berry experienced Panda's sexual harassment first hand in the Spring of 2004 when he requested that they meet off campus and engage in "adult activities". She also stated that Dr. Panda made sexual remarks to female students such as, "that ass if fat", "you on the patch", and making gestures with his finger referring to intercourse. She described his advances as "unwanted" and "unwarranted". Talisha Murphy described how Panda sexually harassed her from 2001 through February 2005. Panda would make comments about her chest size, legs, butt, and what she does with her boyfriend in bed. In April 18, 2004, Panda asked Murphy to walk with him when he leaned attempting to stick his tongue down her throat. Murphy was fearful that she would get a bad grade because he uses lots of essays. Panda informed her that he gave her boyfriend a good grade because he was my boyfriend, even though he didn't deserve it. She also reported that a Hispanic student told her that she received a better grade if she showed Panda her chest. In short, because of DSU's inaction dealing with Panda, any reasonable woman would have been detrimentally affected by Panda's ongoing harassment.

## III. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS WHETHER DEFENDANT IS LIABLE BECAUSE DSU HAD ACTUAL NOTICE OF PANDA'S PAST HARASSMENT.

Deliberate indifference amounts when a University has notice of a harasser's past conduct and unreasonably fails to supervise that harasser. Williams v. Board of Regents of the University System of Georgia. 477 F.3d 1287 (11th Cir.) In Williams, a Title IX claim survived summary judgment when the University recruited an athlete whom they knew had disciplinary and criminal problems and failed to adequately supervise that student which resulted in the sexual assault of another student.  The Williams case presents a factually similar scenario to this case.. In other

35

Title IX cases, the defendant did not learn about the alleged harasser's proclivities until the alleged harasser became a teacher or a student at the defendant's school. Id. However In Williams, the plaintiff alleged that school officials knew about the attacker's past sexual misconduct when they recruited him and gained his admission to the University of Georgia.

**A. The Plaintiff contends that DSU had actual notice of Panda's Past Sexual Assault which occurred at DSU's campus.**

DSU was on notice as to Panda's past accusations of sexual assault. In 1992, defendant Panda was the Chair of DSU's Business department. That same year, Panda was also accused of sexual assault by a temporary worker (white female) who was specifically hired to serve Panda. The allegations are particularly egregious. The temporary worker represented that Panda molested and sexually assaulted her after Panda offered to show the young woman a well-known short-cut to avoid the cold. The worker was very young along with being "red-faced and "visibly shaken") DSU employee Cheatham will never forget the encounter as the woman was "shaking like a leaf". After listening to the young lady, Cheatham directed that she report it and escorted her to the Office of Human Resources ("HR").

Similar to Williams, the plaintiff is alleging that DSU was on notice of the Panda's past acts. DSU may claim to not have been on notice of this incident, but the evidence demonstrates otherwise Any dispute would be an issue of material fact to be determined by the jury. In addition, it would seem particularly bizarre because if DSU denied having notice of the 1992 incident as it occurred on DSU's own campus while Panda was an employee of DSU. In addition, records of all sexual harassment complaints were kept in a file at the Affirmative Action Officer Drexel Ball's office. Ball recalls both receiving the complaint and scheduling the hearing. As a

matter of policy, Ball would always retain a copy of any complaint of sexual or racial harassment for his file and then send a copy to human resources. The written notice would have been kept in Panda's file in Ball's office. Upon his resignation, Ball transferred his files to Mark Farley on December 30, 2005

**B. The Plaintiff contends that DSU had actual notice of previous complaints of sexual harassment against Panda as of the January 2005 Meeting**

Similar to <u>Williams</u>, the plaintiff is alleging that DSU had actual notice of prior complaints of sexual harassment against Panda by other female students at the time of the January 2055 meeting between Farley and Hurd.

