## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TAMMY HURD,                          :
                                     :
    Plaintiff,                    :
                                     :
       v.                       :     C.A. No. 07-117
                                     :
DELAWARE STATE UNIVERSITY            :
and DANDESON PANDA, individually     :
and in his official capacity,        :
                                     :
    Defendants.                   :


## PLAINTIFF'S ANSWERING BRIEF TO DEFENDANT DANDESON PANDA'S
## MOTION FOR SUMMARY JUDGMENT


YOUNG, MALMBERG & HOWARD, P.A.

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
30 The Green
Dover, DE 19901
Supreme Court I.D. 4447
302-672-5600
*Attorney for Plaintiff*

DATED: June 26, 2008

# TABLE OF CONTENTS

PAGE

TABLE OF CITATIONS…………………………………………………………………4

NATURE AND STAGE OF
PROCEEDINGS…………………………………………………………………………..5

SUMMARY OF THE ARGUMENT……………………………………………………..6

STATEMENT OF FACTS…………………………………………………………….7-28

ARGUMENT………………………………………………………………………...28-38

I. THE COURT HAS ALREADY RULED THAT PLAINTIFF'S TITLE IX CLAIM AGAINST DEFENDANT PANDA IN HIS OFFICIAL CAPACITY IS PROPER ……………………..29-34

II. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS WHETHER THE PLAINTIFF SUFFERED RACIAL DISCRIMINATION BECAUSE SHE WAS SUBJECTED TO A HOSTILE ENVIRONMENT BASED UPON HER RACE………………………………….34-35

III.    PANDA CAN BE HELD INDIVIDUALLY LIABLE UNDER SECTION 1983…...35-38

CONCLUSION……………………………………………………………………………39

## TABLE OF CITATIONS

Page No.

Cases:

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir.1996)................34

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)................................28

Bostic v. Smyrna School Dist F. Supp. 2d 2003 WL 23181326 (D.Del.2004)............36

Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001).......................................34

Davis v. Scherer, 468 U.S. 183 (1984)

Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir.1999)...........................34

Franklin v. Gwinnett Co. Public Schools, 503 U.S. 60 (1992)...............................29

Hafer v. Melo, 502 U.S. 21 (1991)...........................................................36

Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)...33, 34

In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993)...........................28

Mann v. Univ. of Cincinnatic, 864 F. Supp. 44, 47 (S.D. Ohio 1994).....................29, 35

Meritor Say. Bank, FSB v. Vinson, 477 U.S. 57 (1986)....................................34

Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996).....................28

Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999) .......................................28

Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)..
....................................................................................28

Say. Bank, FSB v. Vinson, 477 U.S. 57, 65-68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)....33

## NATURE AND STAGE OF PROCEEDINGS

On February 26, 2007, plaintiff Tammy Hurd ("plaintiff Hurd") filed this complaint against defendants Delaware State University ("defendant DSU") and Dandeson Panda ("defendant Panda"), in his official and individual capacity. The action arises to remedy discrimination on the basis of sex and race in the terms, conditions, and privileges of plaintiff Hurd's education under provisions of Title IX of the Education Amendments of 1972, and Title VI of the Civil Rights Act of 1964 and 42 U.S.C. §1983.

On March 27, 2007, defendant DSU filed their answer to the complaint. Defendant Panda filed a Motion to Dismiss on May 4, 2007 in lieu of filing an answer to the complaint. Defendant Panda's motion to dismiss was granted in part and denied in part. Plaintiff voluntarily dismissed all Title IX claims that defendant Panda could be held liable in his individual capacity. The Court decided that whether the defendant Panda is in fact liable in his official capacity is a question of material fact for a jury to decide. Defendant Panda filed an Answer in this case on May 7, 2008.

This is plaintiff Hurd's answering brief in support of denying defendant Panda's motion for summary judgment.

5

## SUMMARY OF ARGUMENT

1.     The Court has already ruled that Panda may be held liable in his official capacity under Plaintiff's Title IX claim. Most courts including the Supreme Court have allowed suits under Title IX to proceed against both the institution and its officials. Mann v. Univ. of Cincinnati, 864 F.Supp. 44, 48 (S.D. Ohio 1994)

2.     There are genuine issues of material facts as whether the Plaintiff suffered from a hostile educational environment based on her race.

3.     The defendant Panda can be held liable under section 1983 in his individual capacity as it has been previously been held by Courts that professors at state universities can be held individually liable under section 1983 for sexual harassment of students. Mann v. Univ. of Cincinnati, 864 F.Supp. 44, 48 (S.D. Ohio 1994)

## STATEMENT OF FACTS

### A. The Parties

Delaware State University (hereinafter "DSU"), the second-largest university in the state

of Delaware, is a historically black university. DSU is a fully accredited, comprehensive

university which receives federal and state funds with a main campus and two satellite sites that

encompass six colleges and a diverse population of undergraduate and advanced degree students.

Diversity plays an important role in academic life at DSU. (Rodriguez Dep. p. 17-18 at B196 –

B221)

The Plaintiff, Tammy Hurd (hereinafter "Hurd"), is a 38 year old, married white female,

and was a non-traditional transfer student who previously earned a Marketing Degree at

Delaware State University. (Hurd Dep. p. 6-7 at B1 –B33) Hurd is married to Jason Hurd who

works as a Bailiff for the State of Delaware Courts in Kent County. (B-335) (Hurd Dep. p. 11 at

B1 –B33) While seeking her degree, she also cared for two minor children and financially

supported them by working as a bartender and cocktail server at Dover Downs. (Hurd Dep. p. 6,

12-15 at B1 –B33)

Hurd was a good and responsible student while at DSU. (Rodriguez Dep. p. 28-29 at

B196 –B221) (Panda Dep. p. 44-46 at B34 –B94) Hurd was required to enroll in Panda's

classes because of the degree that she was seeking. (B-333)

Defendant Dr. Dandeson Panda (hereinafter "Panda"), an African-American male, was a

professor employed at DSU from January 1989 through June 30, 2005. During his employment

with DSU, Panda never received any training for sexual, racial, and gender discrimination (Panda

7

Dep. p. 16-18 at B34 –B94) He was not knowledgeable about DSU's policy concerning sexual

harassment. (Panda Dep. p. 16-18 at B34 –B94) Panda was a popular professor heavily involved

with a number of activities on campus. (Panda Dep. p. 71-73 at B34 –B94) Particularly, Panda

served as a former advisor to Alpha Ph Alpha, a high profile Greek fraternity on campus (Panda

Dep. p. 71-73 at B34 –B94) Panda shared a special bond with the fraternity as he was fellow

brother during his undergraduate days. (Panda Dep. p. 73-74 at B34 –B94) He was also involved

in the Black Executive Exchange Program (BIG) which lots of students participated in. (Panda

Dep. p. 77 at B34 –B94) He was also active during homecoming and attended DSU basketball

games. (Panda Dep. p. 78 at B34 –B94) Previously, Panda was the chairman of his department

but was removed in 2003. (Viswanathan Dep. p.27 at B127 –B164) Nanda Viswanathan was

elected as the new chair by a large majority vote. (Viswanathan Dep. p.39 at B127 –B164)

The faculty was not happy with Panda's performance because he was not around enough.

