**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

TAMMY HURD,                          :
                                      :
                 Plaintiff,        :
                                        :
           v.                       :
                                        :
DELAWARE STATE UNIVERSITY and    :      C.A. No. 07-117
DANDESON PANDA, individually and in his    :
official capacity,                          :
                                        :
                Defendants.     :
_____:

**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY**
**JUDGMENT BY DEFENDANT DELAWARE STATE UNIVERSITY**

Respectfully submitted by:

**WHITE AND WILLIAMS LLP**

**MARC S. CASARINO (#3613)**
**JENNIFER HURVITZ BURBINE(#4416)**
824 N. Market Street, Suite 902
Wilmington, DE 19801
Telephone: 302-467-4520
Facsimile: 302-467-4550
Attorneys for Defendant _Delaware_
_State University_

Dated:   July 3, 2008

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................... ii, iii

ARGUMENTS ........................................................................................................1

    I. STANDARD OF REVIEW........................................................................1

    II. PLAINTIFF CONCEDES THAT HER § 1983 CLAIM AGAINST DSU MUST BE DISMISSED ...........................................................................2

    III. PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST DSU PURSUANT TO TITLE IX...........................................................................2

        A. Plaintiff Failed To Demonstrate (i) An Actionable Hostile Environment Existed Prior to January 3, 2005, (ii) DSU Had Actual Notice Of Any Such Hostile Environment, or (iii) DSU Acted With Deliberate Indifference To Sexual Harassment By Dr. Panda Of Which DSU Was Actually Aware ...............................3

        B. Plaintiff's Reference To "After-The-Fact" Knowledge And Hearsay Statements Should Not Be Considered On Summary Judgment ...................................8

        C. DSU Reasonably Responded And Was Not Deliberately Indifferent ..................12

            1. DSU Acted Promptly and Appropriately To Plaintiff's Allegations Regarding Post-January 3, 2005 Conduct Once Such Conduct Was Brought To DSU's Attention ...............................................14

    IV. PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST DSU PURSUANT TO TITLE VI............................................................................15

    V. PLAINTIFF HAS FAILED TO STATE A CLAIM WARRANTING IMPOSITION OF PUNITIVE DAMAGES .........................................................16

CONCLUSION........................................................................................................17

# TABLE OF AUTHORITIES

## CASES

<u>Adams v. Andrews</u>, 1999 WL. 544727 (S.D.N.Y. July 27, 1999) ................................2, 16

<u>Alegria v. State of Texas</u>, 2007 WL. 3256586 (S.D.Tex. Nov. 2, 1997) .........................13

<u>Alexander v. Sandoval</u>, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) .............15

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)..........................................................................................................................1

<u>Aoutif v. City Univ. of New York</u>, 2005 WL. 3334277 (E.D.N.Y. Dec. 8, 2005) .......2, 16

<u>Babiker v. Ross Univ. Sch. of Med.</u>, 2000 WL. 666342 (S.D.N.Y. May 19, 2000)1, 15, 16

<u>Black v. Zaring</u>, 104 F.3d 822 (6th Cir. 1997) ....................................................................5

<u>Doe v. Dallas Indep. Sch. Dist.</u>, 220 F.3d 380, (5th Cir. 2000)...........................................13

<u>Frederick v. Simpson College</u>, 149 F. Supp. 2d 826 (S.D. Iowa 2001) ............................13

<u>Gallant v. Board of Trustees of California State Univ.</u>, 997 F. Supp. 1231 (N.D.Cal. 1998) ....................................................................................................................7

<u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)...............................................................................................................2

<u>Hackman v. Valley Fair</u>, 932 F.2d 239, 241 (3rd Cir. 1991)...............................................4

<u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)..5, 6

<u>Horowitz v. Federal Kemper Life Assurance Co.</u>, 57 F.3d 300 (3rd Cir. 1995) .................1

<u>Johnson v. Galen Health Institutes, Inc.</u>, 267 F. Supp. 2d 679 (W.D.Ky 2003)....5, 6, 7, 14

<u>Klemenic v. Ohio State Univ.</u>, 10 F. Supp. 2d 911 (S.D.Ohio 1998)..................................7

<u>Langadinos v. Appalachian Sch. of Law</u>, 2005 WL. 2333460 (W.D.Va. Sept. 25, 2005)15

<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)..........................................................................................1

<u>Nichols v. Bennett Detective & Protective Agency, Inc.</u>, 2006 WL. 1530223 (D. Del. May 31, 2006).........................................................................................................1, 11

Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224 (3rd Cir. 1993) ........................................................................................................................1

Philbin v. Trans Union Corp., 101 F.3d 957, 961 (3rd Cir. 1996) ................................1, 11

Porto v. Town of Tewksbury, 488 F.3d 67 (1st Cir. 2007) .................................................14

Pryor v. Nat'l Collegiate Athletic Ass'n, 228 F.3d 548 (3rd Cir. 2002) ...........................15

Tripp v. Long Island Univ., 48 F. Supp. 2d 220 (E.D.N.Y. 1999) ................................1, 16

Wills v. Brown University, 184 F.3d 20 (1st Cir. 1999) ....................................................12

Yatzus v. Appoquinimink School District, 458 F. Supp. 2d 235 (D. Del. 2006)............1, 4

Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir. 1994) ...........................................2, 16

## STATUTES

Fed.R.Civ.P. 56(c) .............................................................................................................1

# ARGUMENTS[1]

## I.    Standard Of Review.

Summary judgment should be granted if the court concludes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[2]  The moving party bears the burden of proving that no genuine issue of material fact is in dispute.[3]  However, once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial'."[4]  Only "facts that could alter the outcome are 'material,' and disputes are 'genuine' only if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[5]  The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue.[6]

In other words, the nonmoving party must do more than create some metaphysical doubt by simply restating her allegations from the pleadings.[7]  Moreover, the nonmoving party may not pass off a sham affidavit as creating a fact dispute where the contents of the affidavit are not genuine.[8]  Nor should the nonmoving party's mere speculation and conjecture or inadmissible hearsay statements be considered on a motion for summary judgment.[9]  Having offered nothing beyond speculation,

---

[1] Initially capitalized terms shall have the meanings ascribed to them in DSU's Opening Brief unless otherwise defined herein.

[2] Fed.R.Civ.P. 56(c).

[3] See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

[4] Id. at 587 (quoting Fed.R.Civ.P. 56(e)).

[5] Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3rd Cir. 1995) (citations omitted).

[6] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

[7] Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3rd Cir. 1993).

[8] Yatzus v. Appoquinimink School District, 458 F.Supp.2d 235, 247 (D. Del. 2006).

[9] Nichols v. Bennett Detective & Protective Agency, Inc., 2006 WL 1530223, at *6  (D. Del. May 31, 2006) (attached as Exhibit 1) (citing Philbin v. Trans Union Corp., 101 F.3d 957, 961 (3rd Cir. 1996) ("the hearsay statement is not capable of being admissible at trial, and could not be considered on a motion for summary judgment") (internal citations and quotation marks omitted)); Tripp v. Long Island Univ., 48 F.Supp.2d 220, 223 (E.D.N.Y. 1999) (dismissing student's Title VI claim against university because it was based on nothing more than conclusory allegations of racial animus) (citation omitted); Babiker v. Ross Univ. Sch. of Med., 2000 WL 666342 at *4-5 (S.D.N.Y. May 19, 2000) (attached at App. A166 to A175)

conclusory allegations, hearsay and misstated facts, Plaintiff has failed to rebut DSU's motion for summary judgment and the Complaint must be dismissed as to DSU.

## II.    Plaintiff Concedes That Her § 1983 Claim Against DSU Must Be Dismissed.

Plaintiff does not dispute that her § 1983 claim against DSU fails as a matter of law and must be dismissed because it is barred by the Eleventh Amendment and/or because it is subsumed by Title IX.  Accordingly, summary judgment on Plaintiff's § 1983 claim against DSU should be entered.

## III.    Plaintiff Has Failed To State A Claim Against DSU Pursuant To Title IX.

Plaintiff concedes that she was not subjected to *quid pro quo* harassment.  Instead, Plaintiff makes the conclusory argument that she was subjected to hostile environment sexual harassment.  Plaintiff's hostile environment sexual harassment argument misses the mark in two significant ways.  First, even when considered in a light most favorable to Plaintiff, the record simply does not demonstrate a hostile environment of sexual harassment.  Second, for Title IX liability to attach to DSU, Plaintiff must demonstrate that DSU had ***actual notice*** of the hostile environment and acted with deliberate indifference to Plaintiff's complaints about the hostile environment.[10]

As to this latter point, Plaintiff's efforts to demonstrate that DSU had actual notice of a hostile environment fail.  Plaintiff relies on sheer speculation, conclusory allegations and hearsay to suggest that DSU was aware of prior sexual harassment allegations against Dr. Panda.  The Court cannot consider such information on summary judgment.  Plaintiff also creates a false sense of DSU's knowledge by confusing the chronology of events in this matter.  Finally, Plaintiff simply embellishes matters and ignores portions of the record that contradict her claims.

---

(holding that hearsay, conclusory allegations are insufficient, as a matter of law, to give rise to an inference of discrimination) (citing Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir. 1994) ("A plaintiff alleging . . . discrimination by a university must do more than recite conclusory allegations."); Adams v. Andrews, 1999 WL 544727, *2 (S.D.N.Y. July 27, 1999) ("Conclusory allegations do not a cause of action make [under Title VI].") (attached at App. A189 to A191). See also, Aoutif v. City Univ. of New York, 2005 WL 3334277, *4 (E.D.N.Y. Dec. 8, 2005) ("conclusory, isolated, and unspecified statements cannot provide a rational basis for inferring discriminatory intent or motivation, and a claim based on such allegations cannot survive a motion to dismiss.") (citation omitted) (attached at App. A192 to A195).

