**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TAMMY HURD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 07-117-MPT |
| | : | |
| DELAWARE STATE UNIVERSITY and | : | |
| DANDESON PANDA, in his official | : | |
| capacity, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM ORDER**

**I.  Procedural History**

On February 26, 2007, Tammy Hurd ("Hurd") filed a complaint against Delaware

State University ("DSU") and Dr. Dandeson Panda ("Dr. Panda"), both individually and

in his official capacity, alleging sex discrimination under Title IX, race discrimination

under Title VI, and violation of due process rights under 42 U.S.C. § 1983.  On May 4,

2007, Dr. Panda filed a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).  Dr.

Panda argued that Hurd failed to state a claim upon which relief may be granted

because he could not be individually liable under Title VI or Title IX, and punitive

damages were not available against him under Title IX.

On May 25, 2007, Hurd filed an answering brief, and conceded therein that

Panda could not be individually liable and that punitive damages were not available

under Title IX.  Accordingly, Hurd's action against Dr. Panda in his individual capacity

and her demand for punitive damages were dismissed.[1]

DSU and Dr. Panda followed on May 30, 2008 with motions for summary judgment pursuant to Fed. R. Civ. P. 56(c) in which they move to dismiss Hurd's 42 U.S.C. § 1983, Title IX, Title VI and punitive damages claims.  Dr. Panda separately argues for summary judgment on the grounds that he is not a proper defendant in his official capacity.   Hurd's answering briefs were filed on June 24, 2008 and June 26, 2008, wherein she concedes her 42 U.S.C. § 1983 claim and, in essence, her Title VI claim, should be dismissed.  Reply briefs from DSU and Dr. Panda were submitted on July 3, 2008 and July 4, 2008 respectively.

## II.  Facts[2]

Hurd is a thirty-eight year old white female who was enrolled at DSU.  Hurd bases her claims on incidents that began in the Fall semester of 2004 at DSU. Because of the degree she was seeking, Hurd was required to take classes taught by Dr. Panda, a black male professor at DSU.  During the Fall semester, Hurd contends that Dr. Panda asked her if she received a "booty call" when she answered her phone during a class break.  Throughout that semester, Dr. Panda inquired whether Hurd and another male student named Derek Batton ("Derek") were a "couple" or if they were on a "hot date."  When Hurd turned in her final exam at the conclusion of the semester, Dr. Panda said to her "Derek has something for you.  Derek says he has something really big for you."  Hurd attempted to deflect the remarks, but Dr. Panda continued, "Derek

---

[1] In its memorandum order of January 28, 2008, the court dismissed Hurd's action against Dr. Panda in his individual capacity.  Although the analysis focused on Title IX, plaintiff does not dispute that Dr. Panda cannot be individually liable under Title VI and Title IX.  Therefore, the court clarifies its prior decision that the only claims remaining against Dr. Panda are in his official capacity.

[2] The facts presented are as alleged by Hurd.

says he has something that will be really big for you."

Dr. Panda also remarked that he and Hurd should date or get together and followed with an inquiry of "how he could get in line?"  Hurd responded that he had to be patient, to which Dr. Panda replied,

> You are right.  You are right.  We shouldn't have sex, because if we had sex, you would be screaming my name when you are with your boyfriend. If we hooked up, you would be with your boyfriend and scream my name. You would be making love to your boyfriend and you would scream out, Panda, Panda!  Then your boyfriend would wonder what you were screaming.

Although Hurd responded that Dr. Panda was being "bad," she did not specifically say that his comments were unwelcomed or harassing.

On January 3, 2005, Hurd reported Dr. Panda's conduct to Mark Farley ("Farley"), Vice-President of Human Resources for DSU.  At that time, Hurd chose not to file a formal complaint.  Instead, allegedly on Farley's advice, she e-mailed Dr. Panda expressing her concerns about his sexual comments.  Dr. Panda contends that he did not receive that e-mail because it was incorrectly addressed.  After their meeting, Farley did nothing regarding Hurd's concerns about Dr. Panda.

In the Spring semester of 2005, Hurd needed another class taught by Dr. Panda. Dr. Panda's comments began anew.  On the first day of class, he remarked that, "Derek is not here to protect you this time."  On February 1, 2005, Dr. Panda told Hurd, "Derek has something for you."  That same day, Dr. Panda approached Derek and Hurd and said to Derek, "I know you got something she needs.  You should give it to her."  He then commented to Hurd, "Derek has something that will hurt you."