During their meeting, Farley informed Hurd that he had received prior sexual harassment complaints against Panda from other female students. However, none of the women would file a "formal" complaint. (B-336) If presumed true, then DSU had actual notice as to Panda's acts of sexual harassment. At the very least, DSU's actions met the minimum standard for deliberate indifference as it `caused [students] to undergo harassment or make them liable or vulnerable' to it." <u>Davis v. Monroe County Board of Education</u>, 526 U.S. 629 (1999)

**C. The Plaintiff contends that DSU's responded with deliberate indifference to Hurd's complaint considering their knowledge of Panda's past incidents of sexual assault and harassment**

"[T]he deliberate indifference must, at a minimum, `cause [students] to undergo harassment or make them liable or vulnerable' to it." <u>Davis</u>, 526 U.S. at 645, 119 S.Ct. 1661, 143 L.Ed.2d 839. This Court has upheld Title IX claims against a defendant where "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to the employee's misconduct." <u>Bostic</u>

v. Smyrna School District, et al. 2003 WL 723262 (D. Del.) citing Gebser v. Lago Vista

Independent School District ( Gebser ), 524 U.S. 274 (1998), and Davis. "[T]he deliberate

indifference must, at a minimum, `cause [students] to undergo harassment or make them liable or

vulnerable' to it." See Davis.

There is no dispute that DSU had actual notice of the harassment as of the January 2005

meeting between Farley and  Hurd. In addition, all of the alleged acts of harassment occurred on

DSU's campus where they obviously have authority. Hurd wanted to put DSU on notice as to Dr.

Panda's sexually harassing behavior. During the meeting, Hurd communicated to Farley the

details of Dr. Panda's harassment as described in paragraph seven (7) of her affidavit. She also

passed information to Farley that fellow student Derek Batton was present during the sexually

harassing behavior. Hurd made it clear to Farley that she wanted an end to Dr. Panda's harassing

behavior.

DSU acted with deliberate indifference when it unreasonably failed to supervise Panda after

being on notice that other female students were harassed. During her January 2005 meeting with

Farley discussing Panda, Farley informed Hurd that he received previous complaints of sexual

harassment against Panda from other female students.

Similar to Williams, DSU had notice as to Panda's past conduct and failed to adequately

supervise him to protect the students.  DSU had direct  knowledge that there were past

complaints against sexual harassment and took no precautionary steps in his supervision. At the

very least, DSU's deliberate indifference caused Hurd and other students to be vulnerable to

Panda's harassment.. It should make no difference that the female students refused to file a

formal complaint since Farley could certainly obtain information in order to take actions to

protect the campus community without the filing of formal complaints.

DSU acted with deliberate indifference when it unreasonably failed to supervise Panda after being on notice that he previously received a formal complaint of sexual harassment by a temporary worker in 1992. In deed, Farley affirmatively stated that he would have handled the Hurd's complaint differently in January 2005 if he was aware of the 1992 incident. Certainly, the incident could demonstrate Panda's "patter of behavior".

DSU was on notice of the prior charge of harassment for the reasons as described above which occurred during Panda's employment at DSU. The incident was a serious allegation of sexual assault which DSU had notice of. During Drexel Ball's tenure as Affirmative Action Officer, all records of all sexual harassment complaints were kept in a file at his office also forward to Human Resources. According to Ball, a record would have also been kept of the complaint. Notifications of all complaints were memorialized in writing. As a matter of policy, Ball would always retain a copy of any complaint of sexual or racial harassment.
Further evidence that DSU had notice of the 1992 incident is the fact that Dr. Oriaku Nwosu was aware of both the temporary worker's allegations against Panda and plaintiff Hurd's allegations as he was on the investigative committee for the complaint in 1992 and was also copied on a letter to Panda notifying him of Hurd's charges. (B284)

DSU acted with deliberate indifference when Farley promised to "look into the matter" and then failed to do so. Farley represented to Hurd that sending the email should be done simply as an initial matter to ensure that Panda knew that his comments were unwelcome. Then Farley promised Hurd that he would  "look into the matter"17. In addition, under DSU policy and

---

17 "Mr. Farley expressed that he would look into the matter and that as an initial matter and email or letter should be sent to Dr. Panda to document

procedure, DSU has an obligation to investigate all complaints. Despite Farley's promise, he did

nothing. He didn't interview any witnesses nor did he engage in any further fact finding. Despite

promising Hurd that he would "look into the matter" after she sent the email, Farley believed that

it was Hurd's duty to contact him and that he had no duty to follow up on the matter. Following

Farley's suggestion, Hurd sent an email to Panda on January 4, 2005. Panda received the email

on or around January 2005. After receiving the email in January 2005, Panda and Farley never

spoke about its contents. After the email was sent, Farley simply assumed that Panda would

modify his behavior.