(Viswanathan Dep. p.34 at B127 –B164) In addition, Panda's application to be a permanent

professor was turned down around 2004 or 2005. (Viswanathan Dep. p.30 at B127 –B164) Panda

was upset about the rejection since being a full-time professor is more prestigious than an

associate professor. (Viswanathan Dep. p.30 at B127 –B164)

## B. DSU's Policy and Procedure concerning Sexual Harassment

DSU's policy recognizes its obligation under Delaware Code and Title VII of the Civil

Rights Act to protect students and employees from sexual harassment. Admirably, DSU's policy

goes even further and implements a sexual harassment policy higher than that required by federal

law.

DSU's policy- sexual harassment states:

8

"This policy prohibits sexual harassment of others even when the conduct does not rise to the level of creating a hostile work environment under federal law." (DSU Policy- Sexual Harassment)

DSU has an obligation to investigate all complaints of harassment. (Farley Dep. p.19 at B95 –B126) DSU's procedures require the University President to play a prominent role in the handling the disposition of such complaints. Under DSU policy, the President of DSU shall establish a procedure to handle complaints made about sexual or any other forms of harassment or discrimination protected in the Non-discrimination Policy. (DSU Policy – Sexual Harassment)1 (DSU Policy – Sexual Harassment) (B280-281 and B282-B283) Further, if the Vice-President is unable to resolve a complaint, the President is in charge with holding "an information conference with the parties and making a finding and decision of whether there has been a violation of University policy and the action to be taken." (DSU Procedure-Discrimination Complaint Resolution Procedure) (B280-B281 and B282-B283) If the University receives any complaint of sexual harassment, an investigation is conducted. (Sessoms Dep. p.50 at B127 –B164) The University believes that sexual harassment seriously damages the integrity of our academic institution, destroys the institution's positive work and educational atmosphere, and causes psychological and/or physiological damage to the victim. (B280-281 and B282-B283)

---

1 The President of the University will implement this policy by establishing a procedure to handle complaints made about sexual or any other forms of harassment or discrimination protected in the Non-discrimination Policy. The procedure will provide:

1. that the right to confidentiality for the complainant and the accused will be respected consistent with the University's legal obligations, and with the necessity to investigate allegations of misconduct and take into corrective actions when this conduct has occurred; and

2. that persons filing complaints of sexual or other forms of harassment or discrimination will be protected against reprisals, but that the deliberate filing of false accusations of harassment or discrimination will be condemned and may lead to possible disciplinary action.

(DSU Sexual Harassment Policy)

Harassment by a faculty member against a student is to be taken more seriously because of the professor's position of power. (B-127) Faculty members are in positions of power and authority when compared to students (Viswanathan Dep. p.11 at B127 –B164) A professor or (person of power) has a duty to prevent a hostile environment. (Viswanathan Dep. p.12 at B127 – B164) A professor determines grade outcomes for students. (Viswanathan Dep. p.11 at B127 – B164) The authority of a professor is to be taken carefully. (Viswanathan Dep. p.13 at B127 – B164)

The professor-student relationship also raises concerns that a student might be apprehensive about reporting a complaint of harassment against a professor. When you have two people in unequal positions of power, the not so powerful person might be apprehensive about confronting someone in power. (Viswanathan Dep. p.13 at B127 –B164)

DSU investigates complaints whether they are formal or informal. (Farley Dep. p.33 at B95 –B126) If it's an informal complaint, Human Resources speaks with the complainant. Then, the investigator follows up directly with the person who's been alleged to be the harasser. And then HR moves through the process in order to remediate the problems, whether those be in accordance with the collective bargaining agreement, or the disciplinary policies..... (Farley Dep. p.33 at B95 –B126)

It is uncertain whether DSU has a policy or procedure concerning documentation of harassment complaints. President Sessoms testified that that DSU does have such a policy and procedure in the employee handbook- although no such handbook or policy was ever provided to the plaintiff in response to its Request for Production of Documents. (Sessoms Dep. p. 12-13 at B165–B195) In addition, there apparently are complaint forms for sexual harassment which have

never been provided to the plaintiff in responses to its Request for Production of Documents. (Sessoms Dep. p. 12, 58 at B165–B195)

According to University President Allen Sessoms, a professor asking a student if she received a phone call soliciting sex constitutes sexual harassment. (Sessoms Dep. p.48 at B165–B195) In addition, a professor's act of continually inquiring into student relationships could constitute sexual harassment. (Sessoms Dep. p.47-48 at B165–B195) Another example of sexual harassment would be a professor telling a female student that a male student has "something really big for her" – referencing genitals- constitutes sexual harassment. (Sessoms Dep. p.49 at B165–B195) A professor telling a female student they shouldn't hook up because she would scream his name rises to the level of sexual harassment. (Sessoms Dep. p.49-50 at B165–B195)

In 1992, defendant Panda was the Chair of DSU's Business department. That same year, Germaine Scott- Cheatham (African-American female) was hired as a secretary for the department of accounting. (Cheatham Dep. p 5 at B261 –B279)

A temporary worker (white female) was hired to support the Department of Business and Economics. (Panda Dep. p. 79 at B34 –B94) The temporary worker specifically worked as a secretary under defendant Panda. (Cheatham Dep. p 17 at B261 –B279) One day, the temporary worker came to Cheatham "red-faced", "visibly shaken", and really upset. (Cheatham Dep. p 20-22 at B261 –B279) Cheatham recalls the temporary worker being particularly young. While walking across campus, Panda offered to show the young woman a well-known short-cut between the Price Building that staff members used in the wintertime to avoid the cold. (B-308) Panda then molested and sexually assaulted her by digging his hands into her pockets. (Cheatham Dep. p 18-22 at B261 –B279) (Panda Dep. p. 79 at B34 –B94) Cheatham will never forget the

11

encounter as the secretary was "shaking like a leaf". (Cheatham Dep. p 17 at B261 –B279) After

listening to the young lady, Cheatham directed that she report it and escorted her to the Office of

Human Resources ("HR"). (Cheatham Dep. p 18-19 at B261 –B279) In fact, Cheatham was

adamant that Panda's secretary report the incident to HR. (Cheatham Dep. p 18-19 at B261 –

B279)

     After being questioned by Farley concerning the Hurd allegations, Cheatham thought it

was important to disclose the facts concerning the 1992 incident to HR . (Cheatham Dep. p 24 at

B261 –B279) Upon HR's request, Cheatham drafted a memorandum of the assault on April 12,

2005 and gave it to Farley.[2]

### DSU would have a record of the 1992 Complaint against Panda

     At the time of the incident, Drexel Ball ("Ball") was the Executive Assistant to the

President. (Cheatham Dep. p 35 at B261 –B279) (Ball Dep. p. 7, 17 at B222 –B260)

As part of that position, Ball also assumed the position of affirmative action officer. (Ball Dep. p.