[10] Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).

**A.    Plaintiff Failed To Demonstrate (i) An Actionable Hostile Environment Existed Prior To January 3, 2005, (ii) DSU Had Actual Notice Of Any Such Hostile Environment, or (iii) DSU Acted With Deliberate Indifference To Sexual Harassment By Dr. Panda Of Which DSU Was Actually Aware**

The chronology of events is particularly important in this matter as Plaintiff must prove that (i) a hostile environment of sexual harassment existed prior to her January 3, 2005 meeting with Mark Farley, (ii) DSU had actual notice of, and acted with deliberate indifference to, such pre-January 3rd hostile environment, (iii) the hostile environment continued after the January 3rd meeting, and (iv) DSU had actual notice of, and acted with deliberate indifference to, such post-January 3rd hostile environment. Plaintiff embellishes or simply makes up "facts" in an effort to create the appearance of a hostile environment of sexual harassment prior to January 3, 2005. Plaintiff claims in her responsive brief that from September, 2004 through December, 2004, Dr. Panda "continually (over and over again)" inquired whether Plaintiff and her former boyfriend, Derek Batton, were a couple. First, DSU contends that even if Dr. Panda asked two students if they were a couple, such inquiry does not amount to sexual harassment. It certainly does not rise to a sufficiently offensive level to constitute a hostile environment. This is especially true given that Plaintiff and Mr. Batton were in fact dating, a fact Plaintiff conveniently ignores in her responsive brief.

Nevertheless, Plaintiff's claim in her responsive brief and sham affidavit that Dr. Panda repeatedly asked her and Mr. Batton if they were a couple during the Fall, 2004 semester are directly contradicted by her previously sworn testimony in this matter. At her April 3, 2008 deposition, Plaintiff was specifically asked to identify all remarks made to her by Dr. Panda that she considered sexually harassing.[11] Plaintiff testified that the first such comment was Dr. Panda asking if Plaintiff received a "booty call" when she listened to a voice message on her cell phone sometime in September, 2004 near the beginning of the Fall, 2004 semester.[12] Plaintiff further testified that another

---

[11] Plaintiff Dep. p. 15 ln 20 to p. 26 ln 1 at Plaintiff's Appendix to Responsive Brief at B5-B8 (hereinafter referred to as "**Plaintiff's App.**").
[12] Plaintiff Dep. p. 15 ln 20 to p. 16 ln 1 at Plaintiff's App. B5. <u>See</u> <u>also</u> Chronology at App. A5.

allegedly sexually harassing comment by Dr. Panda was not made to Plaintiff, for another four months, until December, 2004 near the end of the Fall, 2004 semester.[13]

Contrary to her responsive brief and sham affidavit, Plaintiff testified at her deposition to recalling two (2) other incidents where Dr. Panda asked if Plaintiff and Mr. Batton were "on a date" or "a couple" or something to that effect as Dr. Panda passed by them on campus.[14]  Plaintiff recalled only those two incidents of Dr. Panda commenting about Plaintiff and Mr. Batton being a couple, which is hardly equivalent to being asked "continually (over and over again)" as Plaintiff now alleges. ***Moreover, Plaintiff clearly testified that she has no idea whether Dr. Panda commented about Plaintiff and Mr. Batton being a couple during the Fall, 2004 semester.***[15]

It is only when faced with summary judgment that Plaintiff developed a miraculous recall of her memory as demonstrated by her sham affidavit.  On summary judgment, "when, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists."[16]  To determine if an affidavit submitted in opposition to summary judgment is a sham affidavit, the court should consider whether:

> (1) the affiant was cross-examined during earlier testimony; (2) the affiant had access to the relevant evidence at the time of the earlier testimony; (3) the affidavit was predicated on newly discovered evidence; and (4) the earlier testimony reflects confusion which the affiant attempts to explain.[17]

Applying these factors to the present case demonstrates that Plaintiff's affidavit is a sham affidavit unworthy of consideration on summary judgment.  Plaintiff was subjected to examination at deposition by her own counsel and defendants' counsel.  There was no apparent confusion or misunderstanding by Plaintiff with respect to the questions posed to her during the deposition.

---

[13] Plaintiff Dep. p. 24 ln 21 to p. 25 ln 17 at Plaintiff's App. B7.  See also Chronology at App. A5-A6.
[14] Plaintiff's Dep. p. 20 ln 6 to p. 24 ln 3 at Plaintiff's App. B6-B7.
[15] Plaintiff's Dep. p. 20 ln 10-19 at Plaintiff's App. B6.
[16] Yatzus, 458 F.Supp.2d at 247 (quoting Hackman v. Valley Fair, 932 F.2d 239, 241 (3rd Cir. 1991)).
[17] Yatzus at 247 (citations omitted).

PHLDMS1 4452180v.2

Plaintiff possessed all necessary information to fully respond to questions during her deposition. Thus, Plaintiff's affidavit in opposition to summary judgment is merely a litigation tactic designed to concoct a factual dispute where none exists. More specifically, realizing that the September, 2004 and December, 2004 alleged comments by Dr. Panda are too infrequent and lacking in severity to constitute a hostile environment of sexual harassment, Plaintiff embellished the "facts" through her affidavit to suggest that there were numerous other incidents occurring in the Fall, 2004 semester to create a sexually hostile environment. The Court should not consider such made-up "facts" on summary judgment and Plaintiff's affidavit should be stricken from the record as a sham affidavit.

Thus, the true record the Court is faced with on summary judgment is that Dr. Panda allegedly asked Plaintiff if she received a "booty call" in September, 2004 and allegedly engaged in a banter with Plaintiff in December, 2004 where Plaintiff joked about Dr. Panda getting in line with other guys to have a relationship with Plaintiff. Prior to January 3, 2005, Plaintiff never reported the September, 2004 incident to anyone, including never having reported it to DSU.[18] Plaintiff claims to have "laughed off" the December, 2004 repartee.[19]

Even if accepted as true, these isolated sporadic incidents do not establish a hostile educational environment. To establish a *prima facie* case for hostile environment under Title IX, Plaintiff "must produce evidence that her educational experience was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of her education and create a sexually hostile environment."[20] "The conduct complained of is judged both objectively and subjectively; it must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile."[21] In determining whether Plaintiff has established that the educational environment at DSU was hostile or abusive, the Court must consider (1) the conduct's severity; (2) the

---

[18] Plaintiff Dep p.17 ln 22 to p.18 ln 7 at App. A11 to A12.
[19] Chronology at App. A5 to A9 .
[20] Johnson v. Galen Health Institutes, Inc., 267 F.Supp.2d 679, 685 (W.D.Ky 2003) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).
[21] Johnson, 267 F.Supp.2d at 685 (citing Black v. Zaring, 104 F.3d 822 (6th Cir. 1997)).

frequency of the abusive conduct; (3) whether it is physically threatening or humiliating rather than merely offensive; and (4) whether it unreasonably interfered with Plaintiff's performance.[22]

Applying these factors to the matter at hand demonstrates that Dr. Panda's isolated and sporadic comments during the Fall, 2004 semester, even if accepted as true, did not create a hostile environment of sexual harassment prior to January 3, 2005. First, both comments were made only to Plaintiff and, according to her, no one else in the class knew about them. Thus, there is no issue of Plaintiff feeling humiliated or otherwise demeaned before her classmates. The "booty call" comment apparently did not trouble Plaintiff enough to cause her to report it to anyone. Plaintiff did not miss any classes nor did her performance suffer as a result of either comment by Dr. Panda.

In fact, Plaintiff could not wait to get started on work for future classes she wanted to take with Dr. Panda. On January 4, 2005, Plaintiff sent Dr. Panda an email stating:

> Happy New Year!!! I am so excited to start this new semester. I am going to see what I can do to finish up my degrees and begin teaching ASAP. I am just reminding you that I am still in need of the syllabus for International Management and International Marketing. I want to begin my notes early so that I may be able to focus more in class instead of steady [sic] writing notes from the book.
>
> I also wanted to mention quickly that I was uncomfortable with our last conversation the last day of class regarding my dating life. I very much enjoy your class and your teaching methods, however of [sic] we could just avoid conversations such as the one we had the day of finals I would really appreciate it.
>
> I am going to finish checking up on a few things regarding the alternative program through the state of Delaware for teaching. If it looks like something that I can accomplish then I may be in need of a couple more classes of yours this semester. I will let you know by the end of the week. I may need your help in getting in because they are already booked in the system.
>
> Thank you for your time and patience.[23]

---

[22] Johnson, 267 F.Supp.2d at 685 (citing Harris, 510 U.S. at 23).
[23] App. at A90.

Plaintiff's January 4th email to Dr. Panda does not remotely suggest that Plaintiff was so offended or fearful of Dr. Panda that she never wanted to take another course with him. To the contrary, Plaintiff's jovial email repeatedly comments how much she enjoys Dr. Panda's classes and expresses her excitement about having additional classes with Dr. Panda. Indeed, Plaintiff herself deemed the December, 2004 banter with Dr. Panda worthy of only a quick passing reference buried among her claims of enjoying and very much looking forward to Dr. Panda's classes. Plaintiff's jovial, flattering email belies her after-the-fact suggestion that she was so troubled by Dr. Panda that she could not go on with his classes.