On February 8, 2008, Dr. Panda again told Hurd "Derek has something for you."

3

Dr. Panda later commented to Derek about Hurd, "If she takes me to Vegas, I would tear that p***y up."  On February 10, 2005, Dr. Panda asked Hurd during class, "If I ask you to show me some skin, what would you do for me?"  Dr. Panda answered his own question with, "You would give me a high five right?"  He then looked at Derek and said, "You need to hook a brother up.  What they don't know, you know."

During the same time frame, Dr. Panda told his class, "You cannot get me for sexual harassment.  You cannot get a dime.  Sexual harassment is not clearly defined."  Thereafter on, February 17, 2005, Dr. Panda announced to the class that Hurd was, "filing a sexual harassment suit against all the black men at the school."  He later told Hurd, "Black man would put a hurting on you.  You know what they say about black men.  Black men would put a hurting on you.  But we won't go into that."

On March 1, 2005, Dr. Panda commented about Hurd's relationship difficulties by saying "Don't worry about it, you are a girl, you can get d**k anywhere.  Men are dogs, you can get d**k anywhere."  On March 21, 2005, Hurd filed a formal complaint with Farley against Dr. Panda for sexual harassment.  Thereafter, she did not return to the campus for a period of time, and missed approximately two weeks of class.  After an investigation by DSU, Dr. Panda was suspended on March 24, 2005 and voluntarily resigned from DSU on June 1, 2005.

### III.  Standard of Review

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."[3]  At the summary judgment stage, the court is

not to weigh the evidence and determine the truth of the matter, but to determine

whether there is a genuine issue of material fact for trial.[4]  The moving party bears the

burden of proving that no genuine issue of material fact exists.[5]  "Facts that could alter

the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a

rational person could conclude that the position of the person with the burden of proof

on the disputed issue is correct."[6]  If the moving party has demonstrated an absence of

material fact, the nonmoving party then "must come forward with 'specific facts showing

that there is a genuine issue for trial.'"[7]  The court will "view the underlying facts and all

reasonable inferences therefrom in the light most favorable to the party opposing the

motion."[8]  The mere existence of some evidence in support of the nonmoving party,

however, will not be sufficient for denial of a motion for summary judgment; there must

be enough evidence to enable a jury reasonably to find for the nonmoving party on that

issue.[9]  If the nonmoving party fails to make a sufficient showing on an essential

element of its case with respect to which it has the burden of proof, the moving party is

entitled to judgment as a matter of law.[10]

---

[3] Fed. R. Civ. P. 56(c).

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[5] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n.10 (1986).

[6] *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n.1 (3d Cir.1995) (internal citations omitted).

[7] *Matsushita,* 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) (emphasis omitted)).

[8] *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995).

[9] *See Anderson,* 477 U.S. at 249.

[10] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV.  Analysis

### Suit Against Dr. Panda in his Official Capacity

The Supreme Court has stated that a claim against a defendant in his/her official capacity, "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent."[11]  In such actions, a plaintiff seeking damages looks to the government entity itself and not the official.[12]  That conclusion, however, does not prevent plaintiffs from bringing Title IX claims against individuals in their official capacity in addition to the entity itself.

Hurd relies on two cases which allowed a Title IX action to proceed against employees in their official capacity.[13]  Those cases show judicial preference for plaintiffs to shape their cases even though the inclusion of an official capacity claim adds nothing of substance to the complaint.[14]

In *Kennedy v. Hardiman*, a municipality was sued along with individuals in their official capacity, the court explained why such official capacity claims can survive summary judgment:

> [T]his court can see no reason for dismissing either of the official-capacity claims.  By naming an individual in his official capacity, rather than merely naming the [entity] itself, a plaintiff focuses the attention of the parties, the court, and perhaps later the jury, on the particular official whom he seeks

---

[11] *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978)).

[12] *Id.* at 166.

[13] *Franklin v. Gwinnett Co. Public Schools*, 503 U.S. 60 (1992) (denying a motion for summary judgment and allowing the entire matter to proceed under Title IX, which included parties named in their official capacity); *Mann v. Univ. of Cincinnati*, 864 F. Supp. 44 (S.D. Ohio 1994) (allowing an official capacity claim to proceed without explanation).

[14] *Kennedy v. Hardiman*, 684 F. Supp. 540, 542 (N.D. Ill. 1988) (denying motion for summary judgment and allowing plaintiff to maintain case against individuals in their official capacity).

to hold responsible for implementing an allegedly unlawful . . . policy.[15]

Dr. Panda's argument that allowing this case to continue against him solely in his official capacity as merely duplicative is unpersuasive in light of the authority previously cited herein.  Accordingly, his motion for summary judgment is denied.