In addition, DSU acted with deliberated indifference when Farley gave Hurd only two options

concerning Panda's harassment:

a) File a "formal" complaint against Dandeson Panda with the understanding that Hurd would

have to continue attending his classes during the investigation period or;

b) Send an email to Dr. Panda notifying him that his comments were unwelcome.

Both options exposed Hurd to future harassment by Panda.. Even if Hurd filed a formal

response, he would have to continue attending Panda's classes pending the outcome of the

investigation. Alternatively, Hurd continued to be subjected to a hostile environment by sending

Panda an email. Farley never gave Hurd the option of not taking any further classes with Panda.

Farley emphasized to Hurd that there was a possibility of retaliation (through the lowering of her

grades by Panda) if she filed a formal complaint and Farley were to directly contact Dr. Panda

concerning the charges. Based on Farley's advice and the fact that she would have to continue

attending Dr. Panda's classes during the investigation of any "formal" complaint, Hurd decided

---

that his comment was unwelcome."

to send the email to Dr. Panda rather than have Farley directly contact Panda concerning the allegations. After choosing not to file a "formal" complaint, Hurd made it clear to Farley that she did not want Panda to interact with her in a fashion creating a hostile educational environment. Prior to sending the proposed email to Dr. Panda, Hurd sent a copy to Mark Farley for his review. After sending Farley the email, he approved the draft. Tellingly, Farley never followed up on whether the email sent to Dr. Panda curbed the harassment.

In addition, DSU acted with deliberate indifference because they never educated Panda as to their policy and procedures concerning sexual harassment. During his employment with DSU, Panda never received any training of sexual, racial, and gender discrimination and was not knowledgeable about DSU's policy concerning sexual harassment.

**I.     THE PLAINTIFF SUFFERED RACIAL DISCRIMINATION BECAUSE SHE WAS SUBJECTED TO A HOSTILE ENVIRONMENT BASED UPON HER RACE**

A hostile environment may form the basis of a Title VII discrimination claim. Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001) (citing Meritor Say. Bank, FSB v. Vinson, 477 U.S. 57, 65-68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The inquiry into whether an environment is hostile requires the consideration of "all the circumstances ... [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). That analysis "must concentrate not on individual incidents, but on the overall scenario." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir.1999). To establish a Title VII claim

based upon a hostile work environment, a plaintiff must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir.1996).

Here, DSU created a racially hostile environment for the plaintiff, a 38 year old, married white female. Of course, the racially harassing comments were intertwined with Panda's most sexually harassing comments. During a class lecture on or around February 10, 2005, Dr. Panda was discussing cultural differences. Suddenly, Panda approached Hurd and asked, "If I ask you to show me some skin what would you do for me?" Hurd did not have time to reply and he said, "You would give me a high five right?" He then looked at Derek Batton and said, **"You need to hook a brother up. What they don't know, you know."** Again, on or around February 17, 2005, Panda announced in class that Hurd was **filing a sexual harassment suit against all the black men at the school.** During that same class, he also said that **"black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that."** On March 21, 2005, Hurd emailed Mark Farley asking to file a "formal" complaint against Panda. In addition, Hurd sent a certified mail letter to Dr. Allen Sessoms on March 20, 2005 alleging racial harassment. As a direct result of Panda's sexual and racial harassment, Hurd was forced to leave campus.

## II.    PLAINTIFF IS ENTITLED TO A CLAIM WARRANTING THE IMPOSITION OF PUNITIVE DAMAGES

In order to recover punitive damages under a Title VII claim,[4] the plaintiff must show that

the defendant acted "with malice or with reckless indifference to the federally protected rights of [the plaintiff]." Herbert v. Lando, 441 U.S. 153, 162 n. 7, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

  The United States Supreme Court emphasized that intentional discrimination or retaliation, by itself, is not enough to assess punitive damages ; rather, the defendant must have been at least recklessly indifferent to the fact that the plaintiff's federal rights were being violated. Id. Therefore, an employer who intentionally engaged in conduct that violated federal discrimination laws, but was unaware that her conduct violated any laws, would not be liable for punitive damages. Id. at 2125.