7 at B222 –B260) During Ball's tenure, records of all sexual harassment complaints were kept in

a file at his office [3] and in the employee's personnel file. (Ball Dep. p. 8-10, 20-21, 66 at B222 –

B260) (Sessoms Dep. p.8-9 at B165–B195) (Sessoms 8-9) A record of the complaint would have

also been kept in Panda's personnel file. (Ball Dep. p. 22 at B222 –B260)

     The affirmative action officer was in charge of handling sexual harassment and racial

harassment complaints. (Ball Dep. p. 8 at B222 –B260) Ball also led seminars on sexual

harassment. (Ball Dep. p. 7 at B222 –B260) During Ball's tenure, there was a set procedure on

---

2 Although DSU was in possession of this memorandum since April 12, 2005, it was only produced to Plaintiff's
Counsel during Mark Farley's April 18, 2008 deposition. Plaintiff's Request for Production of Documents was sent
on September 20, 2007.
3 Ball testified unequivocally that he always kept a record concerning any complaint of sexual or racial harassment.

handling complaints of sexual and racial harassment 4. (Ball Dep. p. 9, 56 at B222 –B260) Even

if a complaint was verbal, DSU would always follow through with a hearing. (Ball Dep. p. 80 at

B222 –B260) (Farley Dep. p.23 at B95 –B126)Verbal complaints are just as important as written

complaints. (Farley Dep. p.24 at B95 –B126) Specifically, the University could not trivialize any

complaints. (Ball Dep. p. 80 at B222 –B260) Even with an informal complaint, Ball would

contact the professor concerning the complaint.  (Ball Dep. p. 82 at B222 –B260) DSU had an

obligation to tell the professor that the behavior was inappropriate.  (Ball Dep. p. 82-83 at B222 –

B260) Once a complaint came to his desk, an investigation would be conducted in the form of

appointing a committee. (Ball Dep. p.8 at B222 –B260) The committee would be composed of a

five-member panel, which included members of the faculty and staff. During Ball's tenure,

records of all sexual harassment complaints were kept in a file at his office and in the employee's

personnel file. (Ball Dep. p. 8-10, 20-21, 66 at B222 –B260) (Sessoms Dep. p.8-9 at B165–

B195) A record of the complaint would have also been kept in Panda's personnel file. (Ball Dep.

p. 22 at B222 –B260) In fact, it was his duty to keep a record of all complaint. (Ball Dep. p. 86 at

B222 –B260) Notifications of all complaints were memorialized in writing. (Ball Dep. p. 88 at

B222 –B260) As a matter of policy, Ball would always retain a copy of any complaint of sexual

or racial harassment.

Upon receiving a complaint of sexual harassment, Ball would **definitely** consider any

previous complaints against the employee. (Ball Dep. p. 90 at B222 –B260) Prior complaints

against an employee could demonstrate a "pattern of behavior".  (Ball Dep. p. 90 at B222 –B260)

---

In addition, a written notification to Panda concerning a time and place of a hearing would have been retained.

4 Ball clearly recalled the policy and procedures concerning the handling of sexual harassment complaints at the time
he received the complaint against sexual harassment by the temporary worker against Panda in 1992.

After the investigation, the President of DSU would inform the respondent concerning the committee's decision.

Ball received the complaint of sexual harassment by the temporary worker against Panda in 1992 5. (Ball Dep. p. 11 at B222 –B260) After receiving the complaint, Ball formed a committee and a Mrs. Braxton chaired the investigation 6. (Panda Dep. p. 84 at B34 –B94) (Ball Dep. p. 12 at B222 –B260) In addition, Dr. Nwosu was also part of the committee.  (Panda Dep. p. 81 at B34 –B94) A written complaint was requested to the complainant.  (Panda Dep. p. 80-82 at B34 –B94) Ball informed Panda that a complaint was filed against him and that the university would investigate the complaint. (Panda Dep. p. 80 at B34 –B94) Panda would have been informed both verbally and in writing. (Ball Dep. p. 813-14, 16 at B222 –B260) The written notice would also have stated that there was a complaint against him and there would be an investigation, and there would be a hearing scheduled. (Ball Dep. p.14 at B222 –B260)

The written notice would have been kept in Panda's file in Ball's office. (Ball Dep. p. 8-10, 20-21, 66 at B222 –B260) A record of the complaint against Panda would have been kept in Ball's file. (Ball Dep. p. 12-13 at B222 –B260) A meeting was scheduled to deal with the complaint, but the complainant never showed up. According to Ball, all procedures were followed with respect to informing the respondent and setting up the hearing. (Ball Dep. p. 55 at B222 –B260)

---

5 It should be noted that much of Ball's recollection of the events concerning the sexual harassment complaint were refreshed by Germaine Cheatham's April 2005 Memorandum and portions of the Dandeson Panda's deposition transcript. However, Ball recalls receiving the complaint "very clearly" because of Panda's unusual request that he bring his wife with him to the hearing. In addition, Ball independently recalls appointing Mrs. Braxton as the chair of the committee.

6 Braxton is now deceased.

After resigning his position at DSU, Ball transferred his files to Mark Farley on

December 30, 2005 7. (Ball Dep. p. 71 at B222 –B260)The files would have included the records

concerning the sexual harassment complaint by the temporary employee against Panda. (Ball

Dep. p. 23 at B222 –B260) Based on the nature of the sexual harassment charges by the

temporary employee against Panda, the policy of DSU concerning the retention of those records

and the fact that a committee was formed and a meeting was scheduled to investigate those

charges, Ball believes there would be some kind of records retained by DSU concerning these

type of charges. Ball was never interviewed by Farley concerning the complaint by Tammy Hurd

even though he was employed by DSU at the time of the investigation concerning Hurd's

complaint. (Ball Dep. p. 19 at B222 –B260)

## C. **Defendant Panda's Continuing Harassment against the Plaintiff Hurd**

Panda's ongoing harassment against Hurd began in September 2004. (B-333) It occurred

within the first few weeks of class. (Hurd Dep. p. 18 at B1 –B33)

Specifically, Panda asked Hurd if she received a **"booty call"**8. (Hurd Dep. p. 16-17 at B1

–B33) (B-333) During a break in the class, Hurd noticed that she received a voice mail message

---

7 Ball's employment with DSU ended on December 30, 2005. After his employment with DSU, Ball began employment at Lincoln University in Lincoln, Pennsylvania in January 2006 as Director of Public Relations. Prior to resigning his position with DSU, Ball set forth an informal complaint against DSU concerning age discrimination. According to Ball, President Allen Sessoms announced at a Board of Trustees meeting that "I am moving Drexel Ball, because I want to hire a younger person." The move was part of President Sessoms' reorganization of the President's office. A complaint was filed with the EEOC and through an agreement between DSU and Ball. According to Ball, his resignation had nothing to do with his complaint of age discrimination.