Under these circumstances, there is no reasonable basis upon which to conclude that Plaintiff was subjected to a hostile environment of sexual harassment during the Fall 2004 semester. No reasonable person could find the stray "booty call" comment and "get in line with other guys" banter so severe as to create a sexually harassing hostile environment.[24] Plaintiff herself claims to have "laughed off" the "get in line with other guys" banter and apparently did not find the "booty call" comment offensive enough to report to anyone. According to Plaintiff, there were no sexually harassing comments by Dr. Panda for the almost four months that elapsed between the September and December incidents. These isolated comments do not create a hostile environment.

It is undisputed that Plaintiff neither missed classes nor did her performance suffer as a result of any conduct attributed to Dr. Panda. No one else in the classes Plaintiff took with Dr. Panda reported any misconduct by Dr. Panda.[25] Thus, even considering the facts in a light most favorable to Plaintiff, it is apparent that her educational experience was not permeated with discriminatory intimidation,

---

[24] This alleged harassment is akin to the level of conduct that has historically been found not to rise to the level of severe and pervasive sexual harassment. See e.g., Johnson, 267 F.Supp.2d 679 (professor's crude language during lectures, inappropriate touching of student and propositioning student for sex did not create an objectively hostile educational environment giving rise to liability under Title IX); Gallant v. Board of Trustees of California State Univ., 997 F.Supp. 1231 (N.D.Cal. 1998) (professor's graphic comments about his sexual desire for another man and a greeting kiss on student's cheek does not rise to the level of severe or pervasive sexual harassment); Klemenic v. Ohio State Univ., 10 F.Supp.2d 911 (S.D.Ohio 1998) (coach did not create a sexually hostile environment by asking the student to go out with him and sending her a sexually suggestive magazine article because the acts were not severe or pervasive).

[25] Plaintiff Dep p. 44, ln 2-20 at App. A13.

ridicule and insult that was sufficiently severe or pervasive to alter the conditions of her education and create a sexually hostile environment. Accordingly, because there is no hostile environment of sexual harassment, Plaintiff has failed to establish an essential element of her Title IX claim, which mandates dismissal of the claim as a matter of law.

### B.    Plaintiff's Reference To "After-The-Fact" Knowledge And Hearsay Statements Should Not Be Considered On Summary Judgment

Plaintiff's response makes the conclusory allegation that DSU had prior knowledge that Dr. Panda was sexually harassing students. To support this allegation, Plaintiff references a complaint made against Dr. Panda in 1992 by a temporary worker and claims by other students that came to light during the investigation of Plaintiff's complaint. None of these claims demonstrate that DSU had actual knowledge of ongoing sexual harassment by Dr. Panda against Plaintiff. Moreover, the so-called evidence of these claims is nothing but speculation, conjecture and inadmissible hearsay that should not be considered on summary judgment.

With respect to the 1992 temporary worker allegation, Plaintiff relies upon the deposition testimony of Germain Scott-Cheatham and Drexel Ball. Examination of their testimony evidences that neither (i) recalls the temporary worker who allegedly made the claim, (ii) actually witnessed Dr. Panda harass anyone, (iii) know the facts or circumstances surrounding DSU's investigation of the matter, or (iv) the resolution of the matter. Such unreliable testimony does not create a genuine dispute of fact. Ms. Cheatham's and Mr. Ball's testimony is nothing more than speculation about rumors. Such hearsay and hearsay-within-hearsay cannot be considered on summary judgment and should be stricken from the record in this matter.

Ms. Cheatham was a secretary in Dr. Panda's department in 1992.[26] She recalls a temporary worker being visibly upset and, upon asking her what was wrong, being told that Dr. Panda had made a

---

[26] Transcript of May 16, 2008 Deposition of Germaine Scott-Cheatham p. 16 (hereinafter, "**Cheatham Dep.**") at Plaintiff's App. B266.

sexual pass at the temporary worker.[27]  Ms. Cheatham cannot recall the name or any other information from which anyone can identify the temporary worker to verify her story.[28]  Dr. Panda vehemently denies that any such incident ever occurred with respect to this temporary worker.[29]  Ms. Cheatham told the temporary worker to report the incident.[30]  She cannot recall whether she walked with the temporary employee to the building that then housed DSU's human resources office because her memory of the event is so "blurry".[31]  She has no knowledge of what became of the matter since she never saw the temporary worker again and did not think it was necessary to follow up with anyone.[32]  In fact, the matter happened so long ago that Ms. Cheatham had much difficulty recalling anything specific about it.[33]  She has no knowledge of Dr. Panda allegedly harassing anyone beyond the unverified allegation by the temporary worker.[34]

Mr. Ball was DSU's affirmative action officer in 1992.[35]  He left employment at DSU in December, 2005.[36]  He originally had no recollection of the 1992 allegations by the temporary worker, but his memory was jogged when Plaintiff's counsel discussed the incident with him.[37]  In any event, Mr. Ball has no first-hand knowledge of the 1992 incident.[38]  He cannot recall the name or any other information from which anyone can identify the temporary worker and verify this story.[39]  He does not know if there was a written complaint made by the temporary worker.[40]  He cannot recall how he even

---

[27] Cheatham Dep. p. 17-18 at Plaintiff's App. B266-B267.
[28] Cheatham Dep. p. 16 at Plaintiff's App. B266 and p. 21 at Plaintiff's App. B267.
[29] Dr. Panda Dep. p. 83 at Plaintiff's App. B56.
[30] Cheatham Dep. p. 18 at Plaintiff's App. B267.
[31] Id. p. 18-19 at Plaintiff's App. B267.
[32] Id. p. 23 at Plaintiff's App. 268.
[33] Id.
[34] Cheatham Dep. p. 25 at Plaintiff's App. 268.
[35] Transcript of June 9, 2008 Deposition of Drexel Ball (hereinafter "**Ball Dep.**") p. 7-8 at Plaintiff's App. B225.
[36] Ball Dep. p. 31 at Plaintiff's App. B231.  Mr. Ball's separation from employment at DSU is subject to a confidentiality agreement entered as part of the resolution of employment-related litigation Mr. Ball brought against DSU.  DSU reserves all rights under such confidentiality agreement and otherwise with respect to Mr. Ball and, specifically, all claims against Mr. Ball for violation of his agreements with DSU.
[37] Ball Dep. p. 53-53 at Plaintiff's App. B236-B237.  DSU maintains that *ex parte* communication between Plaintiff's counsel and DSU's former employee Mr. Ball is improper and reserves all rights to challenge such communications and admission of Mr. Ball's statements in this matter.
[38] Ball Dep. p. 52-63 at Plaintiff's App. B236-B239.
[39] Id.
[40] Id.

- 9 -

came to hear of this incident.[41]  All that he can recall is that he somehow heard an allegation about Dr. Panda, formed a committee to investigate the allegation and the temporary worker never pursued the matter.[42]  Mr. Ball was not part of the investigation committee and concedes that because there was no pursuit of the complaint by the temporary worker there was never an actual investigation.[43]  He has no idea what happened with the matter thereafter.  He cannot say whether there were actually any written records of this incident.[44]  He has no knowledge of Dr. Panda allegedly harassing anyone beyond the unverified allegation by the temporary worker.[45]

The statements by Ms. Cheatham and Mr. Ball are hearsay and hearsay-within-hearsay. Neither of them are fully confident that their recollection of the events allegedly occurring way back in 1992 are even accurate.  Neither of them can identify the temporary worker who allegedly made a complaint nor point to any documentation of such complaint.  Ms. Cheatham's statements about what this mystery person told her back in 1992 are pure hearsay.  Ms. Cheatham has no personal knowledge, or even second-hand knowledge, of whether the temporary worker told the details of her allegations to anyone at DSU.  Reliance on Mr. Ball's testimony about the 1992 incident is even more problematic. He concedes having no personal knowledge of the incident.  He never talked with the temporary worker, never saw a written complaint concerning the incident, and does not know if there was ever a written record of the incident.  He acknowledges that there was never an investigation of the incident because the temporary worker failed to pursue the matter.  Worse yet, Mr. Ball cannot even recall who he heard such hearsay statements from or otherwise verify his supposed "knowledge" of the incident.

---

[41] Id.

[42] Id.  Most troubling is that Mr. Ball does not even know the details of what Dr. Panda allegedly did more than 16 years ago.

[43] Id.

[44] Id.

[45] Ball Dep. p. 77 at Plaintiff's App. B242.

- 10 -

Such inadmissible hearsay statements cannot be considered on a motion for summary judgment and should be disregarded by the Court.[46]

Even if the Court were to consider such untrustworthy testimony, nothing said by Ms. Cheatham and Mr. Ball evidence that DSU had actual notice that Dr. Panda was sexually harassing Plaintiff, or anyone else for that matter.  Both Ms. Cheatham and Mr. Ball testified that beyond the unverified allegations by the temporary worker they had not heard of Dr. Panda harassing anyone.  It is ludicrous for Plaintiff to suggest that an unverified event, with no written documentation, allegedly occurring more than 12 years prior to Plaintiff's complaint, and with no reported incidents in the intervening period somehow put DSU on actual notice that Dr. Panda was sexually harassing students and, more particularly, sexually harassing Plaintiff.

Perhaps recognizing this infirmity of her Title IX claim, Plaintiff makes the spectacular allegation that DSU was aware that Dr. Panda was sexually harassing other students but did nothing about it.  To support this conclusory allegation, Plaintiff references statements by DSU students Wayne Holmes, Tracye R. Berry, and Talisha Murphy that Dr. Panda allegedly sexually harassed them during their time at DSU.  Plaintiff implies that DSU was aware of these students' allegations prior to Plaintiff meeting with Mr. Farley on January 3, 2005.  However, this ignores the reality that it was Plaintiff who identified these students to Mr. Farley *only after she met with him on March 21, 2005* and suggested that Mr. Farley talk to these students.