### 42 U.S.C. § 1983

Hurd's claim against DSU and Dr. Panda under 42 U.S.C. § 1983 fails as a matter of law because it is barred by the Eleventh Amendment of the United States Constitution and because it is subsumed by Title IX.[16]  Hurd, apparently, concedes that her 42 U.S.C. § 1983 should be dismissed since she presents no argument addressing that issue in her answering brief.  Thus, as a matter of law, Hurd's 42 U.S.C. § 1983 claim is dismissed, and judgment on the issue is entered in favor of both defendants.

### Title IX Sexual Harassment - Hostile Environment

Under Title IX, as relevant here, "[n]o person. . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."[17]  A defendant is liable under Title IX if a plaintiff proves by a

---

[15] *Id.*

[16] *McKay v. Delaware State University*, 2000 WL 1481018, *10-11 (D. Del. 2000) ("[T]he Eleventh Amendment bars § 1983 claims against state entities and state officials sued in their official capacities.); *A.W. v. Jersey City Public Schools*, 486 F. 3d 791, 805 (3d Cir. 2007) (citing *Henkle v. Gregory*, 150 F. Supp. 2d 1067, 1073-74 (D. Nev. 2001) ("Given the Supreme Court decisions and the intervening congressional action, we conclude that Congress intended to create a private right of action in Title IX to secure enforcement of its provisions and that this implied right of action is part of Title IX's enforcement scheme.  When combining Title IX's administrative remedies and private right of action, 'the remedial devices provided in [Title IX] are sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983.'"); *See also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 673 n. 2 (1979) ("When a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983.").

[17] 20 U.S.C. § 1681(a).

7

preponderance of the evidence that :  1) plaintiff was subjected to sexual harassment; 2) an authority able to institute corrective measures had actual notice of the harassment; and 3) the authority was deliberately indifferent to a substantial risk of sexual harassment.[18]  The specific abuse complained of in the present matter is hostile environment sexual harassment, which, in turn, has four factors that must be considered:  1) the severity of the conduct; 2) the frequency of the abusive conduct; 3) whether the conduct was physically threatening or just offensive; and 4) whether the conduct unreasonably interfered with a plaintiff's performance.[19]  In addition to the aforementioned factors, a plaintiff must show an objective basis that a reasonable person in her situation would have considered the environment sexually hostile.[20]

Therefore, Hurd must demonstrate both an objective and subjective hostile sexual environment and that DSU knew of the harassment, but did nothing to prevent further harassment.

A.  Whether the Environment was Sexually Hostile

DSU argues that Hurd cannot present a genuine subjective belief that she thought the environment was sexually hostile nor prove that a reasonable person would objectively conclude the same.  The very nature of the inquiry into whether an environment was sexually hostile requires a factual analysis.  DSU interprets the incidents at issue merely as joking banter in contrast with Hurd's characterization as

---

[18] *Williams ex rel. Hart v. Paint Valley Local School Dist.*, 400 F.3d 360, 363 (6th Cir. 2005); *Morse v. Regents of the Univ. of Colorado*, 154 F.3d 1124, 1127 (10th Cir. 1998) (stating Title IX prima facie case after *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 118 S. Ct. 1989 (1998)); *Frederick v. Simpson College*, 149 F. Supp. 2d 826, 835 (S.D. Iowa 2001).
[19] *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 685 (W.D. Ky 2003).
[20] *Id.*

8

sexual harassment.  DSU relies on *Johnson v. Galen Health Institutes*,[21] to argue that the alleged harassment is not severe and pervasive enough for a reasonable jury to conclude that there was an objectively hostile sexual environment.  *Johnson*, however, is distinguishable from the facts in the instant matter.  There were only four instances of questionable severity in *Johnson*.[22]  Many of the instances were not directed specifically at the plaintiff.[23]  The plaintiff was not adversely affected by the harassment in that she never stopped attending class.[24]  Moreover, although Johnson's Title IX claim was dismissed, the court noted that the scenario still created a "close question."[25]

 In contrast with *Johnson*, Hurd raises numerous occurrences of more severe sexual harassment.  The comments and incidents allegedly occurred more frequently and on a regular basis.  Hurd notes at least seven detailed instances, involving sexually explicit statements and advances, all of which were targeted directly at her.  Hurd contends that because of Dr. Panda's harassment, she missed approximately six to ten classes.  Viewed in the light most favorable to her, a reasonable jury could find that the environment was sexually hostile.