  The conduct need not be egregious, however; if the employer was acting "in the face of a perceived risk that its actions [would] violate federal law," punitive damages are warranted. Id. The Third Circuit has also recognized that, since most employers know that discrimination on the basis of race or gender is prohibited by federal law, courts should presume such knowledge unless the employer affirmatively proves ignorance. Alexander, 208 F.3d at 432 (denying the defendant's argument that punitive damages were not warranted because "there [was] not any suggestion that [the defendant] did not know that it was illegal, and had been for thirty years, to discriminate on the basis of race"). Furthermore, circumstantial evidence, by itself, can support an award of punitive damages. Id.

  Here there are still material issues of fact that need to be determined for the Court to determine if an award of punitive damages is justified. It is undisputed that DSU has confirmed that plaintiff's charges of sexual harassment are legit. It is also undisputed that defendant DSU retained an employee whom they knew engaged in a sexual assault. In addition, DSU's HR President, had knowledge that other female students previously complained about Panda. In

addition, it should be presumed that DSU knows that discrimination on the basis of race or

gender is prohibited by federal law unless DSU can affirmatively prove ignorance. Therefore,

issues of material fact still remain concerning the issue.

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that the Court should deny

defendant Delaware State University's motion for summary judgment.


Respectfully submitted,


**YOUNG, MALMBERG & HOWARD, P.A.**


/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
30 The Green
Dover, DE 19901
Supreme Court I.D. 4447
302-672-5600
*Attorney for Plaintiff*

**B-333 – B-341**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TAMMY HURD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 07-117 |
| | : | |
| DELAWARE STATE UNIVERSITY | : | |
| and DANDESON PANDA, individually | : | |
| and in his official capacity, | : | |
| | : | |
| Defendants. | : | |

## AFFIDAVIT OF TAMMY E. HURD

The affiant, Tammy E. Hurd, hereby duly sworn, deposes and states as follows:

1. I am the named plaintiff in the above suit.

2. During all times pertinent, I was enrolled as a student at Delaware State University and took several required courses with Dr. Dandeson Panda.

3. In September 2004, during a class break, Dr. Panda went into the hallway for a knock at the door. During the break, I checked on a voice mail message which I received from my children's school.

4. While retrieving the message, Dr. Panda noticed me on my phone and asked me if I received a "booty call".

5. The comment was sexual in nature and I was deeply offended by it.

6. Throughout the semester, Dr. Panda would continually (more than twice) make remarks about a fellow student, Dereck Batton and myself us as a couple. Even when both of us insisted we were not a couple, Dr. Panda continued his remarks.

7. In addition, Dr. Panda would always identify Mr. Batton and me whenever he needed a couple to use as an example in class.

8. He typically remarked that Mr. Batton and I were on a "hot date".

9. Even though we both firmly informed him that this was not the case, Dr. Panda continued his remarks.

1

10. In December 2004, when I turned in my final exam for Dr. Panda's class, he initiated a conversation with me stating the following:

a. **"Derek has something for you. Derek says he has something really big for you"** (Panda said it several times)

b. Knowing Panda was in charge of my academic grades, I attempted to deflect Panda's remarks by stating Derek has a girlfriend.

c. Panda continued saying **"Derek says he has something that will be really big for you."**

d. In a further attempt to diffuse Panda's remarks, I firmly responded that Derek and I were not a couple and both had significant others.

e. Ignoring the rebuke, Dr. Panda told me that Derek and I should date or get together.

f. Further, in an effort to diffuse Dr. Panda's remarks through humor, I told Dr. Panda that I was living with my boyfriend and that if Derek was interested, he would have to get in line with the rest of them.

g. Dr. Panda continued **"how can I get in that line?"**

h. Shocked by his response, I inquired, **"You want to get in line?"**

i. In another effort to dissuade Panda's sexual advances:

"You have to be patient, like everyone else."

h. Panda, undeterred by the rebuffs continued, **"You are right. You are right. We shouldn't have sex, because if we had sex, you would be screaming my name when you have sex with your boyfriend."**

11. During the conversation, I was not attempting to engage in ideal banter with Dr. Panda, but was simply trying to diffuse Dr. Panda's sexual advances.