8 Definition of "Booty Call":

1.   a telephone call, usually the sole purpose of which is to elicit a spontaneous and/or casual sexual encounter with the person so contacted.

2.   a sexual encounter that ensues from such a call.

3.   the recipient of such a call " usually used of a person who accepts or typically accepts the caller's invitation.

http://www.allwords.com/word-booty+call.html

on her cell phone. (B-333) (Hurd Dep. At 16) The voice message she received was from her children's' school, so Hurd stepped out of the class room to see if she needed to pick up the children. (B-333) (Hurd Dep. At 16-17) When retrieving the message, Panda said:

> **"What is that, a booty call?"** A surprised Hurd did not respond. The statement made Hurd feel extremely uncomfortable. (Hurd Dep. p. 18 at B1 –B33) The comment was sexual in nature and Hurd was offended by it. (B-333)

Throughout the semester (the semester lasted three (3) months), Panda continually (over and over again) inquired as to whether Hurd and another male student named Derek Batton were a "couple" or if they were on a "hot date". (B-333) (Hurd Dep. At 20-23) Both Batton and Hurd were firm that they were not a couple and attempted to ignore Panda's continuing comments. (B-333) (Hurd Dep. p. 20 at B1 –B33) Both Hurd and Batton attempted to thwart the remarks by firmly and clearly asserting that they were both in relationships with others. (Hurd Dep. p. 23 at B1 –B33) (B-333)

Panda's behavior escalated just after Hurd turned in her final exam for Panda's class. (Hurd Dep. p. 25 at B1 –B33) (B-334) While turning in her final exam, Panda engaged Hurd in the following conversation[9]: (B-334)

> **"Derek has something for you.  Derek says he has something really <u>big</u> for you" several times."** Knowing Panda was in charge of her academic grade, Hurd attempted to deflect Panda's remarks by stating Derek has a girlfriend. Panda continued saying **"Derek says he has something that will be <u>really</u> <u>big</u> for you."** (Hurd Dep. p. 25 at B1 –B33)

---

9 Despite Hurd's representations that the comments by Panda were unwelcome and made her uncomfortable, Farley minimized the conversation as "banter". (Farley, 29-30)

(B-334)

Hurd told him again that Derek and she were not a couple. (B-334) And he made another remark that **they should date or get together.** (B-334) Hurd told him that she was living with her boyfriend, that if Derek was interested, he would have to get in line with the rest of them.. (B-334) And Dr. Panda then inquired **"how he could get in line?"** (B-334) A perplexed Hurd then asked him, "You want to get in line?" (B-334) Then Panda said:

> **"Yes, I want to get in line. What do I have to do to get in line?"  I said, "You have to be patient, like everyone else."  And he says, "You are right.  You are right.  We shouldn't have sex, because if we had sex, you would be screaming my name when you are with your boyfriend."** (Hurd Dep. p. 24-25 at B1 –B33) (B-334)

During the conversation, Panda's remarks continued :

> **"….if we hooked up you would be with your boyfriend and scream my name.  You would be making love to your boyfriend and you would scream out, Panda, Panda! Then your boyfriend would wonder what you were screaming."** (Hurd Dep. p. 25 at B1 –B33) (B-334)

Hurd's told Panda to stop being "bad" as a rebuttal to his advances. (B-334)  (Hurd Dep. p. 27 at B1 –B33) She was attempting to diffuse Dr. Panda's sexual advances. (B-334 thru B-335)  Hurd did not intend to engage him in any "joking banter". (B-334 thru B-335)  (Hurd Dep. p. 27 at B1 –B33) Panda's comments were clearly sexual to Hurd. (Hurd Dep. At 26) Any nervous joking during the conversation by Hurd was an attempt (abet failed) to diffuse Dr. Panda's sexual advances. (B-335) Dr. Panda's sexual advances and sex talk during that and future conversations were unwelcome and humiliating. (B-335)

Deeply upset about Panda's remarks, she confided to her husband about what happened. (B-335) (Hurd Dep. p. 29 at B1 –B33) After that event, Hurd kept a chronological diary concerning Panda's harassment. (B-326-B-330) Hurd was so distraught by the conversation that she felt her future at DSU was in jeopardy because of Panda's behavior. (B-335)

She was nervous about going back to DSU that next semester. (B-335) (Hurd Dep. p. 29 at B1 –B33) She feared taking another class with Panda and that his behavior would continue to escalate. (B-335) (Hurd Dep. p. 29 at B1 –B33) However, because of Hurd's major, she was required to enroll in future classes with Dr. Panda. (B-335)

## C. Hurd's First Report of Panda's Sexual Harassment to DSU

Hurd directly reported the incident of sexual harassment to Mark Farley, Vice-President of Human Resources 10. (B-335)  Under DSU policy, Farley was the appropriate person for Hurd to complain to. (Hurd Dep. p. 24-25 at B1 –B33) Hurd and Farley met on January 3, 2005.11 (Hurd Dep. p. 28 at B1 –B33) (B-335) Prior to meeting with Farley, Hurd spoke with another professor, Dr. Pitts, who encouraged her to see Farley about the incident. (B-335) The purpose of the meeting with Farley was to stop Dr. Panda's sexually harassing behavior. (B-335) Hurd also wanted to place Delaware State University on notice as to Dr. Panda's sexually harassing behavior. (B-335) (Farley Dep. p.9 at B95 –B126) After hearing about Hurd's complaint, Farley

---

10 Hurd's assertion that she directly contacted Farley is consistent with the testimony of Nanda Viswanathan who has no recollection of Hurd mentioning to him that Dr. Panda had made any inappropriate comments to her. (Visawathan Dep. p.42 at B95 –B126)  In fact, Viswanathan was "shocked and "surprised" when he read DSU's Responses to Plaintiff's Requests for Interrogatories #4 which states that on or about January 3, 2005, Plaintiff apparently mentioned to Dr. Nanda Viswanathan that Dr. Panda had made inappropriate comments. (B-296) Viswanathan goes even further in his testimony- "Did not happen, that's right." (Visawathan Dep. p.43 at B95 – B126)

11 In DSU's Statement of Facts, they assert that Hurd only reported an uncomfortable conversation with Panda, however, in DSU's Responses to Plaintiff's Requests for Interrogatories, they concede that Hurd was reporting Panda engaging in a "sexually charged" conversation with the Plaintiff which made her uncomfortable and that she was upset about.

was left with the impression that the matter was urgent. (Farley Dep. p.24,37 at B95 –B126)