After she met with Mr. Farley on January 3, 2005, Plaintiff began talking to fellow students on campus and with whom she worked with at Dover Downs about her allegations against Dr. Panda.[47]

First, this directly contradicts Plaintiff's statement in her sham affidavit that Mr. Farley was the only

---

[46] Nichols, 2006 WL 1530223, at *6 (citing Philbin, 101 F.3d at 961) ("the hearsay statement is not capable of being admissible at trial, and could not be considered on a motion for summary judgment") (internal citations and quotation marks omitted)).

[47] Farley Dep. p. 14 at App. A51 and p. 42 at App. A61.  See also April 20, 2005 statement from Wayne Holmes at Plaintiff's App. B320 describing Plaintiff's discussion of allegations against Dr. Panda while working with Mr. Holmes at Dover Downs.  Plaintiff failed to attach the entire statement from Mr. Holmes, specifically leaving out the portion where Mr. Holmes talks about Plaintiff discussing her allegations with others.  A complete version of Mr. Holmes' statement is attached hereto as Exhibit 2.

person with whom she discussed the matter and serves as additional basis to disregard Plaintiff's sham affidavit.[48]  Second, the statements themselves are all dated after March 21, 2005 and are from students that Plaintiff pre-interviewed and recommended to Mr. Farley for further interview about Dr. Panda.[49]

It is readily apparent from the statements relied upon by Plaintiff that the complaining students did not come forward until after Plaintiff made her March 21, 2005 complaint.  It is beyond cavil that DSU had no knowledge of these students' complaints until after Plaintiff's March 21, 2005 complaint.  Plaintiff's reliance on these statements evidences a fundamental misunderstanding of Title IX liability.  DSU can be held liable under Title IX only where it had actual knowledge of harassment and acted with deliberate indifference to such known harassment.  These "after-the-fact" statements are irrelevant in the Title IX context and should be stricken from the record.[50]  Plaintiff has therefore failed to demonstrate an essential element of her Title IX claim.  Accordingly, summary judgment on Plaintiff's Title IX claim in favor of DSU is appropriate.

### C.    DSU Reasonably Responded And Was Not Deliberately Indifferent

Even though Plaintiff's Title IX claim must be dismissed for failure to demonstrate the requisite level of harassment and/or DSU's knowledge of a hostile environment of sexual harassment, for sake of completeness DSU will demonstrate why Plaintiff's Title IX claim also fails for lack of actual notice and because DSU's response under the circumstances was reasonable.  As previously stated, there was no conduct by Dr. Panda against Plaintiff that constitutes actionable sexual harassment.  Thus, it cannot be said that DSU had actual notice of that which does not exist.  Gebser makes clear that DSU can only be found liable under Title IX for consciously disregarding acts of sexual harassment that are actually known.  This standard necessarily requires that the acts of sexual harassment exist.

---

[48] See Plaintiff's sham affidavit at ¶ 55.
[49] Farley Dep. p. 14 at App. A51.  See also statements at Plaintiff's App. B320-B324.
[50] Wills v. Brown University, 184 F.3d 20, 29 (1st Cir. 1999) (affirming trial court's disregard of other students' complaints as irrelevant because the university was not told of the other students' complaints until after learning of the plaintiff's Title IX claim).

- 12 -

At the January 3, 2005 meeting between Plaintiff and Mr. Farley, Plaintiff reported only the December, 2004 banter she had with Dr. Panda. From Plaintiff's rendition of that banter, Mr. Farley felt that Dr. Panda may have acted unprofessionally, but not that the lone colloquy between Plaintiff and Dr. Panda constituted actionable sexual harassment. Thus, DSU disputes that Plaintiff can satisfy the essential element of actual notice to maintain her Title IX claim.

In the event the Court deems Plaintiff's rendition to Mr. Farley at the January 3, 2005 meeting of the December, 2004 banter with Dr. Panda to satisfy the actual notice requirement, Plaintiff's Title IX claim still fails because DSU reasonably responded to Plaintiff's complaint based on the circumstances then known. "What constitutes appropriate remedial action for allegations of discrimination in Title IX cases depends on the particular facts of each case."[51] The Court must also consider the reasonableness of the response in light of the seriousness and credibility of the complaint.[52]

On January 3, 2005, Mr. Farley was ready and willing to follow up on Plaintiff's complaint about the lone December, 2004 "get in line" banter. Plaintiff herself instructed, *actually demanded*, that Mr. Farley not divulge to anyone, especially not to Dr. Panda, that she had brought the matter to Mr. Farley's attention. Mr. Farley agreed to honor Plaintiff's request with the understanding that Plaintiff would send Dr. Panda an email advising that the December, 2004 banter was unwelcome by Plaintiff. Mr. Farley gave Plaintiff his cell phone and home phone numbers and *made clear to Plaintiff that she was to immediately contact Mr. Farley if any further incidents occurred*. Plaintiff sent the email to Dr. Panda as far as Mr. Farley was aware.

Neither Mr. Farley nor anyone else at DSU heard any further complaints from Plaintiff until her March 21, 2005 letter to President Sessoms. Thus, by all reasonable appearances, the remedial action

---

[51] Alegria v. State of Texas, 2007 WL 3256586, *5 (S.D.Tex. Nov. 2, 1997) (attached at App. A152 to A165) (citing Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 384 (5th Cir. 2000), *cert. denied*, 531 U.S. 1073, 121 S.Ct. 766, 148 L.Ed.2d 667 (2001)).
[52] Frederick v. Simpson College, 149 F.Supp.2d 826 at 839-40 (S.D. Iowa 2001)(citations omitted).

taken by DSU, i.e., Plaintiff sending an email to Dr. Panda, served to stop the alleged harassment given that DSU heard nothing further about the matter. Whether DSU's remedial action in response to the January 3rd complaint was effective "is not one of effectiveness by hindsight."[53] Under the circumstances then known, DSU reasonably responded to the January 3rd complaint and by all outward appearances such response was effective.

## 1. DSU Acted Promptly and Appropriately To Plaintiff's Allegations Regarding Post-January 3, 2005 Conduct Once Such Conduct Was Brought To DSU's Attention

Although, Plaintiff claims that after her January 3rd meeting with Mr. Farley, Dr. Panda engaged in several other conversations with her that she deemed sexually harassing, she did not bring those incidents to DSU's attention until March 21, 2005.[54] As such, Plaintiff cannot maintain a Title IX claim against DSU for any incidents between January 3rd and March 21st because of the utter failure to give notice and an opportunity to remediate. Rather than immediately notify DSU that the initial email warning was ineffective, Plaintiff began discussing her allegations against Dr. Panda with various other students, engaged a lawyer, and began building a factual basis to bring a lawsuit against DSU.[55]

When Plaintiff returned to make a formal complaint on March 21st, DSU investigated thoroughly, and took immediately remedial action against Dr. Panda. DSU respectfully suggests that in light of the "constellation of surrounding circumstances, expectations, and relationships" known at the time, it acted reasonably as to Plaintiff's January and March 2005 complaints. Plaintiff's Title IX claim must therefore be dismissed.[56]

---

[53] See Porto v. Town of Tewksbury, 488 F.3d 67, 74 (1st Cir. 2007) (holding school did not act with deliberate indifference under Title IX where initial response to complaint of sexual harassment reasonably appeared to be effective).

[54] This begs the obvious question, why did Plaintiff not immediately contact Mr. Farley upon the first post-January 3rd incident with Dr. Panda that Plaintiff felt was a continuation of the alleged sexual harassment?

[55] Plaintiff Dep p. 100 ln 5-8 at App. A30.

[56] Johnson, 267 F.Supp.2d, n.6 (whether gender oriented conduct rises to the level of actionable harassment depends on constellation of surrounding circumstances, expectations and relationships).

- 14 -

## IV.     Plaintiff Has Failed To State A Claim Against DSU Pursuant To Title VI.

To establish a claim under Title VI, Plaintiff must show: (1) DSU, as an institution, engaged in racial discrimination against Plaintiff, (2) DSU is receiving federal financial aid, and (3) Plaintiff was an entitled beneficiary of the program or activity receiving the aid.[57] **_DSU cannot be found vicariously liable under Title VI._**[58]  Instead, Plaintiff must prove that DSU, as an institution, intentionally discriminated against Plaintiff because of her race.[59]

Plaintiff curiously cites to no Title VI authority, but relies exclusively on Title VII decisions to support her Title VI claim.  DSU can only surmise that Plaintiff ignores the wealth of Title VI authority because it so clearly undermines her claims against DSU.  DSU further surmises that Plaintiff erroneously believes reference to the _respondeat superior_ liability element of a Title VII claim will somehow overcome the fact that DSU cannot be held liable on a _respondeat superior_ theory under Title VI.[60]

Ironically, the facts, even when considered in a light most favorable to Plaintiff, demonstrate that no one, especially not DSU, intentionally harassed or discriminated against Plaintiff on account of her race.  Plaintiff concedes that no personnel from DSU, **_including Dr. Panda_**, discriminated on account of Plaintiff's race.[61]  Indeed, Plaintiff cannot state a lucid reason for why she filed a racial

---

[57] Babiker, 2000 WL 666342 at *4 (citations omitted).
[58] See, Langadinos v. Appalachian Sch. of Law, 2005 WL 2333460, *10 (W.D.Va. Sept. 25, 2005) (attached at App. A176 to A188) (Under Title VI, educational institution is not vicariously liable for conduct of its personnel).
[59] Id. (Rejecting plaintiff's claim that school's failure to enforce its nondiscrimination policies gave rise to Title VI liability because ". . . a school faces liability only when it intentionally does something wrong, not when it merely sits by and does nothing at all.") (citing Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 568 (3rd Cir. 2002) (rejecting theory that deliberate indifference to plaintiff's civil rights is actionable under Title VI in school setting) (citing Alexander v. Sandoval, 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (Holding Title VI prohibits only intentional discrimination, not discrimination by omission))).
[60] See, Langadinos, 2005 WL 2333460 at *10.
[61] Plaintiff Dep p. 106 ln 3-21; p. 117 ln 8-17; p. 118 ln 1-3 at App. A32 to A36.