Moreover, the characterization of Dr. Panda's comments raise genuine issues of material fact.  That determination is at the heart of Hurd's Title IX claim.  As a result,

---

[21] 267 F. Supp. 2d 679 (W.D. Ky 2003).

[22] *Johnson*, 267 F. Supp. 2d at 686 ("First, Johnson says Wheat inappropriately touched her by sitting too close together on at least five occasions. . . Second, she says he often referred to sexual body parts with perverse slang.  Third, she alleges that he talked openly in class about his genitalia.  Fourth, Johnson claims on the last day of her clinical, he put his hands on her arms and shoulders before allegedly propositioning her.").

[23] *Id*. ("[T]he absence of severe conduct directed at Johnson seems to set this case apart even from those that other courts have found insufficient.").

[24] *Id*. ("Last, it appears Johnson never stopped going to class.").

[25] *Id*.

9

whether a sexually hostile educational environment existed is a matter for the trier of fact.

### B.  Whether DSU had Actual Notice and Responded with Indifference

Once a hostile sexual environment is proven, the next inquiry is whether the institution had actual notice and took no action to remedy the situation.  Under the standard espoused in *Gebser v. Lago Vista*,[26] DSU is only liable under Title IX if:

> [A]n official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.  We think, moreover, that the response must amount to deliberate indifference to discrimination.[27]

Whether DSU was aware or knew of Dr. Panda's sexual harassment and whether its response constituted deliberate indifference are factual questions.

The parties agree that notice was provided to DSU on two occasions:  on January 3, 2005 when Hurd met with Farley to discuss the incidents during the fall semester; and on March 21, 2005 when Hurd filed a formal complaint against Dr. Panda.  DSU contends that there is no evidence of indifference and maintains that because Hurd did not file a formal complaint and chose, instead, to send an e-mail to Dr. Panda, it had no obligation to address the harassment until her formal complaint on March 21, 2005.  However, whether DSU's inaction was reasonable is a question for the jury.

Additionally, Hurd contends that DSU had notice of Dr. Panda's conduct from prior incidents of alleged harassing behavior discussed below.  As a result, genuine

---

[26] 524 U.S. 274 (1998).
[27] *Id.* at 290.

issues of material fact exist as to Hurd's claims of sexual harassment under title IX against DSU.

**Punitive Damages**

Whether punitive damages are recoverable under Title IX depends on whether the institution acted "with malice or reckless indifference to the federally protected rights of [the plaintiff.]"[28]  There are two time frames relevant to the punitive damages analysis in the case: 1) the time period before Hurd complained to Farley on January 3, 2005; and 2) the time period in between January 3, 2005 and March 21, 2005, when Hurd filed her formal complaint against Dr. Panda.  The question of whether DSU reacted with malice or reckless indifference to Hurd's concerns should be assessed independently for those two time periods.

Hurd argues that DSU had notice of Dr. Panda's sexually harassing behavior before January 3, 2005 based on the following evidence:  an incident that occurred in 1992 between Dr. Panda and a temporary employee which resulted in a formal complaint to DSU and statements by two DSU students, Tracye Berry ("Berry") and Talisha Murphy ("Murphy") who assert to have been sexually harassed by Dr. Panda. Such evidence is insufficient to support Hurd's claim for punitive damages.

The 1992 incident is more than twelve years removed from the relevant time frame.  That single incident alone is insufficient on which to base a finding of malice or

---

[28] *Kolstad v. American Dental Ass'n.*, 527 U.S. 526, 534 (1999) (referring to Title VII case); *Loch v. Board of Edu. of Edwardsville Community School Dist. No. 7*, 2008 WL 2782844, *12 (S.D. Ill. July 15, 2008) ("As the Seventh Circuit has indicated, 'federal courts look to cases decided under Title VII to inform analysis under Title IX.'").

reckless indifference.  Regarding the statements of the two students[29] filed by Hurd in opposition to defendants' motion for summary judgment, neither statement meets the requirements of Rule 56(e), and are not admissible evidence.[30]  Neither statement was made under oath.  Both contain hearsay comments from third parties regarding Dr. Panda.  "Summary judgment, of course, looks only to admissible evidence."[31] Moreover, evidence "that [is] inadmissible at trial should not be considered when determining whether Plaintiff has established a triable issue of fact."[32]  Even if the court accepts the statements as evidence of sexually harassing incidences that Berry and Murphy experienced with Dr. Panda, Berry's unsworn comments fail to indicate that she ever complained to school officials about Dr. Panda's behavior.  In Murphy's unsworn statement dated April 25, 2005, she admits that she never reported Dr. Panda's conduct to DSU personnel.[33]

Thus, for the period before January 3, 2005, punitive damages are not warranted since DSU's conduct was neither malicious nor recklessly indifferent.  A question of fact remains whether DSU's conduct or failure to respond to Hurd's concerns between January 3, 2005 and March 21, 2005 constituted malice or reckless indifference.