12. Any nervous joking during the conversation by me was an attempt (abet failed) to diffuse Dr. Panda's sexual advances.

13. Dr. Panda's sexual advances and sexual talk during that and future conversations between us were unwelcome and humiliating.

14. After the above conversation, I confided to my husband, Jason Hurd what Dr. Panda had said as stated in paragraph nine (9).

15. As a result of Panda's actions, I was distraught about my future at Delaware State University.

16. As a result of Panda's actions, I was fearful about taking another class with Dr. Panda.

17. Because of my major, I was required to enroll in future classes with Dr. Panda.

18. After the incident described n paragraph nine (9), I was fearful that Dr. Panda's sexual acts would continue to escalate (as they had done during the previous semester).

19. Contrary to DSU's representations, I initiated the meeting with Mark Farley on January 3, 2005, Vice President of Human Resources concerning Dr. Panda's behavior.

20. I purpose of the meeting with Mark Farley was to stop Dr. Panda's sexually harassing behavior.

21. As confirmed by Dr. Nanda Viswanathan's testimony, I never contacted Viswanathan concerning Dr. Panda's sexually harassing behavior.

22. I would not want to risk disclosing such information to Dr. Nanda Viswanathan as he was a colleague of Dr. Panda's and I did not want to risk any sort of retaliation.

23. The only person I spoke with prior to contacting Mark Farley was Dr. Pitts, to receive his advice as to what actions I should take concerning Dr. Panda's sexually harassing acts.

24. I met with Mark Farley on January 3, 2005, to place Delaware State University on notice of Dr. Panda's sexually harassing behavior.

25. During the meeting, Farley never offered me any "formal" documentation to fill out.

3

26. I communicated to him the details of Dr. Panda's acts as described in paragraph seven (7) of this affidavit.

27. During the meeting, Farley agreed and confirmed that Dr. Panda's remarks where sexual in nature.

28. During the approximately (1) hour meeting, Farley informed me that other female students had previously reported being sexually harassed by Dr. Panda but none would file a "formal" complaint.

29. During the meeting, I relayed to Farley that Derek Batton was present during the sexually harassing behavior.

30. Farley never encouraged me to file a "formal" complaint of sexual harassment against Dr. Panda.

31. Upon meeting with Farley, he gave me two options concerning Panda's harassment:

a) File a "formal" complaint against Dandeson Panda with the understanding that I would have to continue attending his classes during the investigation period or;

b) Send an email to Dr. Panda notifying him that his comments were unwelcome.

32. Farley's explained to me that there could be an issue of retaliation if he were to directly contact Dr. Panda by lowering my grades.

33. I made it clear to Farley that I wanted an end to Dr. Panda's harassing behavior.

34. I decided to send the email to Dr. Panda rather than file a "formal" complaint based on Farley's advice and the fact that I would have to continue to attend Dr. Panda's classes during the investigation of a "formal" complaint.

35. Farley never asked  me as to whether I experienced any other incidents with Dr. Panda constituting sexual harassment.

36. Prior to sending the proposed email to Dr. Panda, I sent a copy to Mark Farley for his review.

37. After sending Farley the email, he approved the draft.

38. Mark Farley never followed up on whether the email sent to Dr. Panda curbed the harassment.

39. After sending the email to Dr. Panda, Panda's harassing behavior against me actually escalated.

40. In fact, during my first class back with Dr. Panda that next semester, Dr. Panda threatened me by saying "Derek is not here to protect you this time."

41. On or around February 1, 2005, while heading to class in the parking lot, Dr. Panda said **"Derek has something for you."** I said nothing and just smiled and walked to class."

42. During class, Dr. Panda approached Derek and me in class and said **"I know you got something she needs." You should give it to her**." Then he stared at me and said **"Derek has something that will hurt you."**

43. On or around February 8, 2008, after an exam, I approached Dr. Panda with my test and he began saying **"Derek has <u>something</u> for you."**

44. After Derek Batton turned in his test that same day, Panda engaged Derek Batton in a conversation regarding a trip to Las Vegas with me.

45. Dr. Panda said, **"If she takes me to Vegas I would tear that pussy up."**

46. During a class lecture on or around February 10, 2005, Dr. Panda was discussing cultural differences.

47. Dr. Panda approached me and asked, "If I ask you to show me some skin what would you do for me?" I did not have time to reply and he said, "You would give me a high five right?"