During the meeting, Farley never offered Hurd any documentation to fill out. (B-335) During the meeting, Hurd communicated to Farley the details of Dr. Panda's harassment as described in paragraph seven (7) of her affidavit. (B-336) She also relayed information to Farley that student Derek Batton was present during the sexually harassing behavior. (B-336) However, Farley never followed up with Batton to confirm any of the allegations. (Farley Dep. p.41 at B95 –B126) Farley has no set list of questions to ask a complainant when receiving a sexual harassment complaint and does not use any sort of manual in conducting such an interview. (Farley Dep. p.40 at B95 –B126) During the meeting, it was clear to Farley that Hurd was upset about Panda's comments. (Farley Dep. p.40 at B95 –B126) Farley never asked if Panda's conduct was affecting her education. (Farley Dep. p.40 at B95 –B126) Farley took no notes concerning the meeting. (Farley Dep. p.19 at B95 –B126) Farley never issued any type of report or any type of investigation. (Farley Dep. p.19 at B95 –B126)

After hearing the complaint during the January meeting, DSU concedes that Hurd was making a generalized complaint that Panda engaged in a "sexually-charged" conversation with her that was unwelcome. (Farley Dep. p.8, 27 at B95 –B126) (B-336)

Hurd made it clear to Farley that she wanted an end to Dr. Panda's harassing behavior. (B-336) During the approximately (1) hour meeting, Farley informed Hurd that he had previously received sexual harassment complaints against Panda from other female students. (B-336) (Hurd Dep. p. 57 at B1 –B33) However, none of the women would file a "formal" complaint. (B-336) Despite his knowledge of these other complaints, Farley never encouraged Hurd to file a "formal" complaint of sexual harassment against Dr. Panda. In addition, Farley never asked Hurd

as to whether she experienced any other incidents with Dr. Panda constituting sexual harassment. (B-336) During the January 2005 meeting, Farley only gave Hurd two options concerning Panda's harassment:

a) File a "formal" complaint against Dandeson Panda with the understanding that she would have to continue attending his classes during the investigation period or;

b) Send an email to Dr. Panda notifying him that his comments were unwelcome.

(B-336)

Farley never gave Hurd the option of not taking any further classes with Panda. (Hurd Dep. p. 123 at B1 –B33) Farley emphasized to Hurd the possibility of retaliation by Panda (through the lowering of her grades) if she filed a formal complaint and Farley were to directly contact Dr. Panda concerning the charge. (B-336) Based on Farley's advice and the fact that she would have to continue attending Dr. Panda's classes during an investigation of any "formal" complaint, Hurd decided to send the email to Dr. Panda rather than have Farley directly contact Panda concerning the allegations. (B-336) After choosing not to file a "formal" complaint, Hurd made it clear to Farley that she did not want Panda to interact with her in a fashion creating a hostile environment. (Hurd Dep. p. 92 at B1 –B33)

Prior to sending the proposed email to Dr. Panda, Hurd sent a copy to Mark Farley for his review. (B-336) After sending Farley the email, he approved the draft. (B-336) However, Farley never followed up on whether the email sent to Dr. Panda curbed the harassment. (B-336)

Farley represented to Hurd that sending an email as an initial matter would ensure that

Panda knew his comments were unwelcome. Then Farley promised to "look into the matter"12. (B-297) (Farley Dep. p.36 at B95 –B126) Despite Farley's promise, he did nothing. (Farley Dep. p.18-19 at B95 –B126) He didn't interview any witnesses nor did he engage in any further fact finding. (Farley Dep. p.22 at B95 –B126) Despite promising Hurd that he would "look into the matter", Farley believed that it was Hurd's duty to contact him and that he had no duty to follow up on the matter. (Farley Dep. p.7, 20 at B95 –B126)

Following Farley's suggestion, Hurd sent an email to Panda on January 4, 2005. (Panda Dep. p. 94 at B34 –B94) (1-04-05 Email from Tammy Hurd to Dandeson Panda) Panda received the email on or around January 2005. (Panda Dep. p. 99 at B34) After receiving the email in January 2005, Panda and Farley never spoke about its contents. (Panda Dep. p. 94, 101 at B34) After the email was sent, Farley simply assumed that Panda would modify his behavior. (Farley Dep. p.18-20 at B95 –B126)

Upon receiving the email, Panda never changed any of his behavior. (Panda Dep. p. 95-96 at B34) Panda never followed up with Hurd concerning the referenced conversation she emailed him about. (Panda Dep. p. 103 at B34) In addition, Farley did nothing after the initial email was sent. (Farley Dep. p.22 at B95 –B126) In addition, there is no evidence that Farley review any prior complaints against Panda even though he was aware that DSU kept records of all complaints concerning prior acts of sexual harassment. (Farley Dep. p.23 at B95 –B126)

### D. Panda's Harassment Escalates After Hurd's Email

Panda's harassment escalated after Hurd's email. (B-336) During the first class of the next semester, Panda threatened Hurd by saying, "Derek is not here to protect you this time." (B-337)

---

12 "Mr. Farley expressed that he would look into the matter and that as an initial matter an email or letter should be sent to Dr. Panda to document that his comment was unwelcome."
Supplemental Responses to Plaintiff's First Set of Interrogatories Directed to Delaware State University (B-297)

On or around February 1, 2005, while heading to class in the parking lot, Dr. Panda said **"Derek has something for you."** (B-337) Hurd said nothing and just walked to class." (B-337) During class, Dr. Panda approached Derek Batton and her and said **"I know you got something she needs." You should give it to her**." (B-337) Then he stared at Hurd and said "**Derek has something that will hurt you."** (B-337)

Around February 8, 2008, after an exam, Hurd approached Dr. Panda with her test and he began saying **"Derek has <u>something</u> for you."** (B-337) After Derek Batton turned in his test that same day, Panda engaged Derek Batton in a conversation regarding a possible trip to Las Vegas with Hurd. Panda said, "**If she takes me to Vegas, I would tear that pussy up."** (B-337)

During a class lecture on or around February 10, 2005, Dr. Panda was discussing cultural differences. (B-337)   Suddenly, Panda approached Hurd and asked, "If I ask you to show me some skin what would you do for me?" (B-337) Hurd did not have time to reply and he said, "You would give me a high five right?" (B-337) He then looked at Derek Batton and said, "**You need to hook a brother up. What they don't know, you know."** (B-337)

On or around February 15, 2005, Panda was giving a lecture on different cultures and what powers women have in each culture. (B-337) Suddenly, Panda's talks turned to the subject of sexual harassment. (B-337)   In discussing sexual harassment, Dr. Panda announced "**You cannot get me for sexual harassment. You cannot get a dime. Sexual harassment is not clearly defined."** (B-337)

Finally, on or around February 17, 2005, Panda announced in class that Hurd was **filing a sexual harassment suit against all the black men at the school**. (B-337) During that same class, he also said to Hurd ..."**a black man would put a hurting on you. You know what they**

**say about black men. Black men would put a hurting on you. But we won't go into that."**
(B-338)

After hearing the above February 17, 2005 remarks, Hurd was deeply fearful that Dr.
Panda knew about her complaint to Farley concerning sexual harassment as Mark Farley was the
only individual she discussed the matter with. (B-338) Specifically, she was concerned about
retaliation by Panda. (B-338) The remarks about sexual harassment prompted Hurd to email
Mark Farley as to whether anything had been done based on her complaint against Dandeson
Panda during their January meeting. (B-338) Hurd sent the email between February 17, 2005 and
March 21, 2005. (B-338) Farley replied to her email stating that another female student had come
forward but she was still not willing to file a "formal" complaint. (B-338)