- 15 -

discrimination claim against DSU.[62]  The Court cannot accept Plaintiff's "naked assertions unsubstantiated by specific factual support."[63]

Dismissal of Plaintiff's Title VI claim against DSU is appropriate because the claim is based solely on Plaintiff's conclusory allegations of discrimination by persons other than DSU.[64]  Even if the Court were to assume that the incidents did occur as Plaintiff suggests, the incidents are irrelevant to a Title VI claim against DSU.  It is without dispute that none of the incidents from which Plaintiff draws her conclusory allegations of racial harassment involve conduct by DSU.  Accordingly, Plaintiff's Title VI claim against DSU must be dismissed because Plaintiff fails to identify any actionable conduct by DSU constituting harassment or discrimination on account of Plaintiff's race.

### V.    Plaintiff Has Failed To State A Claim Warranting Imposition Of Punitive Damages

DSU stands on the arguments made in its Opening Brief, which demonstrate that punitive damages are not warranted in this matter.

---

[62] Plaintiff Dep p. 106 ln 3-21 at App. A32.  DSU leaves Plaintiff to her burden of proving a good faith basis for having brought her Title VI claim against DSU.

[63] See Tripp, 48 F.Supp.2d at 223 (dismissing student's Title VI claim against university because it was based on nothing more than conclusory allegations of racial animus) (citation omitted).

[64] See Babiker, 2000 WL 666342 at *4-5 (holding that hearsay, conclusory allegations are insufficient, as a matter of law, to give rise to an inference of discrimination) (citing Yusuf, 35 F.3d at 713 ("A plaintiff alleging . . . discrimination by a university must do more than recite conclusory allegations."); Adams, 1999 WL 544727 at *2 ("Conclusory allegations do not a cause of action make [under Title VI].").  See also, Aoutif, 2005 WL 3334277 at *4 ("conclusory, isolated, and unspecified statements cannot provide a rational basis for inferring discriminatory intent or motivation, and a claim based on such allegations cannot survive a motion to dismiss.") (citation omitted).

## **CONCLUSION**

For the reasons and authorities set forth above and in DSU's Opening Brief, DSU is entitled to summary judgment.  In the event the Court does not dismiss the entire complaint against DSU, DSU reserves all rights to challenge the admissibility of Plaintiff's evidence on the basis of, but not limited to, relevance, hearsay, speculation, conjecture, prejudice and vagueness.


Respectfully submitted by:

**WHITE AND WILLIAMS LLP**

_____
**MARC S. CASARINO (#3613)**
**JENNIFER HURVITZ BURBINE(#4416)**
824 N. Market Street, Suite 902
Wilmington, DE 19801
Telephone: 302-467-4520
Facsimile: 302-467-4550
Attorneys for Defendant *Delaware*
*State University*

Dated:  July 3, 2008

- 17 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____

TAMMY HURD,                                :
                                           :
                    Plaintiff,             :
                                           :
        v.                                 :
                                           :
DELAWARE STATE UNIVERSITY and              :        C.A. No. 07-117
DANDESON PANDA, individually and in his    :
official capacity,                         :
                                           :
                    Defendants.            :
_____:

## CERTIFICATE OF SERVICE

I, Marc S. Casarino, do hereby certify that on this 3rd day of July, 2008, the REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT DELAWARE STATE UNIVERSITY was served upon the following via U.S. Mail:

Ronald G. Poliquin, Esquire          Richard R. Wier, Jr., Esquire
Young, Malmberg & Howard, P.A.       Two Mill Road, Suite 200
30 The Green                         Wilmington, DE 19806
Dover, DE 19901

                              **WHITE AND WILLIAMS LLP**

                    By:    /s/ *Marc S. Casarino*_____
                           MARC S. CASARINO (#3613)
                           824 North Market Street, Suite 902
                           P. O. Box 709
                           Wilmington, DE  19899-0709
                           (302) 467-4520

                           Attorneys for Defendant *Delaware State University*

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))**

**H**Nichols v. Bennett Detective & Protective Agency, Inc.

D.Del.,2006.

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

Robin D. NICHOLS, Plaintiff,

v.

BENNETT DETECTIVE & PROTECTIVE AGENCY, INC., a Delaware corporation, and Allen's Family Foods, Inc., a Delaware corporation, Defendants.

**No. Civ.A. 05-55-KAJ.**

May 31, 2006.

William D. Fletcher, Jr., Noel E. Primos, Schmittinger and Rodriguez, P.A., Dover, Delaware, for Plaintiff.

Roger D. Landon, Philip T. Edwards, Murphy Spadaro & Landon, Wilmington, Delaware, for Defendant Bennett Detective & Protective Agency, Inc.

Matthew F. Boyer, Connolly Bove Lodge & Hutz, Wilmington, Delaware, for Defendant Allen's Family Foods, Inc.

Arthur M. Brewer, Laura A. Pierson Scheinberg, Shawe & Rosenthal, LLP, Baltimore, Maryland, of counsel.

**MEMORANDUM OPINION**

JORDAN, J.

**I. INTRODUCTION**

**\*1** Before me are two Motions for Summary Judgment, one filed by defendant Bennett Detective & Protective Agency, Inc. ("Bennett") (Docket Item ["D.I."] 43), and the other filed by defendant Allen's Family Foods, Inc. ("Allen") (D.I.45).[FN1] The complaint, filed by plaintiff Robin D. Nichols, alleges that Bennett discriminated against her on the basis of her race and sex, in violation of the Delaware Discrimination Act ("DDA"), 19 Del. C. § 710, et seq. (D.I. 1, Ex. A at ¶¶ 24-25), and that both Defendants discriminated against her on the basis of her race, in violation of 42 U.S.C. § 1981(id. at ¶¶

27-28). Nichols also alleges that Allen tortiously interfered with her contract with Bennett (id. at ¶¶ 30-31), and that an agent of Allen, Raymond Miller, made false statements about her that constitute slander per se (id. at ¶¶ 33-38).

> FN1. Bennett and Allen will be referred to collectively herein as "Defendants."

Nichols initially filed her complaint in the Delaware Superior Court, but the case was removed to this court pursuant to 28 U.S.C. § 1441.[FN2]Jurisdiction over the § 1981 claim is appropriate under 28 U.S.C. § 1331. Supplemental jurisdiction over all other claims is proper under 28 U.S.C. § 1367. For the reasons that follow, the Motions for Summary Judgment will be granted.

> FN2. The Notice of Removal was filed only by Bennett, a failing because all defendants must join a petition for removal. Hanrick v. Hanrick, 153 U.S. 192, 196 (1894) ("the suit could not be removed by one of several plaintiffs or defendants"). However, "a motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the motion of removal."28 U.S.C. § 1447(c); see also Roe v. O'Donohue, 38 F.3d 298, 301-02 (7th Cir.1994), overruled on other grounds byMurphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344 (1999) (finding that where only one defendant filed a notice of removal, removal was improper, but where plaintiff did not move to remand within 30 days, remand was improper). Thus, jurisdiction can properly be exercised in this case.

**II. BACKGROUND** [FN3]

> FN3. The following rendition of background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))

Bennett is a security business that contracts with various companies, including Allen, to provide security guards and related services. (Deposition of Wayne Keller,[FN4] D.I. 47, Ex. 7 at 7:11-17.) Bennett's contract with Allen provides that Bennett will supply security officers at Allen's plants in Harbeson, Delaware, and Cordova, Maryland. (D.I. 47, Ex. 2 at A003.) The contract further provides that "[i]t is mutually understood that Bennett is an independent contractor and that all guards employed by Bennett to perform the services as herein provided are and shall be employees of Bennett and not employees of [Allen]."(*Id.* at A004.)

> FN4. Wayne Keller is the Vice-President at Bennett. (Keller Deposition, D.I. 47, Ex. 7 at 4:14.)

Nichols, an African-American female, worked as a Bennett security guard at Allen's Harbeson plant from July 30, 2001 until December 13, 2003. (Keller Deposition, D.I. 47, Ex. 7 at 29:4-12.) On beginning her employment with Bennett, Nichols signed a document entitled "Condition of Employment," which provided that "Bennett Security has the right to move any security officer to another job site at any time."(D.I. 47, Ex. 1 at A001.) On December 11, 2003, Nichols, who served as a supervisor of other guards, had an altercation with Joseph Joshua Whiteman, one of her subordinates. (Nichols Deposition, D.I. 47, Ex. 4 at 39:21-40:9.) Nichols had received a call from Raymond Miller [FN5] asking her to send Whiteman to see him. (*Id.* at 39:24-40:2.)According to Nichols, when she told Whiteman to go see Miller, Whiteman argued with her and then pushed her. (*Id.* at 40:3-22.)Nichols pushed him back, and the two continued to push each other back and forth until Whiteman pushed Nichols into a file cabinet and CB radio. (*Id.* at 40:22-41:3.)

> FN5. Raymond Miller is the manager of human resources for Allen's Harbeson, Delaware plant. (Miller Deposition, D.I. 47, Ex. 5 at 4:16-20.)