---

[29] A third statement, which is from the boyfriend of one of the students, was also submitted.  That statement only contains what Murphy related to him regarding her conversations and contacts with Dr. Panda.  It contains no first-hand knowledge of any inappropriate incidents between Dr. Panda and Murphy.

[30] Fed. R. Civ. P. 56(e) "An adverse party may not rest upon mere allegations  or denials . . . but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

[31] *Arnold Pontiac-GMC v. Budd Baer, Inc.*, 826 F.2d 1335, 1339 (3d Cir. 1987).

[32] *Sosa v. Chertoff*, 2008 WL 800691, *3 (D.N.J. Mar. 21, 2008); *see also, Blackburn v. United Parcel Service*, 179 F.3d 81, 95 (3d Cir. 1999); *Reganick v. Southwestern Veterans' Center*, 2008 WL 768423, *6, n.8 (W.D. Pa. Mar. 20, 2008).

[33] Murphy also notes that Farley assisted in preparing her statement.  The declaration, however, is dated April 25, 2005, more than a month after Hurd's formal complaint and Dr. Panda's suspension.

**Title VI Racial Discrimination**

A claim of Title VI racial discrimination has three requirements:  1) the entity engaged in racial or national origin discrimination; 2) the entity receives federal financial aid; and 3) the plaintiff was an entitled beneficiary of the program or activity receiving the aid.[34]  Under Title VI, an institution cannot be held vicariously liable for the actions of its staff.[35]  An institution is only liable if it intentionally harassed or discriminated on the basis of race or nationality.[36]  Vicarious liability cannot be imputed to DSU for the actions of its faculty.[37]

Although Hurd argues that DSU is liable because of alleged discriminatory conduct by Dr. Panda, she concedes in her deposition that no personnel from DSU, including Dr. Panda, racially discriminated against her. .

In light of Hurd's concession and since DSU cannot be liable for Dr. Panda's conduct, DSU's motion for summary judgment on the Title VI claim is granted.[38]

Therefore, IT IS ORDERED and ADJUDGED that defendants' motions for summary judgment (D.I. 73, 75) are granted in part and denied in part as follows:

1.  Defendants' motion for summary judgment of 42 U.S.C. § 1983 is granted and plaintiff's claims under that statute are dismissed.

---

[34] *See New York Urban League, Inc. v. State of N.Y.*, 71 F.3d 1031 (2d Cir. 1995); *Babiker v. Ross Univ. Sch. of Med.*, 2000 WL 666342, *4 (S.D.N.Y. May 19, 2000).

[35] *Langadinos v. Appalachian Sch. of Law*, 2005 WL 2333460, *10 (W.D. Va. Sept. 25, 2005).

[36] *Id.* ("Unlike employers, who can be vicariously liable for the discriminatory acts of their employees, schools can be held liable under Title VI . . . only for intentional conduct because those statutes prohibit intentional discrimination.").

[37] *Id.* (Further stating that no liability attaches when the entity merely sits by and does nothing at all. In other words, indifference is not actionable.).

[38] Hurd makes a confusing Title VII argument in her answering brief which asserts liability against DSU under *respondeat superior*.  No Title VII claim was raised in Hurd's complaint.  No amendment has been filed to add a Title VII claim.  As a result, Hurd's Title VII arguments are irrelevant.

2.  Defendants' motion for summary judgment of sexual harassment based on hostile environment under Title IX is denied.

3. Defendants' motion for summary judgment of racial discrimination under Title VI is granted and plaintiff's claims under that statute are dismissed.

4.  Defendant Panda's motion for summary judgment based on suit in his official capacity is denied.

5.  Defendant DSU's motion for summary judgment of punitive damages is granted for the period before January 3, 2005.  Regarding the period after January 3, 2005, the motion is denied.


Dated:  September 25, 2008                              /s/ Mary Pat Thynge_____
                                                       UNITED STATES MAGISTRATE JUDGE