48. He then looked at Derek Batton and said, **"You need to hook a brother up. What they don't know, you know."**

49. On or around February 15, 2005, during a lecture by Panda on different cultures and what powers women have in each culture.

50. During that lecture, Dr. Panda posed the question as to the powers women have over men in the United States.

51. Panda's talks turned to the subject of sexual harassment.

52. In discussing sexual harassment, Dr. Panda announced **"You cannot get me for sexual harassment. You cannot get a dime. Sexual harassment is not clearly defined."**

53. Finally, on or around February 17, 2005, Panda announced in class that I was **filing a sexual harassment suit against all the black men at the school**.

54. During that same class, he also said that **"black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that."**

55. After that class, I was deeply fearful that Dr. Panda knew about my complaint to Farley concerning sexual harassment as Mark Farley was the only individual I discussed the matter with.

56. I was concerned about retaliation by Panda.

57. Dr. Panda's remarks about sexual harassment prompted me to email Mark Farley as to whether anything had been done based on her complaint against Dandeson Panda during their January meeting.

58. It is my belief that the email was sent between February 17, 2005 and March 21, 2005.

59. Farley replied that another female student had come forward but she was still not willing to file a "formal" complaint.

60. During the second class that day, Dr. Panda approached me again saying he hoped I was not offended by his earlier remarks.

61. Then Derek Batton asked him if the two of us (Hurd and Panda) had something going on that he didn't know about.

62. Panda then curtly asked Derek, **"If he wanted to fail?"**

63. Derek was directed to mind his own business by Dr. Panda.

64. On or around February 22, 2005, class was particularly uncomfortable as Dr. Panda displayed obvious animosity towards me.

65. On or around March 1, 2005, Dr. Panda noticed that I was "down" and asked me if I was mad at him.

66. I told him that I had a lot going on right now.

67. Panda then gave an up lifting speech about not letting things get to me and to focus on my education.

68. Just following the speech and during the second class, Dr. Panda approached me again and told me that I needed to talk to someone and that a minister would be a good idea.

6

69. After Panda's inquiry, I disclosed that I was having relationship problems and that I kicked my boyfriend out of my residence.

70. Dr. Panda then replied **"Don't worry about it, you are a girl you can get dick anywhere. Men are dogs, you can get dick anywhere."**

71. On March 21, 2005, I emailed Mark Farley asking to file a "formal" complaint.

72. It was well known on campus that I filed the complaint against Dr. Panda which led to his suspension.

73. Dr. Panda was a popular professor on campus and active in the Greek fraternity, Alpha Phi Alpha (along with other activities- who had a prominent presence on campus).

74. I was aware that there was a petition drive in support of Dr. Panda signed by over 200 students.

75. I received several phone calls from a fellow student,."Alvin", who warned me that other students on campus were "gunning for the white girl who took down" Dr. Panda.

76. I was the only white female in that particular class so it was obvious as to whom those students were "gunning" for.

77. It was decided that I would not physically attend classes because of the turmoil that the complaint and suspension caused.

78. As a result of Defendants' actions, I was vilified .by portions of the campus community.

79. The defendants' actions through out my academic career caused me to be personally upset and emotionally distraught.

80. I sought counseling at the Center for Human Development for issues deriving from the facts in this lawsuit.

81. As a result of Dr. Panda's harassing behavior, there were time I could not cope with being in his presence and therefore I missed approximately six to ten classes.

82. Because of Defendants' actions, my education has been substantially delayed as I have not been able to complete my second degree at DSU for both procedural and emotional obstacles.

83. This affidavit does not intend to represent all of the facts concerning this case or Plaintiff's knowledge of the facts in this case.

84. If called to testify, I could competently testify to the foregoing facts.

_Tammy E. Hurd_
Tammy E. Hurd

STATE OF DELAWARE    :
                     :ss
COUNTY OF KENT       :

SWORN TO AND SUBSCRIBED before me, a Notary Public on this _27_ day of June, 2008.

_____
Notary Public

**RONALD G. POLIQUIN**
**ATTORNEY AT LAW**
**MEMBER OF THE DELAWARE BAR**