Prior to her second class that day, Dr. Panda approached Hurd saying he hoped she was
not offended by his earlier remarks. (B-338) Derek Batton then asked him if the two of them
(Hurd and Panda) had something going on that he didn't know about. (B-338) Panda then curtly
asked Derek, **"If he wanted to fail**?" Derek was directed to mind his own business by Dr.
Panda. (B-338) Panda's class scheduled on February 22, 2005, was particularly uncomfortable to
Hurd as Dr. Panda displayed obvious animosity towards her. (B-338)

On or around March 1, 2005, Dr. Panda noticed that Hurd was "down" and asked her if
she was mad at him. (B-338) She told him that she had a lot going on at the time. (B-338) Panda
then attempted to give an up lifting speech about not letting things get to her and to focus on her
education. (B-338) Just following the speech and during the second class, Panda approached
Hurd again and told her that she should talk to a minister. (B-338) Upon Panda's inquiry, Hurd
disclosed that she was having relationship problems. (B-339 ) Dr. Panda then replied **"Don't**

**worry about it, you are a girl you can get dick anywhere. Men are dogs, you can get dick anywhere."** (B-339)

On March 21, 2005, Hurd emailed Mark Farley asking to file a "formal" complaint against Panda. (B-339). In addition, Hurd sent a certified mail letter to Dr. Allen Sessoms on March 20, 2005 outing her complaint of racial and sexual harassment. Afterward, Farley instructed Hurd not come back on campus. (Hurd Dep. p. 98 at B1 –B33) A committee was formed to handle the complaint. It consisted of Dr. Patrick Liverpool, Dr. Nanda Viswanathan, and Mark Farley. (B-284) Viswanathan was Panda's immediate supervisor. (Viswanathan Dep. p.19 at B127 –B164)

The committee met with Hurd, Derek Batton, and Dandeson Panda. After meeting with Hurd, Derek Batton, and Dandeson Panda, the committee ultimately believed Hurd's allegations. (Viswanathan Dep. p.21 at B127 –B164) Batton's statement confirmed Hurd's allegations. (Viswanathan Dep. p.21, 71 at B127 –B164)Viswanathan viewed Batton as a mature individual. (Viswanathan Dep. p.71-76 at B127 –B164) Although a committee was formed, it appears that Viswanathan and Liverpool were only present for the interviews with Derek Batton and Dandeson Panda. Panda did not respond in detail but rather gave a general denial of the charges. (Viswanathan Dep. p.52 at B127 –B164) The committee's consensus was that Hurd's case was strong. (Viswanathan Dep. p.78 at B127 –B164) Given the substantiation and nature of the charges, Panda was suspended from employment on March 24, 2005. (B-284) Although Panda was suspended, Viswanathan believed that he was only suspended for the semester. (Viswanathan Dep. p.89 at B127 –B164) President Allen Sessoms was not involved with the investigation. (Viswanathan Dep. p.81 at B127 –B164)

24

It appears that Farley orchestrated the remaining investigation entirely himself. After being prompted by Hurd, Farley learned that Panda's acts were far more pervasive then he thought. (Farley Dep. p.49 at B95 –B126) Three additional students submitted written statements verifying other students who were harassed by Panda. (B-320) (B-321) (B322-B324) Student Wayne Holmes stated that Panda once stuck his tongue down another female student's mouth-uninvited. (B-320) Student Tracye R. Berry experienced Panda's sexual harassment first hand in the Spring of 2004 when he requested that they meet off campus and engage in "adult activities". She also stated that Dr. Panda making sexual remarks to female students such as, "that ass if fat", "you on the patch", and making gestures with his finger referring to intercourse. She described his advances as "unwanted" and "unwarranted". (B-321) Talisha Murphy described how Panda sexually harassed her from 2001 through February 2005. Panda would make comments about her chest size, legs, butt, and what she does with her boyfriend in bed. (B-322-B-324) In April 18, 2004, Panda asked Murphy to walk with him when he leaned attempting to stick his tongue down her throat. (B322-B324) Murphy was fearful that she would get a bad grade because he used lots of essays. (B322-B324) Panda informed her that he gave her boyfriend a good grade because he was my boyfriend, even though he didn't deserve it. (B-322-B-324) She also reported that a Hispanic student told her that she received a better grade if she showed Panda her chest. (B322-B324)

After his investigation, Farley found merit in a lot of her complaints. (Farley Dep. p.14 at B95 –B126) He concluded that Panda violated DSU's policy concerning sexual harassment and committed sexual harassment against Hurd. (Farley Dep. p.13-14 at B95 –B126) Ultimately, Farley believed in the validity of Hurd's complaints. (Farley Dep. p.65 at B95 –B126) However,

Farley doesn't have any documentation concerning the investigation. (Farley Dep. p.65 at B95 –

B126). In fact, he didn't take any notes or fill out any forms concerning the outcome of the

investigation. (Farley Dep. p.64 at B95 –B126) As of April 4, 2005, Hurd was unaware of the

investigation results so she sent a letter to Farley inquiring as to what the status of investigation

was. (B-319) Hurd never received a response to the letter. Panda eventually separated from DSU

as of June 1, 2005

## ARGUMENT

### I. THE COURT HAS ALREADY RULED THAT PLAINTIFF'S TITLE IX CLAIM AGAINST DEFENDANT PANDA IN HIS OFFICIAL CAPACITY IS PROPER

#### A.   Standard of Review:

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999). The nonmoving party, however, must demonstrate the existence of a material fact — not mere allegations — supplying sufficient evidence for a reasonable jury to find for the nonmovant. See Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the `mere scintilla' [of evidence] standard." Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. See Anderson, 477 U.S. at 249-50.

**B. The Court has already determined that Panda may be held liable under Title IX in his official capacity.**

Courts have allowed Title IX suits to proceed against individuals in their official capacity. Mann v. Univ. of Cincinnatic, 864 F. Supp. 44, 47 (S.D. Ohio 1994). In Mann, the defendant was also a professor at a state university who was alleged to have sexually harassed one of his students. There, the defendant filed a motion for summary judgment under Fed. R. Civ. P.56(c) on the basis that no genuine issue of material fact existed for trial because suit could not be brought against an individual in his official capacity under Title IX. Id at 45. The Mann court denied the motion for summary judgment primarily relying on the Supreme Court's decision in Franklin v. Gwinnett Co. Public Schools, 503 U.S. 60 (1992). The Court allowed a Title IX suit to proceed against an individual in his official capacity.

**C. Hurd was subjected to a hostile educational environment by Panda's continuing sexual harassment**

Here, Plaintiff Tammy Hurd was subjected to a hostile environment based on her gender. Panda's harassment began in September 2004, within the first few weeks of class. Panda's ongoing harassment against Hurd lasted from September 2004 until March 21, 2005.