**\*2** Eventually, Whiteman went to speak with Miller, at which point Nichols called the police to report her altercation with Whiteman. (*Id.* at 41:7-9.)Although Nichols informed her superiors at Bennett, Mark Habicht [FN6] and Wayne Keller, that she had called the police, she did not inform Miller.(*Id.* at 47:19-

21.)When the police arrived, Nichols knocked at Miller's office door to inform Whiteman that the police were there and wanted to speak to him.[FN7](*Id.* at 41:9-19.)The police took a statement from Whiteman. (*Id.* at 41:19-22.)Whiteman later apologized to Nichols, and no charges were filed. (*Id.* at 42:7-17.)

> FN6. Mark Habicht is the Vice-President of Operations at Bennett. (D .I. 47, Ex. 6 at 5:22-24.)

> FN7. Miller asserts that he was alone in his office when he was informed that the State Police were on the premises. (Miller Deposition, D.I. 47, Ex. 5 at 10:16-19.) Miller testified that when he heard about the incident, he went to the security post and spoke to both Nichols and a state trooper about the incident. (*Id.* at 11:10-12:13.)The discrepancy between Miller's and Nichols's recollection in that regard is not material to the outcome of the motions for summary judgment.

Later that same day, Miller called Habicht to discuss the incident. Habicht recalled that Miller stated,

I called out to the guardhouse a couple of times and [Nichols] answered the phone and there was yelling in the background and then she slammed the phone down. And I called back and she did the same thing ... I can't have that out there ... Enough is enough, she's got to go.

(Habicht Deposition, D.I. 47, Ex. 6 at 20:8-15.) The next day, Habicht and Keller went to meet with Miller. (*Id.* at 22:6-18.)Miller "reiterated the fact that [Nichols] had to go, that he couldn't have that kind of activity going on in his plant, it was too disruptive."(*Id.* at 23:15-19.)[FN8]Miller had previously requested the transfer of two other Bennett security guards, David Leggins, a black male, and Daniel Steele, a white male. (Habicht Deposition, D.I. 44, Ex. A at 41:3-42:24.)

> FN8. There is a dispute between Allen and Bennett as to who initially suggested that Nichols be transferred. Keller confirms Habicht's testimony, stating that it was Miller who initially suggested that Nichols

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))

be transferred. (Keller Deposition, D.I. 47, Ex. 7 at 16:23-17:2.) Miller, however, testified that Keller and Habicht suggested the transfer, and that he simply agreed. (Miller Deposition, D.I. 49, Appendix at B38-39, 39:10-12, 39:24-40:9.) Miller claims that he was upset that the police were called because it "created kind of a disruptive environment. And when you hear about these things out of the blue, you don't know if some act of violence may have taken place or exactly what, if somebody got hurt on the job. You just don't know. And so that was my concern."(Miller Deposition, D.I. 47, Ex. 5 at 15:4-10.) The source of the suggestion that Nichols be transferred, however, is not material, as it has no bearing on the outcome of the motions for summary judgment. *See infra* note 11 and accompanying text.

Miller, Habicht, and Keller agreed that, to avoid further disruption, Nichols could finish her work week, but that she would not return to the plant the following week. (Keller Deposition, D.I. 47 at 22:4-8.) On December 15, Nichols received a message from Bennett telling her not to return to work at Allen the next day. (Nichols deposition, D.I. 47, Ex. 4 at 42:18-23.) Bennett replaced Nichols at the Harbeson Plant with another African-American woman. (D.I. 44, Ex. A at 43-44.)

Bennett did not immediately have another job for her to go to. (D .I. 47, Ex. 4 at 101:24-102:1.) Within days, Bennett offered Nichols a thirty-two hour a week job working at another customer's site, and she was set to start training for that position around December 19, 2003. (Keller Deposition, D.I. 47, Ex. 7 at 32:21-24.) However, she called out sick the first day of training, and, because the customer needed someone to start immediately, Bennett put another officer in that position. (*Id.* at 33:19-34:4.)On December 23 and 24, Nichols filled in for another officer at yet another location, and she worked there again on December 29. (*Id.* at 35:3-22.)When the security guard for whom she was filling in returned to work on December 29, however, Bennett was once more without a position for Nichols. (Nichols Deposition. D.I. 47, Ex. 4 at 106:19-107:1.) On January 5, 2004, Nichols called Bennett and informed them that she was going to resign in two weeks. (*Id.*

at 107:15-18.)Nichols last day of employment at Bennett was January 19, 2004. (*Id.* at 29:2-15.)

**\*3** While Nichols says that she cannot "say for a fact" that Whiteman told his version of the incident to Allen employees (*id.* at 54:24-55:4), she nevertheless alleges that someone at Allen questioned Whiteman about the December 11 incident but that no one ever allowed her to tell her side of the story. (*Id.* at 53:24-54:2.)Miller claims, however, that he spoke only to Nichols about the incident, and that he never spoke to Whiteman about it. (Miller Deposition, D.I. 47, Ex. 5 at 11:22-12:24.)

Nichols also alleges that, at some point in the days after the incident, she had a conversation with Valerie Brittingham, an Allen employee who worked for Miller. According to Nichols, their conversation was as follows:

[Brittingham said] What in the world happened?... [Whiteman] talk[ed] to Mr. Miller, and Mr. Miller is down there telling everybody that everything was your [Nichols's] fault, and like, you know, I wasn't capable of doing my job. And I was: Well, why in the world would Mr. Miller say something like that about me? And she was like: Well, you know, he's a racist.

(*Id.* at 58:1-12.)[FN9]

> FN9. Brittingham recalls things differently. She testified at her deposition that she never talked to Nichols about the incident, and that she never told Nichols that Miller was a racist. (Brittingham Deposition, D.I. 47, Ex. 8 at 10:24-11:13.)

On January 19, 2004, Nichols began training to become a certified nursing assistant ("CNA"). (Nichols Deposition, D.I. 47, Ex. 4 at 108:15-18.) During the period of her training, Nichols was paid seven dollars an hour, and when her training was completed, she was paid about nine dollars and thirty-five cents an hour (*id.* at 109:4-19), which was more than the seven dollars an hour she made at Bennett (*id.* at 122:8-16). Nichols worked as a CNA until May 2004. (*Id.* At 20-24.) Nichols subsequently worked as a school bus driver from September 2004 until April 2005, and as a security guard for Allied Security for about two weeks in April 2005. (*Id.* at 110:1-113:14.)She has been unemployed since

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))**

leaving the job at Allied Security. (*Id.* at 113:15-17.)

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex v. Catrett,* 477 U.S. 317, 323 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

IV. DISCUSSION

A. Discrimination in Violation of 42 U.S.C. § 1981 and the Delaware Discrimination Act

*4 Nichols has alleged that both Bennett and Allen discriminated against her based on her race, in violation of § 1981, and that Bennett also discriminated against her based on her race and sex, in violation of the DDA.[FN10] Claims under 42 U.S.C. § 1981 and claims under the DDA, 19 Del. C. § 710 et seq., both must be evaluated according to the burden-shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir.1999) ("disparate treatment race discrimination claims

under Title VII[and] section 1981... require application of the familiar burden-shifting framework the Supreme Court articulated in *McDonnell Douglas Corp. v. Green* "); Giles v. Family Court of Delaware, 411 A.2d 599, 602 (Del.1980) (applying *McDonnell Douglas* burden-shifting to claim under the DDA). That analysis proceeds in three steps. First, the **plaintiff** "must carry the initial burden ... of establishing a prima facie case of ... discrimination." McDonnell Douglas, 411 U.S. at 802. "The burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [**plaintiff**]'s rejection ." *Id.* The burden then shifts again to the **plaintiff** "to show that [the defendant's] stated reason for respondent's rejection was in fact pretext." Id. at 804.

> FN10. In her Answering Brief to Allen's Motion for **Summary** **Judgment**, Nichols asserts, apparently for the first time, a claim against Allen for discrimination under the DDA. (D.I. 49 at 13-14.) However, Nichols cannot assert a claim against Allen under the DDA for a number of reasons. First, she did not assert such a claim in her complaint. (D.I. 1 at ¶¶ 23-25 ("Defendant Bennett discriminated against Plaintiff with regard to the terms and conditions of her employment on the basis of her race and sex in violation of 19 Del. C. § 710 et seq.").) Second, Allen asserts, and Nichols has presented no evidence to the contrary, that Nichols never filed a claim of discrimination with the Delaware Department of Labor, a necessary prerequisite to filing a complaint under the DDA. 19 Del.Code § 712(b). Finally, even had she filed a claim of discrimination, Nichols cannot make a claim under § 711(a) of the DDA against Allen, because such claims are cognizable only against an "employer." See 19 Del.Code § 711(a). Although Nichols argues that Allen was her "joint employer" because Allen exercised control over aspects of her employment and because she interacted on a daily basis with Miller, her argument is contradicted by Allen's contract with Bennett, which provided that "[i]t is mutually understood that Bennett is an independent contractor and that all guards employed by Bennett to perform the services as herein provided are and shall be employees of Bennett and not

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))**

employees of [Allen]." (D.I. 47, Ex. 2 at A004.) Accordingly, Nichols has not and cannot state a claim of discrimination against Allen under the DDA, 19 Del. C. § 711(a).

### 1. § 1981 Claims

42 U.S.C. § 1981 provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

To establish a prima facie case of racial discrimination under 42 U.S.C. § 1981, Nichols must show "(1) that [she] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts[.]" Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir.2001); see also Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir.2002). The United States Court of Appeals for the Third Circuit has also stated that "the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 499 (3d Cir.1999). Those elements are (1) that the plaintiff is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination. Jones, 198 F.3d at 410-11. It appears that the Third Circuit applies the first standard where there is a claim under § 1981, but not an accompanying claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. See Brown, 250 F.3d at 797;Pryor, 288 F.3d at 569. However, it appears that Court applies the second standard when there is an accompanying Title VII claim.Jones, 198 F.3d at 411-12;Schurr, 196 F.3d at 499. Because Nichols has not made a claim under Title VII here, I will use the standard set out in

Brown and Pryor.