Panda's behavior created a hostile work environment based on the totality of the circumstances. Panda's acts of sexual harassment ranged from just generally annoying behavior to outright threatening. The first incident occurred within the first few weeks of class when Panda asked if Hurd received a **"booty call"** Hurd interpreted the comment as sexual in nature and she was deeply offended by it. Then, throughout the semester (the semester lasted three (3) months), Panda continually inquired as to whether Hurd and Batton were a "couple" or if they were on a "hot date". Although these incidents are relatively mild in severity, the Court should

balance that with the frequency of the acts and the other more severe acts.

The defendant DSU attempts to characterize the incident concerning Hurd turning in her final exam as classroom banter. Whether the incident is banter or not is an issue of material fact for a jury to decide. Hurd represents that any joking was an attempt to deflect Panda's sexual remarks. In addition, the language used by Panda seems more suitable for a pornographic movie then common classroom banter: **"Derek says he has something that will be <u>really</u> <u>big</u> for you." (Panda said this several times)** In addition, Pandas' remarks escalated as the conversation went on:

> "….if we hooked up you would be with your boyfriend and scream my name. You would be making love to your boyfriend and you would scream out, Panda, Panda! Then your boyfriend would wonder what you were screaming." In addition, Panda continued saying **"Derek says he has something that will be <u>really</u> <u>big</u> for you."**

Hurd told Panda to stop being "bad" in an attempt to rebut his advances. Her response was an attempt to diffuse Dr. Panda's sexual advances. Hurd did not intend to engage in any "joking banter". Panda's comments were clearly sexual and offensive to Hurd. Dr. Panda's sexual advances during this and future conversations were unwelcome and humiliating.

Certainly, Hurd's actions after the incident show no indication that she was engaging in common banter. Demonstrating how serious she took the incidents, she reported the incident to Mark Farley and began to keep a chronological diary concerning Panda's acts of harassment. Farley described Hurd as upset during their meeting. Hurd reported Panda's conduct to stop his behavior. Unfortunately, the Farley approved email sent to defendant Panda as suggested by Farley seemed to only escalate the hostile environment. Upon receiving the email, Panda never

changed any of his behavior. In addition, Farley took no actions after the initial email was sent out.

Panda's harassment included threats, during the first class of the next semester, Panda informed Hurd that "Derek is not here to protect you this time."

In February 1, 2005, Dr. Panda continued his previous remarks and told Hurd that "Derek has something for you." During that class, Dr. Panda approached Derek Batton and her and said **"I know you got something she needs." You should give it to her."** Then he stared at Hurd and said **"Derek has something that will hurt you."** Clearly these incidents are frequent and severe. Later, Panda's statements continued to escalate in crudeness. After an exam, Hurd approached Dr. Panda with her test and he began saying **"Derek has <u>something</u> for you."** Then Panda said to Derek Batton **"If she takes me to Vegas, I would tear that pussy up."**

Some of Panda's statements were acts of intimidation targeted at anyone who would dare file a complaint to him. During one lecture, Panda was discussing sexual harassment and announced to the class **"You cannot get me for sexual harassment. You cannot get a dime. Sexual harassment is not clearly defined."** On February 17, 2005, Panda announced to his class that Hurd was **filing a sexual harassment suit against all the black men at the school.** The only possible purpose for Panda's statement was to create a hostile environment for Hurd. Obviously, the statement was meant to harm Hurd's reputation on campus. During that same class, he also said **"black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that."**

After hearing the above February 17, 2005 remarks, Hurd was deeply fearful that Dr. Panda knew about her complaint to Farley concerning sexual harassment as Mark Farley was the only

individual she discussed the matter with. She was concerned about retaliation by Panda. The remarks about sexual harassment prompted Hurd to email Mark Farley as to whether anything had been done based on her complaint against Dandeson Panda during their January meeting. Farley replied to her email stating that another female student had come forward but she was still not willing to file a "formal" complaint.

On or around March 1, 2005, at a time when Hurd was emotionally distraught, Panda told her **"Don't worry about it, you are a girl you can get dick anywhere. Men are dogs, you can get dick anywhere."**

In sum, the acts of discrimination were consistent from September 2005 until through March 21, 2005. The incidents varied in severity but all were intended to intimidate Hurd. Based on the totality of the circumstances, Hurd suffered in a hostile environment- both sexual and racial.

The sexual harassment detrimentally affected the Plaintiff. For example, after Panda spoke of the Hurd screaming his name while having sex with her boyfriend on the last day of class, she became deeply upset and confided with her husband what happened that day. Hurd was distraught about her future at DSU due to Panda's behavior. She was nervous about going back to DSU that next semester. She feared taking another class with Panda. Unfortunately, because of Hurd's major, she was required to enroll in future classes with Dr. Panda

In addition, Hurd suffered emotional distress after filing her second complaint against Panda. It was well known on campus that Hurd filed the complaint against Dr. Panda which led to his suspension. Dr. Panda was a popular professor on campus and active in the Greek fraternity, Alpha Phi Alpha (along with other activities- he had a prominent presence on campus). Hurd was also well aware that a petition drive in support of Dr. Panda was signed by over 200 students.

31

Hurd also received 5-6 phone calls from a fellow student,."Alvin", who warned her not to come back on campus as students were "gunning for the white girl who took down Dr. Panda". As Hurd was the only white female in that particular class, it was obvious as to whom those students were "gunning" for. It was decided by Farley that Hurd would not physically attend classes because of the turmoil that the complaint and suspension caused on campus. After leaving DSU, Hurd was treated medically for emotional distress as a result of Panda's actions..

### D. Panda's acts of sexual harassment constitute both a subjective and objective Hostile Environment

The sexual harassment that Hurd experienced would detrimentally affect any reasonable women in her position—as many women were the victims of Panda's harassment. In deed, three additional students submitted written statements verifying that they were harassed by Panda. Student Wayne Holmes stated that Panda once stuck his tongue down another female student's mouth- uninvited. Student Tracye R. Berry experienced Panda's sexual harassment first hand in the Spring of 2004 when he requested that they meet off campus and engage in "adult activities". She also stated that Dr. Panda made sexual remarks to female students such as, "that ass is fat", "you on the patch", and making gestures with his finger referring to intercourse. She described his advances as "unwanted" and "unwarranted". Talisha Murphy described how Panda sexually harassed her from 2001 through February 2005. Panda would make comments about her chest size, legs, butt, and what she does with her boyfriend in bed. In April 18, 2004, Panda asked Murphy to walk with him when attempted to stick his tongue down her throat. Similar to Hurd's fears, Murphy was fearful that Panda would retaliate that because he used a lot of essays for his exams. Panda informed her that he gave her boyfriend a good grade because he was her

boyfriend, even though he didn't deserve it. She also reported that a Hispanic student told her

that she received a better grade if she showed Panda her chest. In short, because of DSU's

inaction dealing with Panda, any reasonable woman would have been detrimentally affected by

Panda's ongoing harassment.