**\*5** A claim under § 1981 requires proof of purposeful or intentional discrimination. General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982) ("We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination."). Additionally, proof of "discrimination concerning one or more of the activities enumerated in the statute" is required to establish a claim under § 1981.Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir.2001). The statute defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."42 U.S.C. § 1981(b).

### a. Allen

Nichols appears to base her allegation that Allen discriminated against her under § 1981 on her assertion that Miller requested she be transferred.[FN11] Nichols cannot show, however, that Allen discriminated against her under § 1981, as Nichols has not shown that Allen's actions interfered with any contract she may have had with Bennett. Nichols's "Condition of Employment" agreement with Bennett provided that Bennett "has the right to move any security officer to another job site at any time."(D.I. 47, Ex. 1 at A001.) Assuming that Miller requested that she be moved, that did not interfere with the performance, modification, or termination of her employment relationship with Bennett. Even if one were to characterize that relationship as being governed by a contract, it specifically provided for her transfer. (D.I. 47, Ex. 1 at A001 ("Bennett Security has the right to move any security officer to another job site at any time.").) In other words, Miller's request that she be transferred could not constitute an interference with her enjoyment of the benefits, privileges, terms or conditions of her contractual relationship since she had no right to remain at Allen. Hence, Nichols fails to establish the third prong of the three-part test for the establishment of a prima facie case.

> FN11. Nichols asserts that the disagreement over whether Miller requested that she be transferred, or whether Keller and Habicht

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))**

suggested it, creates a genuine issue of material fact that precludes summary judgment. However, as I hope will be clear from the analysis here, determining who suggested that Nichols be transferred is not relevant to the outcome of this motion, and thus, there is no genuine issue of material fact.

Even if Nichols could establish a prima facie case, however, summary judgment for Allen would still be appropriate. Had Nichols established a prima facie case of discrimination, the burden would shift to Allen to establish a legitimate, non-discriminatory reason for requesting her transfer. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Allen asserts that Miller requested Nichols's transfer not because of her race, but "because of the disruptive environment Ms. Nichols's call to the police caused and her failure to notify [Miller] of the call."(D.I. 46 at 14.) Miller's statements to Keller and Habicht that "[Nichols] had to go, that he couldn't have that kind of activity going on in his plant, it was too disruptive" support Allen's assertion that Miller requested Nichols's transfer because she was disruptive. (Habicht Deposition, D.I. 47, Ex. 6 at 23:15-19.) Nichols bears the burden of showing that this explanation is merely a pretext for discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 804.

*6 However, Nichols has come forward with no evidence to meet that burden. In support of her claims, Nichols relies heavily on her own testimony that Brittingham told her that Miller is a racist who "[told] everybody that everything was [Nichols's] fault, and ... [that she] wasn't capable of doing [her] job."(Nichols Deposition, D.I. 47, Ex. 4 at 58:1-12.) Assuming that Nichols version of that conversation were true,[FN12] Nichols's testimony about what Brittingham told her is **hearsay** and cannot be considered on a motion for **summary judgment**. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir.1996) ("the **hearsay** statement is not capable of being admissible at trial, and could not be considered on a motion for **summary judgment**") (internal citations and quotation marks omitted). Thus, even viewing the facts in the light most favorable to Nichols, I may not consider that **hearsay** testimony.

> FN12. Again, Nichols's testimony in that regard is flatly contradicted by Brittingham's

own testimony. (*Supra* note 9.)

The only admissible evidence in the record that can be stretched to connect Nichols's transfer, or Miller's other actions, to her race is the fact that Whiteman, who is a white man, was not transferred while Nichols, an African-American woman, was. Previously, however, Bennett, at Miller's request, transferred Daniel Steele, a white man, and David Leggins, a black man from Allen. Thus, the sole fact that Nichols was transferred while Whiteman was not is insufficient to rebut Allen's proffered reason for requesting Nichols transfer. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir.1998) ("a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons"). Therefore, Allen's Motion for Summary Judgment on Nichols's claim of discrimination under 42 U.S.C. § 1981 would be granted, even if Nichols had provided a prima facie case of discrimination.

b. Bennett

Again, viewing the facts in the light most favorable to Nichols, it still appears that Bennett did nothing more than transfer Nichols to placate an angry client. The transfer, however, raises more complicated issues with respect to Bennett than it does with respect to Allen. Allen said it wanted her off its site. It said nothing about, and had no input into, what happened to her next. Bennett did have that control, and though it had the right to transfer Nichols, and worked to find her a new position, it did not find her one right away, and the two positions it offered her were part-time positions. Thus, Nichols's transfer, while not an interference with any contractual right Nichols had, could be seen as an adverse employment action. *See infra* section IV.A.2.

Nevertheless, Nichols cannot show that her transfer was evidence of an intent to discriminate on the basis of race on the part of Bennett. In fact, in her deposition, Nichols stated that she did not believe that Keller or Habicht intended to discriminate against her on the basis of her race. (D.I. 47, Ex. 4 at 116:5-14.) [FN13]Again, the only connection between Nichols race and her transfer is that she was transferred while Whiteman was not. However,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))**

Bennett had, in the past, transferred at least two other employees at Miller's request, a white man and a black man. Moreover, Bennett replaced Nichols with another African-American woman. (D.I. 44, Ex. A at 43-44.) Thus, Nichols has not shown that Bennett intended to discriminate against her on the basis of her race. *Lin v. Rohm and Haas Co.,* 293 F.Supp.2d 505, 518 (E.D.Pa.2003) (finding insufficient evidence of intent to discriminate where the defendant identified employees outside of the protected class that were treated similarly to **plaintiff**). Consequently, Nichols has failed to make out a prima facie case of discrimination against Bennett, and Bennett's Motion for **SummaryJudgment** will be granted as to Nichols's claims under § 1981.

> FN13. Nichols testified as follows:
>
> Q: Do you believe that Bennett's actions in this matter against you were actions based on their intent to discriminate [against] you on the basis of your race?
>
> A: Do you mean Mark [Habicht] and Wayne [Keller] or by-
>
> Q: I mean Bennett, the company.
>
> A: The company?
>
> Q: Yes.
>
> A: Other than Josh [Whiteman] at the time-I don't think Mark [Habicht] and Wayne [Keller]; but Josh [Whiteman] my coworker that I had the incident from or with. (D.I. 47, Ex. 4 at 116:5-14.)

*7 Even if Nichols had made out a prima facie case of discrimination, however, Nichols cannot show that Bennett's stated reason for transferring her was a pretext for discrimination. Bennett asserts that Nichols, by calling the police to the plant after her altercation with Whiteman, caused a disruption that caused a potential breakdown in Bennett's client relationship with Allen. (D.I. 44 at 17.) Therefore, in order to maintain that relationship, it was necessary to transfer Nichols. (*Id.*) Nichols has come forward with no evidence to show that that explanation was a pretext for discrimination. Again, the only evidence

that connects her transfer to her race is that Whiteman was not transferred, while Nichols was, and again, that fact alone is not sufficient to rebut Bennett's non-discriminatory reason for transferring Nichols. *See Simpson,* 142 F.3d 639, 646. Therefore, summary judgment will be granted to Bennett on Nichols's claim under § 1981.

2. DDA Claim Against Bennett

To establish a prima facie case of discrimination under the DDA, a plaintiff must establish the same elements as are required for a claim under Title VII.*Giles,* 411 A.2d at 601-02 ("While the *McDonnell Douglas* test was developed in the context of Title VII cases, in our view it is appropriate for a § 711(a) action [under the DDA] as well, because the language of the Delaware statute is substantially the same as the Title VII language defining an unlawful employment practice."). Those elements are (1) that the plaintiff is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination.*Jones,* 198 F.3d at 410-11. The precise elements to be proven, however, will vary with the facts of the case. *McDonnell Douglas,* 411 U.S. at 802 n. 13 (1973) ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.")

Nichols alleges that Bennett discriminated against her on the basis of her race and sex in violation of the DDA. (D.I. 1 at ¶¶ 24-25.) At least for the purposes of this motion, Bennett does not dispute that Nichols is a member of a protected class, and that she was qualified for her position. (D.I. 44 at 16-21.) However, Bennett asserts that Nichols cannot establish a prima facie case of discrimination under the DDA, 19 *Del. C.* § 711(a), because she did not suffer an adverse employment action, and because there can be no inference of discrimination because her position was filled by an African American woman. (D.I. 44 at 10-15.) Additionally, Bennett asserts that even if Nichols can establish a prima facie case of discrimination, her claims must fail because she cannot show that Bennett's legitimate, non-discriminatory reason for transferring her was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))**

pretextual. (*Id.* at 16-21.)

**\*8** An "adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."*Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir.2001). A job transfer can be considered an adverse employment action. *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n. 7 (3d Cir.1994) ("It is clear, however, that a transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action"). As already noted, *supra* at section IV.A.1.b., Nichols's transfer could be viewed as an adverse employment action.[FN14] When Bennett transferred Nichols, it did not immediately have another position for her. (Nichols deposition, D.I. 47, Ex. 4 at 101:24-102:1.) Further, both of the positions it offered her were part-time positions (Keller Deposition, D.I. 47, Ex. 7 at 32:21-35:22), while her position at Allen was full-time. Thus, for the purposes of this motion, Nichols has provided sufficient evidence to raise a material issue of fact as to whether she suffered an adverse employment action.