## II. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS WHETHER THE PLAINTIFF SUFFERED RACIAL DISCRIMINATION BECAUSE SHE WAS SUBJECTED TO A HOSTILE ENVIRONMENT BASED UPON HER RACE

A hostile environment may form the basis of a Title VII discrimination claim. Cardenas v.

Massey, 269 F.3d 251, 260 (3d Cir. 2001) (citing Meritor Say. Bank, FSB v. Vinson, 477 U.S.

57, 65-68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The inquiry into whether an environment is

hostile requires the consideration of "all the circumstances ... [including] the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295

(1993). That analysis "must concentrate not on individual incidents, but on the overall scenario."

Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir.1999).

To establish a Title VII claim based upon a hostile work environment, a plaintiff must

show: "(1) that he or she suffered intentional discrimination because of race; (2) the

discrimination was pervasive and regular; (3) the discrimination detrimentally affected the

plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race

in that position; and (5) the existence of respondeat superior liability." Aman v. Cort Furniture

Rental Corp., 85 F.3d 1074, 1081 (3d Cir.1996).

Here, Panda's actions created a racially hostile environment for the plaintiff, a 38 year

33

old, married white female. Of course, the racially harassing comments were intertwined with Panda's mostly sexually harassing comments. However, the severity of Panda's remarks should not be minimized. During a class lecture on or around February 10, 2005, Dr. Panda was discussing cultural differences. Suddenly, Panda approached Hurd and asked, "If I ask you to show me some skin what would you do for me?" Hurd did not have time to reply and he said, "You would give me a high five right?" He then looked at Derek Batton and said, **"You need to hook a brother up. What they don't know, you know."** Again, on or around February 17, 2005, Panda announced in class that Hurd was **filing a sexual harassment suit against all the black men at the school**. During that same class, he also said that **"black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that."** On March 21, 2005, Hurd emailed Mark Farley asking to file a "formal" complaint against Panda. In addition, Hurd sent a certified mail letter to Dr. Allen Sessoms on March 20, 2005 alleging racial harassment. As a direct result of Panda's sexual and racial harassment, Hurd was forced to leave campus.

### III. PANDA CAN BE HELD INDIVIDUALLY LIABLE UNDER SECTION 1983

Defendant Panda argues in his opening brief, that Hurd cannot bring a claim against him in his official capacity. However, Panda ignores whether the section 1983 claim is brought against Panda as an individual.

Professors at state universities can be held individually liable under section 1983 for sexual harassment of students. Mann v. Univ. of Cincinnati, 864 F.Supp. 44, 48 (S.D. Ohio 1994)

In Mann, that court decided that a section 1983 claim could proceed against the professor

34

in his individual capacity. Similarly, Hurd brings a section 1983 claim against Panda in his individual capacity for his acts as a professor at a state university.

Under Section 1983, state employees may be sued in their personal or individual capacity. Under these circumstances, an employee or board member of a state university may be found to be individually liable even though the university may not be. The plaintiff must show that the individual employee violated a clearly established law and that the individual exhibited a callous indifference for the rights of the plaintiff. In Davis v. Scherer, 468 U.S. 183 (1984), the Supreme Court held that:

> "Officials are shielded from liability for civil damages insofar as their
> conduct does not violate the clearly established statutory or constitutional rights
> of which a reasonable person would have known."

In Hafer v. Melo, 502 U.S. 21 (1991), the Supreme Court held that state officers may be personally liable for damages under Section 1983 based upon actions taken in their official capacities. The Court held that the state officer's potential liability is not limited to acts under color of state law that are outside their authority or not essential to operation of state government, but also extends to acts within their authority and necessary to performance of governmental functions and Eleventh Amendment immunity does not erect barriers against suits to impose individual and personal liability on state officers under Section 1983.

Panda's counsel has previously brought claims on behalf of students for both Title IX and section 1983 claims. In Bostic v. Smyrna School Dist F. Supp. 2d 2003 WL 23181326 (D.Del.2004), plaintiff's counsel represented two students who brought forth both section 1983 claims against school officials in both their individual and official capacities along with claims

under Title IX. Defendant Panda's position in their motion for summary judgment seems to be in direct contradiction to that position.

Here, Panda's acts of sexual harassment violated a clearly established law and he exhibited a callous indifference for the rights of the plaintiff. In addition, the plaintiff has a clearly established protected property interest in the completion or continued enrollment in school. In sum, the acts of discrimination by Panda interfered with that right through his acts of sexual harassment from September 2005 through March 21, 2005. The plaintiff's ability to attend campus and complete her classes were not only interfered with but permanently interrupted as a direct result of Panda's actions. To date, Hurd is unable to step forth on DSU's campus and has been unable to complete her last remaining class to earn her second degree at least partially due to Panda's acts of sexual harassment.

The sexual harassment detrimentally affected the Plaintiff. For example, after Panda spoke of the Hurd screaming his name while having sex with her boyfriend on the last day of class, she became deeply upset and confided with her husband what happened that day. Hurd was distraught about her future at DSU due to Panda's behavior. She feared taking another class with Panda and that his behavior would continue to escalate. Unfortunately, because of Hurd's major, she was required to enroll in future classes with Dr. Panda

In addition, Hurd suffered emotional distress after filing her second complaint against Panda. It was well known on campus that Hurd filed the complaint against Dr. Panda which led to his suspension. Dr. Panda was a popular professor on campus and active in the Greek fraternity, Alpha Phi Alpha (along with other activities- he had a prominent presence on campus). Hurd was also well aware that a petition drive in support of Dr. Panda was signed by over 200

students. Hurd also received 5-6 phone calls from a fellow student,."Alvin", who warned her not to come back on campus as students on campus were "gunning for the white girl who took down Dr. Panda".. Hurd was the only white female in that particular class so it was obvious as to whom those students were "gunning" for. It was decided by Farley that Hurd would not physically attend classes because of the turmoil that the complaint and suspension caused on campus. After leaving DSU, Hurd was treated medically for emotional distress as a result of Panda's actions.

Panda's acts of sexual harassment displayed a particularly callous indifference for the rights of the Hurd. In discussing sexual harassment during a classroom lecture, Dr. Panda told the class **"You cannot get me for sexual harassment. You cannot get a dime. Sexual harassment is not clearly defined."** During another lecture, Panda announced in class that Hurd was **filing a sexual harassment suit against all the black men at the school**. During that same class, he also said that a…**"black man would put a hurting on you. You know what they say about black men. Black men would put a hurting on you. But we won't go into that."** These were acts in obvious violation of state law and demonstrated a callous indifference for her rights.

37

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that the Court should deny defendant

Panda's motion for summary judgment.

Respectfully submitted,

**YOUNG, MALMBERG & HOWARD, P.A.**

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
30 The Green
Dover, DE  19901
Supreme Court I.D. 4447
302-672-5600
*Attorney for Plaintiff*