> FN14. I emphasize that, at this stage, I am required to view these circumstances in the light most favorable to Nichols.

But Bennett also contends that the circumstances of Nichols's transfer cannot give rise to an inference of discrimination. (D.I. 44 at 15.) Nichols was transferred from Allen after an altercation with Whiteman, which, viewing the facts in the light most favorable to her, was caused by Whiteman. (Nichols Deposition, D.I. 47, Ex. 4 at 40:3-41:3.) Whiteman was not disciplined after this incident, while Nichols, a black female, was transferred and reassigned only to part-time positions. (Habicht Deposition, D.I. 47, Ex. 6 at 29:2-5.) While these circumstances may not be sufficient to show that a business explanation was merely a pretext for discrimination, they may be sufficient at the prima facie stage of the analysis to allow a reasonable jury to infer that unlawful discrimination took place. *See Simpson*, 142 F.3d at 646 (finding that an "inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group ... may be acceptable at the prima facie stage of the analysis").

However, even assuming that Nichols could make out a prima facie case, for the reasons enumerated *supra* in section IV.A.1.b., Nichols cannot show that Bennett's legitimate, non-discriminatory reason for transferring her was a pretext for discrimination. This is true as to discrimination on the basis of both her race and her sex, as Bennett replaced her with an African-American woman and had previously transferred a white male and a black male from Allen. Therefore, summary judgment will be granted to Bennett on Nichols's DDA claim.[FN15]

> FN15. It is noteworthy that Nichols actually resigned her position at Bennett. To establish that her transfer was actually a constructive discharge, Nichols
>
>> must be able to show that [her] former employer deliberately made [her] working conditions intolerable, and thereby forced [her] to quit. Demotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal. However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.
>
>> *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir.2004) (internal citations and quotations omitted). Nichols argues only that the fact that no full-time position was made available to her after her transfer was "a sufficiently undesirable and abhorrent action to cause a reasonable person to feel compelled to terminate her employment."(D.I. 51 at 12.) In her briefing, Nichols has brought nothing to my attention to show that her transfer was "essentially a career-ending action or a harbinger of dismissal" or that the discrimination she experienced made her work situation intolerable.

**B. Tortious Interference with Contract**

Allen has also moved for summary judgment on Nichols's claims that Allen tortiously interfered with

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))

Nichols's contract with Bennett. (D.I. 46 at 14-17.) A plaintiff alleging a claim for tortious interference with contract must prove: "(1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury."*Gill v. Delaware Park, LLC,* 294 F.Supp.2d 638, 645 (D.Del.2003).

*9 Allen asserts that Nichols cannot make out any of the elements of a prima facie case of tortious interference with contract. Allen claims that Nichols did not have a contract with Bennett, that, even if she did, Miller did not know about it, that Miller committed no intentional act to interfere with any contract, that Miller was justified, and that Nichols was not injured. (D.I. 46 at 14-17.) Nichols claims that she did have a contract with Bennett, even though she was an employee at will, that Miller's actions in asking for her transfer were not justified, and that Miller's demand that she be transferred interfered with her otherwise healthy employment relationship with Bennett. (D.I. 49 at 14-17.) [FN16]

> FN16. Nichols also appears to assert that her toritous interference claim can be maintained because at-will employees are entitled to good faith and fair dealing in their employment relationships, and that the claim is sustainable under 42 U.S.C. § 1981. (*Id.* at 17-18.)However, Nichols has not pleaded a claim for breach of the covenant of good faith and fair dealing. Additionally, she cannot make out a claim for tortious interference with contract based on § 1981 alone; she must establish all of the elements of the tortious interference claim. Thus, neither of those arguments provide a reason to deny summary judgment. Furthermore, she cannot sustain her § 1981 claims against Allen or Bennett and, therefore, even if § 1981 provided a legal basis to make a tortious interference claim, that claim could not be made against Allen here.

The Delaware Supreme Court has not addressed the issue of whether an at-will employee can make a claim of tortious interference with contract. *Nelson v. Fleet Nat. Bank,* 949 F.Supp. 254, 261 (D.Del.1996). However, this court has previously predicted that

"the Supreme Court of Delaware would hold an action for tortious interference with contract may be maintained in conjunction with an at-will employment contract."*Id.* Thus, Nichols's action is not subject to summary judgment simply because she is an at-will employee.

However, in *Nelson,* although the employees were employees at-will, they apparently had some sort of employment contract. *Id.* (noting that the plaintiff's manager presented her "with a less favorable employment contract than her previous one, and threatened to fire her if she did not sign it"). To make out a claim that Allen, through Miller, tortiously interfered with her employment contract with Bennett, Nichols must show both that she had some such contract with Bennett and that Allen was aware of that contract. *Gill v. Delaware Park, LLC,* 294 F.Supp.2d at 645.[FN17]

> FN17. Both Nichols and Keller testified that she had no such contract. (D.I. 47, Ex. 4 at 62:1-5; *id.,* Ex. 7 at 39:16-19.)

At that last point, at least, Nichols suffers a failure of proof. Even if Nichols could show that the "Condition of Employment" document she signed (D.I.47, Ex. 1) amounts to an employment contract, she has put forward no facts to show that Miller, or anyone else at Allen, was aware of the "Conditions of Employment." Moreover, Nichols has provided no evidence that Miller committed an intentional act that was a significant factor in causing a breach of her contract with Bennett. The "Conditions of Employment" document explicitly states that "Bennett Security has the right to move any security officer to another job site at any time."(*Id.* at A001 .)Thus, even if this document is considered an employment contract, Miller's request that Nichols be transferred did not cause a breach of that contract, since such a transfer was explicitly allowed by the contract.

Furthermore, Nichols has presented no evidence that she was injured by her transfer, as is required to make out a claim of tortious interference with contact. After being transferred, Nichols resigned from Bennett, and immediately started a new job making more money than she had made while working for Bennett. Nichols leaves it to **speculation** that she suffered a loss during the brief period between her

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.))**

transfer and resignation. For all of these reasons, **summaryjudgment** will be granted to Allen on Nichols's tortious interference with contract claim.

C. Defamation

**\*10** To establish a cause of action for defamation in Delaware, a **plaintiff** must show that defendant made a "false and defamatory statement of fact concerning the **plaintiff**... in an unprivileged publication to a third party. But a statement is not defamatory unless it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." _Ramunno v. Cawley,_ 705 A.2d 1029, 1035 (Del.1998) (internal quotation marks omitted)."[T]he general rule is that oral defamation is not actionable without special damages." _Spence v. Funk,_ 396 A.2d 967, 970 (Del.1978). However, where the defamatory oral statement "(1) malign[s] one in a trade, business or profession, (2) impute[s] a crime, (3) impl[ies] that one has a loathsome disease, or (4) impute[s] unchastity to a woman," a cause of action for slander can be maintained without proof of special damages. _Id._

Here, Nichols alleges that Miller told people that she could not do her job and blamed her for the incident with Whiteman, thus maligning her in her business or profession. (D.I. 49 at 18-19.) However, Nichols's only evidence of Miller's alleged statements is her own **hearsay** testimony about what Brittingham told her. (_Id._) As was stated above, that **hearsay** is inadmissible and cannot be considered in support of her motion. _Philbin,_ 101 F.3d at 961. Therefore, Nichols has no evidence to support her claim of slander, and **summaryjudgment** on this claim will be granted to Allen.

V. CONCLUSION

Accordingly,    Bennett's    Motion    for **SummaryJudgment** (D.I.43) and Allen's Motion for **SummaryJudgment** (D.I.45) will be granted. An appropriate order will follow.

*ORDER*

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion for **SummaryJudgment** filed by defendant Bennett Detective & Protective Agency, Inc., (D.I.43), and the Motion for **SummaryJudgment** filed by defendant Allen's Family Foods, Inc., (D.I.45), are GRANTED.

D.Del.,2006.
Nichols v. Bennett Detective & Protective Agency, Inc.
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

**CONFIDENTIAL**

Statement from Wayne Holmes
Wednesday, April 20, 2005

I have known Dr. Panda since summer of my sophomore year. I have had a total of 3-4 classes under Dr. Panda.

I lived with Talisha for about 18 months and if she had a class with Dr. Panda, she had issues with him. The first situation that Talisha told me about was that once Dr. Panda pretended to be removing a piece of lint from her shirt and felt her breast.
In the first few months that I lived with Talisha, she told him that Dr. Panda would call her on her cell phone at all hours of the night.

Another situation Talisha told me about was one day outside of the MBNA Building, Dr. Panda saw her and came up to her to say hello and he moved in to hug her and kiss her on the cheek but when Talisha moved toward him he stuck his tongue in her mouth.

Talisha said that she was uncomfortable going to his office because he always wanted to have the door closed. I went to Dr. Panda's office with Talisha once and he tried to close the door because he did not see me. When he saw me he did not close the door.

Talisha and I would talk about what we should do about Dr. Panda.

In my opinion, I think Dr. Panda thought that because no one had ever confronted him about his actions, that it was no big deal and that students thought he was joking.

I met Tammy at Dover Downs. She and I both work there. One day we were talking about school and classes and Dr. Panda's name came up because Tammy was taking one of his classes. Tammy told me that sometimes he makes her feel uncomfortable by some of the things he would say to her.   Tammy asked me what she should do about it.

I think the situation with Tammy will be a racial issue – because she is white and he thinks she can't take the joke. The other issue will be if this was happening to other girls, why didn't they bring it up sooner.

I did not come forward sooner because what if Talisha backed out and did not pursue it – I would still have to attend classes here and Dr. Panda knows a lot of people and they would probably believe him. I still want to graduate and I don't want to be held back by Dr. Panda.

_____   4/20/05
Wayne Holmes